No. 23-10078

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

SUSAN NEESE; JAMES HURLY,

Plaintiffs-Appellees,

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
HEALTH AND HUMAN SERVICES; UNITED STATES OF AMERICA,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR DEFENDANTS-APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

LEIGHA SIMONTON
*United States Attorney*

CHARLES W. SCARBOROUGH
ASHLEY C. HONOLD
*Attorneys, Appellate Staff
Civil Division, Room 7261
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-9018*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff doctors brought a pre-enforcement challenge under the Administrative Procedure Act (APA) to a U.S. Department of Health and Human Services (HHS) Notice of Interpretation. That document informs the public that, consistent with *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and Title IX of the Education Amendments of 1972, HHS will interpret and enforce the prohibition against sex discrimination in Section 1557 of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), to include discrimination on the basis of sexual orientation and gender identity. 86 Fed. Reg. 27,984, 27,985 (May 25, 2021).

Although plaintiffs willingly treat and diagnose transgender patients, and do not discriminate on the basis of sexual orientation, the district court concluded that they had demonstrated a credible threat of enforcement sufficient to confer standing to challenge the Notice of Interpretation. The district court also held that plaintiffs' challenge was reviewable under the APA. Finally, the district court held that *Bostock*'s reasoning for its conclusion that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity does not apply to the prohibitions against sex discrimination in Title IX and Section 1557. Because these are important issues implicating the jurisdiction of the courts and the proper application of a recent Supreme Court decision, the government believes that oral argument would aid in the consideration of this appeal.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................v

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ..............................................................4

STATEMENT OF THE ISSUES...................................................................4

STATEMENT OF THE CASE .......................................................................5

    A.    Statutory Background ................................................................5

    B.    Factual Background .................................................................7

    C.    Prior Proceedings .................................................................10

SUMMARY OF ARGUMENT ..................................................................... 14

STANDARD OF REVIEW ......................................................................... 17

ARGUMENT ............................................................................................. 17

I.     Plaintiffs Lack Standing. ................................................................. 17

II.    Plaintiffs' Claims Are Not Reviewable. ........................................... 23

    A.    The Notice of Interpretation is Not Final Agency Action Because it Has No Binding Legal Effect on Plaintiffs. .............................................23

    B.    Plaintiffs Have an Adequate Alternative Remedy that Forecloses Pre-Enforcement Review Now. ....................................................26

    C.    Plaintiffs' Challenge is Independently Barred Under *Thunder Basin*. .........28

III.   The Notice of Interpretation Is Not Contrary to Law Because *Bostock*'s Reasoning Applies to Title IX and Section 1557.................................. 31

CONCLUSION ......................................................................................... 40

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Adams by & through Kasper v. School Board of St. Johns Cty.,*
   57 F.4th 791 (11th Cir. 2022) ................................................................. 38, 39

*Bank of Louisiana v. Federal Deposit Ins. Corp.,*
   919 F.3d 916 (5th Cir. 2019) ............................................................ 29, 30, 31

*Barilla v. City of Houston,*
   13 F.4th 427 (5th Cir. 2021) ..................................................................... 18

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................ 24

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) ................................................... 1, 4, 5, 15, 16, 24, 32,
                                                                      33, 34, 35, 36, 37, 39

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988)........................................................................... 26, 29

*Carder v. Continental Airlines, Inc.,*
   636 F.3d 172 (5th Cir. 2011) .................................................................. 33

*Cement Kiln Recycling Coal. v. EPA,*
   493 F.3d 207 (D.C. Cir. 2007) ................................................................ 24

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................................ 17

*Dodds v. U.S. Dep't of Educ.,*
   845 F.3d 217 (6th Cir. 2016) .................................................................. 37

*Doe v. Snyder,*
   28 F.4th 103 (9th Cir. 2022) ......................................................... 16, 34, 36

*Doe by & through Doe v. Boyertown Area Sch. Dist.,*
   897 F.3d 518 (3d Cir. 2018)......................................................................37

*Elgin v. Department of the Treasury,*
   567 U.S. 1 (2012) ................................................................................... 29

*Environmental Conservation Org. v. City of Dallas*,
    529 F.3d 519 (5th Cir. 2008) ................................................ 21

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*,
    301 F.3d 329 (5th Cir. 2002) ................................................ 21

*Franklin v. Gwinnett Cty. Pub. Sch.*,
    503 U.S. 60 (1992) ................................................ 33, 36

*Free Enter. Fund v. Public Accounting Oversight Bd*,
    561 U.S. 477 (2010) ................................................ 29

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ................................................ 26

*Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*,
    245 F.3d 1172 (10th Cir. 2001) ................................................ 33

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *reh'g en banc denied*,
    976 F.3d 399 (4th Cir. 2020), *cert. denied*,
    141 S. Ct. 2878 (2021) ................................................ 16, 33, 34, 38

*Hinojosa v. Horn*,
    896 F.3d 305 (5th Cir. 2018) ................................................ 26, 27

*Jarkesy v. SEC,*
    803 F.3d 9 (D.C. Cir. 2015) ................................................ 31

*Lakoski v. James*,
    66 F.3d 751 (5th Cir. 1995) ................................................ 33, 37

*Louisiana Crawfish Producers, In re*,
    852 F.3d 456 (5th Cir. 2017) ................................................ 17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................ 21

*Mabry v. State Bd. of Cmty. Colls. & Occupational Educ.*,
    813 F.2d 311 (10th Cir. 1987) ................................................ 33

*Martinez v. Pompeo*,
    977 F.3d 457 (5th Cir. 2020) ................................................ 28

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ................................................ 22

*Meritor Sav. Bank, FSB v. Vinson,*
  477 U.S. 57 (1986) ............................................................................. 33, 36

*Murray v. New York Univ. Coll. of Dentistry,*
  57 F.3d 243 (2d Cir. 1995) ................................................................. 33

*National Football League Players Ass'n v. National Football League,*
  874 F.3d 222 (5th Cir. 2017) ............................................................. 17

*National Pork Producers Council v. U.S. EPA,*
  635 F.3d 738 (5th Cir. 2011) ............................................................. 24

*National Rifle Ass'n of Am. v. McCraw,*
  719 F.3d 338 (5th Cir. 2013) ............................................................. 18

*Parents for Privacy v. Barr,*
  949 F.3d 1210 (9th Cir. 2020) ........................................................... 37

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,*
  139 S. Ct. 2051 (2019) ....................................................................... 27

*Pederson v. Louisiana State Univ.,*
  213 F.3d 858 (5th Cir. 2000) ..........................................................36-37

*Rhea Lana, Inc. v. Department of Labor,*
  824 F.3d 1023 (D.C. Cir. 2016) ......................................................... 24

*Rogers v. Bennett,*
  873 F.2d 1387 (11th Cir. 1989) ......................................................... 30

*Sackett v. EPA,*
  566 U.S. 120 (2012) ...................................................................... 27, 28

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ............................................................. 18

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ...................................................... 11, 14, 17, 18

*Taylor v. Cohen,*
  405 F.2d 277 (4th Cir. 1968) ............................................................. 30

*Texas v. EEOC*
  933 F.3d 433 (5th Cir. 2019) ............................................................. 25

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994) ................................................ 3, 12, 15, 28-29, 29, 30

*Town of Sanford v. United States,*
140 F.3d 20 (1st Cir. 1998) ................................................. 28

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
858 F.3d 1034 (7th Cir. 2017) ............................................ 37

*Whole Woman's Health v. Jackson,*
142 S. Ct. 522 (2021) ................................................... 17, 27

## Statutes:

Administrative Procedure Act (APA):
5 U.S.C. § 703 ......................................................... 27
5 U.S.C. § 704 ................................................ 11, 23, 26

Section 1557 of the Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, 124 Stat. 119 (2010),
42 U.S.C. § 18116(a) .................................. 5, 15, 25, 26, 29, 34
Education Amendments of 1972:
20 U.S.C. § 1681(a) .................................................. 5
20 U.S.C. § 1682 ...................................... 15, 25, 26, 29
20 U.S.C. § 1683 ................................... 15, 25, 26, 29, 30
20 U.S.C. § 1686 ................................................ 13, 38

Federal Mine Safety and Health Act of 1977,
30 U.S.C. § 801 *et seq.* ............................................ 30

28 U.S.C. § 1291 ........................................................ 4

28 U.S.C. § 1331 ........................................................ 4

28 U.S.C. § 1343 ........................................................ 4

## Regulations:

34 C.F.R. § 106.33 ................................................ 13, 38

45 C.F.R. § 92.206(b)(1) ............................................. 6

45 C.F.R. § 92.206(c) .................................................................................................7

**Other Authorities:**

86 Fed. Reg. 27,984 (May 25, 2021) ........................................... 1, 6, 11, 24, 25

87 Fed. Reg. 41,390 (July 12, 2022) ...................................................... 39

87 Fed. Reg. 47,824 (Aug. 4, 2022) ............................................ 3, 6, 7, 14, 15, 20, 21, 23

## INTRODUCTION

This appeal involves a pre-enforcement challenge to a Notice of Interpretation issued by the U.S. Department of Health and Human Services, which explains HHS's interpretation of Section 1557 of the Affordable Care Act. That document informs the public that, consistent with the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and Title IX, HHS will "interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) Discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." 86 Fed. Reg. 27,984, 27,985 (May 25, 2021).

Plaintiffs are two doctors who, based on the record in this case, do not discriminate on the basis of sexual orientation or gender identity in providing medical care and have no intention to do so. Indeed, plaintiffs willingly treat and diagnose transgender patients, including by managing their hormone therapy. Plaintiffs are concerned, however, that HHS will conclude that they have discriminated on the basis of gender identity if they refuse to provide services outside their specialty area, such as declining to assist a minor with transitioning because they are not familiar with managing the gender transition of a patient who is going through puberty; or if they provide medically appropriate care to transgender patients consistent with their physiological sex characteristics, such as recommending that a transgender man undergo a pelvic exam or diagnosing a transgender woman with prostate cancer.

Plaintiffs brought this action on behalf of a proposed class of "all health-care providers subject to section 1557," ROA.107, arguing that HHS's Notice of Interpretation is unlawful under the APA. While acknowledging that the rationale of *Bostock* applies to Title IX and Section 1557, plaintiffs argued that *Bostock* nevertheless permits doctors to discriminate on the basis of sexual orientation and gender identity so long as they would have acted in the same manner if the patient had been a member of the opposite "biological sex." ROA.102-103, ¶¶ 16-20. The government moved to dismiss on a variety of grounds, arguing (among other things) that plaintiffs lacked standing to pursue a pre-enforcement challenge to HHS's Notice of Interpretation and that the notice is not reviewable under the APA. The government also defended the Notice of Interpretation on the merits in its motion for summary judgment.

The district court rejected the government's threshold jurisdictional defenses, certified a broad class of "all health-care providers subject to Section 1557," and declared the Notice of Interpretation unlawful. On the merits, the court went even further than plaintiffs had urged, holding that *Bostock*'s reasoning does not apply to Title IX or Section 1557 at all, and that those statutes do not prohibit discrimination on the basis of sexual orientation or gender identity. ROA.1205.

The district court made multiple errors. First, the court wrongly concluded that plaintiffs had satisfied the high bar to demonstrate pre-enforcement standing. Plaintiffs have not demonstrated that their conduct is proscribed by Section 1557 or

2

that they face a credible threat of enforcement under Section 1557 sufficient to confer

standing under Article III.  Indeed, HHS's 2022 Notice of Proposed Rulemaking

(NPRM) interpreting Section 1557 underscores that the agency does not view

plaintiffs' intended conduct as gender-identity discrimination.  *See* 87 Fed. Reg.

47,824, 47,866, 47,867 (Aug. 4, 2022) (explaining that the proposed rule would not

require doctors to perform services outside their normal specialty area, or prohibit

doctors from "treating an individual for conditions that may be specific to their sex

characteristics," such as treating a transgender man with a pregnancy test).

Second, plaintiffs' claims are not reviewable under the APA.  HHS's Notice of

Interpretation is not final agency action, as it does not determine any legal rights or

obligations.  Additionally, plaintiffs have an adequate alternative remedy that

forecloses any APA claims: they may challenge HHS's interpretation of discrimination

on the basis of sex, outlined in the Notice of Interpretation, in any enforcement

action that is ever brought against them.  Plaintiffs' challenge is also independently

barred by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994), as Congress

intended the administrative enforcement proceedings to be an exclusive remedy.

Third, *Bostock*'s rationale for concluding that Title VII's prohibition against sex

discrimination encompasses sexual-orientation and gender-identity discrimination

applies to the prohibitions against sex discrimination in Title IX and Section 1557.

HHS's Notice of Interpretation is thus lawful.  Even assuming, as the Court did in

*Bostock*, that sex refers only to "biological" sex, "it is impossible to discriminate against

3

a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1739, 1741. The district court did not explain how an entity could discriminate on the basis of sexual orientation or gender identity without also discriminating based on sex, and the court thus erred in holding that HHS's Notice of Interpretation was unlawful.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court pursuant to 28 U.S.C. §§ 1331 and 1343, ROA.99, but the district court's jurisdiction is contested on multiple grounds. *See infra* Parts I, II. The district court entered its order granting in part and denying in part the parties' motions for summary judgment on November 11, 2022. ROA.1168. The government filed a timely notice of appeal on January 20, 2023. ROA.1207. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether plaintiffs have standing to challenge HHS's Notice of Interpretation interpreting Section 1557 to prohibit discrimination based on gender identity and sexual orientation, where they face no credible threat of enforcement from HHS because they do not discriminate on the basis of sexual orientation and they treat transgender patients without objection.

2.      Whether HHS's Notice of Interpretation is reviewable under the APA.

4

3.    Whether the district court erred in ruling that HHS's Notice of

Interpretation is contrary to law, based on its conclusion that the rationale of *Bostock*

does not apply to Title IX and Section 1557.

## STATEMENT OF THE CASE

### A.    Statutory Background

Section 1557 of the Affordable Care Act prohibits, as relevant here, "any health

program or activity" "receiving Federal financial assistance" from discriminating

against an individual based on "ground[s] prohibited under" several other statutes.

42 U.S.C. § 18116(a).  One of the specified statutes is Title IX of the Education

Amendments of 1972, which prohibits discrimination "on the basis of sex."

20 U.S.C. § 1681(a).

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that

Title VII's prohibition against discrimination "because of" sex encompasses

discrimination because of sexual orientation and transgender status.  *Id.* at 1737-1741.

The Supreme Court reasoned that "[a]n employer who fires an individual for being

homosexual or transgender fires that person for traits or actions it would not have

questioned in members of a different sex."  *Id.* at 1737.  Because "[s]ex plays a

necessary and undisguisable role in the decision," the Court held that such

discrimination is prohibited by the plain text of Title VII.  *Id.*

In May 2021, HHS issued a "Notification of Interpretation and Enforcement

of Section 1557 . . . and Title IX" to inform the public that, consistent with *Bostock*

and Title IX, HHS would "interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) Discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." 86 Fed. Reg. at 27,985. The Notice of Interpretation emphasizes that it "will guide [the Office for Civil Rights (OCR)] in processing complaints and conducting investigations, but does not itself determine the outcome in any particular case or set of facts." *Id.*

In July 2022, HHS issued an NPRM, which proposed to interpret Section 1557's prohibition against sex discrimination to include discrimination on the basis of gender identity and sexual orientation. 87 Fed. Reg. at 47,824. The NPRM proposed that covered entities must not "[d]eny or limit health services, including those that are offered exclusively to individuals of one sex, to an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* at 47,918 (proposed 45 C.F.R. § 92.206(b)(1)). In the preamble, HHS explained that under this proposed provision, "a covered entity that routinely provides gynecological or obstetric care could not deny an individual a pelvic exam or pregnancy-related care because the individual is a transgender man." *Id.* at 47,865. Similarly, a covered entity "could not refuse to provide a transgender woman a prostate cancer screening because her sex is listed female in her electronic health record, if the entity otherwise provides these screenings to cisgender individuals." *Id.* at 47,865-47,866.

Additionally, the NPRM explained that the proposed rule does not "prohibit a covered entity from treating an individual for conditions that may be specific to their

sex characteristics." 87 Fed. Reg. at 47,866. For example, it would be permissible for a covered entity to treat a transgender man with a pregnancy test. *Id.*

The NPRM also explained that "[n]othing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service." 87 Fed. Reg. at 47,918 (proposed 45 C.F.R. § 92.206(c)). The proposed rule "does not require health care professionals to perform services outside of their normal specialty area; therefore a provider that declines to provide services outside its specialty area would have a legitimate, nondiscriminatory reason for its action." *Id.* at 47,867; *see also id.* at 47,866.

### B.    Factual Background

Plaintiffs are two doctors who treat and diagnose transgender patients without objection. Plaintiff Dr. Susan Neese practices general internal medicine for adults. ROA.610. She does not accept patients below the age of 16 and instead refers them to a pediatrician. ROA. 726:16-727:11. Dr. Neese testified that she does not discriminate on the basis of sexual orientation and conceded that she was not harmed when HHS interpreted Section 1557 to prohibit sexual-orientation discrimination. ROA.611 ("I treat gay and lesbian patients frequently, if not daily. I cannot recall ever refusing care to any of them."); ROA.616; ROA.617; ROA.722:6-723:16. Dr. Neese has adult patients who are transgender, and she manages their hormone therapy without objection. ROA.420, ¶ 8 ("I have several . . . transgender patients[] for whom I manage their hormones and all their other medical conditions. These patients are all

in their 30s or 40s."); ROA.420, ¶ 7; ROA.611 ("I do not refuse to provide [my transgender patients] services.").

Dr. Neese is "categorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning." ROA.420, ¶ 10. She explained that this is because the transition of minors is "not [her] area of specialty" and she would not be "comfortable [managing] a teenager transition due to the complexity of the medical and emotional issues that case would present." ROA.420, ¶ 9; ROA.611; ROA.731:3-13 (testifying that she is "not familiar" with the medical processes for managing gender transition for a patient who is going through puberty).[1] For these reasons, she refused on one occasion to take on a 16-year-old patient who sought hormone therapy for gender transition. ROA.420, ¶ 9; ROA.611. Dr. Neese asserts that she does not believe that a refusal to provide hormone therapy to minors is discrimination on the basis of gender identity, but she is concerned that HHS will consider it as such. ROA.423; ROA.616.

Dr. Neese also asserts that she is concerned that HHS will conclude that she has engaged in gender-identity discrimination if she recommends medically appropriate care to transgender patients consistent with their physiological sex characteristics, such as recommending that a transgender man undergo a pap smear or

---

[1] Plaintiffs alleged in the amended complaint that Dr. Neese is "unwilling to provide referrals for minors seeking a sex-change operation." ROA.104, ¶ 23. But Dr. Neese testified that she does not accept patients below the age of 16 for any reason and instead refers them to a pediatrician. ROA.726:16-727:11.

a breast exam. ROA.421-422, ¶¶ 14-16; ROA.612-614. Dr. Neese explained that she has an adult transgender male patient who was assigned female at birth who refused to allow her to conduct pap smears and breast examinations and refused a pelvic ultrasound to diagnose pelvic pain. ROA.421, ¶¶ 13-15; ROA.612-613. Dr. Neese asserts that she does not believe that "insisting that patients obtain preventive care consistent with their biological sex constitutes 'discrimination on the basis of gender identity'" but that she believes that HHS "would regard that as discriminatory because it fails to affirm the gender identity that the patient is asserting." ROA.423, ¶ 20; ROA.615-616.

Plaintiff Dr. James Hurly is a pathologist who diagnoses patients based on laboratory analyses. ROA.459; ROA.658. Dr. Hurly testified that he does not discriminate on the basis of sexual orientation and conceded that he was not harmed when HHS interpreted Section 1557 to prohibit sexual-orientation discrimination. ROA.660-661; ROA.778:7-22. Dr. Hurly is concerned, however, that HHS will conclude that he has engaged in gender-identity discrimination if he diagnoses a transgender patient with a condition consistent with that patient's sex assigned at birth. ROA.460, ¶¶ 7-11; ROA.659-660. According to Dr. Hurly, a pathologist in his medical group once diagnosed a transgender female patient who was assigned male at birth with prostate cancer, and the patient called the medical group's secretary and denied that she had prostate cancer, insisting that she could not have a prostate. ROA.460, ¶ 7; ROA.659; ROA.784:15-786:20.

C.     **Prior Proceedings**

Plaintiffs filed suit challenging HHS's Notice of Interpretation on behalf of a proposed class of "all health-care providers subject to section 1557 of the Affordable Care Act." ROA.107.  Plaintiffs alleged that the Notice of Interpretation was unlawful under the APA because HHS misinterpreted *Bostock*.  ROA.108.  In their view, *Bostock*'s reasoning permits medical providers to discriminate on the basis of sexual orientation or gender identity, so long as they would have acted in the same manner if the patient had been a member of the opposite "biological sex."  ROA.102-103, ¶¶ 16-20.  Plaintiffs requested that the district court hold unlawful and set aside the Notice of Interpretation, enjoin HHS from enforcing its interpretation of Section 1557, and issue a declaratory judgment.  ROA.109.

1.     The government filed a motion to dismiss, arguing that plaintiffs lacked standing and that their challenge was not ripe.  ROA.123-146.  The government also argued that the court lacked subject-matter jurisdiction because the Notice of Interpretation is not "final agency action" under the APA; Section 1557 and Title IX provide an adequate and exclusive alternative remedy; and Congress intended to preclude pre-enforcement judicial review by providing an elaborate procedural scheme for administrative enforcement proceedings under Section 1557.  ROA.146-153.  Finally, the government argued that plaintiffs failed to state a claim because the notice is consistent with *Bostock* and Title IX.  ROA.153-159.

The district court denied the government's motion to dismiss.  First, the court held that plaintiffs have standing because the Notice of Interpretation creates a "credible threat of enforcement" by simply stating that HHS "will interpret 'Section 1557's prohibition on discrimination on the basis of sex to include' both '[d]iscrimination on the basis of sexual orientation' and 'discrimination on the basis of gender identity,'" and explaining that HHS's interpretation of Section 1557 will "'guide [OCR] in processing complaints and conducting investigations.'"  ROA.257 (first alteration in original) (first quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014); and then quoting 86 Fed. Reg. at 27,984, 27,985).  The court concluded that plaintiffs are at risk of enforcement because they alleged that they have "(1) refused requested treatments to help [transgender] patients or (2) refused to abide [by] the . . . preferences of some [transgender] patients."  ROA.260.

Second, the district court held that plaintiffs' challenge was ripe because it presents a pure question of law and plaintiffs will endure hardship from delayed review because they will feel pressure to change their medical practice.  ROA.263-267.

Third, the district court held that the Notice of Interpretation is final agency action reviewable under the APA.  ROA.265-267.  The court also rejected the government's argument that plaintiffs have an adequate alternative remedy under 5 U.S.C. § 704 because they may defend against any future enforcement of Section 1557 under the express administrative and judicial review provisions provided by Congress.  ROA.268-269.  The court reasoned that requiring plaintiffs to wait to make

11

their arguments in an enforcement proceeding would defeat the purpose of a pre-enforcement challenge. ROA.269. The court did not address the government's argument that plaintiffs' challenge is barred under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), because Congress provided an elaborate procedural scheme for administrative enforcement proceedings under Section 1557 that culminates in the opportunity for judicial review. *See* ROA.152-153.

**2.** Following the denial of the government's motion to dismiss, the government took discovery related to standing. Plaintiffs filed a motion to certify the proposed class, and the district court certified a class of "[a]ll health-care providers subject to Section 1557 of the Affordable Care Act." ROA.1204. The parties filed cross-motions for summary judgment.

The district court granted plaintiffs' motion for summary judgment in large part, concluding that the Notice of Interpretation was unlawful, but on different and broader grounds than plaintiffs had urged. ROA.1174 n.3 (explaining that the court would not "address[] the substance of Plaintiffs' arguments" because it disagreed with their premise). Plaintiffs argued that *Bostock* applies to Title IX and Section 1557 but permits medical providers to discriminate on the basis of sexual orientation and gender identity so long as they would have acted in the same manner if the patient had been a member of the opposite "biological sex." ROA.409-412. In contrast, the district court flatly held that "*Bostock* does not apply to Section 1557 or Title IX" at all,

ROA.1173, and that, unlike Title VII, these statutes do not prohibit discrimination on the basis of sexual orientation or gender identity, ROA.1172-1192.

The court reasoned that Title VII and Title IX use different language: Title VII prohibits discrimination "because of sex," and Title IX prohibits discrimination "on the basis of sex." ROA.1173; ROA.1179-1180 (quotation marks omitted). The court also relied on a provision of Title IX stating that educational institutions can "maintain[] separate living facilities for the different sexes," 20 U.S.C. § 1686, and a Title IX implementing regulation stating that educational institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33. ROA.1181. The court reasoned that "[i]f 'on the basis of sex' included 'sexual orientation' and 'gender identity,' . . . Title IX and its regulations would be nonsensical." ROA.1181. The court concluded that because Title IX does not prohibit discrimination on the basis of sexual orientation or gender identity, neither does Section 1557.

Turning to remedy, the court declared HHS's Notice of Interpretation unlawful and declared that "Plaintiffs and members of the certified class need not comply with the interpretation of 'sex' discrimination adopted by" HHS in the Notice of Interpretation, and that "Section 1557 of the [Affordable Care Act] does not prohibit discrimination on account of sexual orientation and gender identity, and the interpretation of 'sex' discrimination" in *Bostock* "is inapplicable to the prohibitions on 'sex' discrimination" in Title IX and Section 1557. ROA.1205; *see also* ROA.1187-

13

1192.  The court denied injunctive relief because plaintiffs did not brief the relevant factors.  ROA.1187; ROA1192.

The government filed a timely notice of appeal.  ROA.1207.

## SUMMARY OF ARGUMENT

I.    The district court erred in holding that plaintiffs have standing to challenge HHS's Notice of Interpretation.  To demonstrate pre-enforcement standing, a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  Plaintiffs have not even attempted to demonstrate that their intended course of conduct—refusing to provide services outside their specialty, and providing medically appropriate care to transgender patients consistent with their physiological sex characteristics—are affected with a constitutional interest.

Moreover, plaintiffs have not demonstrated that their intended course of conduct is proscribed by Section 1557 or that they face a credible threat of enforcement under Section 1557.  Both plaintiffs testified that they have not engaged in sexual-orientation discrimination and do not intend to do so.  And plaintiffs have not demonstrated that they intend to engage in any conduct that HHS views as gender-identity discrimination.  Indeed, HHS's 2022 NPRM explains that the proposed rule would "not require health care professionals to perform services outside of their normal specialty area," 87 Fed. Reg. at 47,867, and would not

14

"prohibit a covered entity from treating an individual for conditions that may be specific to their sex characteristics," such as treating a transgender man with a pregnancy test, *id.* at 47,866.

**II.**    Aside from standing, there are at least three additional threshold barriers to judicial review of plaintiffs' challenge.  First, HHS's Notice of Interpretation is not "final agency action" within the meaning of the APA.  That document only informs the public of the agency's interpretation of Title IX and Section 1557 following the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).  It does not alter legal rights or obligations or mandate any particular result in any future enforcement proceeding.

Second, plaintiffs have an adequate alternative remedy that forecloses APA review of their pre-enforcement challenge.  If HHS or any individual attempts to enforce Section 1557 against plaintiffs based on the interpretation in the challenged Notice of Interpretation, plaintiffs would be able to challenge HHS's interpretation of discrimination on the basis of sex at that time.

Third, plaintiffs' challenge is independently barred under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), because Congress provided an elaborate procedural scheme for administrative enforcement proceedings that culminates in the opportunity for judicial review.  *See* 42 U.S.C. § 18116(a) (incorporating the enforcement mechanisms under referenced statutes, including Title IX); *see also* 20 U.S.C. § 1682 (administrative process under Title IX); *id.* § 1683 (judicial review under

Title IX). That comprehensive scheme demonstrates that Congress did not intend for pre-enforcement judicial review of Section 1557 claims.

**III.** On the merits, the district court erred in holding HHS's Notice of Interpretation unlawful. Contrary to the court's view, the Supreme Court's reasoning for its conclusion in *Bostock*—that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity— applies to the prohibitions against sex discrimination in Title IX and Section 1557. HHS's challenged Notice of Interpretation is thus lawful.

As the Supreme Court explained in *Bostock*, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 140 S. Ct. at 1741. Under Title IX and Section 1557, a covered entity discriminates on the basis of sex when it discriminates on the basis of sexual orientation or gender identity. Indeed, the Fourth and Ninth Circuits have concluded that *Bostock* applies to Title IX. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616-619 (4th Cir. 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Doe v. Snyder*, 28 F.4th 103, 113-114 (9th Cir. 2022). The district court thus erred in going out of its way to embrace a theory—that *Bostock*'s reasoning does not apply at all—that is broader than what plaintiffs argued. *See* ROA.1174.

16

## STANDARD OF REVIEW

This Court reviews questions of subject-matter jurisdiction and grants of summary judgment de novo. *National Football League Players Ass'n v. National Football League*, 874 F.3d 222, 225 (5th Cir. 2017) (per curiam); *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017).

## ARGUMENT

### I.    Plaintiffs Lack Standing.

1.    To establish standing under Article III, a plaintiff must demonstrate that it has suffered a concrete injury, or that such an injury is "imminent" or "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). In a pre-enforcement challenge like this one, a plaintiff can satisfy that standard by proving "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). However, pre-enforcement review is the exception, not the rule. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537-538 (2021) (making clear that there is no "unqualified right to pre-enforcement review" and that many statutory and constitutional rights "are as a practical matter asserted typically as defenses," not in "pre-enforcement cases").

As an initial matter, plaintiffs have not even attempted to demonstrate that their intended course of conduct—refusing to provide services outside their specialty, and providing medically appropriate care to transgender patients consistent with their

physiological sex characteristics—is affected with a constitutional interest. *See* ROA.166-179; ROA.408-409.  Unlike the cases in which the Supreme Court and this Court have recognized pre-enforcement standing, plaintiffs do not assert an intention to engage in conduct protected by the Constitution. *See, e.g., Susan B. Anthony List*, 573 U.S. at 162 (recognizing pre-enforcement review where plaintiff intended to engage in constitutionally protected speech); *Barilla v. City of Houston*, 13 F.4th 427, 432-433 (5th Cir. 2021) (same); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 (5th Cir. 2020) (same); *National Rifle Ass'n of Am. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) (recognizing pre-enforcement review where plaintiff intended to engage in constitutionally protected Second Amendment activity).  In particular, plaintiffs testified that they do not have any religious objections to the interpretation in HHS's notification. ROA.618; ROA.662.

More fundamentally, plaintiffs have not demonstrated that their intended course of conduct is even arguably proscribed by Section 1557 or that they face a credible threat of enforcement under Section 1557 sufficient to demonstrate an Article III injury.  As to sexual-orientation discrimination, both plaintiffs testified that they have not engaged in sexual-orientation discrimination and do not intend to do so, and they admit that they were not harmed by HHS's interpretation prohibiting such discrimination.  ROA.611 ("I treat gay and lesbian patients frequently, if not daily.  I cannot recall ever refusing care to any of them."); ROA.616 ("I have never engaged in conduct that I regard as 'discrimination on the basis of sexual orientation,'

18

or that I believe Secretary Becerra would regard as 'discrimination on the basis of sexual orientation.'"); ROA.617; ROA.722:6-723:16 ("Q[:] When HHS . . . interpreted section 1557 to prohibit discrimination on the basis of sexual orientation, do you believe that harmed you [in] any way?  A[:] No."); ROA.660-661; ROA.778:7-22.

As to gender-identity discrimination, plaintiffs have not demonstrated that they intend to engage in any conduct that HHS views as gender-identity discrimination. Dr. Neese manages the hormone therapy of her adult transgender patients without objection.  ROA.420, ¶ 8 ("I have several . . . transgender patients[] . . . for whom I manage their hormones and all their other medical conditions.  These patients are all in their 30s or 40s."); ROA.420, ¶ 7; ROA.611 ("I do not refuse to provide [my transgender patients] services.").  Although she is unwilling to assist minors with transitioning, Dr. Neese explained that she did not believe she could appropriately manage the transition of a minor, as "[t]hese are complex medical issues which I do not specialize in," ROA.612, and that she would not be "comfortable [managing] a teenager transition due to the complexity of the medical and emotional issues that case would present," ROA.420, ¶ 9.  *See also* ROA.731:3-13 (testifying that she is "not familiar" with the medical processes for managing gender transition for a patient who is going through puberty).

Plaintiffs do not explain how a medical provider's refusal to provide services outside their specialty area could be considered gender-identity discrimination.  And HHS has never taken the position that declining to provide services outside a

physician's area of specialty constitutes gender-identity discrimination. To the contrary, the 2022 NPRM emphasizes that the proposed rule would "not require health care professionals to perform services outside of their normal specialty area; therefore a provider that declines to provide services outside its specialty area would have a legitimate, nondiscriminatory reason for its action." 87 Fed. Reg. at 47,867.

Dr. Neese and Dr. Hurly also assert that they are concerned that HHS will conclude that they have engaged in gender-identity discrimination if they provide medical care to transgender patients that is consistent with the patient's sex characteristics, such as recommending that a transgender man undergo a pelvic exam or diagnosing a transgender woman with prostate cancer. But plaintiffs do not explain how a medical provider's care based on a transgender patient's physiological sex characteristics could be considered gender-identity discrimination, and HHS has never taken the position that such conduct constitutes gender-identity discrimination. Indeed, HHS explained in the 2022 NPRM that it would *not* consider such conduct to be gender-identity discrimination. The proposed rule would not "prohibit a covered entity from treating an individual for conditions that may be specific to their sex characteristics," such as treating a transgender man with a pregnancy test. 87 Fed. Reg. at 47,866. To the contrary, under the proposed rule, *denying* transgender patients medically appropriate care based on their sex characteristics would constitute unlawful gender-identity discrimination. *Id.* at 47,865. In other words, it would be gender-

20

identity discrimination to *deny* a pelvic exam to a transgender man in need of such services if the provider provides pelvic exams to cisgender women. *Id.*

**2.** The district court acknowledged the government's argument that HHS does not consider plaintiffs' intended conduct to constitute gender-identity discrimination, as reflected in HHS's 2022 NPRM. ROA.1152-1153. However, the court incorrectly treated that as a mootness argument and rejected it. ROA.1152-1153. The court reasoned that the NPRM does not "withdraw or nullify" the challenged Notice of Interpretation. ROA.1153.

The district court misunderstood the government's argument as to the NPRM. This case does not involve a question of mootness, where the government would bear the burden of showing that a change in circumstances rendered a once-live claim moot. *See Environmental Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (defendant bears the burden of demonstrating mootness). Instead, the question here is whether plaintiffs have demonstrated a credible threat that HHS will view their proposed conduct as discriminatory and initiate some type of enforcement action against them—a question of standing on which *plaintiffs* have the burden of proof. *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332-333 (5th Cir. 2002) ("At the summary judgment stage, 'the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts'" to satisfy their burden of demonstrating standing (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))).

Plaintiffs have not met their burden. The NPRM is not a change that mooted plaintiffs' claims; it merely underscores what was true before: that plaintiffs' intended conduct does not constitute gender-identity discrimination. HHS has consistently maintained this position, and it is now reflected in the NPRM. *See* ROA.139-140 (arguing in the government's motion to dismiss—prior to the issuance of the NPRM—that plaintiffs have not plausibly alleged that the challenged Notice of Interpretation will prohibit plaintiffs' intended conduct); ROA.577-578 (explaining that "in cases evaluating claims of unlawful discrimination under federal civil rights laws, courts generally allow a defendant 'to articulate some legitimate, nondiscriminatory reason' for taking an action that would constitute prima facie discrimination" (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973))). Indeed, HHS has never enforced Section 1557 in the manner that plaintiffs fear, nor suggested that it would do so.

The district court also erred in concluding that "a provider can only guess as to whether the powers that be at HHS will regard its refusal to provide puberty blockers to a minor as 'legitimate' or 'nondiscriminatory.'" ROA.1153. HHS has never stated or even suggested that a medical provider's refusal to provide services outside its specialty area could constitute discrimination, let alone brought an enforcement action for such conduct. That is the sole conduct at issue as related to Dr. Neese's refusal to assist minors with gender transition. *See* ROA.420, ¶ 9; ROA.731:3-13 (testifying that she is "not familiar" with the medical processes for managing gender transition for a

patient who is going through puberty).  Moreover, the 2022 NPRM explains that the

proposed rule "does not require health care professionals to perform services outside

of their normal specialty area; therefore a provider that declines to provide services

outside its specialty area would have a legitimate, nondiscriminatory reason for its

action."  87 Fed. Reg. at 47,867.

The district court further erred in concluding that the Notice of

Interpretation's statement that HHS will comply with the Religious Freedom

Restoration Act (RFRA) and all other legal requirements indicates that plaintiffs have

demonstrated a credible threat of enforcement because they "(1) do not invoke RFRA

and (2) have not argued they are protected by another federal law or court order

preventing enforcement."  ROA.259.  HHS's statement confirming that it will comply

with all applicable legal requirements in no way demonstrates that HHS will bring an

enforcement action against plaintiffs for declining to provide services outside their

areas of specialty or for providing medical care for transgender patients consistent

with their physiological sex characteristics.

## II.    Plaintiffs' Claims Are Not Reviewable.

### A.    The Notice of Interpretation is Not Final Agency Action Because it Has No Binding Legal Effect on Plaintiffs.

**1.**    Judicial review under the APA is generally limited to "final agency

action."  5 U.S.C. § 704.  Such action must (1) represent "the consummation of the

agency's decisionmaking process," and (2) conclusively determine legal "rights or

obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). Even assuming that HHS's Notice of Interpretation reflects the consummation of the agency's views about how best to read Title IX and Section 1557, it does not determine any legal rights or obligations.

The Notice of Interpretation simply informs the public of HHS's interpretation of Section 1557 in light of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020); it "create[s] no new legal obligations beyond those the [statute] already imposed." *Rhea Lana, Inc. v. Department of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016); *see also National Pork Producers Council v. U.S. EPA*, 635 F.3d 738, 756 (5th Cir. 2011). Additionally, the Notice of Interpretation does not bind the agency or compel it to reach a particular conclusion about any particular set of facts. 86 Fed. Reg. at 27,985 ("This interpretation will guide OCR in processing complaints and conducting investigations, but does not itself determine the outcome in any particular case or set of facts."); *see also Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007) (noting that non-binding disclaimers are "relevant to the conclusion that a guidance document is non-binding").

Moreover, under HHS's enforcement framework, many steps must occur before any enforcement action or termination of federal funding, which underscores that the Notice of Interpretation does not conclusively determine any legal rights or obligations. Prior to any enforcement action or termination of federal funding, HHS would first have to "advise[] the appropriate person . . . of the failure to comply with

the requirement and . . . determine[] that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682; 42 U.S.C. § 18116(a) (incorporating the enforcement mechanisms under referenced statutes, including Title IX). Additionally, prior to the termination of federal funding, there would need to be an administrative hearing and an "express finding on the record . . . of a failure to comply with such requirement," and notice to congressional committees. 20 U.S.C. § 1682. Finally, the statute expressly provides for judicial review. 20 U.S.C. § 1683.

    **2.**    The district court's reliance on *Texas v. EEOC*, 933 F.3d 433, 443-446 (5th Cir. 2019), is misplaced. In that case, this Court determined that an EEOC Notice of Interpretation was final agency action reviewable under the APA where it was binding on EEOC staff, limited their discretion, and, by its terms, "le[ft] no room for EEOC staff *not* to" take certain action. *Id.* at 443. This Court also emphasized that the EEOC guidance "explicitly declare[d] that it [wa]s intended to be a playbook for employers to use to avoid liability." *Id.* at 444. This Court thus concluded that the guidance "carrie[d] legal consequences and dictate[d] employers' rights and obligations." *Id.* at 443. In contrast, the HHS Notice of Interpretation does not bind the agency to a legal position with respect to any particular medical procedure or set of facts. Indeed, the HHS Notice of Interpretation explicitly provides that it "does not itself determine the outcome in any particular case or set of facts." 86 Fed. Reg. at 27,985. Nor does it create safe harbors for avoiding liability. Thus, unlike the EEOC guidance at issue in *Texas v. EEOC*, no legal consequences flow from the

HHS Notice of Interpretation here, and therefore it is not final agency action reviewable under the APA.

### B.     Plaintiffs Have an Adequate Alternative Remedy that Forecloses Pre-Enforcement Review Now.

**1.**     As this Court has recognized, Section 704 also "limits the APA to the review of those agency actions which otherwise lack an 'adequate remedy in a court.'" *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (per curiam) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)); 5 U.S.C. § 704.  The relief offered by the "alternat[e] remedy" will "be deemed adequate 'where a statute affords an opportunity for *de novo* district-court review' of the agency action."  *Garcia v. Vilsack*, 563 F.3d 519, 522-523 (D.C. Cir. 2009).

That standard is met here: in any enforcement action brought against plaintiffs based on the legal interpretation expressed in HHS's Notice of Interpretation, that interpretation will be subject to de novo review by a court.  *See* 42 U.S.C. § 18116(a) (incorporating the enforcement mechanisms under referenced statutes, including Title IX); *see also* 20 U.S.C. § 1682 (administrative process under Title IX); *id.* § 1683 (judicial review under Title IX).  Indeed, HHS would not seek deference to the interpretation expressed in the non-binding Notice of Interpretation in any future enforcement action.  Section 1557 thus "provides a direct and guaranteed path to judicial review."  *Hinojosa*, 896 F.3d at 312.

**2.**     The district court erred in concluding that plaintiffs do not have an adequate alternative remedy because plaintiffs could not obtain equitable relief in an enforcement action.  ROA.268.  As this Court has explained, "[t]he adequacy of the [alternative] relief available need not provide an identical review that the APA would provide." *Hinojosa*, 896 F.3d at 310.  To determine whether alternative relief is adequate, the court must "look[] specifically at the party seeking relief and its particular claim." *Id.* at 311.  Here, plaintiffs seek a declaration that the interpretation of discrimination on the basis of sex in HHS's Notice of Interpretation is unlawful.  ROA.108-109.  If HHS were to bring an enforcement action against plaintiffs based on the legal interpretation expressed in that document, that interpretation would be subject to judicial review.

The district court further erred in relying on *Sackett v. EPA*, 566 U.S. 120 (2012), to conclude that requiring plaintiffs to wait to make their arguments in an enforcement proceeding "would defeat the purpose of a pre-enforcement challenge." ROA.269.  As an initial matter, the Supreme Court has made clear that there is no "unqualified right to pre-enforcement review." *Whole Woman's Health*, 142 S. Ct. at 537-538.  The default rule under the APA is that challenges to agency action are raised as defenses in an enforcement action.  *See* 5 U.S.C. § 703 (providing that "agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement"); *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2059 (2019) (Kavanaugh, J., concurring in the judgment) (similar).  And this

Court has explained that a "legal remedy is not inadequate for purposes of the APA because it is procedurally inconvenient for a given plaintiff." *Martinez v. Pompeo*, 977 F.3d 457, 460 (5th Cir. 2020) (per curiam) (quoting *Town of Sanford v. United States*, 140 F.3d 20, 23 (1st Cir. 1998)).

In any event, this case is nothing like *Sackett*. In that case, the agency had issued a compliance order directly to the plaintiffs informing them that their land was subject to certain restrictions, that the compliance order represented the agency's final word on that matter, that the plaintiffs were therefore forbidden from undertaking a proposed construction project, and that failure to comply would result in significant penalties that would be measured from the date of the compliance order. *See Sackett*, 566 U.S. at 124-125. Here, as explained above, plaintiffs face no immediate consequences from the Notice of Interpretation. *Supra* Part I. Plaintiffs have not identified any complaint or investigation arising from the Notice of Interpretation, or identified any aspect of their practice that conflicts with it. Moreover, the notice does not impose any obligations or consequences independent from the underlying prohibition against sex discrimination in Section 1557.

## C.    Plaintiffs' Challenge is Independently Barred Under *Thunder Basin*.

Where it is "fairly discernible" that an elaborate statutory review scheme for administrative enforcement proceedings was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded. *See Thunder Basin Coal Co. v.*

*Reich*, 510 U.S. 200, 207, 216 (1994) (quotation omitted).  Even where exclusivity is fairly discernible from the statutory scheme, particular claims may proceed outside that scheme if they are not "of the type Congress intended to be reviewed within th[e] statutory structure."  *Id.* at 212; *see also Bank of Louisiana v. Federal Deposit Ins. Corp.*, 919 F.3d 916, 925 (5th Cir. 2019).  The Court "presum[es] that Congress does not intend to limit . . . jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) the suit is "wholly collateral to a statute's review provisions," and (3) the claims lie "outside the agency's expertise."  *Elgin v. Department of the Treasury*, 567 U.S. 1, 15 (2012) (citation omitted) (quoting *Free Enter. Fund v. Public Accounting Oversight Bd*, 561 U.S. 477, 489 (2010)).

That rule is fatal to plaintiffs' challenge.  Congress did not intend to permit pre-enforcement review of Section 1557 claims because it provided an elaborate procedural scheme for administrative enforcement proceedings that culminates in the opportunity for judicial review.  *See* 42 U.S.C. § 18116(a) (incorporating the enforcement mechanisms under referenced statutes, including Title IX); *see also* 20 U.S.C. § 1682 (administrative process under Title IX); *id.* § 1683 (judicial review under Title IX); *Bowen*, 487 U.S. at 903 ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action.").

In *Thunder Basin*, a mine operator brought a pre-enforcement challenge to an agency's interpretation of a statute, which could have formed the basis for enforcement action against the operator.  *See* 510 U.S. at 216.  Confronted with a

review process remarkably similar to that found in Title IX and Section 1557, the Supreme Court held that Congress's intent to preclude pre-enforcement judicial review was "fairly discernible in the statutory scheme" under the Federal Mine Safety Act of 1977. *Id.* at 207 (citation omitted); *see* 30 U.S.C. § 801 *et seq.* The Court therefore rejected the mine operator's attempt to bring a pre-enforcement challenge to the agency's interpretation. *See Thunder Basin*, 510 U.S. at 207-208. The same result is warranted here. *Cf. Rogers v. Bennett*, 873 F.2d 1387 (11th Cir. 1989) (same result under the parallel disability rights statute); *Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (same result under Title VI, parallel race discrimination statute).

Additionally, there is no sound basis for concluding that plaintiffs' claims are "of the type Congress intended to be reviewed [outside] th[e] statutory structure." *Thunder Basin*, 510 U.S. at 212. First, a finding that the administrative review scheme precludes pre-enforcement review would not "foreclose all meaningful judicial review," *Bank of Louisiana.*, 919 F.3d at 925, because the administrative review scheme culminates in the opportunity for judicial review, 20 U.S.C. § 1683. Second, plaintiffs' claims are not "wholly collateral" to the administrative review scheme. *Bank of Louisiana.*, 919 F.3d at 928. Instead, their claims are "inextricably intertwined" with the issue that would be at the heart of any future enforcement proceeding: whether certain conduct constitutes unlawful discrimination under Section 1557. *Id.*

Third, plaintiffs' claims are not outside of HHS's expertise. As this Court has explained, "there are precious few cases involving interpretations of statutes

authorizing agency action in which our review is not aided by the agency's statutory construction." *Bank of Louisiana.*, 919 F.3d at 928 (quoting *Jarkesy v. S.E.C.*, 803 F.3d 9, 29 (D.C. Cir. 2015)). This Court has also explained that this factor points toward finding that the district court lacked subject matter jurisdiction if the agency could find plaintiffs "innocent of the statutory violations it was accused of committing." *Id.* at 929. Here, if a patient filed a complaint with HHS and accused plaintiffs of violating Section 1557 by refusing to provide services outside their specialty and providing medically appropriate care to transgender patients consistent with their physiological sex characteristics, then HHS could conclude that the relevant conduct is not unlawful sex discrimination under Section 1557.

For these reasons, the district court lacked jurisdiction over plaintiffs' claims.

## III.    The Notice of Interpretation Is Not Contrary to Law Because *Bostock*'s Reasoning Applies to Title IX and Section 1557.

**A.**    The Supreme Court's reasoning for its conclusion in *Bostock* that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity applies to the prohibitions against sex discrimination in Title IX and Section 1557. HHS's challenged Notice of Interpretation is thus lawful.

As the Supreme Court explained in *Bostock*, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against

that individual based on sex." 140 S. Ct. at 1741.[2]  Similarly, under Title IX and

Section 1557, a covered entity discriminates on the basis of sex when it discriminates

on the basis of sexual orientation or gender identity.

For example, if a medical provider refuses to treat the broken bone of a

transgender man because he presents as a man but was assigned female at birth, but

would treat the broken bone of a similarly situated cisgender man who presents as a

man and was assigned male at birth, the provider is discriminating on the basis of sex.

As the Supreme Court explained in *Bostock*, if an employer fires a transgender woman

who was assigned male at birth but retains an otherwise identical employee who was

assigned female at birth, "the employer intentionally penalizes a person identified as

male at birth for traits or actions that it tolerates in an employee identified as female at

birth." 140 S. Ct. at 1741.  Thus, "the individual employee's sex plays an

unmistakable and impermissible role in the discharge decision."  *Id.* at 1741-1742.

Similarly, if a university refuses to enroll a lesbian student into an English class

because she is attracted to women, but enrolls similarly situated male students who are

attracted to women, the university is discriminating on the basis of sex.  *See Bostock*,

140 S. Ct. at 1741 ("If the employer fires the male employee for no reason other than

the fact he is attracted to men, the employer discriminates against him for traits or

actions it tolerates in his female colleague.").

---

[2] As in *Bostock*, this Court can assume without deciding that "'sex' . . . refer[s] only to biological distinctions between male and female."  140 S. Ct. at 1739.

Although *Bostock* involved Title VII, the Supreme Court and courts of appeals, including this Court, consistently look to interpretations of Title VII to inform Title IX because both statutes prohibit discrimination on the basis of sex using nearly identical language. *See, e.g., Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986), a Title VII case, in analyzing a Title IX claim); *Carder v. Continental Airlines, Inc.*, 636 F.3d 172, 180 (5th Cir. 2011) ("Based on its legislative history, this court has interpreted Title IX as being intended to prohibit a wide spectrum of discrimination . . . in the same manner as Title VII."); *Lakoski v. James*, 66 F.3d 751, 756 (5th Cir. 1995) ("Any difference between their prohibitions of sex discrimination is not compelled by statutory language."); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021) ("Although *Bostock* interprets Title VII," "it guides our evaluation of claims under Title IX."); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."); *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995) (collecting cases); *Mabry v. State Bd. of Cmty. Colls. & Occupational Educ.*, 813 F.2d 311, 317 n.6 (10th Cir. 1987) ("Because Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination, we regard it as the most appropriate analogue[.]"). Accordingly, *Bostock*'s analysis of the prohibition against sex discrimination in Title VII informs the interpretation of the prohibition

against sex discrimination in Title IX.  And Section 1557 prohibits discrimination based on the "ground[s] prohibited under" Title IX.  42 U.S.C. § 18116(a).

The Fourth and Ninth Circuits have specifically concluded that the rationale of *Bostock* applies to Title IX.  In *Grimm*, the Fourth Circuit held that a school's restroom policy requiring students to use restrooms based on their sex assigned at birth discriminated against a transgender male student on the basis of sex in violation of Title IX.  972 F.3d at 616.  The Fourth Circuit explained that because the school "could not exclude [the transgender student] from the boys bathroom without referencing his" sex assigned at birth, "his sex remains a but-for cause" for the school's actions.  *Id.*; *see also Bostock*, 140 S. Ct. at 1739 ("So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.").

Similarly, in *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022), the Ninth Circuit concluded that *Bostock* applies to Title IX and Section 1557.  The Ninth Circuit explained that it "construe[s] Title IX's protections consistently with those of Title VII" and that "[g]iven the similarity in language prohibiting sex discrimination in Titles VII and IX, we do not think *Bostock* can be limited" to Title VII."  *Id.* at 114.

**B.**     In district court, plaintiffs conceded that the rationale of *Bostock* applies to Title IX and Section 1557, but argued that *Bostock* allows medical providers to discriminate on the basis of sexual orientation or gender identity so long as they would have acted in the same manner if the patient had been a member of the opposite "biological sex."  ROA.409-410.  The district court acknowledged plaintiffs'

34

concession that "*Bostock* applies to Title IX and [S]ection 1557," ROA.1174, but rejected that premise and instead ruled in plaintiffs' favor on a much broader theory: that *Bostock*'s reasoning does not apply at all.  As plaintiffs appeared to recognize by making a more limited argument below, the district court erred; the logic and reasoning of *Bostock* apply to Title IX and Section 1557.

The district court noted that "*Bostock* does not purport to interpret Section 1557, Title IX, or any other non-Title VII statute."  ROA.1174.  But that observation provides no basis for ignoring the clear implications of *Bostock*'s reasoning for Title IX and Section 1557, which similarly prohibit discrimination on the basis of sex.  Although the Supreme Court only analyzed Title VII in *Bostock*, indicating that it would "not prejudge" future cases, 140 S. Ct. at 1753, the Court's central conclusion that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," *id.* at 1741, applies to Title IX and Section 1557.  The district court nowhere explained how a covered entity could discriminate on the basis of sexual orientation or gender identity without discriminating based on sex in violation of Title IX and Section 1557.

The district court further erred in concluding that *Bostock* does not apply to Title IX or Section 1557 because Title VII prohibits discrimination "because of" sex, whereas Title IX prohibits discrimination "on the basis of" sex.  ROA.1179.  This slight difference in language is irrelevant to the reasoning set forth in *Bostock*.  Indeed, in *Bostock* itself, the Supreme Court used the phrases "because of," "based on," and

"on the basis of" interchangeably.  *See, e.g.*, *Bostock*, 140 S. Ct. at 1753 ("employers are prohibited from firing employees *on the basis of* homosexuality or transgender status" (emphasis added)); *id.* at 1741 ("An employer violates Title VII when it intentionally fires an individual employee *based in part* on sex." (emphasis added)); *id.* ("it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual *based on* sex" (emphasis added)); *id.* at 1743 ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part *because of* sex." (emphasis added)); *id.* at 1747 ("discrimination *based on* homosexuality or transgender status necessarily entails discrimination based on sex" (emphasis added)); *see also Snyder*, 28 F.4th at 114 ("While the language in Title VII is 'because of sex' and the language in Title IX is 'on the basis of sex,' *Bostock* used those phrases interchangeably throughout the decision.").

Both the Supreme Court and this Court have consistently construed Title VII and Title IX to provide similar protections against sex discrimination, despite minor differences in language.  *See, e.g.*, *Franklin*, 503 U.S. at 75 (explaining that Title IX imposes "the duty not to discriminate *on the basis of* sex, and 'when a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor "discriminate[s]" *on the basis of* sex'" (emphases added) (quoting *Meritor Sav. Bank*, 477 U.S. at 64); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000) (explaining that a Title IX violation is present where an "institution intended to treat

women differently *because of* their sex" (emphasis added)); *Lakoski*, 66 F.3d at 757

(collecting cases and explaining that "Title IX's proscription of sex discrimination[]

. . . does not differ from Title VII's").

The district court reasoned that these cases do not "have much force here"

because they "consider only Title IX's application to biological sex." ROA.1176. But

as explained above, this Court can assume without deciding that "'sex' . . . refer[s]

only to biological distinctions between male and female," as the Supreme Court did in

*Bostock.* 140 S. Ct. at 1739. Again, the district court nowhere explained how an entity

could discriminate on the basis of sexual orientation or gender identity without

discriminating on the basis of sex. Moreover, several other courts of appeals had

previously concluded that Title IX prohibits gender-identity discrimination, even

before *Bostock. See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,

858 F.3d 1034, 1049-1050 (7th Cir. 2017); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217,

221-222 (6th Cir. 2016) (per curiam); *cf. Doe by & through Doe v. Boyertown Area Sch.*

*Dist.*, 897 F.3d 518, 535 (3d Cir. 2018); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1217

(9th Cir. 2020).

The district court further erred in relying on provisions of Title IX and a

Department of Education regulation explaining that sex-separate bathrooms and

locker rooms are permissible to support its conclusion that *Bostock*'s reasoning is

inapplicable to Title IX and Section 1557. The court suggested that these provisions

are "safe harbors" that would not be possible if Title IX prohibited gender-identity

discrimination. ROA.1181. But the court's conclusion rests on a misunderstanding of the relevant statutory and regulatory provisions.

Section 1686 of Title IX states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The implementing regulation states that educational institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

As the Fourth Circuit explained in *Grimm*, these provisions are not "safe harbors" allowing discrimination based on gender identity; instead, they clarify "that the act of creating sex-separated [facilities] in and of itself" does not violate Title IX. 972 F.3d at 618 & n.16. Regardless of how provisions permitting the separation of students by sex apply to policies on who can access sex-separate spaces, such provisions say nothing about whether Title IX and Section 1557 generally prohibit discrimination on the basis of gender identity in other contexts. Indeed, plaintiffs' health care practices are not affected in any way by the Title IX provisions regarding sex-separate facilities.[3]

---

[3] For similar reasons, *Adams by & through Kasper v. School Board of St. Johns Cty.*, 57 F.4th 791 (11th Cir. 2022), provides no support for the district court's broad conclusion that *Bostock* does not apply to Title IX or Section 1557. In *Adams*, the

*Continued on next page.*

Finally, the district court erred in reasoning that *Bostock*'s rationale does not apply to Title IX and Section 1557 because this would undermine "one of [Title IX's] major achievements, giving young women an equal opportunity to participate in sports." ROA.1181 (quoting *Bostock*, 140 S. Ct. at 1779 (Alito, J., dissenting)). But the issue of whether Title IX and Section 1557 generally prohibit gender-identity discrimination does not turn on the specifics of how students will be deemed eligible for certain sex-separate sports teams. Moreover, the Department of Education explained in a recent NPRM that the application of Title IX to students' eligibility to participate on a particular male or female athletics team will be addressed in a forthcoming notice of proposed rulemaking. *See* 87 Fed. Reg. 41,390, 41,538 (July 12, 2022). The Department of Education explained that, under certain circumstances, Title IX allows the Department to permit sex separation in athletics in ways that Title IX would otherwise prohibit. *See id.* ("[A]s to intercollegiate athletics, Congress contemplated that the Department might promulgate regulations that permit sex separation in contexts and in a manner that Title IX might otherwise prohibit, as long as such regulations are 'reasonable' and result in overall equality in athletic

Eleventh Circuit held that a school's restroom policy prohibiting a transgender male student from using the boys' restroom did not violate Title IX, but its holding and reasoning were limited to the specific context of sex-separate facilities. *See id.* at 815 (holding that the school's restroom policy was authorized by the Title IX provisions permitting separate facilities based on sex). The Eleventh Circuit did not address whether Title IX prohibits gender-identity discrimination outside of that specific context.

opportunities for the sexes").  Accordingly, the district court erred in concluding that the application of *Bostock*'s reasoning to Title IX and Section 1557 outside the context of athletics would necessarily disadvantage cisgender females.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated and remanded with instructions to dismiss for lack of jurisdiction.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

LEIGHA SIMONTON
  *United States Attorney*

CHARLES W. SCARBOROUGH

 *s/ Ashley C. Honold*
ASHLEY C. HONOLD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7261*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9018*
  *ashley.c.honold@usdoj.gov*

March 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Ashley C. Honold*
Ashley C. Honold

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate

Procedure 32(a)(7)(B) because it contains 9,894.  This brief also complies with the

typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-

(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a

proportionally spaced typeface.


*s/ Ashley C. Honold*
Ashley C. Honold

**ADDENDUM**

# TABLE OF CONTENTS

Section 1557, 42 U.S.C. § 18116 ........................................................................A1

Title IX, 20 U.S.C. § 1681(a)............................................................................A2

20 U.S.C. § 1686 ..............................................................................................A3

34 C.F.R. § 106.33 ............................................................................................A4

**42 U.S.C. § 18116**

**§ 18116. Nondiscrimination**

(a) In general

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

(b) Continued application of laws

Nothing in this title (or an amendment made by this title) shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975, or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

(c) Regulations

The Secretary may promulgate regulations to implement this section.

**20 U.S.C. § 1681(a)**

**§ 1681. Sex**

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . .

**20 U.S.C. § 1686**

**§ 1686. Interpretation with respect to living facilities**

(a) Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

**34 C.F.R. § 106.33**

**§ 106.33. Comparable facilities.**

A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.