No. 23-10078

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

SUSAN NEESE; JAMES HURLY,

Plaintiffs-Appellees,

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
HEALTH AND HUMAN SERVICES; UNITED STATES OF AMERICA,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

## RECORD EXCERPTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

LEIGHA SIMONTON
  *United States Attorney*

CHARLES W. SCARBOROUGH
ASHLEY C. HONOLD
  *Attorneys, Appellate Staff
  Civil Division, Room 7261
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-9018*

# TABLE OF CONTENTS

**Page**

1.  Docket Sheet (ROA.1) ....................................................................RE1

2.  Defendants' Notice of Appeal,
    Dkt. No. 72 (ROA.1207) (Jan. 20, 2023) ........................................RE13

3.  Opinion and Order Denying Motion to Dismiss,
    Dkt. No. 30 (ROA.249) (April 26, 2022) ........................................RE16

4.  Opinion and Order Granting Plaintiffs' Motion for Class Certification,
    Dkt. No. 65 (ROA.1150) (Oct. 14, 2022) ........................................RE45

5.  Opinion and Order Granting Summary Judgment,
    Dkt. No. 66 (ROA.1167) (Nov. 11, 2022) ........................................RE62

6.  Final Judgment,
    Dkt. No. 71 (ROA.1205) (Nov. 22, 2022) ........................................RE88

7.  Declaration of Susan Neese (without exhibits),
    Dkt. No. 47-1 (ROA.419) (Aug. 5, 2022) ........................................RE90

8.  Susan Neese's Answers to First Set of Interrogatories,
    Dkt. No. 58 (ROA.610) (Aug. 26, 2022) ........................................RE96

9.  Transcript of Deposition of Susan Neese (excerpts),
    Dkt. No. 59 (ROA.701) (Aug. 26, 2022) ........................................RE107

10. Declaration of James Hurly (without exhibits),
    Dkt. No. 47-2 (ROA.459) (Aug. 5, 2022) ........................................RE113

11. James Hurly Answers to First Set of Interrogatories,
    Dkt. No. 58 (ROA.657) (Aug. 26, 2022) ........................................RE117

12. Transcript of Deposition of James Hurly (excerpts),
    Dkt. No. 59 (ROA.762) (Aug. 26, 2022) ........................................RE125

CERTIFICATE OF SERVICE

1.      **Docket Sheet**

APPEAL,CLOSED,HISTORIC

# U.S. District Court
# Northern District of Texas (Amarillo)
# CIVIL DOCKET FOR CASE #: 2:21-cv-00163-Z

Neese et al v. Becerra et al

Assigned to: Judge Matthew J. Kacsmaryk

Case in other court:  USCA5, 23-10078

Cause: 05:702 Administrative Procedure Act

Date Filed: 08/25/2021

Date Terminated: 11/22/2022

Jury Demand: None

Nature of Suit: 899 Other Statutes:
Administrative Procedure Act/Review or
Appeal of Agency Decision

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Susan Neese**

represented by **Jonathan F Mitchell**
111 Congress Avenue
Suite 400
Austin, TX 78701
512-686-3940
Fax: 512-686-3941
Email: jonathan@mitchell.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Charles W Fillmore**
The Fillmore Law Firm LLP
201 Main Street
Suite 801
Fort Worth, TX 76102
817/332-2351
Fax: 817/870-1859
Email: chad@fillmorefirm.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christopher L Jensen**
Sprouse Shrader Smith PLLC
PO Box 15008
Amarillo, TX 79105-5008
806/468-3335
Fax: 806/373-3454
Email: chris.jensen@sprouselaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Gene Patrick Hamilton**
America First Legal Foundation
300 Independence Ave SE
Washington, DC 20003

23-10078.1

202-964-3721
Email: gene.hamilton@aflegal.org
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**H Dustin Fillmore, III**
The Fillmore Law Firm LLP
201 Main Street
Suite 801
Fort Worth, TX 76102
817/332-2351
Fax: 817/870-1859
Email: dusty@fillmorefirm.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Marvin W Jones**
Sprouse Shrader Smith
701 S Taylor
Suite 500
Amarillo, TX 79101
806/468-3344
Fax: 806/373-3454 FAX
Email: marty.jones@sprouselaw.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**James Hurly**                    represented by     **Jonathan F Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Charles W Fillmore**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christopher L Jensen**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Gene Patrick Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**H Dustin Fillmore, III**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Marvin W Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Plaintiff**

**Jeffrey Barke**                                    represented by    **Charles W Fillmore**
*TERMINATED: 08/08/2022*                                              (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

                                                                      **Christopher L Jensen**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

                                                                      **Gene Patrick Hamilton**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

                                                                      **H Dustin Fillmore, III**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

                                                                      **Marvin W Jones**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

                                                                      **Jonathan F Mitchell**
                                                                      (See above for address)
                                                                      *ATTORNEY TO BE NOTICED*
                                                                      *Bar Status: Admitted/In Good Standing*

V.

**Defendant**

**Xavier Becerra**                                  represented by    **Jeremy S B Newman**
*in his official capacity as Secretary of*                           DOJ-Civ
*Health and Human Services*                                          Civil Division, Federal Programs Branch
                                                                     1100 L Street NW
                                                                     Washington, DC 20005
                                                                     202-532-3114
                                                                     Email: jeremy.s.newman@usdoj.gov
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     *Bar Status: Not Admitted*

                                                                     **Brian Walters Stoltz-DOJ**

U.S. Attorney's Office
1100 Commerce Street
Third Floor
Dallas, TX 75242
214-659-8626
Email: brian.stoltz@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christopher D Dodge**
US Department of Justice
1100 L Street NW
Washington, DC 20005
202-598-5571
Email: christopher.d.dodge@usdoj.gov
*TERMINATED: 03/17/2022*
*Bar Status: Not Admitted*

**Jordan Landrum Von Bokern-DOJ**
U.S. Department of Justice
1100 L St
Washington, DC 20530
202-305-7919
Fax: 202-616-8460
Email: Jordan.L.Von.Bokern2@usdoj.gov
*TERMINATED: 05/09/2022*
*Bar Status: Not Admitted*

**Defendant**

**United States of America**    represented by    **Jeremy S B Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Brian Walters Stoltz-DOJ**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christopher D Dodge**
(See above for address)
*TERMINATED: 03/17/2022*
*Bar Status: Not Admitted*

**Jordan Landrum Von Bokern-DOJ**
(See above for address)
*TERMINATED: 05/09/2022*
*Bar Status: Not Admitted*

**Amicus**

**Madison Kenyon**    represented by

RE4

**Christian D Stewart**
Morgan Williamson LLP
701 S Taylor
Suite 440 LB 103
Amarillo, TX 79101
806-358-8116
Fax: 806-358-1901
Email: cstewart@mw-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Johannes S Widmalm-Delphonse**
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655
Fax: 480-444-0028
Email: jwidmalmdelphonse@adflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Scruggs**
Alliance Defending Freedom
15100 N 90th St
Scottsdale, AZ 85260
480-444-0020
Fax: 480-444-0028
Email: jscruggs@adflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Rachel A Csutoros**
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
571-707-4655
Fax: 480-444-0288
Email: rcsutoros@adflegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

<u>**Amicus**</u>

**Maddie Dichiara**                    represented by    **Christian D Stewart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Johannes S Widmalm-Delphonse**

RE5

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Scruggs**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Rachel A Csutoros**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Chelsea Mitchell**                    represented by    **Christian D Stewart**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Johannes S Widmalm-Delphonse**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Jonathan Scruggs**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Rachel A Csutoros**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/25/2021 | 1 (p.13) | COMPLAINT against Xavier Becerra, United States of America filed by Susan Neese, James Hurly. (Filing fee $402; Receipt number 0539-12167699) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. |

| | | |
|---|---|---|
| | | Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.13) Exhibit(s), # 2 (p.28) Cover Sheet) (Mitchell, Jonathan) (Entered: 08/25/2021) |
| 08/26/2021 | 2 (p.28) | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Reno). Clerk to provide copy to plaintiff if not received electronically. (daa) (Entered: 08/26/2021) |
| 08/26/2021 | 3 (p.30) | Summons issued as to Xavier Becerra, United States of America, U.S. Attorney, and U.S. Attorney General. (daa) (Entered: 08/26/2021) |
| 08/26/2021 | 4 | Magistrate Judge Reno has notified the clerk that if this case is later referred, she must recuse. Therefore, via the direction of Judge Matthew J. Kacsmaryk, Magistrate Judge D. Gordon Bryant has been selected for matters that may be later referred. (djs) (Entered: 08/26/2021) |
| 08/30/2021 | 5 (p.42) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by James Hurly, Susan Neese. (Mitchell, Jonathan) (Entered: 08/30/2021) |
| 09/16/2021 | 6 (p.44) | Summons Returned Executed as to Xavier Becerra on 9/3/2021 ; United States of America on 9/3/2021, re: 1 (p.13) Complaint. (Hamilton, Gene) Modified entry title on 9/17/2021 (daa). (Entered: 09/16/2021) |
| 11/02/2021 | 7 (p.57) | NOTICE of Attorney Appearance by Christopher D Dodge on behalf of Xavier Becerra, United States of America. (Filer confirms contact info in ECF is current.) (Dodge, Christopher) (Entered: 11/02/2021) |
| 11/02/2021 | 8 (p.58) | MOTION to Dismiss *for Lack of Subject Matter Jurisdiction and Failure to State a Claim* filed by Xavier Becerra, United States of America with Brief/Memorandum in Support. (Dodge, Christopher) (Entered: 11/02/2021) |
| 11/02/2021 | 9 (p.94) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Xavier Becerra, United States of America. (Dodge, Christopher) (Entered: 11/02/2021) |
| 11/03/2021 | 10 (p.97) | NOTICE of Attorney Appearance by Brian Walters Stoltz-DOJ on behalf of Xavier Becerra, United States of America. (Filer confirms contact info in ECF is current.) (Stoltz-DOJ, Brian) (Entered: 11/03/2021) |
| 11/23/2021 | 11 (p.99) | AMENDED COMPLAINT *(FIRST)* against Xavier Becerra, United States of America filed by Susan Neese, James Hurly, Jeffrey Barke. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.13) Exhibit(s)) (Mitchell, Jonathan) (Entered: 11/23/2021) |
| 12/06/2021 | 12 (p.115) | NOTICE of Attorney Appearance by Jordan Landrum Von Bokern-DOJ on behalf of Xavier Becerra, United States of America. (Filer confirms contact info in ECF is current.) (Von Bokern-DOJ, Jordan) (Entered: 12/06/2021) |
| 12/06/2021 | 13 | Unopposed Motion for Extension of Time to File Answer filed by Xavier Becerra, |

| | | |
|---|---|---|
| | (p.116) | United States of America (Von Bokern-DOJ, Jordan) (Entered: 12/06/2021) |
| 12/13/2021 | 14 (p.119) | MOTION Extension of Page Limit for Defendants' Motion to Dismiss filed by Xavier Becerra, United States of America (Von Bokern-DOJ, Jordan) (Entered: 12/13/2021) |
| 12/14/2021 | 15 (p.122) | ORDER granting 13 (p.116) Motion for Extension of Time to File Answer; granting 14 (p.119) Motion Extension of Page Limit. The Court ORDERS Defendants to file a brief in response to the Plaintiffs' First Amended Complaint (ECF No. 11) not to exceed 30 pages on or before December 14, 2021 at 5:00 p.m. CST. (Ordered by Judge Matthew J. Kacsmaryk on 12/14/2021) (awc) (Entered: 12/14/2021) |
| 12/14/2021 | 16 (p.123) | MOTION to Dismiss *First Amended Complaint* filed by Xavier Becerra, United States of America with Brief/Memorandum in Support. (Von Bokern-DOJ, Jordan) (Entered: 12/14/2021) |
| 01/04/2022 | 17 (p.162) | RESPONSE filed by Jeffrey Barke, James Hurly, Susan Neese re: 16 (p.123) MOTION to Dismiss *First Amended Complaint* (Mitchell, Jonathan) (Entered: 01/04/2022) |
| 01/13/2022 | 18 (p.191) | MOTION for Extension of Page Limit for Defendants' Reply filed by Xavier Becerra, United States of America (Dodge, Christopher) (Entered: 01/13/2022) |
| 01/14/2022 | 19 (p.195) | ORDER granting 18 (p.191) MOTION for Extension of Page Limit for Defendants' Reply (Ordered by Judge Matthew J. Kacsmaryk on 1/14/2022) (vls) (Entered: 01/14/2022) |
| 01/18/2022 | 20 (p.196) | REPLY filed by Xavier Becerra, United States of America re: 16 (p.123) MOTION to Dismiss *First Amended Complaint* (Dodge, Christopher) (Entered: 01/18/2022) |
| 01/20/2022 | 21 (p.219) | ORDER denying as moot 8 (p.58) Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim. (Ordered by Judge Matthew J. Kacsmaryk on 1/20/2022) (daa) (Entered: 01/21/2022) |
| 02/08/2022 | 22 (p.221) | ORDER for Scheduling Order Proposal: If this case is not settled or otherwise resolved on or before March 1, 2022, the Joint Proposed Scheduling Order ("JPSO") due date, then the parties must submit a JPSO. Parties must submit the JPSO on or before March 1, 2022. (Ordered by Judge Matthew J. Kacsmaryk on 2/8/2022) (daa) (Entered: 02/08/2022) |
| 03/01/2022 | 23 (p.226) | Joint MOTION for Extension of Time to File Joint Proposed Scheduling Order filed by Jeffrey Barke, James Hurly, Susan Neese (Attachments: # 1 (p.13) Proposed Order) (Mitchell, Jonathan) (Entered: 03/01/2022) |
| 03/02/2022 | 24 (p.230) | ORDER granting 23 (p.226) Joint Motion to Extend Deadline for Submitting Joint Proposed Scheduling Order. The Court ORDERS Plaintiffs and Defendants to file their joint proposed scheduling order 14 days after the Court rules on the pending Motion to Dismiss the First Amended Complaint (ECF No. 16). (Ordered by Judge Matthew J. Kacsmaryk on 3/2/2022) (daa) (Entered: 03/02/2022) |
| 03/16/2022 | 25 (p.231) | NOTICE of Attorney Appearance by Jeremy S B Newman on behalf of Xavier Becerra, United States of America. (Filer confirms contact info in ECF is current.) (Newman, Jeremy) (Entered: 03/16/2022) |
| 03/16/2022 | 26 (p.232) | Unopposed MOTION to Withdraw as Attorney filed by Xavier Becerra, United States of America (Attachments: # 1 (p.13) Proposed Order) (Dodge, Christopher) (Entered: 03/16/2022) |

| | | |
|---|---|---|
| 03/17/2022 | 27 (p.237) | ORDER granting 26 (p.232) Defendants' Unopposed Motion to Withdraw as Attorney. Attorney Christopher D Dodge terminated. (Ordered by Judge Matthew J. Kacsmaryk on 3/17/2022) (daa) (Entered: 03/17/2022) |
| 04/04/2022 | 28 (p.238) | NOTICE to the Court filed by Jeffrey Barke, James Hurly, Susan Neese (Attachments: # 1 (p.13) Exhibit(s), # 2 (p.28) Exhibit(s)) (Mitchell, Jonathan) Modified title on 4/5/2022 (daa). (Entered: 04/04/2022) |
| 04/12/2022 | 29 (p.247) | RESPONSE filed by Xavier Becerra, United States of America re: 28 (p.238) Notice (Other) (Newman, Jeremy) (Entered: 04/12/2022) |
| 04/26/2022 | 30 (p.249) | OPINION AND ORDER - The Court DENIES Defendants' 16 (p.123) MOTION to Dismiss *First Amended Complaint* (Ordered by Judge Matthew J. Kacsmaryk on 4/26/2022) (vls) (Main Document 30 replaced on 4/27/2022) (ali). Replaced document with a text searchable doc on 4/27/2022 (ali). (Entered: 04/26/2022) |
| 05/05/2022 | 31 (p.278) | Unopposed MOTION to Withdraw as Attorney filed by Xavier Becerra, United States of America with Brief/Memorandum in Support. (Attachments: # 1 (p.13) Proposed Order) (Von Bokern-DOJ, Jordan) (Entered: 05/05/2022) |
| 05/09/2022 | 32 (p.283) | ORDER granting 31 (p.278) Defendants' Unopposed Motion to Withdraw as Attorney. Attorney Jordan Landrum Von Bokern-DOJ terminated. (Ordered by Judge Matthew J. Kacsmaryk on 5/9/2022) (daa) (Entered: 05/09/2022) |
| 05/10/2022 | 33 (p.284) | ANSWER to 11 (p.99) Amended Complaint,, filed by Xavier Becerra, United States of America. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: _Attorney Information - Bar Membership_. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Newman, Jeremy) (Entered: 05/10/2022) |
| 05/10/2022 | 34 (p.292) | Proposal for contents of scheduling and discovery order by Jeffrey Barke, James Hurly, Susan Neese. (Mitchell, Jonathan) (Entered: 05/10/2022) |
| 05/11/2022 | 35 (p.297) | SCHEDULING ORDER: Joinder of Parties due by 5/27/2022. Amended Pleadings due by 5/27/2022. Discovery due by 7/29/2022. See Order for other deadlines. (Ordered by Judge Matthew J. Kacsmaryk on 5/11/2022) (daa) (Entered: 05/11/2022) |
| 05/14/2022 | 36 (p.302) | Unopposed MOTION to Amend/Correct 35 (p.297) Scheduling Order filed by Jeffrey Barke, James Hurly, Susan Neese (Attachments: # 1 (p.13) Proposed Order) (Mitchell, Jonathan) (Entered: 05/14/2022) |
| 05/16/2022 | 37 (p.307) | ORDER granting 36 (p.302) Motion to Amend/Correct 35 (p.297) Scheduling Order. (Ordered by Judge Matthew J. Kacsmaryk on 5/16/2022) (vls) (Entered: 05/16/2022) |
| 05/16/2022 | 38 (p.308) | AMENDED SCHEDULING ORDER (Ordered by Judge Matthew J. Kacsmaryk on 5/16/2022) (vls) (Entered: 05/16/2022) |
| 07/27/2022 | 39 (p.313) | STIPULATION OF DISMISSAL *of Plaintiff Jeffrey Barke, M.D.* by Jeffrey Barke, James Hurly, Susan Neese. (Mitchell, Jonathan) (Entered: 07/27/2022) |
| 08/05/2022 | 40 (p.315) | NOTICE of Attorney Appearance by Christian D Stewart on behalf of Madison Kenyon, Maddie Dichiara, Chelsea Mitchell. (Filer confirms contact info in ECF is current.). Party Madison Kenyon, Maddie Dichiara, Chelsea Mitchell added. |

23-10078.9

| | | (Stewart, Christian) (Entered: 08/05/2022) |
|---|---|---|
| 08/05/2022 | 41 (p.316) | Unopposed MOTION for Leave to File Amici Curiae Brief of Three Female Athletes in Support of Plaintiffs filed by Maddie Dichiara, Madison Kenyon, Chelsea Mitchell (Attachments: # 1 (p.13) Exhibit(s) Proposed Amici Curiae Brief of Three Female Athletes in Support of Plaintiffs, # 2 (p.28) Proposed Order) (Stewart, Christian) (Entered: 08/05/2022) |
| 08/05/2022 | 42 (p.354) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number 0539-13013165) filed by Maddie Dichiara, Madison Kenyon, Chelsea Mitchell (Attachments: # 1 (p.13) Exhibit(s) Certificate of Good Standing, # 2 (p.28) Proposed Order)Attorney Jonathan Scruggs added to party Maddie Dichiara(pty:am), Attorney Jonathan Scruggs added to party Madison Kenyon(pty:am), Attorney Jonathan Scruggs added to party Chelsea Mitchell(pty:am) (Scruggs, Jonathan) (Entered: 08/05/2022) |
| 08/05/2022 | 43 (p.360) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number 0539-13013232) filed by Maddie Dichiara, Madison Kenyon, Chelsea Mitchell (Attachments: # 1 (p.13) Exhibit(s) Certificate of Good Standing, # 2 (p.28) Proposed Order)Attorney Rachel A Csutoros added to party Maddie Dichiara(pty:am), Attorney Rachel A Csutoros added to party Madison Kenyon(pty:am), Attorney Rachel A Csutoros added to party Chelsea Mitchell(pty:am) (Csutoros, Rachel) (Entered: 08/05/2022) |
| 08/05/2022 | 44 (p.365) | MOTION to Certify Class filed by James Hurly, Susan Neese (Attachments: # 1 (p.13) Proposed Order) (Mitchell, Jonathan) (Entered: 08/05/2022) |
| 08/05/2022 | 45 (p.369) | Brief/Memorandum in Support filed by James Hurly, Susan Neese re 44 (p.365) MOTION to Certify Class (Attachments: # 1 (p.13) Exhibit(s), # 2 (p.28) Exhibit(s)) (Mitchell, Jonathan) (Entered: 08/05/2022) |
| 08/05/2022 | 46 (p.400) | MOTION for Summary Judgment filed by James Hurly, Susan Neese (Attachments: # 1 (p.13) Proposed Order) (Mitchell, Jonathan) (Entered: 08/05/2022) |
| 08/05/2022 | 47 (p.404) | Brief/Memorandum in Support filed by James Hurly, Susan Neese re 46 (p.400) MOTION for Summary Judgment (Attachments: # 1 (p.13) Declaration(s), # 2 (p.28) Declaration(s)) (Mitchell, Jonathan) (Entered: 08/05/2022) |
| 08/08/2022 | 48 (p.497) | NOTICE: The Court DIRECTS the United States District Clerk to terminate Plaintiff Jeffrey Barke. (Ordered by Judge Matthew J. Kacsmaryk on 8/8/2022) (daa) (Entered: 08/08/2022) |
| 08/08/2022 | 49 (p.498) | ORDER granting 41 (p.316) Unopposed Motion for Leave to File Amici Curiae Brief. (Ordered by Judge Matthew J. Kacsmaryk on 8/8/2022) (daa) (Entered: 08/08/2022) |
| 08/08/2022 | 50 (p.499) | AMICI CURIAE BRIEF filed by Maddie Dichiara, Madison Kenyon, Chelsea Mitchell (daa) (Entered: 08/08/2022) |
| 08/08/2022 | 51 (p.531) | ORDER granting 42 (p.354) Application for Admission Pro Hac Vice of Jonathan Scruggs. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 8/8/2022) (daa) (Entered: 08/08/2022) |
| 08/08/2022 | 52 | ORDER granting 43 (p.360) Application for Admission Pro Hac Vice of Rachel A |

23-10078.10

| | | |
|---|---|---|
| | (p.532) | Csutoros. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 8/8/2022) (daa) (Entered: 08/08/2022) |
| 08/09/2022 | 53 (p.533) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number 0539-13019773) filed by Maddie Dichiara, Madison Kenyon, Chelsea Mitchell (Attachments: # 1 (p.13) Exhibit(s) Certificate of Good Standing, # 2 (p.28) Proposed Order)Attorney Johannes S Widmalm-Delphonse added to party Maddie Dichiara(pty:am), Attorney Johannes S Widmalm-Delphonse added to party Madison Kenyon(pty:am), Attorney Johannes S Widmalm-Delphonse added to party Chelsea Mitchell(pty:am) (Widmalm-Delphonse, Johannes) (Entered: 08/09/2022) |
| 08/09/2022 | 54 (p.539) | ORDER granting 53 (p.533) Application for Admission Pro Hac Vice of Johannes S Widmalm-Delphonse. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Matthew J. Kacsmaryk on 8/9/2022) (daa) (Entered: 08/09/2022) |
| 08/26/2022 | 55 (p.540) | MOTION for Summary Judgment filed by Xavier Becerra, United States of America (Attachments: # 1 (p.13) Proposed Order) (Newman, Jeremy) (Entered: 08/26/2022) |
| 08/26/2022 | 56 (p.546) | Brief/Memorandum in Support filed by Xavier Becerra, United States of America re 55 (p.540) MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* (Newman, Jeremy) (Entered: 08/26/2022) |
| 08/26/2022 | 57 (p.585) | RESPONSE filed by Xavier Becerra, United States of America re: 44 (p.365) MOTION to Certify Class (Newman, Jeremy) (Entered: 08/26/2022) |
| 08/26/2022 | 58 (p.608) | Appendix in Support filed by Xavier Becerra, United States of America re 57 (p.585) Response/Objection, 55 (p.540) MOTION for Summary Judgment *Part 1 of 3 - A1-A68* (Newman, Jeremy) (Entered: 08/26/2022) |
| 08/26/2022 | 59 (p.678) | Appendix in Support filed by Xavier Becerra, United States of America re 57 (p.585) Response/Objection, 55 (p.540) MOTION for Summary Judgment *Part 2 of 3 - A69-185* (Newman, Jeremy) (Entered: 08/26/2022) |
| 08/26/2022 | 60 (p.795) | Appendix in Support filed by Xavier Becerra, United States of America re 57 (p.585) Response/Objection, 55 (p.540) MOTION for Summary Judgment *Part 3 of 3 - A186-329* (Newman, Jeremy) (Entered: 08/26/2022) |
| 09/09/2022 | 61 (p.939) | REPLY filed by James Hurly, Susan Neese re: 44 (p.365) MOTION to Certify Class (Attachments: # 1 (p.13) Exhibit(s), # 2 (p.28) Exhibit(s), # 3 (p.30) Exhibit(s), # 4 Exhibit(s), # 5 (p.42) Declaration(s)) (Mitchell, Jonathan) (Entered: 09/09/2022) |
| 09/16/2022 | 62 (p.1079) | REPLY filed by James Hurly, Susan Neese re: 46 (p.400) MOTION for Summary Judgment (Mitchell, Jonathan) (Entered: 09/16/2022) |
| 09/30/2022 | 63 (p.1094) | REPLY filed by Xavier Becerra, United States of America re: 55 (p.540) MOTION for Summary Judgment (Newman, Jeremy) (Entered: 09/30/2022) |
| 10/08/2022 | 64 (p.1114) | NOTICE of *Supplemental Authority* filed by James Hurly, Susan Neese (Attachments: # 1 (p.13) Exhibit(s)) (Mitchell, Jonathan) (Entered: 10/08/2022) |
| 10/14/2022 | 65 (p.1150) | Memorandum Opinion and Order granting re: 44 (p.365) MOTION to Certify Class filed by James Hurly, Susan Neese (Ordered by Judge Matthew J. Kacsmaryk on |

| | | |
|---|---|---|
| | | 10/14/2022) (vls) (Main Document 65 replaced with a text searchable doc on 10/16/2022) (ali). (Entered: 10/14/2022) |
| 11/11/2022 | 66 (p.1167) | Memorandum Opinion and Order - The Court GRANTS IN PART Plaintiffs' Motion. The Court awards Plaintiffs' requested relief under the APA and DJA, excluding injunctive relief. The Court GRANTS IN PART Defendants' Motion and DENIES Plaintiffs' request for injunctive relief. The Court DENIES all other relief not expressly stated herein. The Court ORDERS parties to submit competing proposed judgments within 10 days of the date of this Opinion and Order. (Ordered by Judge Matthew J. Kacsmaryk on 11/11/2022) (vls) (Main Document 66 replaced with a text searchable doc on 11/12/2022) (ali). (Entered: 11/11/2022) |
| 11/21/2022 | 67 (p.1193) | MOTION entry of class-certification order that complies with Rule 23 filed by James Hurly, Susan Neese (Attachments: # 1 (p.13) Proposed Order) (Mitchell, Jonathan) (Entered: 11/21/2022) |
| 11/21/2022 | 68 (p.1198) | NOTICE of *Defendants' Proposed Judgment* filed by Xavier Becerra, United States of America (Stoltz-DOJ, Brian) (Entered: 11/21/2022) |
| 11/21/2022 | 69 (p.1202) | NOTICE of *Plaintiffs' Proposed Final Judgment* filed by James Hurly, Susan Neese (Mitchell, Jonathan) (Entered: 11/21/2022) |
| 11/22/2022 | 70 (p.1204) | ORDER: The Court certifies the following class under Federal Rule of Civil Procedure 23(b)(2): All health-care providers subject to Section 1557 of the Affordable Care Act ("ACA"). Plaintiffs Susan Neese and James Hurly are appointed class representatives. The Court appoints Jonathan F. Mitchell to serve as class counsel under Rule 23(g). (Ordered by Judge Matthew J. Kacsmaryk on 11/22/2022) (daa) (Entered: 11/22/2022) |
| 11/22/2022 | 71 (p.1205) | FINAL JUDGMENT. (Ordered by Judge Matthew J. Kacsmaryk on 11/22/2022) (daa) (Entered: 11/22/2022) |
| 01/20/2023 | 72 (p.1207) | NOTICE OF APPEAL as to 66 (p.1167) Memorandum Opinion and Order,, 71 (p.1205) Judgment, 30 (p.249) Memorandum Opinion and Order, to the Fifth Circuit by Xavier Becerra, United States of America. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Newman, Jeremy) (Entered: 01/20/2023) |
| 01/30/2023 | | USCA Case Number 23-10078 in USCA5 for 72 (p.1207) Notice of Appeal, filed by Xavier Becerra, United States of America. (daa) (Entered: 02/14/2023) |

2.      **Defendants' Notice of Appeal**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION
_____

SUSAN NEESE, M.D., *et al.*,

    Plaintiffs,

v.

XAVIER BECERRA, *et al.*,

    Defendants.

Civil Action No. 2:21-cv-163-Z

## **NOTICE OF APPEAL**

Please take notice that Defendants hereby appeal to the United States Court of Appeals for the Fifth Circuit from the Court's November 22, 2022 Final Judgment, ECF No. 71, the Court's November 11, 2022 Opinion and Order, ECF No. 66, the Court's April 26, 2022 Opinion and Order, ECF No. 30, and all prior orders and decisions that merge into those orders and judgment.

Dated: January 20, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

/s/ Jeremy S.B. Newman
Jeremy S.B. Newman (Mass. Bar No. 688968)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

CHAD E. MEACHAM
United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:      214-659-8626
Facsimile:      214-659-8807
brian.stoltz@usdoj.gov

*Attorneys for Defendants*

RE14

## CERTIFICATE OF SERVICE

On January 20, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Jeremy S.B. Newman*
Jeremy S.B. Newman
Trial Attorney
United States Department of Justice

**3.** **Opinion and Order Denying Motion to Dismiss**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



SUSAN NEESE *et al.*,                §
                                     §
        Plaintiffs,                  §
                                     §
v.                                   §        2:21-CV-163-Z
                                     §
XAVIER BECERRA, in his official      §
capacity as the Secretary of the United §
States Department of Health and Human §
Services, *et al.*,                  §
                                     §
        Defendants.                  §

**OPINION AND ORDER**

Justice Alito predicted this day would come: "Although the Court does not want to think

about the consequences of [*Bostock v. Clayton County*], we will not be able to avoid those issues

for long. The entire Federal Judiciary will be mired for years in disputes about the reach of the

Court's reasoning." 140 S. Ct. 1731, 1783 (2020) (Alito, J., dissenting). With similar prescience,

Justice Kavanaugh identified the *category* of controversy at issue here: "*Healthcare* benefits may

emerge as an intense battleground under the Court's holding." *Id.* at 1781 (Kavanaugh, J.,

dissenting) (collecting cases) (emphasis added). With poetic force, Justice Alito likened *Bostock*

to a "pirate ship" sailing under a "textualist flag," but representing "a theory of statutory

interpretation that Justice Scalia excoriated — the theory that courts should 'update' old statutes

so that they better reflect the current values of society." *Id.* at 1755–56 (Alito, J., dissenting).

Today, the metaphorical "pirate ship" arrives at an inland port: the Amarillo Division of the

Northern District of Texas.

Before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion") (ECF No. 16), filed on December 14, 2021.[1] In support of two claims, Plaintiffs argue that Section 1557 of the Affordable Care Act and *Bostock* "do not prohibit discrimination on account of sexual orientation and gender identity" if the healthcare providers "would have acted in the same manner had the patient had been a member of the opposite biological sex." ECF No. 11 at 10. Having considered the pleadings, *Bostock*, and relevant cases, the Court **DENIES** Defendants' Motion.

BACKGROUND

Section 1557 of the Affordable Care Act prohibits discrimination on the basis of "sex." *See* 42 U.S.C. § 18116(a) (incorporating into Section 1557, *inter alia*, Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a)). In *Bostock*, the Supreme Court held that Title VII's "because of . . . sex" terminology should be read to prohibit "sexual orientation" and "gender identity" (combined, "SOGI") discrimination.[2] *See generally* 140 S. Ct. 1731. Citing *Bostock*, the Department of Health and Human Services ("HHS") announced it would "interpret and enforce" Section 1557's prohibition on discrimination "on the basis of sex" to include SOGI. *See generally* Department of Health and Human Services, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27,984 (May 25, 2021) ("Notification").

---

[1] Plaintiffs include Dr. Susan Neese, Dr. James Hurly, and Dr. Jeffrey Barke. Defendants include Xavier Becerra, in his official capacity as Secretary of Health and Human Services, and the United States.

[2] In the First Amended Complaint (ECF. No. 11), Defendants' Motion (ECF. No. 16), and Plaintiffs' Brief in Opposition (ECF. No. 17), Plaintiffs and Defendants intermittently use the terms "homosexual," "bisexual," and "transgender" to refer to the disputed categories "sexual orientation" and "gender identity" referenced in *Bostock* and the Notification. Because the relevant jurisprudence, statutes, regulations, and administrative issuances assume the former is included in the latter, this Court will refer to "SOGI" as collective of all aforementioned categories — unless particularity is necessary for the Court's analysis.

Plaintiffs — Texas and California-based physicians — allege Defendants misread *Bostock* and that healthcare providers may continue to discriminate on the basis of SOGI, "so long as one does not engage in 'sex' discrimination when doing so." ECF No. 11 at 5. Specifically, Plaintiffs aver that neither Section 1557 nor *Bostock* prohibit such discrimination, "as long as they would have acted in the exact same manner if the patient had been a member of the opposite biological sex." ECF No. 17 at 16. Plaintiffs "object only to the Secretary's claim that *Bostock* defined 'sex' discrimination to encompass all forms of discrimination on the basis of sexual orientation or gender identity." *Id.* Plaintiffs state they "fully intend to comply with *Bostock* and its interpretation of 'sex.'" *Id.*

Plaintiffs have discriminated on the basis of sex in their medical practices, and each receives federal money subject to Section 1557. *See generally* ECF No. 11. Dr. Neese "has treated patients suffering from gender dysphoria in the past and has on occasion prescribed hormone therapy for them." *Id.* at 5. But Dr. Neese "does not believe that hormone therapy or sex-change operations are medically appropriate for everyone who asks for them, even if those individuals are suffering from gender dysphoria, and she will on occasion decline to prescribe hormone therapy or provide referrals for sex-change operations." *Id.* at 6. "Dr. Neese is categorically unwilling to prescribe hormone therapy to minors who are seeking to transition, and she is equally unwilling to provide referrals to minors seeking a sex-change operation." *Id.* She "believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety." *Id.*

Plaintiffs allege "Dr. Neese has treated many transgender patients . . . in the past, and she expects to continue doing so in the future." *Id.* Dr. Neese claims she "is likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that

she is unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive care that corresponds to their biological sex, and she intends to provide care to these individuals in a manner consistent with her ethical beliefs." *Id.*

Dr. Hurly "recognizes that some biological men may identify as women (and vice versa)." *Id.* In his practice, Dr. Hurly "has encountered situations . . . when he must insist that a patient acknowledge his biological sex rather than the gender identity that he asserts." *Id.* at 7. Plaintiffs provide an example: Dr. Hurly "once diagnosed a biological male patient with prostate cancer, but the patient refused to accept Dr. Hurly's diagnosis because he identified as a woman and insisted that he could not have a prostate." *Id.* Dr. Hurly "explain[ed] to this patient that he was indeed a biological man with a prostate, and that he needed to seek urgent medical treatment for his prostate cancer." *Id.* Plaintiffs claim "Dr. Hurly has treated transgender patients in the past, and he expects to continue doing so in the future." *Id.* Plaintiffs further allege: "Dr. Hurly is likely to encounter transgender patients who will deny or dispute their need for health care that corresponds to their biological sex, and he intends to provide care to these individuals in a manner consistent with his ethical beliefs." *Id.*

The last Plaintiff, Dr. Barke, "is unwilling to prescribe hormone therapy to minors who are seeking to transition, and he is unwilling to provide referrals to minors seeking a sex-change operation." *Id.* He "believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety." *Id.* at 8. "Dr. Barke has treated many transgender patients . . . in the past, and he expects to continue doing so in the future." *Id.* He "is likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that he is unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive

23-10078.252

care that corresponds to their biological sex." *Id.* Dr. Barke "intends to provide care to these individuals in a manner consistent with his ethical beliefs." *Id.*

Plaintiffs bring two claims. First, Plaintiffs ask the Court to hold unlawful and set aside the Notification and enjoin Defendants from enforcing the interpretation of Section 1557 detailed in the Notification. *Id.* at 10. Second, Plaintiffs ask the Court to declare Section 1557 does not prohibit discrimination on the basis of SOGI. *Id.* They argue instead it only prohibits "sex" discrimination, which means a provider would have acted differently towards an identically situated member of the opposite biological sex. *Id.*

### STANDARDS OF REVIEW

Federal courts are courts of limited jurisdiction; they possess only power authorized by the Constitution and federal statutes. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019). "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).

When a motion to dismiss for lack of subject-matter jurisdiction "is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). When a complaint could be dismissed under Rule 12(b)(1) or 12(b)(6), "the court should dismiss only on the jurisdictional ground[,] . . . without reaching the question of failure to state a claim." *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). Doing so avoids the issuance of an advisory opinion and prevents a court lacking jurisdiction "from prematurely dismissing a case with prejudice." *Ramming*, 281 F.3d at 161; *Steel Co.*, 523 U.S. at 101.

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Twombly*, 550 U.S. at 555 (internal marks omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal marks omitted). "The 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Id*. (quoting *Martin K. Eby Constr. Co., Inc. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

The court must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). After assuming the veracity of any well-pleaded allegations, the court should then "determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This "plausibility" standard is not necessarily a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* "Determining whether a complaint states a plausible

claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

ANALYSIS

**A. Rule 12(b)(1) Dismissal**

1. Plaintiffs Have Standing

The Court begins by determining whether this dispute can be "appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 494 U.S. 149, 155 (1990)). The judicial power of federal courts is limited to certain "cases" and "controversies." U.S. CONST. art. III, § 2. "Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). When considering whether a plaintiff has standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

To have standing, the party invoking federal jurisdiction must establish she suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) an injury that is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) an injury that is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. A plaintiff seeking only injunctive or declaratory relief cannot establish standing based on an alleged past injury alone. *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003). She must instead show an injury with "continuing, present adverse effects" or a "substantial likelihood that she will suffer injury in the future." *Id.*

To engage in pre-enforcement review, a plaintiff must allege a "credible threat of enforcement" to establish Article III standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("In some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."). An "administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review." *Susan B. Anthony List*, 573 U.S. at 165. A plaintiff need not first violate the statute and expose himself to liability to establish an injury for standing purposes. *See, e.g.*, *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979). "Indeed, the entire point of a pre-enforcement challenge is to allow courts to rule on the legality of a plaintiff's conduct *before* an enforcement action is brought." *Bear Creek Bible Church v. E.E.O.C.*, No. 4:18-CV-00824-O, 2021 WL 5449038, at *9 (N.D. Tex. Oct. 31, 2021). In determining whether a threat is credible or speculative, the Fifth Circuit "look[s] to the practical likelihood that a controversy will become real." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). A plaintiff must show a "serious" intention to engage in prohibited conduct. *Nat'l Fed'n of the Blind of Tex. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011). The Fifth Circuit — for example — denied standing to plaintiff charities when they had not alleged facts sufficient for the court to determine whether the charities intended to engage in specific conduct prohibited by the challenged statute. *Id.*

If a plaintiff possesses standing, the remaining plaintiffs may seek the same relief whether or not they individually possess standing. *Id.*; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 501 n.18

(5th Cir. 2004) ("[W]hen one of multiple co-parties raising the same claims and issues properly has standing, we do not need to verify the independent standing of the other co-plaintiffs.").

a. *Injury in Fact*

Plaintiffs satisfy the first *Lujan* factor, which weighs whether Plaintiffs sustained an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. Defendants first argue "Plaintiffs . . . provide no basis to conclude that HHS will treat particular practices and factual scenarios as prohibited discrimination in future enforcement proceedings" when they "point to the Notification's general statements on the impermissibility of discrimination because of sexual orientation and gender identity." ECF No. 16 at 16. Defendants next argue "Plaintiffs do not adequately allege that any of their own practices put them at risk of an enforcement proceeding" and, Plaintiffs instead "recount abstract hypotheticals and anecdotes about the medical treatment of gay and transgender individuals" and "speculate that they might one day have patients seeking treatment Plaintiffs would prefer not to provide." *Id.* These arguments fail.

First, Plaintiffs have a "credible threat of enforcement" that creates an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Susan B. Anthony List*, 573 U.S. at 161; *Lujan*, 504 U.S. at 560–61. The Notification states Defendants will interpret "Section 1557's prohibition on discrimination on the basis of sex to include" both "[d]iscrimination on the basis of sexual orientation" and "discrimination on the basis of gender identity." 86 Fed. Reg. 27,984, 27,985. That "interpretation will guide [the Office of Civil Rights ("OCR")] in processing complaints and conducting investigations" although it "does not itself determine the outcome in any particular case or set of facts." *Id.* Equipped with this new interpretation, OCR will "appl[y]

the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination." *Id.*

Defendants argue "Plaintiffs have not alleged how OCR will apply the Notification's reasoning to particular factual situations." ECF No. 16 at 16. To support this argument, Defendants rely on *Trump v. New York*. 141 S. Ct. 530 (2020) (per curiam). In *Trump*, the Supreme Court considered a challenge to a presidential memorandum that declared a census policy of excluding "from the apportionment base aliens who are not in a lawful immigration status." *Id.* at 534 (quoting 85 Fed. Reg. 44679, 44680 (2020)). The Supreme Court determined the plaintiffs' standing theory was "riddled with contingencies and speculation that impede judicial review." *Id.* at 535. For instance, although the President "ha[d] made clear his desire to exclude aliens without lawful status from the apportionment base," he had "qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible.'" *Id.* (quoting 85 Fed. Reg. 44679, 44680). The Supreme Court therefore reasoned "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).

In contrast, how OCR "might eventually implement" its new interpretation of "sex" is more than "conjecture." *Id.* (quoting *Lyons*, 461 U.S. at 108). Plaintiffs alleged future injury is not based on a "speculative chain of possibilities." *Amnesty Int'l USA*, 568 U.S. at 410. The Notification expressly states Defendants' "interpretation will guide OCR in processing complaints and conducting investigations." 86 Fed. Reg. 27,984, 27,985. In doing so, OCR will "appl[y] the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination." *Id.* Whereas the memorandum in *Trump* provided no

23-10078.258

"prediction how the Executive Branch might eventually implement th[e] general statement of policy," the Notification itself details how OCR will "enforc[e] Section 1557's prohibition on sex discrimination" through existing "enforcement mechanisms." *Trump*, 141 S. Ct. at 535; 86 Fed. Reg. 27,984, 27,985.[3]

The Notification — too clever by half, maybe — states the new interpretation "does not itself determine the outcome in any particular case or set of facts." 86 Fed. Reg. 27,984, 27,985. Of course it doesn't. Each particular case or set of facts is different and must be independently reviewed. The next sentence is telling. That sentence states, "OCR will comply with the Religious Freedom Restoration Act [("RFRA")], 42 U.S.C. [§] 2000bb *et seq*., and all other legal requirements," including "applicable court orders." *Id.* The "particular case or set of facts" may indicate OCR should not enforce the new interpretation against an entity protected by a court order or statute. *Id.* Plaintiffs — however — suffer a "credible threat of enforcement" because they: (1) do not invoke RFRA and (2) have not argued they are protected by another federal law or court order preventing enforcement. *Susan B. Anthony List*, 573 U.S. at 161.

Second, Plaintiffs adequately allege their practices put them at risk of an enforcement action. Defendants seem to assert Plaintiffs must wait until a patient with a SOGI status at issue in this case requests objectionable medical care, then sue for declaratory relief once it becomes certain Defendants will take actions that could trigger an enforcement proceeding under Section 1557. Such certainty is not required. *See Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) ("The purpose of the Declaratory Judgment Act is to settle actual

---

[3] On March 31, 2022, Assistant Attorney General Kristen Clarke sent a letter to all state attorneys general, endorsing the Secretary's interpretation of Section 1557. *See* ECF No. 28-1 at 1–4 (the "Letter"). The Letter warns "restricting an individual's ability to receive medically necessary care, *including gender-affirming care*, from their health care providers solely on the basis of their sex assigned at birth or their gender identity may also violate Section 1557." *Id.* at 3 (emphasis added). Neither Plaintiffs' Complaint nor this Court's conclusion *relies* on the Letter. ECF No. 28 at 2. But the Letter *reinforces* the Court's conclusion that Plaintiffs have alleged a "credible threat of enforcement."

controversies *before* they ripen into violations of law or breach of some contractual duty." (internal marks omitted)).

Restated, Plaintiffs must allege a "credible threat of prosecution" under the challenged regulation to establish an enforcement action is impending. *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). The Notification is aimed at medical practitioners — such as Plaintiffs — who may discriminate "on the basis of sex," as interpreted by the Notification. *See generally* 86 Fed. Reg. 27,984. Plaintiffs allege they have: (1) refused requested treatments to help SOGI patients or (2) refused to abide the SOGI preferences of some patients. *See, e.g.*, ECF No. 11 at 6 (Dr. Neese "will on occasion decline to prescribe hormone therapy or provide referrals for sex-change operations, consistent with her Hippocratic Oath to do no harm."); ECF No. 11 at 7 ("Dr. Hurly had to firmly explain to [a] patient that he was indeed a biological man with a prostate . . . ."). And Plaintiffs allege they are "likely" to encounter SOGI patients who will: (1) request hormone therapy and referrals for sex-change operations or (2) dispute that they need preventive care that corresponds to their biological sex. *See id.* at 6–8.

If Defendants enforce the Notification as written against Plaintiffs' practices as pled, Plaintiffs face "a credible threat of prosecution." *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298); 86 Fed. Reg. 27,984, 27,985. If Defendants remain silent on their particular case-by-case enforcement plans, Plaintiffs *still* face "a credible threat of prosecution." *Compare Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020) ("Where the policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the students' speech is arguably regulated by the policy, there is standing."); *Ctr. For Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) ("Controlling

precedent . . . establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad [law] can be sufficient injury to support standing.").

The Notification states –– three times — that Defendants "will interpret and *enforce*" Section 1557's protected class "sex" to include SOGI, which directly implicates Plaintiffs' treatment or non-treatment of transgender patients as pled in their Complaint. *See* ECF No. 11 at 8; *cf. Montclair Police Officers' Ass'n v. City of Montclair*, No. CV-12-6444-PSG, 2012 U.S. Dist. LEXIS 196338, at *4–5 (C.D. Cal. Oct. 24, 2012) (applying relaxed pre-enforcement test in vagueness challenge, asking whether the allegedly vague provisions created a chilling effect on constitutionally protected conduct). For this reason and reasons stated above, the Court finds Plaintiffs have suffered an "injury in fact" sufficient to satisfy the first requirement of pre-enforcement standing.

b. *Traceability and Redressability*

Plaintiffs have satisfied *Lujan*'s second and third prongs: traceability and redressability. *Lujan*, 504 U.S. at 560–61. Defendants argue "Plaintiffs have [ ] failed to allege traceability because they have not identified an injury attributable to the Notification or an injury that would be redressed by vacating the Notification." ECF No. 16 at 20. They contend the "request[ed] relief [ ] would treat the Notification . . . as a legislative rule that can be revoked and rendered nugatory." *Id.* As "only a statement of policy," the Notification is "not binding on anyone and carries no legal force." *Id.* Thus, Defendants contend, Plaintiffs' alleged injury cannot be traced to the policy and "is also why the Notification does not inflict present-day injury." *Id.* at 21.

Here, Plaintiffs have alleged a non-speculative injury that is "fairly traceable" to Defendants' actions because the Notification — not Section 1557 –– pressures Plaintiffs to adjust their practices or face "the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination." 86 Fed. Reg. 27,984, 27,985;

*cf. Texas v. E.E.O.C.*, 933 F.3d 433, 448 (5th Cir. 2019) ("The Guidance, not Title VII, condemns

Texas's felon-hiring policies, and it, not Title VII, pressures Texas to change its laws and policies

or risk referral to the Attorney General by [the Equal Employment Opportunity Commission

("EEOC")]."). The pressure on Plaintiffs to change their practices exists, in part, because OCR

wields prosecutorial power to bring enforcement actions against Plaintiffs based on the

Notification. *Id.* at 449 ("The pressure on [Plaintiff] to change its laws exists, in part, because the

Attorney General has prosecutorial power to bring enforcement actions against [Plaintiff] based

on EEOC referrals or a pattern-or-practice claim."). If a "plaintiff is himself an object of the

[government] action at issue[,] . . . . there is ordinarily little question that the action or inaction has

caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*,

504 U.S. at 561–62. The Notification expressly states Defendants "will interpret and enforce"

Section 1557 in a manner adverse to Plaintiffs' plausibly pled practices. Consequently, Plaintiffs'

injuries are traceable to the Notification.

Regarding redressability: a judicial remedy redresses an injury when the "risk [of the

alleged harm] would be reduced to some extent if [the plaintiffs] received the relief they seek."

*Massachusetts v. U.S. Env't Prot. Agency*, 549 U.S. 497, 526 (2007). The "remedy need not

forestall *every* injury a plaintiff will suffer." *Planned Parenthood of Greater Tex. Surgical Health

Servs. v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 4775135, at *7 (N.D. Tex. Oct. 13,

2021). Because a court order preventing OCR from using "the enforcement mechanisms provided

for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination"

would reduce the harm Plaintiffs allege to some extent, their alleged injury is redressable by a

favorable decision of this Court. 86 Fed. Reg. 27,984, 27,985; *see also* ECF No. 17 at 16

(describing how a favorable decision could redress Plaintiffs' alleged injury). As Plaintiffs note,

their proposed remedies would preclude Defendants from enforcing a "misguided interpretation of Section 1557[,] . . . and the plaintiffs and other health-care providers can safely operate without fear of enforcement proceedings or the loss of federal funds." ECF No. 17 at 16–17. Based on the foregoing, the Court finds Plaintiffs' alleged injury is "fairly . . . trace[able] to the challenged action of the defendant" and is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61.

2. Plaintiffs' Claims Are Ripe

"The ripeness inquiry reflects 'Article III limitations on judicial power' as well as 'prudential reasons for refusing to exercise jurisdiction.'" *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010)). "Ripeness ensures that federal courts do not decide disputes that are 'premature or speculative.'" *Id.* (quoting *Shields*, 289 F.3d at 835); *see also Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967))).

To determine whether a case is ripe for adjudication, a court should consider: "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Texas*, 497 F.3d at 498. "The fitness and hardship prongs must be balanced." *Id.* "A case is generally ripe if any remaining questions are purely legal ones." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987). But "even where an issue presents purely legal questions, the plaintiff must show some hardship in order to

establish ripeness." *Central & S. W. Servs. v. U.S. Env't Prot. Agency*, 220 F.3d 683, 690 (5th Cir. 2000).

    a.  *Fitness for Judicial Review*

Defendants argue Plaintiffs' claims are not fit for judicial review because they present "non-legal questions about future enforcement under [Section] 1557 that require factual development to meaningfully review." ECF No. 16 at 22. "[A] challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 681 (N.D. Tex. 2016) (quoting *Texas*, 497 F.3d at 498–99); *see also Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997) (stating facial challenges are generally ripe the moment the challenged regulation is passed). "An additional consideration is 'whether resolution of the issues will foster effective administration of the statute.'" *Texas*, 497 F.3d at 498–99 (quoting *Merchs. Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 920 (5th Cir. 1993)).

Here, Plaintiffs present a pure question of law. That question is straightforward: Does *Bostock* prohibit discrimination based on SOGI under the Section 1557 definition of "sex" — or does *Bostock* permit discrimination based on SOGI if the healthcare provider "would have acted in the exact same manner if the patient had been a member of the opposite biological sex?" ECF No. 17 at 16. The answer does not require further factual development. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287–88 (5th Cir. 2012) (finding facial attack on regulation raises a pure question of law). The Court need not consider facts related to a particular patient encounter or enforcement proceeding. *See Susan B. Anthony List*, 573 U.S. at 167 (finding "fitness" factor "easily satisfied" because "petitioners' challenge to the Ohio false statement statute

presents an issue that is 'purely legal, and will not be clarified by further factual development.'"
(quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985))). Instead, the
Court need only consider the Notification's text, which defines "sex" and states that OCR will
"appl[y] the enforcement mechanisms provided for and available under Title IX when enforcing
Section 1557's prohibition on sex discrimination." 86 Fed. Reg. 27,984, 27,985.

The Court also finds the Notification constitutes a "final agency action." *Franciscan All.*,
227 F. Supp. at 681 (quoting *Texas*, 497 F.3d at 498–99). Defendants claim the Notification is not
a final agency action because it is an "interpretive rule and general statement of policy" and
therefore lacks "legal force against Plaintiffs in any prospective enforcement proceeding." ECF
No. 16 at 25. An agency's action is final when the action "mark[s] the 'consummation' of the
agency's decisionmaking process" and is "one by which rights or obligations have been
determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–
78 (1997) (internal marks omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct.
1807, 1813 (2016) (same). Agency action marks the consummation of the agency's
decisionmaking process if it "gives rise to 'direct and appreciable legal consequences.'" *Hawkes
Co.*, 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178). The ultimate determination of finality
is "'flexible' and 'pragmatic.'" *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting
*Abbott Labs.*, 387 U.S. at 149–50).

"[A]n agency guidance document that reflects a 'settled agency position' that the entire
agency intends to follow in its enforcement of its regulations, and that gives 'marching orders' to
a regulated entity, is 'final' agency action against the regulated entity." *Texas v. United States*, 300
F. Supp. 3d 810, 838 (N.D. Tex. 2018) (quoting *Appalachian Power Co. v. U.S. Env't Prot.
Agency*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000)). That the Notification explains it "does not

itself determine the outcome in any particular case or set of facts" does not preclude a determination that it is a final agency action. 86 Fed. Reg. 27,984, 27,985. A guidance document can constitute a final agency action "even if the document contains boilerplate denying its legal effect." *Texas*, 300 F. Supp. 3d at 839. The Notification reflects a "settled agency position" that gives "marching orders." *Id.* (quoting *Appalachian Power Co.*, 208 F.3d at 1020–23). Defendants' settled position is they will "interpret and enforce" Section 1557's prohibition of "discrimination on the basis of sex" to include discrimination based on SOGI. *Id.* (quoting *Appalachian Power Co.*, 208 F.3d at 1020–23); 86 Fed. Reg. 27,984, 27,985. The Notification states Defendants' position on the settled agency position on interpretation of sex and the enforcement mechanisms it will use to ensure compliance with that position. 86 Fed. Reg. 27,984, 27,985.

The Court also finds the Notification is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal marks omitted). Defendants argue "legal consequences" cannot flow from "interpretive rules or statements of policy," such as the Notification. ECF No. 16 at 26. But the Fifth Circuit disagrees: "an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of [the final-agency-action test]." *Texas*, 933 F.3d at 441. "Whether an action binds the agency is evident 'if it either appears on its face to be binding[] or is applied by the agency in a way that indicates it is binding.'" *Id.* (quoting *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015)) (alterations in original); *see also Hawkes*, 136 S. Ct. at 1814 (finding agency actions committing agency to determination about jurisdictional scope to "give[] rise to direct and appreciable legal consequences, thereby satisfying the second prong of *Bennett*" (internal marks omitted)). Here, the Notification determines the "rights and obligations" of healthcare providers that receive federal

funds, such as Plaintiffs. *Texas*, 933 F.3d at 441. And the Notification references the "enforcement mechanisms" it will apply to enforce its new interpretation of "sex," thereby determining the actions from which legal consequences may flow. 86 Fed. Reg. 27,984, 27,985.

Based on the above, the Court finds the issues presented are fit for judicial decision and thus favors a finding that this case is ripe for adjudication.

    b. *Plaintiffs Will Endure Hardship*

The Court finds delayed review of the Notification would cause hardship to Plaintiffs. Defendants' claim that "[t]here is no hardship to Plaintiffs in withholding review" does not withstand scrutiny. ECF No. 16 at 24. Plaintiffs are physicians who are "likely to encounter minor transgender patients" they must diagnose, treat, or refer. *See* ECF No. 11 at 6–8. These medical decisions may be based on the threat of an enforcement action — not what Plaintiffs believe to be the best course of action. *Cf. Susan B. Anthony List*, 573 U.S. at 167–68 ("Denying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core political speech on the one hand or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other."); *Franciscan All.*, 227 F. Supp. 3d at 681 ("Substantial hardship is typically satisfied when a party is forced to choose between refraining from allegedly lawful activity or engaging in the allegedly lawful activity and risking significant sanctions."). Plaintiffs face the fear of losing federal funds if they do not act according to the interpretation of "sex" described in the Notification. ECF No. 11 at 8. Plaintiffs assert that fear will affect their actions. *Id.*

Accordingly, the Court finds the hardship to the parties favors a determination that this case is ripe for adjudication.

3.  The Agency Decision is Final and There Is No Other Adequate Remedy

The Administrative Procedure Act ("APA") allows a litigant to seek judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. As discussed above, the Court finds the Notification constitutes a final agency action. The Court now considers whether "there is no other adequate remedy." *Id.*; *see also Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (stating 5 U.S.C. § 704 "limits the APA to the review of those agency actions which otherwise lack an 'adequate remedy in court'").

"At a minimum, the alternative remedy must provide the [plaintiff] specific procedures by which the agency action can receive judicial review or some equivalent." *Hinojosa*, 896 F.3d at 310 (internal marks omitted). An "alternative remedy need only be adequate[;] the alternative remedy does not need to be as effective as an APA lawsuit, merely that it provide the same general relief." *De La Garza v. Pompeo*, 741 F. App'x 994, 998 (5th Cir. 2018) (internal marks omitted). Defendants argue Plaintiffs "possess an adequate alternative remedy" because "they may defend against any future enforcement of [Section] 1557 under the express administrative and judicial review provisions provided by Congress." ECF No. 16 at 28 (citing 42 U.S.C. § 18116(a)). Plaintiffs disagree. They argue "post-enforcement review . . . is not an 'adequate remedy' within the meaning of [S]ection 704, because the plaintiffs must risk the loss of federal funding if they choose to contest the [ ] Notification in those proceedings." ECF No. 17 at 24.

The "alternative remedy . . . [must] provide the same genre of relief" as an APA lawsuit. *De La Garza*, 741 F. App'x at 998 (internal marks omitted). The Court finds an inability to obtain equitable relief — as would be the case when defending an enforcement action — renders an alternative remedy inadequate. *See, e.g.*, *Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009); *compare Bowen v. Massachusetts*, 487 U.S. 879, 906–08 (1988) (concluding an alternative remedy

in Claims Court was inadequate because Claims Court lacked power to grant equitable relief) *with Citizens for Responsibility & Ethics in Wash v. U.S. Dep't of Just.*, 846 F.3d 1235, 1245–46 (D.C. Cir. 2017) (concluding FOIA was adequate alternative remedy although it only provided for making documents available to plaintiff). Additionally, Plaintiffs need not "run the risk of enforcement proceedings . . . to seek review of an already-final agency action." *De La Garza*, 741 F. App'x at 998. Demanding Plaintiffs' wait to make their arguments in an enforcement proceeding would defeat the purpose of a pre-enforcement challenge. In *Sackett v. United States Environmental Protection Agency*, the Supreme Court permitted a pre-enforcement challenge to an Environmental Protection Agency ("EPA") compliance order although "judicial review ordinarily comes by way of a civil action brought by the EPA." 566 U.S. 120, 127 (2012). Because the plaintiffs could not "initiate [an enforcement action]" and had to "wait for the Agency to drop the hammer" while they accrued daily penalties, "APA review" was the only "adequate remedy." *Id.* at 127, 131.

The same logic applies here. The Notification requires Plaintiffs to alter their medical practices, either: (1) *reverse* the transgender-specific decisions, advice, and treatments discussed in the Complaint; or (2) *continue* the transgender-specific decisions, advice, and treatments discussed in Complain and risk an enforcement action by Defendants. The latter option requires Plaintiffs to "wait for [OCR] to drop the hammer" because Plaintiffs themselves cannot initiate an enforcement action. *Id.* at 127. The Court therefore finds Plaintiffs lack an adequate alternative remedy.

Because Plaintiffs seek judicial review of a "final agency action for which there is no other adequate remedy in court," Plaintiffs satisfy the requirements of APA review. 5 U.S.C. § 704.

**B. Rule 12(b)(6) Dismissal**

Next up: whether Plaintiffs' Complaint "state[s] a claim upon which relief can be granted."

FED. R. CIV. P. 12(b)(6). Though Plaintiffs use *generalized* language in several places, the Court

construes their arguments to refer to only those statutes, regulations, and rules implicated by the

Notification.

Plaintiffs ask the Court to hold unlawful and set aside the Notification and enjoin

Defendants from enforcing the interpretation of Section 1557 stated therein. ECF No. 11 at 10.

Plaintiffs also ask the Court to declare Section 1557 does *not* prohibit healthcare providers from

discriminating on the basis of SOGI. *Id.* Plaintiffs argue Section 1557 only prohibits "sex"

discrimination — which means a provider would have acted *differently* towards an identically

situated member of the opposite biological sex. *Id.* Plaintiffs argue that the Notification misapplies

*Bostock* to the Section 1557 text incorporating Title IX's definition, "on the basis of sex" — and

that no combination of *Bostock*, Section 1557, and Title IX may be fairly read to prohibit a

discriminatory act against SOGI persons if the healthcare provider would take the *same*

discriminatory act "against an identically situated member of the opposite biological sex." ECF

No. 17 at 26.

In response, Defendants argue "Plaintiffs cannot plausibly allege that the Notification is

'not in accordance with the law.'" ECF No. 16 at 31 (quoting 5 U.S.C. § 706(2)(A)). "The

Notification [ ] goes no further than permitted by Congress's statute and the Supreme Court's

interpretation of substantially similar text in *Bostock*." *Id.*

### 1. Discrimination "On the Basis of Sex" under Title IX — and Section 1557

Congress enacted the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010, collectively referred to as the Affordable Care Act ("ACA"), in March 2010. 111 Pub. L. No. 148 (March 23, 2010); 111 Pub. L. No. 152 (March 30, 2010). Section 1557 of the ACA provides an individual shall not be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Defendants argue Section 1557 prohibits discrimination on the basis of SOGI in addition to the longstanding protected class "sex." However, Section 1557 does not employ the terms "sex," "sexual orientation," or "gender identity." *See id.* Instead, Section 1557 expressly incorporates Title IX, which prohibits discrimination "on the basis of sex." *See id.*; 20 U.S.C. § 1681(a).

What does "sex" mean as used in Title IX? Because the statute provides no definition, the Court must construe the term. The Court construes statutory text to give effect to the ordinary public meaning conveyed when Congress enacted the statute. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS §§ 6–7 (2012).

Congress enacted Title IX in 1972. 20 U.S.C. § 1681. At that time, "sex" was commonly understood to refer to physiological differences between men and women — particularly with respect to reproductive functions. *See, e.g.*, *Sex*, AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segmentation and recombination which

underlie most evolutionary change . . . ."); *Sex*, 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."). Indeed, *Bostock* itself "proceed[ed] on the assumption that 'sex' . . . refer[ed] only to biological distinctions between male and female." 140 S. Ct. at 1739.

But the Court cannot interpret "sex" in isolation. *United States v. Morton*, 467 U.S. 822, 828 (1984). The Court must instead "read the statute as a *whole*, so as to give effect to each of its provisions without rendering any language superfluous." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (emphasis added). And the Court must abide judicially accepted principles of linguistics in reading the whole — including compositionality. *See generally* James C. Phillips, *The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished manuscript);[4] *Bostock,* 140 S. Ct. at 1769, n.22 (citing same).

Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each "sex." *See, e.g.*, 20 U.S.C. § 1681(a)(8) (stating if father-son or mother-daughter activities are provided for "one sex," reasonably comparable activities shall be provided for "the other sex."); 20 U.S.C. § 1681(a)(2) (requiring same in school admissions context). And Courts have long interpreted Title IX to prohibit federally funded education programs from treating men better than women (or vice versa). *See, e.g.*, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 680 (1979). As written and commonly construed, Title IX appears to operate in binary terms — male and female — when it references "sex."

---

[4] "Compositionality is the notion that the meaning of a complex expression is a compositional function of the meaning of its semantic parts. Sometimes what you see is what you get: *apple pie* is a pie made from apples. But sometimes the combination of words has a meaning of its own that is not a reliable amalgamation of the components at all, such as *for good* or *at all*." (emphasis added) (internal marks omitted).

But Title IX's prohibition against discrimination "on the basis of sex" cannot be reduced to a literalist but-for test. Although not at issue here, Section 1686 states: "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintain separate living facilities for the different sexes." 20 U.S.C. § 1686. The implementing regulations clarify educational institutions "may provide separate toilet, locker room, and shower facilities *on the basis of sex*, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of *the other sex*." 34 C.F.R. § 106.33 (emphasis added).

Defendants argue Section 1681(a) contains a broader definition of "sex" that includes SOGI. But when read alongside Section 1686, Defendants' argument implodes. It is doubtful Section 1686 *permits* educational institutions to maintain separate living institutions for each SOGI, while a stand-alone Section 1681(a) *prohibits* same. The implementing regulation highlights the sex binary by referencing "the other sex" — which speaks directly to *biological* sex. 34 C.F.R. § 106.33; *see also, e.g.*, 20 U.S.C. 1681(a)(8) (stating "if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*" (emphasis added)). At this stage of litigation, the approved tools of textualism do not support Defendants reading of Title IX — and by extension Section 1557.

Furthermore, Title IX's ordinary public meaning remains intact until changed by Congress. *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). As noted above, the ordinary public meaning of "sex" turned on reproductive function when Congress enacted Title IX. Legislators tried to amend Title IX to include "sexual orientation" and "gender identity" on multiple occasions, but those attempts failed. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). By contrast, Congress *has* enacted hate-crimes legislation

with enhanced penalties for crimes motivated by "sexual orientation" or "gender identity." *See* 18 U.S.C. § 249(a)(2); 34 U.S.C. § 12291(b)(13)(A) (prohibiting discrimination in certain funding programs based on "sexual orientation" and "gender identity," separately from "sex"). Neither the Supreme Court nor the Fifth Circuit have addressed whether discrimination based on SOGI constitutes "sex" discrimination under Title IX or Section 1557, Congress has not amended the law to state as much, and it is questionable whether the Secretary can alter the term "sex" by administrative fiat. *See Franciscan Alliance, Inc. v. Becerra*, 553 F. Supp. 3d 361, 371 & n.7 (N.D. Tex. 2016). At this stage of litigation, Defendants reading of Title IX — and by extension Section 1557 — cannot support or sustain Defendants' Motion.

### 2. *Bostock*, Title IX, and Section 1557

*Bostock*'s Title VII analysis does *not* control the Title IX and Section 1557 analysis with the ease, precision, and force envisioned in Defendants' Motion. Though Courts *generally* apply the legal standards used in Title VII cases to decide Title IX cases — *see, e.g.*, *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 404 (5th Cir. 1996) — Title IX and Section 1557 are not identical to Title VII in every material instance. In *Bostock*, the plaintiff sued for a violation of Title VII. 140 S. Ct. at 1738; 42 U.S.C. § 2000e-2(a)(1). Title VII makes it unlawful for an employer to make certain decisions "*because of*" certain factors, including "sex." *Id.* (emphasis added). By contrast, Title IX prohibits "discrimination *on the basis of* sex." 20 U.S.C. § 1681(a) (emphasis added). These phrases are not necessarily synonymous.

The Court must give full effect to the difference in word choice. Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* BENCHMARKS 224 (1967) ("[W]hen Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things"). "After all, only the words on the page constitute the law adopted

by Congress and approved by the President." *Bostock*, 140 S. Ct. at 1738. By failing to acknowledge the different phrases Title VII and Title IX employ, the Court "would risk amending [the] statutes outside the legislative process reserved for the people's representatives." *Id.* The Supreme Court used a "but-for" causation analysis to decide *Bostock* based on Title VII's text, which bars discrimination "because of" sex. *See id.* at 1739. Since Title IX prohibits "on the basis of sex," the Court cannot reflexively adopt *Bostock*'s but-for causation analysis at this phase of litigation — without further briefing, evidence, or argument.   20 U.S.C. § 1681(a). Importantly, the majority and dissenting justices who adjudicated *Bostock* appear to agree on this point: *Bostock* does not answer all questions arising under Title IX.[5]

### 3. Plaintiffs' Complaint Survives Dismissal

The Court finds Plaintiffs plausibly plead Section 1557 and *Bostock* do not prohibit healthcare providers from discriminating on the basis of SOGI — "as long as they would have acted in the exact same manner if the patient had been a member of the opposite biological sex." ECF No. 17 at 16. *Bostock* expressly cabined its holding to Title VII. *See id.* at 1731. So, the question of whether *Bostock*'s reasoning applies to Section 1557 remains unsettled — at least in the Fifth Circuit. *But see Joganik v. E. Tex. Med. Ctr.*, No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *10 (E.D. Tex. Dec. 14, 2021), *report and recommendation adopted*, 2022 WL 243886 (E.D. Tex. Jan. 25, 2022); *Tovar v. Essential Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949–50 (W.D. Wis. 2018);

---

[5] *See Bostock*, 140 S. Ct. at 1753 ("But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today."); *Id.* at 1780 (Alito, J., dissenting) ("The Court's decision may lead to Title IX cases . . . ."); *Id.* at 1836–37 (Kavanaugh, J., dissenting) ("And the implications of this Court's usurpation of the legislative process will likely reverberate in unpredictable ways for years to come.").

*Prescott v. Rady Child.'s Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098–1100 (S.D. Cal. 2017). That is the question Plaintiffs ask this Court to answer. *See* ECF No. 11 at 10.

Plaintiffs aver that the medical diagnoses, treatments, or referrals alleged in the Complaint do *not* violate Section 1557's prohibition on "sex" discrimination because Plaintiffs "would have acted in the exact same manner if the patient had been a member of the opposite biological sex" — consistent with *Bostock*, notwithstanding SOGI, ECF No. 17 at 16; *see also, e.g.*, ECF No. 11 at 6 ("Dr. Neese believes that she is ethically obligated to inform biologically female patients of their need for cervical-cancer screening and other preventive care designated for women, regardless of the gender identity that the patient asserts. Dr. Neese also believes that she is ethically obligated to advise biologically male patients of their need for prostate-cancer screening, regardless of whether that patient identifies as a man or a woman."); ECF No. 11 at 7 ("Dr. Hurly is likely to encounter transgender patients who will deny or dispute their need for health care that corresponds to their biological sex, and he intends to provide care to these individuals in a manner consistent with his ethical beliefs.").

At times — however — Plaintiffs allege facts indicating that their medical diagnoses, treatments, or referrals may implicate SOGI categories. ECF No. 11 at 6 ("Dr. Neese is categorically unwilling to prescribe hormone therapy to minors who are seeking to transition, and she is equally unwilling to provide referrals to minors seeking a sex-change operation."); ECF No. 11 at 6 ("Dr. Neese believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety."); ECF No. 11 at 7 ("Dr. Barke is unwilling to prescribe hormone therapy to minors who are seeking to transition, and he is unwilling to provide referrals to minors seeking a sex-change operation.").

After reviewing Plaintiffs' Complaint, the Court finds Plaintiffs allege facts sufficient to survive Rule 12(b)(6) dismissal. And for the reasons discussed above, the Court finds the pure question of law remains unanswered: Does *Bostock* prohibit SOGI discrimination under the Section 1557 definition of "sex" — or does *Bostock* permit SOGI discrimination if the healthcare provider "would have acted in the exact same manner if the patient had been a member of the opposite biological sex"? ECF No. 17 at 16.

CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' First Amended Complaint (ECF No. 11).

**SO ORDERED**.

April **26**, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

23-10078.277

**4.     Opinion and Order Granting Plaintiffs' Motion for Class Certification**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SUSAN NEESE, M.D., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-163-Z |
| | § | |
| XAVIER BECERRA, in his official | § | |
| capacity as Secretary of the United | § | |
| States Department of Health and Human | § | |
| Services, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Before the Court is Plaintiffs' Motion to Certify Class ("Motion") (ECF No. 44), filed on

August 5, 2022. Having considered the motions, pleadings, and relevant law, the Court **GRANTS**

Plaintiffs' Motion and **CERTIFIES** Plaintiffs' proposed putative class.

BACKGROUND

Section 1557 of the Affordable Care Act provides "an individual shall not, on the ground[s]

prohibited under" any of four civil rights statutes, "be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under, any health program or activity, any part of

which is receiving Federal financial assistance, . . . or under any program or activity that is

administered by an Executive Agency or any entity established under this title (or amendments)."

42 U.S.C. § 18116(a) (citing 20 U.S.C. § 1681 *et seq.*, 29 U.S.C. § 794, 42 U.S.C. § 2000d *et seq.*,

and 42 U.S.C. § 6101 *et seq.*). In 2020, the Supreme Court decided *Bostock v. Clayton County*,

140 S. Ct. 1731 (2020). *Bostock* involved sex-discrimination claims under Title VII of the Civil

Rights Act of 1964, which prohibits discrimination in employment "because of [an]

individual's . . . sex." 42 U.S.C. § 2000e-2. The Supreme Court held Title VII's prohibition on

discrimination "because of" sex prohibits employers from firing or refusing to hire individuals "for being homosexual or transgender." *Bostock*, 140 S. Ct. at 1743.

On May 10, 2021, Defendant Becerra announced the Department of Health and Human Services ("HHS") will "interpret and enforce" Section 1557 to prohibit: (1) "discrimination on the basis of sexual orientation"; and (2) "discrimination on the basis of gender identity." *See* ECF No. 1-1. Plaintiffs Susan Neese, M.D., and James Hurly, M.D., allege Defendant Becerra's announced interpretation of Section 1557 inflicts immediate, present-day injury on them. ECF No. 11 at 8. This is because they "can only wonder whether they or their practices will lose federal money if they ever refuse to provide gender-affirming care to a transgender patient." *Id.* Plaintiffs allege Defendant Becerra's notification is "not in accordance with law" under Section 706(2)(A) of the Administrative Procedure Act because it wrongfully equates discrimination on account of sexual orientation and gender identity with "sex discrimination." *Id.* at 10. Plaintiffs also seek declaratory relief under 28 U.S.C. § 2201 and ask the Court to declare Section 1557 does not prohibit discrimination based on sexual orientation and gender identity. *Id.* Plaintiffs now move this Court to certify a class of all healthcare providers subject to Section 1557 of the Affordable Care Act under Federal Rule of Civil Procedure 23(b)(2).

## REPRESENTATIVE PLAINTIFFS HAVE STANDING

Standing is a "prerequisite to the class certification inquiry." *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 319 (5th Cir. 2002). When "it is the *class representative* who presents a standing problem, then *that* standing issue must be addressed first, prior to deciding class certification." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020). "After all, if the class representative lacks standing, then there is no Article III suit to begin with — class certification or otherwise." *Id.* To establish standing, "a plaintiff must show (i) that he suffered an injury in fact

that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2202 (2021).

The Court previously found named Plaintiffs have standing because they face a "credible threat of enforcement" that creates an "injury in fact" that is "concrete and particularized" and "actual or imminent." ECF No. 30 at 9 (internal marks omitted). Defendants maintain Plaintiffs lack standing to challenge HHS's interpretation that Section 1557 prohibits discrimination on the basis of sexual orientation. Defendants argue Plaintiffs are uninjured by the portion of the notification that prohibits discrimination on account of "sexual orientation." ECF No. 57 at 9. Additionally, Defendants argue Plaintiffs lack standing: Plaintiffs face no credible threat of future enforcement because HHS does not consider Plaintiffs' anticipated actions to constitute discrimination. *Id.*

These arguments fail. To begin, Plaintiffs' injuries are "fairly traceable" to this action — even if they are not injured by every single word in the notification. Plaintiffs thus have standing to seek their remedy even if their injuries only arise from the gender-identity edict. ECF No. 61 at 6. Second, courts assess standing at the moment the lawsuit is filed and is unaffected by post-filing development. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020); *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) (stating standing is assessed "at the time the action commences"). Thus, the notice of proposed rulemaking concerns only whether Plaintiffs' claims have become moot. But as Plaintiffs explain, Defendants "are not making a mootness argument, and they cannot show that the Notice of Proposed Rulemaking moots [Plaintiffs'] claims when the rulemaking process is not complete and the contents of the proposed rule could change between now and when the rule becomes final." ECF No. 61 at 6 (citing *El Paso*

*Elec. Co. v. FERC*, 667 F.2d 462, 467 (5th Cir. 1982)). Furthermore, a notice of proposed rulemaking does not withdraw or nullify the earlier agency "action" that Plaintiffs challenge. *Id.* at 6–7 (citing *Biden v. Texas*, 143 S. Ct. 2528, 2544–45 (2022)). Third, the Court agrees with Plaintiffs "that the Notice of Rulemaking does nothing to alleviate" their objections to the Secretary notification of May 10, 2021. *Id.* at 7. This is because "a provider can only guess as to whether the powers that be at HHS will regard its refusal to provide puberty blockers to a minor as 'legitimate' or 'nondiscriminatory.'" *Id.* at 8. Accordingly, the named Plaintiffs have standing.

PLAINTIFFS' PUTATIVE CLASS

"[A class action lawsuit] is the most effective means private citizens have to enforce the law."[1] "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). The party seeking class certification bears the burden of proof to establish that the proposed class satisfies Federal Rule of Civil Procedure 23. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). "The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of Rule 23." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

"To establish class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as requirements of Rule 23(b)(1), (2), or (3)." *Stukenberg*, 675 F.3d at 837. Rule 23(a) lists four class-certification requirements: (1) "the class [be] so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of

---

[1] *See* BRIAN T. FITZPATRICK, THE CONSERVATIVE CASE FOR CLASS ACTIONS 2 (2019).

the class"; and (4) "the representative parties will fairly and adequately protect the interests of the

class." FED. R. CIV. P. 23(a). "These four threshold conditions are 'commonly known as

numerosity, commonality, typicality, and adequacy of representation.'" *U.S. Navy SEALs 1–26 v.*

*Austin*, No. 4:21-CV-01236-O, 2022 WL 1025144, at *2 (N.D. Tex. Mar. 28, 2022) (quoting

*Flecha*, 946 F.3d at 766). The Fifth Circuit has articulated an additional, "ascertainably"

requirement. *See John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The

existence of an ascertainable class of persons to be represented by the proposed class representative

is an implied prerequisite of Federal Rule of Civil Procedure 23."); *DeBremaecker v. Short*, 433

F.2d 733, 734 (5th Cir. 1970) (per curiam) ("[T]o maintain a class action, the class sought to be

represented must be adequately defined and clearly ascertainable.").

A party seeking class certification must also satisfy at least one ground listed in Rule 23(b).

A party meets Rule 23(b)(2)'s requirements when it satisfies Rule 23(a)'s four threshold

requirements and "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). This requirement is satisfied

"when a single injunction or declaratory judgment would provide relief to each member of the

class." *Wal-Mart*, 564 U.S. at 360.

**A. The Requirements of Rule 23(a) Are Met**

1. *Plaintiffs' putative class satisfies Rule 23(a)(1)'s numerosity requirement.*

Under Rule 23(a)(1), Plaintiffs must show "the class is so numerous that joinder of all

members is impracticable." "[N]umerosity is generally satisfied if there are more than 40 class

members." *In re Nat'l Football League Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016).

Northern District of Texas Local Rule 23.2(b)(1) allows Plaintiffs to "approximate number of class

members." Plaintiffs estimate that the proposed class of healthcare providers subject to Section 1557 "easily exceeds 1 million." ECF No. 45 at 5. This is because Section 1557's anti-discrimination protections apply to *any* healthcare provider participating in a federally funded healthcare program, such as Medicare, Medicaid, or CHIP. *Id.* at 4.

Defendants assert Plaintiffs must provide evidence that other class members share their contention of harm. ECF No. 57 at 17–18. This is incorrect — at least for the purposes of numerosity analysis. True, Plaintiffs "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350. But Plaintiffs have met their burden, having proved the class consists of more than 40 members. *See* ECF No. 45-1 at 15. Indeed, numerosity is almost never litigated.[2] Defendants' proposed rule would especially defeat the purposes of Rule 23(b)(2), which was designed specifically for cases "seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998) (quoting HERBERT NEWBERG & ALBA Conte, 1 NEWBERG ON CLASS ACTIONS § 4.11 (3d ed. 1992)). Accordingly, Plaintiffs' proposed class satisfies Rule 23(a)(1).

    2. *Plaintiffs' putative class meets Rule 23(a)(2) and Rule 23(a)(3)'s commonality and typicality requirements.*

Commonality requires a plaintiff to show "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). This also requires Plaintiffs to demonstrate class members "have suffered the same injury." *Wal-Mart*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "That common contention, moreover, must be of such a nature

---

[2] In *Wal-Mart*, for example, the representatives proposed a class similar in size (1.5 million female employees), because of Wal-Mart's alleged discrimination against women in violation of Title VII of the Civil Rights Act of 1964. 564 U.S. at 343. The Court's numerosity analysis was contained in one sentence in a footnote in Justice Ginsburg's dissent: "The numerosity requirement is clearly met and Wal-Mart does not contend otherwise." *Id.* at 368 n.2.

23-10078.1155

that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* What matters is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 131, 132 (2009)).

Rule 23(a)'s commonality and typicality requirements "tend to merge." *Id.* at 349 n.5. "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."[3] *Id.* The presence of a single common question can suffice to satisfy Rule 23(a)(2). *See id.* at 359.

Plaintiffs propose at least two questions of law common to all class members. First, whether Defendant Becerra's interpretation of Section 1557 is consistent with the statutory definition of "sex" discrimination, as construed by the Supreme Court in *Bostock.* ECF No. 45 at 5. Second, to what extent does Section 1557's prohibition on "sex" discrimination compel healthcare providers to provide "gender-affirming care" to patients suffering from gender dysphoria? *Id.* Plaintiffs further aver each member suffers the same injury from the legal uncertainty over their legal obligations under Section 1557. *Id.* Plaintiffs also argue their claims

---

[3] In *Falcon,* the Supreme Court held commonality and typicality were not met because the fact that Falcon was allegedly discriminated against for *promotion* was not proof of widespread discriminatory *hiring* practices. 457 U.S. at 157–58. In other words, Falcon did not raise common questions of law or fact between Mexican-American employees and applicants who were not hired and therefore could not represent those who had not been hired. Similarly, in *Wal-Mart*, the Court held there was no "specific employment practice" that tied all 1.5 million claims together. 564 U.S. at 357 ("Merely showing that Wal-Mart's policy of [lower-level supervisor] discretion has produced an overall sex-based disparity does not suffice.").

are "more than typical" of the claims of the class: "they are precisely the same as those of all members of the proposed class." *Id.* at 6.

Defendants argue Rule 23(a)(2) is not met because "many members of the proposed class do not share Plaintiffs' contention or claimed injury" or publicly oppose Plaintiffs' efforts. *See* ECF No. 57 at 9. This contention is better suited for Rule 23(a)(4)'s adequacy of representation analysis. But in any case, this argument does not defeat commonality — and especially not in a Rule 23(b)(2) action. *See, e.g., J.D. v. Azar*, 925 F.3d 1291, 1315–16 (D.C. Cir. 2019) ("When a challenged policy is generally applicable to the class for purposes of Rule 23(b)(2), the history of the Rule confirms the propriety of certifying the class even if some members may be uninterested in pressing the claims."); *In re Whirlpool Corp. Front-Loading Washing Prods. Liability Litig.*, 722 F.3d 838, 854–55 (6th Cir. 2013) (commonality not defeated simply because defendants contended class included owners who were "pleased with the performance of their" machines and thus dissimilar to consumers who complained of mold problem).

"[T]he *Wal-Mart* Court nowhere stated that at the class certification stage, every member of the class must establish that he, she or it was *in fact* injured by the common policy." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 23 (1st Cir. 2015). In other words, Rule 23(b)(2) does not require "a specific policy uniformly affecting — and injuring — each [plaintiff] . . . so long as declaratory or injunctive relief 'settling the legality of the [defendant's] behavior with respect to the class as a whole is appropriate.'" *Prantil v. Arkema Inc.*, 986 F.3d 570, 581–82 (5th Cir. 2021) (quoting *Stukenberg*, 675 F.3d at 847–48) (alterations in original).

Here, "the class members assert an entitlement to relief that is entirely unaffected by the . . . factual differences noted by the government." *J.D.*, 925 F.3d at 1321. "The common questions therefore are 'apt to drive the resolution of the litigation.'" *Id.* (quoting *Wal-Mart*, 564

U.S. at 350). Because the putative class members' claims can be determined "in one stroke," Rule 23(a)(2) is satisfied. *Wal-Mart*, 564 U.S. at 350.

As for typicality, Defendants argue Plaintiffs fail to satisfy this "requirement for the same reason they fail the commonality requirement: the proposed class includes many providers who oppose Plaintiffs' legal contentions and who do not share Plaintiffs' claimed injury." ECF No. 57 at 14. The Court must also reject this argument for the purposes of Rule 23(a)(3). *See J.D.*, 925 F.3d at 1314 ("The class members all assert a common entitlement to make that choice on their own . . . . The class representatives are suited to press that interest on the class's behalf, even if various class members might make varying ultimate decisions about how to exercise their choice."); *see also, e.g., James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) ("[T]he test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." (internal marks omitted)); *Barnes*, 161 F.3d at 141 ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." (quoting 1 NEWBERG ON CLASS ACTIONS § 3.15)); *cf. Vita Nuova, Inc. v. Azar*, No. 4:19-CV-00532-O, 2020 WL 8271942, at *7 (N.D. Tex. Dec. 2, 2020) ("That some class members might make this employment choice differently than Vita Nuova does not render Vita Nuova's claims unrepresentative of the claims of the class as a whole."). Additionally, Defendants argue because Plaintiffs "do not discriminate or wish to discriminate on the basis of sexual orientation," their claims "are atypical of claims of any proposed class members who wish to discriminate on the basis of sexual orientation." ECF No. 57 at 14. For the same reason, this argument fares no better. Therefore, Plaintiffs' putative class satisfies the commonality and typicality requirements of Rule 23(a)(2) and (a)(3).

3. *Plaintiffs' putative class meets Rule 23(a)(4)'s adequacy of representation requirement.*

Under Rule 23(a)(4), the representative party in a class action must "fairly and adequately protect the interests of the class." Rule 23(a)(4)'s adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy encompasses three separate but related inquiries: (1) "the zeal and competence of the representative[s'] counsel"; (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (3) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)) (alterations in original).

Rule 23(a)(3) "preclude[s] class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members."[4] *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003). "Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Id.* at 1189 (quoting CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1768 (2d ed. 1986)); *see also Slade*, 856 F.3d at 412 ("Of course, not all purported conflicts between a class representative and members of the class will defeat adequacy."). "A fundamental conflict exists where some party members claim to have

---

[4] *See, e.g., Amchem Prods.*, 521 U.S. at 626 (finding conflict when class members who were currently injured by asbestos exposure sought "generous immediate payments," whereas exposure-only class members sought to ensure "an ample, inflation-protected fund for the future").

been harmed by the same conduct that benefitted other members of the class."[5] *Id.* The adequacy of representation requirement "tend[s] to merge" with the commonality and typicality criteria of Rule 23(a). *Amchem Prods.*, 521 U.S. at 626 n.20 (quoting *Falcon*, 457 U.S. at 157 n.13) (alteration in original).

Plaintiffs assert they will fairly and adequately represent the interests of fellow class members. ECF No. 45 at 6. Plaintiffs argue there are no conflicts of interest because the requested relief will preserve the rights of those health providers to continue following Defendant Becerra's interpretations of Section 1557 should they choose to do so. *Id.* at 7. Defendants do not dispute Plaintiffs will adequately prosecute the action. However, Defendants insist "conflicts exist . . . because much of the class is opposed to the relief sought by Plaintiffs." ECF No. 57 at 15. Defendants also argue the relief Plaintiffs seek would harm class members because two healthcare facilities that serve the LGBT community stated "growing numbers of LGBTQ patients are likely to turn to their organizations for health-care services" and "many health care providers subject to Section 1557 are themselves lesbian, gay, bisexual, or transgender." *Id.* at 16–17 (internal marks omitted).

---

[5] *See Valley Drug Co.*, 350 F.3d at 1190 (finding conflict when three national wholesalers whose transactions constituted over 50 percent of plaintiffs' total claims experienced net gain from the absence of generic drugs in terazosin hydrochloride market); *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988) (finding conflict among class members in airport-noise case because increased operations at airport "make the area attractive for business and may increase the value of land, even as they make land less attractive for residential purposes."); *In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1365 (N.D. Cal. Feb. 11, 1994) ("[I]n order to obtain class certification, the plaintiffs in a partial disclosure case must demonstrate that the putative class is not filled with in/out traders so as to render the resulting conflicting interests problematic."); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 95 (S.D.N.Y., Sept. 18, 1998) ("As to the existence of alleged conflicts because Class members have differing interests in establishing the dates and amounts of [copper price] manipulation, they do not give rise to a material conflict defeating adequacy under Rule 23(a)(4)").

23-10078.1160

Defendants do not identify any fundamental conflicts. As the D.C. Circuit explained in *J.D.*:

> There might often be a possibility that some absent class members possess conscientious beliefs running counter to an interest in redressing an alleged infringement of their rights. Indeed, '[i]n any conceivable case, some of the members of the class will wish to assert their rights while others will not wish to do so.' Charles Alan Wright, Class Actions, 47 F.R.D. 169, 174 (1969).
>
> That is especially so in the civil rights cases that make up the heartland of actions under Rule 23(b)(2), which by nature can involve polarizing issues. In such situations, courts have been 'reluctant to find the class representatives inadequate' even if 'some class members have an explicit desire to maintain the status quo.' 2 Rubenstein, Newberg on Class Actions § 3:64; *cf.* Charise Cheney, *Blacks on Brown: Intra-Community Debates over School Desegregation in Topeka, Kansas, 1941–1955,* 42 W. Hist. Q. 481 (2001) (describing opposition to school desegregation among black Topekans in the lead-up to *Brown v. Board of Education,* 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954)). As courts have long recognized, "'[i]t is not 'fatal if some members of the class might prefer not to have violations of their rights remedied.'" *Lanner v. Wimmer,* 662 F.2d 1349, 1357 (10th Cir. 1981) (quoting *U.S. Fid. & Guar. Co. v. Lord,* 585 F.2d 860, 873 (8th Cir. 1978)).

925 F.3d at 1317 (alterations in original).

The Court agrees with this reasoning: that some putative class members may disagree with Plaintiffs' aims or beliefs does not defeat the adequacy-of-representation requirement. Furthermore, the Court finds Defendants' theories of harm speculative at best. As Plaintiff notes, *Bostock*'s anti-discrimination protections will remain in place even if Defendant Becerra's notification is held unlawful and set aside. ECF No. 61 at 11. And it is "far from clear that a health-care provider will be 'harmed' by an increased demand for its services." *Id.* Accordingly, the requirements of Rule 23(a)(4) are met.

4. *Plaintiffs' putative class contains no ascertainability problems.*

Ascertainability is a non-textual rule imposed by courts on top of the class-certification criteria detailed in Rule 23. *See DeBremaecker,* 433 F.2d at 734 ("[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."). This

doctrine allows courts to deny certification to vague or poorly defined classes. *See John*, 501 F.3d at 445 n.3 ("There can be no class action if the proposed class is 'amorphous' or 'imprecise.'"). Ascertainability also requires class definitions to be based on objective criteria. *See Marcus v. BMW of N. Am.*, 687 F.3d 583, 593 (5th Cir. 2012).

At least three circuits — however — hold the ascertainability doctrine is categorically inapplicable to Rule 23(b)(2) classes. *See Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016); *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3rd Cir. 2015); *Shook v. El Paso County*, 386 F.3d 963, 972 (10th Cir. 2004); *cf. Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972), *abrogated on other grounds*, *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978). The Fifth Circuit has acknowledged other courts have held that, absent notice and opt-out rights, "a precise class definition is not as critical where certification of a class for injunctive or declaratory relief is sought under rule 23(b)(2)." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004). Although the Fifth Circuit has indicated a putative class "must be adequately defined and clearly ascertainable," it has not explicitly addressed the argument that definiteness should not apply when notice and opt-out rights are not at issue. *DeBremaecker*, 433 F.2d at 734; *see also In re Monumental Life Ins.*, 365 F.3d at 413 ("Where notice and opt-out rights are requested, however, a precise class definition becomes just as important as in the rule 23(b)(3) context."). There is therefore no Fifth Circuit precedent taking direct issue with the Third, Sixth, and Tenth Circuits' analysis.

The Court ascertains that these circuits are correct. Fundamentally, ascertainability addresses the same issues as a Rule 23(b)(3) predominance inquiry — *i.e.*, if it is difficult for the Court to ascertain who class members are, then individualized issues will predominate over common questions. But this is not a concern in Rule 23(b)(2) classes because (b)(2) class members

are not seeking individualized relief and are not entitled to notice and because (b)(2) has no predominance requirement. *See* FED. R. CIV. P. 23(c)(2). Accordingly, this putative class lacks ascertainability problems. But even if the doctrine applies to Rule 23(b)(2) actions, the Court agrees with Plaintiffs: "There is nothing vague or imprecise about the proposed class definitions. A health-care provider is either subject to section 1557 or it isn't." ECF No. 61 at 12.

### B.  Plaintiffs' Putative Class Satisfies Rule 23(b)(2)

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart*, 564 U.S. at 360. The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (quoting Nagareda, 84 N.Y.U. L. REV. at 132). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* The Rule provides no opportunity for "(b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action." *Id.* at 362. The Fifth Circuit has interpreted Rule 23(b)(2) to require two relevant requirements: (1) the "class members must have been harmed in essentially the same way"; and (2) "the injunctive relief sought must be specific." *Stuckenberg*, 675 F.3d at 845 (internal marks omitted).

Plaintiffs do not seek individualized relief for any class member or any subset of the class. *See* ECF No. 45 at 10–11 (seeking APA and declaratory-judgment remedies). And Defendants are "act[ing] . . . on grounds that apply generally to the class" because Section 1557 and Defendant Becerra's notification apply to each of the class members. *Id.* at 8 (quoting FED. R. CIV.

P. 23(b)(2)). Defendants again repeat their argument that class certification is inappropriate because some proposed class members disagree with Plaintiffs. *See* ECF No. 57 at 19–20. But as explained, this argument fails. Accordingly, the putative class satisfies Rule 23(b)(2).

### C.  Plaintiffs' Putative Class Satisfies Article III

A class may ultimately contain no injured class members because the class claims fail on the merits. But is it acceptable that some of the class members may have meritorious claims, while others do not? Here, Defendants repeat their argument that some members of the class support the notification. ECF No. 57 at 20–21. Only this time, Defendants argue certification would violate Article III instead of Rule 23. *Id.*

Neither the Supreme Court nor the Fifth Circuit has resolved whether the Constitution requires *every* absent class member to possess Article III standing. *See TransUnion*, 141 S. Ct. at 2208 n.4; *Flecha*, 946 F.3d at 768. Some courts have held only *the named plaintiff* needs to establish standing to seek relief on behalf of the class. *See Nexium*, 777 F.3d at 31–32 (1st Cir. 2015) (collecting cases). Other courts have held Rule 23(b)(3)'s predominance requirement demands a class cannot contain *any* uninjured class members. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) ("Meeting the predominance requirement demands more than common evidence the defendants colluded to raise fuel surcharge rates. The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.").

In the aforementioned cases, courts used different terminology to address what is essentially a "predominance" issue. The correct answer has little to do with *how many* uninjured class members there are; it has everything to do with how hard it is to identify them. In other words, if a court needs myriad mini-trials to identify and separate uninjured class members, then Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual class members" is not met. But Rule 23(b)(2) contains no predominance requirement. And Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant . . . . [or] an individualized award of monetary damages." *Wal-Mart*, 564 U.S. at 360 (emphasis removed). The Court is thus sympathetic to Chief Justice Roberts' concurrence in *Tyson Foods v. Bouaphakeo*: "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." 577 U.S. 442, 467 (2016) (Roberts, C.J., concurring). But Chief Justice Roberts' concern in *Tyson Foods* — a Rule 23(b)(3) case — was there may not have been any way to ensure that the jury's damages award went only to injured class members. *Id.* Similar concerns do not exist here, where Plaintiffs seek only non-monetary relief.

The same reasons which support certification under Rule 23(b)(2) also support certification here — namely, (b)(2) actions by their nature often involve polarizing questions affecting civil rights. If (b)(2) class representatives were required to prove every absent class member included in the putative class definition shared their contentions, then it is difficult to see how any (b)(2) action could qualify. Furthermore, the alternative would essentially require class representatives to propose a "fail-safe" class: "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 825 (7th Cir. 2012). "Such a class definition is improper because a class member either

RE60                                                    23-10078.1165

wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.* (collecting cases).

Requiring the claims of the class representatives to be identical to those of each class member to establish standing would also "confuse[ ] the requirements of Article III and Rule 23." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018) (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 421 (6th Cir. 1998)). "Indeed, such an approach would render superfluous the Rule 23 commonality . . . requirement[] because any case that survived such a strict Article III analysis would by definition present only common issues." *Id.* In any event — and even if Defendants' proposed rule were adopted — each class member suffers the same injury from the legal uncertainty created by Defendant Becerra's notification of May 10, 2021. This is true regardless of whether some class members disagree with Plaintiffs. Therefore, the Court finds Plaintiffs' proposed putative class satisfies Article III and Rule 23.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion and **CERTIFIES** the class under Rule 23(b)(2).

**SO ORDERED**.

October **14**, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

23-10078.1166

**5.      Opinion and Order Granting Summary Judgment**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SUSAN NEESE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-163-Z |
| | § | |
| XAVIER BECERRA, in his official | § | |
| capacity as the Secretary of the | § | |
| United States Department of Health and | § | |
| Human Services, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

In his *Bostock* dissent, Justice Alito foresaw how litigants would *stretch* the majority opinion like an elastic blanket to cover categories, cases, and controversies expressly not decided. Justice Alito warned: "The entire Federal Judiciary will be mired for years in disputes about the reach of the Court's reasoning." 140 S. Ct. 1731, 1783 (2020) (Alito, J., dissenting); *see also id.* at 1781 (Alito, J., dissenting) ("Similar claims have been brought under the Affordable Care Act (ACA), which broadly prohibits sex discrimination in the provision of healthcare.").

And here we are . . . .

Before the Court is Plaintiffs Susan Neese and James Hurly's Motion for Summary Judgment ("Plaintiffs' Motion") (ECF No. 46) and Defendants' Motion for Summary Judgment ("Defendants' Motion") (ECF No. 55).[1] Having considered the pleadings and applicable law, the Court **GRANTS IN PART** Plaintiffs' Motion and **GRANTS IN PART** Defendants' Motion.

---

[1] Defendants are Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services, and the United States of America.

BACKGROUND

Section 1557 of the Affordable Care Act prohibits discrimination "on the basis of sex."
*See* 42 U.S.C. § 18116(a) (incorporating, among other things, Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), into Section 1557). In *Bostock*, the Supreme Court held Title VII's "because of . . . sex" terminology prohibits "sexual orientation" and "gender identity" discrimination in employment.[2] *See generally* 140 S. Ct. 1731. Citing *Bostock*, the United States Department of Health and Human Services ("HHS") announced it would "interpret and enforce" Section 1557's prohibition on discrimination "on the basis of sex" to include "on the basis of sexual orientation" and "on the basis of gender identity." *See generally* United States Department of Health and Human Services, Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 Fed. Reg. 27,984 (May 25, 2021) ("Notification").

Plaintiffs — two Texas-based physicians — allege Defendants misread *Bostock* and argue that healthcare providers may continue sex-specific medical decisions relevant to "gender identity" "so long as one does not engage in 'sex' discrimination when doing so." ECF No. 11 at 5. Specifically, Plaintiffs allege neither Section 1557 nor *Bostock* prohibits such discrimination, "as long as they would have acted in the exact same manner if the patient had been a member of the opposite biological sex." ECF No. 17 at 16. Plaintiffs "object only to the Secretary's claim that *Bostock* defined 'sex' discrimination to encompass all forms of discrimination on the basis of sexual orientation or gender identity." *Id.* Plaintiffs state they "fully intend to comply with *Bostock* and its interpretation of 'sex.'" *Id.*

---

[2] In this litigation, Plaintiffs and Defendants intermittently use the terms "homosexual," "bisexual," and "transgender" to refer to the disputed categories "sexual orientation" and "gender identity" referenced in *Bostock* and Notification. Though the terminology is potentially underinclusive, overinclusive, inexact, and inaccurate, this Court will refer to "sexual orientation" and "gender identity" as collective of the aforementioned categories — unless particularity is necessary for the Court's analysis.

Plaintiffs make sex-specific decisions relevant to "gender identity" in their medical practices — and both receive federal money subject to Section 1557. *See generally* ECF No. 11. Dr. Neese "has treated patients suffering from gender dysphoria in the past and has on occasion prescribed hormone therapy for them." *Id.* at 5–6. But Dr. Neese "does not believe that hormone therapy or sex-change operations are medically appropriate for everyone who asks for them, even if those individuals are suffering from gender dysphoria, and she will on occasion decline to prescribe hormone therapy or provide referrals for sex-change operations." *Id.* at 6. "Dr. Neese is categorically unwilling to prescribe hormone therapy to *minors* who are seeking to transition, and she is equally unwilling to provide referrals to minors seeking a sex-change operation." *Id.* She "believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety." *Id.*

Plaintiffs allege "Dr. Neese has treated many transgender patients . . . in the past, and she expects to continue doing so in the future." *Id.* Dr. Neese claims she "is likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that she is unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive care that corresponds to their biological sex, and she intends to provide care to these individuals in a manner consistent with her ethical beliefs." *Id.*

Dr. Hurly "recognizes that some biological men may identify as women (and vice versa)." *Id.* at 7. In his practice, Dr. Hurly "has encountered situations . . . when he must insist that a patient acknowledge his biological sex rather than the gender identity that he asserts." *Id.* Plaintiffs provide an example: Dr. Hurly "once diagnosed a biological male patient with prostate cancer, but the patient refused to accept Dr. Hurly's diagnosis because he identified as a woman and insisted that he could not have a prostate." *Id.* Dr. Hurly "explain[ed] to this patient that he

was indeed a biological man with a prostate, and that he needed to seek urgent medical treatment for his prostate cancer." *Id.* Plaintiffs claim, "Dr. Hurly has treated transgender patients in the past, and he expects to continue doing so in the future." *Id.* They allege: "Dr. Hurly is likely to encounter transgender patients who will deny or dispute their need for health care that corresponds to their biological sex, and he intends to provide care to these individuals in a manner consistent with his ethical beliefs." *Id.*

Plaintiffs bring two causes of action: one under the Administrative Procedure Act ("APA") and one under the Declaratory Judgment Act ("DJA"). *Id.* at 10. Plaintiffs argue Section 1557 only prohibits "sex" discrimination, which means a provider would have acted differently towards an identically situated member of the opposite biological sex. *Id.* As for relief, Plaintiffs ask that the Court "hold unlawful and set aside" the Notification, "enjoin" Defendants "from using or enforcing the interpretation of [S]ection 1557 that appears in the Notification," "declare that [S]ection 1557 does not prohibit discrimination on account of sexual orientation and gender identity, . . . but that it prohibits only 'sex' discrimination, which means that provider would have acted differently toward an identically situated member of the opposite biological sex." ECF No. 11 at 10–11.

The Court previously denied Defendants' motion to dismiss and granted Plaintiffs' motion for class certification. *See generally* ECF Nos. 30, 65. The Court certified a class of all healthcare providers subject to Section 1557. Plaintiffs now move for summary judgment on each claim. *See generally* ECF No. 46. Defendants also seek summary judgment, asking that the Court render judgment in Defendants' favor on Plaintiffs' two claims and dismiss this action. *See generally* ECF No. 55.

23-10078.1170

LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.
CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of
the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
"[T]he substantive law will identify which facts are material." *Id.* A genuine issue of material fact
exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving
party." *Id.* "'On cross-motions for summary judgment, [the Court] review[s] each party's motion
independently, viewing the evidence and inferences in the light most favorable to the nonmoving
party.'" *Texas v. Rettig*, 987 F.3d 518, 526 (5th Cir. 2021) (quoting *Amerisure Ins. Co. v.
Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010)).

When reviewing summary-judgment evidence, the court must resolve all reasonable doubts
and draw all reasonable inferences in the light most favorable to the non-movant. *Walker v. Sears,
Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). A court cannot make a credibility determination
when considering conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255.
If some evidence supports a disputed allegation, so that "reasonable minds could differ as to the
import of the evidence," the court must deny the motion. *Id.* at 250.

ANALYSIS

The issues raised in the motions for summary judgment are whether: (1) Plaintiffs possess
standing; (2) the Notification is not in accordance with the law; and (3) Section 1557 prohibits
discrimination on the basis of SOGI. The Court will address standing before proceeding to the two
merits arguments.

### A. Plaintiffs Have Standing

The judicial power of federal courts is limited to certain "cases" and "controversies." U.S. CONST. art. III, § 2; *see also June Medical Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2117 (2020). The case-or-controversy requirement requires a plaintiff to establish that he has standing to sue. *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) ("Every party that comes before a federal court must establish that it has standing to pursue its claims."). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, the party invoking federal jurisdiction must establish he suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) an injury that is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) an injury that is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Id.* at 560–61 (internal marks omitted).

The Court previously found Plaintiffs have standing because they face a "credible threat of enforcement" that creates an "injury in fact" that is "concrete and particularized" and "actual or imminent." ECF No. 30 at 9 (internal marks omitted); *see also* ECF No. 65 at 5 (same). The Court will not once again adjudicate standing here.

### B. The Notification Is "Not in Accordance with the Law"

Congress enacted the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010, collectively known as the Affordable Care Act ("ACA"), in March 2010. 111 Pub. L. No. 148 (March 23, 2010); 111 Pub. L. No. 152 (March 30, 2010). Under Section 1557 of the ACA:

> Except as otherwise provided for in this title (or an amendment made
> by this title), an individual shall not, on the ground prohibited
> under . . . title IX of the Education Amendments of 1972 (20 U.S.C.
> 1681 *et seq.*) . . . be excluded from participation in, be denied the
> benefits of, or be subjected to discrimination under, any health
> program or activity, any part of which is receiving Federal financial
> assistance.

42 U.S.C. § 18116(a). Title IX, in turn, prohibits discrimination "on the basis of sex," among other

things. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance, except [as provided

throughout the statute].").

What does "on the basis of sex" mean as used in Title IX? Defendants offer a simple

answer: apply *Bostock*. *Bostock* "proceed[ed] on the assumption that 'sex' . . . refer[s] only to

biological distinctions between male and female." 140 S. Ct. at 1739. Notwithstanding this

assumption, the Supreme Court devised a "but-for cause" test and determined Title VII's "because

of sex" terminology should be read to prohibit "sexual orientation" and "gender identity"

discrimination in employment. *See id.* Applying *Bostock*, Defendants ask the Court to implement

a "but-for cause" test and interpret Title IX's "on the basis of sex" terminology identically to

Title VII's "because of . . . sex" language. *See* ECF No. 56 at 26.

For the reasons explained below, however, *Bostock* does not apply to Section 1557 or

Title IX. And the Court will not export *Bostock*'s reasoning to Section 1557 or Title IX. Instead, the

Court analyzes "on the basis of sex," as used in Title IX (and incorporated into Section 1557),

by giving the term its ordinary public meaning at the time of enactment and in the context of

Title IX.

### 1. *Bostock* does not apply to Section 1557 or Title IX.

*Bostock* does not purport to interpret Section 1557, Title IX, or any other non-Title VII statute. As the majority opinion states:

> The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. . . . But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and *we do not prejudge any such question today*. . . .
>
> The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'

*Bostock*, 140 S. Ct. at 1753 (emphasis added).

*Bostock* decided only what *Bostock* decided: under Title VII, "[a]n employer who fires an individual merely for being gay or transgender defies the law." *Id.* at 1754; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he rule in *Bostock* extends no further than Title VII."); *Adams v. Sch. Bd. of St. James Cnty., Fla.*, 3 F.4th 1299, 1336 (11th Cir. 2021) (Pryor, C.J., dissenting) (stating *Bostock*'s reasoning applies to Title VII, not Title IX). One cannot rely on the words and reasoning of *Bostock* itself to explain why the Court prejudged what the Court expressly refused to prejudge. *See Pelcha*, 988 F.3d at 324 ("*Bostock* was clear on the narrow reach of its decision and how it was limited *only to Title VII itself*." (emphasis added)); *Washington v. U.S. Dep't of Health and Hum. Servs.*, 482 F. Supp. 3d 1104, 1115 (W.D. Wash. 2020) ("[I]t remains unclear whether, or to what extent, *Bostock*'s rationale will ultimately be applied to Title IX and Section 1557.").[3]

---

[3] Plaintiffs argue "the holding of *Bostock* applies to Title IX and [S]ection 1557." ECF No. 47 at 6. Plaintiffs, however, dispute Defendants' interpretation of *Bostock*. *See id.* at 6–7. Because the Court finds *Bostock* does not apply to Title IX or Section 1557, the Court will not adjudicate this debate. Accordingly, the Court stops addressing the substance of Plaintiffs' arguments here, as the Court disagrees with the premise of those arguments.

23-10078.1174

### 2. *Bostock*'s reasoning does not apply to Section 1557 or Title IX.

Defendants argue *Bostock* and its reasoning apply to Section 1557 and, accordingly, discrimination "on the basis of sex" includes discrimination on the basis of "sexual orientation" and "gender identity." *See* ECF No. 56 at 25 ("Section 1557's prohibition of discrimination 'on the basis of sex' can also be satisfied by showing but-for causation."). "Defendants do not argue that *Title IX* includes discrimination on the basis of sexual orientation and gender identity as distinct, additional grounds of prohibited discrimination." *Id.* at 25 n.5. They instead assert "Section 1557 prohibits discrimination on the basis of sexual orientation and discrimination on the basis of gender identity because discrimination on either of those grounds necessarily involves discrimination on the basis of sex." *Id.* Defendants support this proposition with three categories of case law: (1) Supreme Court; (2) Fifth Circuit; and (3) other circuits. None of the law Defendants cite persuades the Court to export *Bostock*'s reasoning into Section 1557 or Title IX.

### a. No precedential authority exports *Bostock* to the Title IX context.

Defendants cite *Franklin v. Gwinnett County Public School* to argue the Supreme Court reads Title IX's "on the basis of" standard to be a "because of" standard. *See* ECF No. 56 at 26 (citing 503 U.S. 60, 75 (1992)). In *Franklin*, a case preceding *Bostock* by nearly three decades, the Supreme Court stated Title IX imposes "the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex.'" 503 U.S. at 75 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Defendants' argument is unpersuasive for at least two reasons. First, in *Franklin*, the Supreme Court did not employ "but-for causation" analysis to find discrimination on the basis of sex. Because the discrimination at issue involved *biological* "sex," the Court need not and did not employ "but-for" causation analysis to find "sex" discrimination Second, "Title IX

does not use the word 'because.'" *Doe v. Manor Coll.*, 587 F. Supp. 3d 249, 255 (E.D. Pa. 2022).
"The shorthand phrasing used in [*Franklin*] does not change the text of Title IX." *Id.*
So, Defendants' argument centered on "statutory interpretation of the word 'because' [in *Bostock*]
does not apply to Title IX." *Id.*

Defendants next cite two Fifth Circuit cases. *See* ECF No. 56 at 26–27 (citing *Lakoski v.
James*, 66 F.3d 751, 757 (5th Cir. 1995), *and Pederson v. La. State Univ.*, 213 F.3d 858, 880
(5th Cir. 2000)). Defendants rely on these cases (which, again, pre-date *Bostock* by decades) for
the proposition that "the prohibitions of discrimination on the basis of sex of Title IX and Title VII
[are] the same." *Id.* at 26 (quoting *Lakoski*, 66 F.3d at 757). Because, as the cases suggest, "Title
IX's proscription of sex discrimination . . . does not differ from Title VII's," Defendants assert the
Court must interpret "on the basis of sex" under title IX to include discrimination because of
"sexual orientation" and "gender identity." *Lakoski*, 66 F.3d at 757; *see also Pederson*, 213 F.3d
at 880 (explaining Title IX violated when an "institution intended to treat women differently
because of their sex").

The Court is not persuaded that these pre-*Bostock* cases have much force here. Notably,
these cases consider only Title IX's application to biological sex. *See generally Lakoski*, 66 F.3d
751; *Pederson*, 213 F.3d 858. And although the opinions invoke "because of" terminology in
relation to "sex," they do not *hold* Title IX protects "sexual orientation" and "gender identity"
status — or adopt the "but-for causation" test. *See Manor Coll.*, 587 F. Supp. 3d at 255 (Once
more, "Title IX does not use the word 'because.'"). In essence, Defendants seek to retroactively
apply *Bostock*'s interpretation of Title VII to judicial opinions predating *Bostock* by two decades
and related to Title IX by incidental wordplay. It strains credulity to aver that the Fifth Circuit
preemptively applied *Bostock*'s "but-for" reasoning to Title IX because two words overlap.

23-10078.1176

Finally, Defendants cite two cases from the Fourth and Ninth Circuits. *See* ECF No. 56 at 27 (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *and Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022)). Again, these cases do not persuade the Court to export *Bostock*'s reasoning to the Title IX context. In *Grimm*, the Fourth Circuit stated with scant analysis: "Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX." 972 F.3d at 616 (internal marks omitted). The Fourth Circuit simply cited *Jennings v. University of North Carolina* for this proposition but did not elaborate further. *See* 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

Likewise, the Ninth Circuit adopted *Bostock*'s reasoning because that circuit "construe[s] Title IX's protections consistently with those of Title VII." *Snyder*, 28 F.4th at 114. The Ninth Circuit did so despite expressly acknowledging that the statutes employ different language, reasoning that *Bostock* interchangeably used "because of sex" and "on the "basis of sex" throughout the majority opinion. *See id.* True enough. Yet just because a *judicial opinion* employs two phrases interchangeably in one context does not mean *Congress* employed those same terms interchangeably in a different context.[4]

In the Fifth Circuit, however, all Title VII case law does not unquestionably apply to Title IX. *See, e.g.*, *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 655–56 (5th Cir. 1997); *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993); *Beasley v. St. Tammany Par. Sch. Bd.*, No. 96-2333, 1997 WL 382056, at *3 (E.D. La. July 9, 1997) ("Unlike other circuits, this circuit

---

[4] Just as Section 1557 expressly references and employs Title IX's definition of "on the basis of sex," Congress could have expressly adopted and codified Title VII's definition of "because of . . . sex" when enacting Title IX. Congress, of course, refused to do so. Congress also could have also referenced Title VII in Title IX or Section 1557, just as Section 1557 references Title IX. Again, Congress refused to do so. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (Courts may "insist[] that Congress speak with a clear voice" when it imposes conditions on the receipt of federal funds.).

23-10078.1177

does not blindly apply Title VII standards to the Title IX context."). Although the Fifth Circuit has

held "transgender discrimination is a form of sex discrimination under Title VII," it has not held

as much with respect to Title IX or Section 1557. *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595,

603 (5th Cir. 2021). The Court will not reflexively apply new Title VII precedent in the Title IX

context.[5] Accordingly, the Court finds non-precedential opinions of other federal judicial circuits

to be unpersuasive here.

### b. "Based on sex" does not mean "based on SOGI."

Title IX reads no person "shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance [except as provided throughout the statute]." 20 U.S.C.

§ 1681(a). Because Title IX does not define "on the basis of sex," the Court must construe the

phrase.[6]

---

[5] Several other federal courts have considered whether "Section 1557's nondiscrimination requirements encompass gender-identity discrimination." *Tovar v. Essential Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018); *see also, e.g., Joganik v. E. Tex. Med. Ctr.*, No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *6 (E.D. Tex. Dec. 14 2021), *report and recommendation adopted*, 2022 WL 243886 (E.D. Tex. Jan. 25, 2022); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949–50 (W.D. Wis. 2018); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098–1100 (S.D. Cal. 2017) (holding Section 1557 extends to claims of gender identity based on its plain language). This Court, however, is not bound by those conclusions.

[6] Congress enacted Title IX in 1972. 20 U.S.C. § 1681. At that time, "sex" was commonly understood to refer to physiological differences between men and women — particularly with respect to reproductive functions. *See, e.g., Sex*, AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . . ."); *Sex*, 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."). The Court relies on the same definition of "sex" in this case.

Both parties proceed with the assumption that "sex," as used in Title IX, means biological sex. *See, e.g.*, ECF No. 47 at 8, 13; ECF No. 56 at 25 & n.5 (But "Defendants do not concede that this interpretation of 'sex' is correct."); *cf. Bostock*, 140 S. Ct. at 1746–47 ("We agree that homosexuality and transgender status are distinct concepts from sex."); *Grimm*, 972 F.3d at 632 (Niemeyer, J., dissenting) ("As several sources make clear, the term 'sex' in this context must be understood as referring to the traditional biological indicators that distinguish a male from a female, not the person's internal sense of being male or female, or their outward presentation of that internally felt sense."). Parties only dispute whether Title IX's prohibition of discrimination "on the basis of sex" prohibits discrimination on the basis of SOGI.

23-10078.1178

The Court "begin[s] with the text." *United States v. Lauderdale County*, 914 F.3d 960, 961

(5th Cir. 2019). The Court construes statutory text to give effect to the ordinary public meaning

conveyed when Congress enacted the statute. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539

(2019); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL

TEXTS 69–92 (2012). When doing so, the Court "read[s] the statute as a *whole*, so as to give effect

to each of its provisions without rendering any language superfluous." *Bustamante-Barrera v.*

*Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (emphasis added). And the Court must abide by

judicially accepted principles of linguistics in reading the whole — including compositionality.

*See generally* James C. Phillips, *The Overlooked Evidence in the Title VII Cases: The Linguistic*

*(and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished

manuscript); *see also Bostock*, 140 S. Ct. at 1769 n.22 (Alito, J., dissenting) (same).

"Title VII differs from Title IX in important respects." *Meriwether v. Hartop*, 992 F.3d 492,

510 n.4 (6th Cir. 2021). Title IX is not Title VII, and "on the basis of sex" is not "because of sex."[7]

*See Manor Coll.*, 587 F. Supp. 3d at 255 ("Title IX does not use the word

'because.' . . . Thus, . . . statutory interpretation of the word 'because' does not apply to

Title IX."). The Court must give full effect to the difference in word choice. Henry J. Friendly,

*Mr. Justice Frankfurter and the Reading of Statutes*, *in* BENCHMARKS 224 (1967) ("[W]hen

---

Notably, other federal entities — including the Department of Education — have proposed regulations redefining "sex" in Title IX to include "sexual orientation" and "gender identity." *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41391 (July 12, 2022). Those regulations are not at issue here and the Court does not opine on their validity or the correctness of their interpretation.

[7] *See* James C. Phillips, *The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* 1–2 (May 11, 2020) (unpublished manuscript) ("Compositionality is the notion that the meaning of a complex expression is a compositional function of the meaning of its semantic parts. Sometimes what you see is what you get: *apple pie* is a pie made from apples. But sometimes the combination of words has a meaning of its own that is not a reliable amalgamation of the components at all, such as for good or at all." (internal marks omitted)).

Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things."). By failing to acknowledge the different phrases Title VII and Title IX employ, the Court "would risk amending [the] statutes outside the legislative process reserved for the people's representatives." *Bostock*, 140 S. Ct. at 1738.

Because Title IX prohibits "on the basis of sex," the Court cannot reflexively adopt *Bostock*'s but-for causation analysis. 20 U.S.C. § 1681(a); *see also Meriwether*, 992 F.3d at 510 n.4 ("[I]t does not follow that principles announced in the Title VII context automatically apply in the Title IX context."); *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999) (Title VII "precedents are not relevant in the context of collegiate athletics. Unlike most employment settings, athletic teams are gender segregated."); *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) ("It is imperative to recognize that athletics presents a distinctly different situation from . . . employment and requires a different analysis in order to determine the existence *vel non* of discrimination.").

Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each "sex." *See, e.g.*, 20 U.S.C. §§ 1681(a)(2) (allowing schools in some cases to change "from being an institution which admits only students of one sex to being an institution which admits students of *both sexes*" (emphasis added)), 1681(a)(8) (stating if father-son or mother-daughter activities are provided for "one sex," reasonably comparable activities must be provided for "the *other sex*" (emphasis added)). And Courts have long interpreted Title IX to prohibit federally funded education programs from treating men better than women (or vice versa). *See, e.g.*, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 680 (1979). As written and commonly construed, Title IX operates in binary terms — male and female — when it references "on the basis of sex."

23-10078.1180

Title IX's prohibition against discrimination "on the basis of sex" cannot be reduced to a literalist but-for test. For instance, although not at issue here, Section 1686 states: "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The implementing regulations clarify educational institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. It is doubtful Section 1686 *permits* educational institutions to maintain separate living institutions for each "sexual orientation" and "gender identity," while a stand-alone Section 1681(a) *prohibits* same. The implementing regulation highlights the sex binary by referencing "the other sex" — which speaks directly to *biological* sex. 34 C.F.R. § 106.33; *see also, e.g.*, 20 U.S.C. § 1681(a)(8) ("[I]f such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*." (emphasis added)). "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339 (1929). If "on the basis of sex" included "sexual orientation" and "gender identity," as Defendants envision, Title IX and its regulations would be nonsensical.

As evidenced above, Title IX expressly allows sex distinctions and sometimes even *requires* them to promote equal opportunity. Defendants' theory actively "undermine[s] one of [Title IX's] major achievements, giving young women an equal opportunity to participate in sports." *Bostock*, 140 S. Ct. at 1779 (Alito, J., dissenting).[8] The effect of the Notification "may be

---

[8] *See Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting) ("[R]equiring the school to allow [the plaintiff], a biological female who identifies as male, to use the male restroom compromises the separation as explicitly authorized by Title IX."). Specific to athletics, Defendants' misapplication of the statute *inverts* the text, history, and purpose of Title IX while pretending to *expand* it: Title IX was enacted to promote and protect *women* in historically male-dominated sports, but Defendants misapply Title IX to promote and protect *men* who displace women.

to force young women to compete against students who have a very significant biological advantage, including students who have the size and strength of a male but identify as female and students who are taking male hormones in order to transition from female to male." *Id.* at 1779–80 (Alito, J., dissenting).[9]

Although courts start with the words themselves, the text should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001); *see also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in part and dissenting in part) ("A sign that says 'men only' looks very different on a bathroom door than a courthouse door."). "[C]ontext always includes evident purpose." SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63. And "evident purpose always includes effectiveness." *Id.*

Title IX's "overarching purpose," which is "evident in the text" itself, is to prohibit the discriminatory practice of treating women worse than men and denying opportunities to women because they are women (and vice versa). *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344

---

[9] In addition to promoting equal opportunity, Title IX also protects individuals' legitimate and important interest in bodily privacy implicated when a person is nude or partially nude and exposed to others. *See, e.g., West v. Radtke*, No. 20-1570, 2022 WL 4285722, at *10–11 (7th Cir. Sept. 16, 2022); *Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016) (per curiam); *Doe v. Luzerne County*, 660 F.3d 169, 176–77 (3d Cir. 2011) (recognizing individuals have "a constitutionally protected privacy interest in his or her partially clothed body" and this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (stating "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity" (alterations in original) (quoting *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963))); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2009) (explaining "the constitutional right to privacy . . . includes the right to shield one's body from exposure to viewing by the opposite sex"); *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) (explaining "[t]he right to bodily privacy is fundamental" and "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be overserved by an officer of the opposite sex while producing a urine sample); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) (recognizing, although prison inmates "surrender many rights of privacy," their "special sense of privacy in their genitals" should not be violated through exposure unless "reasonably necessary" and explaining "involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating"). An interest commonplace and universally accepted throughout history and across societies. *See Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns").

23-10078.1182

(2011). As many courts have recognized, "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 285 (2d Cir. 2004); *see also Cannon*, 441 U.S. at 704 & n.36.[10] "[I]t would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993).

Defendants' reinterpretation of Title IX through the Notification imperils the very opportunities for women Title IX was designed to promote and protect — categorically forcing biological women to compete against biological men.[11] "A community made up exclusively of one sex is different from a community composed of both." *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996) (internal marks omitted). The "physical differences between men and women . . . are enduring: the two sexes are not fungible." *Id.* (internal marks omitted). Such "immutable" distinctions between the sexes are "determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). For example, "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs," because "equally fit men and women demonstrate their fitness differently." *Bauer v. Lynch*, 812 F.3d 340, 350–51 (4th Cir. 2016); *see also Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" for the same teams.).

---

[10] "[W]hatever approach" cases like *McCormick* or *Cannon* "may have used" to deduce Title IX's purpose, we may rely on them as "an integral part of our jurisprudence" on Title IX. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 286 n.17 (1983).

[11] Defendants argue the Court should not consider "the aspects of Title IX that Congress chose not to incorporate into Section 1557" when interpreting Title IX. ECF No. 56 at 33 n.10. However, the Court considers Title IX provisions not expressly incorporated into Section 1557 because context is highly relevant when interpreting a statute.

"'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Some "physical fitness standards suitable for men may not always be suitable for women, and accommodations addressing physiological differences between the sexes are not necessarily unlawful." *Bauer*, 812 F.3d at 350. Indeed, Title IX and its implementing regulations protect some such accommodations to promote equality of women. *See, e.g.*, 34 C.F.R. §§ 106.34(a)(1) (permitting "sex" separation in "physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball, and other sports the purpose or major activity of which involves bodily contact"), 106.41(b) (allowing discrimination on the basis of "sex" when operating or sponsoring separate teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport"), 106.41(c) (requiring schools to "provide equal athletic opportunity for members of both sexes" to "effectively accommodate the interests and abilities of members of both sexes").

Ironically, Defendants' interpretation *invites* SOGI discrimination by excluding student-athletes from participating on the women's or men's teams based solely on gender identity. Presumably, this would force biological women who identify as men to compete against biological men, even if the biological women have the same physiological characteristics as a typical biological woman.[12] Such an interpretation makes little sense given Title IX's text, structure, history, and purpose. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative

---

[12] And the opposite may be true. *See Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring) ("[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex). Quite the opposite."); *see also id.* at 701 (Wilkins, J., concurring) (same).

23-10078.1184

interpretations consistent with the legislative purpose are available."). There are, of course, outlier individuals with physical attributes above or below their sex's average. Yet sex-separated sports only exist to accommodate the average physiological differences between the sexes. Title IX is not written for individual, case-by-case sex separation. The statute instead applies to each sex as a whole.

Moreover, Title IX says nothing about "sexual orientation" and "gender identity." And why would it? Title IX's protections center on differences between the two biological sexes — not SOGI status.[13] Sure enough, members of Congress have attempted to amend Title IX to shield such categories from discrimination. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). But those members have repeatedly failed. By contrast, Congress has enacted hate-crimes legislation with enhanced penalties for crimes motivated by "sexual orientation" or "gender identity." *See, e.g.*, 18 U.S.C. § 249(a)(2); 34 U.S.C. § 12291(b)(13)(A) (prohibiting discrimination based on "sexual orientation" and "gender identity" separately from "sex").

Indeed, under Defendants' interpretation, Title IX and its regulations would protect behavior Defendants likely find abhorrent. Title IX exempts institutions "traditionally" limited to "only students of one sex," "youth service organizations" traditionally "limited to persons of one sex," and "living facilities for the different sexes." 20 U.S.C. §§ 1681(a)(5), 1681(a)(6)(B), 1686. Title IX's regulations exempt "separation of students by sex within physical education classes" for sports chiefly involving bodily contact" as well as human sexuality classes and choirs separated by "sex." 34 C.F.R. § 106.34(a)(1), (3)–(4). If "on the basis of sex" included "sexual orientation," these regulations would permit heterosexual-only choirs. *See* 20 U.S.C. § 1686; 20 C.F.R.

---

[13] Indeed, "gender identity" was "a concept that was essentially unknown" fifty years ago. *Bostock*, 140 S. Ct. at 1755 (Alito, J., dissenting).

23-10078.1185

§ 106.34(a)(4). And if "on the basis of sex" included "gender identity," schools could not use a biology-based classification to separate physical education classes involving contact sports like boxing or rugby. 34 C.F.R. § 106.34(a)(1).

These contradictions and conflicts arise in the healthcare context to which Section 1557 applies. For example, a hospital could not tailor care to the biological differences between men and women. *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 674 & n.8 (N.D. Tex. 2016). Importing *Bostock*-style reasoning or similar "but-for cause" analysis to Title IX would presumptively criminalize sex-specific treatments that discriminate against patients "on the basis of sex." When adopting Section 1557, Congress could have included "sexual orientation" and "gender identity" in the statutory text. Congress chose not to do so. Instead, Congress limited Section 1557's protections to those afforded by other federal statutes — including Title IX. Because Title IX does not protect "sexual orientation" or "gender identity" status, neither does Section 1557.

Title IX's ordinary public meaning remains intact until changed by Congress, or perhaps the Supreme Court. *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). As noted above, the ordinary public meaning of "sex" turned on reproductive function when Congress enacted Title IX. For an action to occur "on the basis of sex," biological sex must be the motivating factor. "On the basis of sex" does not connote a derivative, "but-for causation" analysis like the Supreme Court reasoned "because of sex" does. *See Bostock*, 140 S. Ct. at 1739. Consequently, the Court will not judicially import *Bostock*'s "but-for causation" test into Title IX. *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (rejecting view that "when courts confront generally worded provisions, they should infer exceptions for situations

23-10078.1186

that the drafters never contemplated and did not intend their general language to resolve"). And because the Court finds Title IX's "on the basis of sex" language does not include "sexual orientation" or "gender identity" status, the Court holds the Secretary cannot alter the phrase by administrative fiat. *See Franciscan Alliance, Inc. v. Becerra*, 553 F. Supp. 3d 361, 371 n.7 (N.D. Tex. 2016). "After all, only the words on the page constitute the law." *Bostock*, 140 S. Ct. at 1738; *see also Grimm*, 972 F.3d at 628 (Niemeyer, J., dissenting) (Reading "sexual orientation" and "gender identity" into Title IX and Section 1557 would "do[] no more than express disagreement with Title IX and its underlying policies, which is not, of course, the role of courts tasked with deciding cases and controversies.").

### C. Section 1557 Does Not Prohibit Discrimination on the Basis of SOGI Status

Plaintiffs seek three primary remedies: (1) "hold unlawful and set aside Secretary Becerra's Notification"; (2) "enjoin Secretary Becerra from using or enforcing the interpretation of [S]ection 1557 that appears in the Notification"; and (3) issue "declaratory relief." ECF No. 11 at 11.

When a legal issue is "fit for judicial resolution" and a regulation "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967). "Judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Id.* at 140. Accordingly, the Court will assess the remedies Plaintiffs seek under the APA and DJA. The Court, however, will not assess the propriety of injunctive relief because Plaintiffs do not brief factors relevant to the appropriateness of injunctive relief. "It is not the court's job to divine the applicable law for the parties," nor is it the Court's job "to manufacture every possible argument [the parties] could conceivably make." *Spencer v.*

*Texaco, Inc.*, No. 96-0228, 1996 WL 363540, at *2 (E.D. La. June 28, 1996); *Holz v. United States*,

No. 3:09-CV-1568-P, 2009 WL 10704725, at *2 n.4 (N.D. Tex. Sept. 29, 2009); *see also eBay*

*Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (detailing injunction requirements).

    The APA allows a litigant to seek judicial review of "final agency action for which there

is no other adequate remedy in a court." 5 U.S.C. § 704. As the Court previously determined, the

Notification constitutes "final agency action for which there is no other adequate remedy in court."

*See* ECF No. 30 at 21 (quoting 5 U.S.C. § 704); *see also Hinojosa v. Horn*, 896 F.3d 305, 310 (5th

Cir. 2018) (per curiam) (stating 5 U.S.C. § 704 "limits the APA to the review of those agency

actions which otherwise lack an 'adequate remedy in court'"). Under the APA, "[t]o the extent

necessary to decision and when presented, the reviewing court shall decide all relevant questions

of law, interpret constitutional and statutory provisions, and determine the meaning or applicability

of the terms of an agency action." 5 U.S.C. § 706. When doing so, "[t]he reviewing court

shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not

in accordance with law." *Id.*

    Under the DJA, "any court of the United States, upon the filing of an appropriate pleading,

may declare the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration

shall have the force and effect of a final judgment or decree . . . ." *Id.* Section 2201(a) "allow[s]

potential defendants to resolve a dispute without waiting to be sued." *Sherwin-Williams Co. v.*

*Holmes County*, 343 F.3d 383, 397 (5th Cir. 2003). It is a defensive action "allowing prospective

defendants to sue to establish their nonliability." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500,

504 (1959); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45–46 (1982).

When presented with a request to decide or dismiss a declaratory-judgment suit, a court must

23-10078.1188

decide whether: (1) "the declaratory action is justiciable"; (2) "the court has the authority to grant declaratory relief"; and (3) "to exercise its discretion to decide or dismiss the action." *Sherwin-Williams*, 343 F.3d at 387. This case satisfies all three factors.

### 1. This declaratory action is justiciable.

The DJA does not create an independent cause of action. *Harris County v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015). In a declaratory-judgment action, the relevant cause of action is the defendant's anticipated lawsuit against the plaintiff. *See Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990) ("Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action."); *Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984) ("[T]he underlying cause of action which is thus actually litigated is the declaratory defendant's, not the declaratory plaintiff's . . . ."); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 500 (5th Cir. 2020) (Oldham, J., concurring) ("[T]he Declaratory Judgment Act . . . does not create a standalone cause of action. Rather, . . . [i]t allows parties who would otherwise be defendants to seek relief as plaintiffs.").

Because Defendants threaten to enforce their interpretation "on the basis of sex" found in the Notification, Plaintiffs can bring this declaratory-judgment action without waiting to see if Defendants will make good on their threats. *See Collin County*, 915 F.2d at 170 ("The Declaratory Judgment Act is designed to afford parties, threatened with liability, but otherwise without a satisfactory remedy, an early adjudication of an actual controversy. . . . [A] party who has an interest in the outcome of future litigation can petition the court for a declaration of its rights and

liabilities."); *Tex. Employers' Ins. Assoc. v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988)

(Litigants need not "be put to the Hobson's choice of foregoing their rights or acting at their peril;

nor, if they had already acted, would they be forced to wait, for perhaps many years, until the

statute of limitations expired, to know whether they had been subjected to some significant

liability."). And even if the DJA does not supply Plaintiffs a cause of action, they possess an

independent cause of action under 5 U.S.C. § 704, as Plaintiffs may seek declaratory relief as part

of their APA claim. *See* 5 U.S.C. § 702 (permitting plaintiffs to seek "relief other than money

damages" when challenging agency action under APA).

### 2. The Court has the authority to grant declaratory relief.

A district court lacks authority to grant declaratory relief and "may not consider the merits

of [a] declaratory judgment action when:" (1) "a declaratory defendant has previously filed a cause

of action in state court against the declaratory plaintiff"; (2) "the state case involves the same issues

as those involved in the federal case"; and (3) "the district court is prohibited from enjoining the

state proceedings under the Anti-Injunction Act." *Travelers Ins. Co. v. La. Farm Bureau Fed'n*,

996 F.2d 774, 776 (5th Cir. 1993) (emphasis removed). Nothing before the Court indicates there

is a pending state-court proceeding between the parties whose existence divests this Court of its

authority to grant declaratory relief.

In exercising its discretion to decide or dismiss a declaratory action, a district court should

consider seven nonexclusive factors, including whether:

(1) there is a pending state action in which all of the matters in controversy may be
fully litigated;

(2) the plaintiff filed suit in anticipation of a lawsuit filed by the defendant;

(3) the plaintiff engaged in forum-shopping in bringing the suit;

(4) possible inequities in allowing the declaratory plaintiff to gain precedence in
time or to change forums exist;

(5) the federal court is a convenient forum for the parties and witnesses;

(6) retaining the lawsuit would serve the purposes of judicial economy; and

(7) the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.

*Sherwin-Williams*, 343 F.3d at 388 (quoting *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590–91 (5th Cir. 1994)).

The Court finds application of these factors favors exercise of the Court's discretion to grant declaratory relief. Regarding factor one, the Court is unaware of any pending state action involving the parties in which all the matters in controversy may be fully litigated. As to factor two, Plaintiffs admit they sued out of concern of future enforcement actions by Defendants. *See* ECF No. 47-1 at 3–6; ECF No. 42-2 at 3–4. For factors three and four, "[m]erely filing a declaratory judgment action in a federal court with jurisdiction to hear it . . . is not in itself improper anticipatory litigation or otherwise abusive 'forum shopping.'" *Sherwin-Williams*, 343 F.3d at 391. Because Plaintiffs are not "using the declaratory judgment process to gain access to a federal forum on improper or unfair grounds," these factors favor Plaintiffs. Factor five also favors Plaintiffs, as witnesses are not a large concern in this case and have not been from the inception of this lawsuit. *Id.* As for factor six, to the Court's knowledge, there are no pending state procedures involving these parties and this controversy, persuading the Court declaratory relief is inappropriate. Finally, pertaining to factor seven, the Court is not being asked to construe a state judicial decree involving the same parties and entered by a court adjudicating a parallel proceeding between the parties.

23-10078.1191

CONCLUSION

Based on the above, the Court **GRANTS IN PART** Plaintiffs' Motion. The Court awards Plaintiffs' requested relief under the APA and DJA, excluding injunctive relief. The Court **GRANTS IN PART** Defendants' Motion and **DENIES** Plaintiffs' request for injunctive relief. The Court **DENIES** all other relief not expressly stated herein. The Court **ORDERS** parties to submit competing proposed judgments **within 10 days** of the date of this Opinion and Order.

**SO ORDERED**.

November _11_, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

23-10078.1192

6.    **Final Judgment**



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SUSAN NEESE, *et al.*,                     §
                                           §
        Plaintiffs,                        §
                                           §
v.                                         §        2:21-CV-163-Z
                                           §
XAVIER BECERRA, in his official            §
capacity as the Secretary of the United    §
States Department of Health and Human      §
Services, *et al.*,                        §
                                           §
        Defendants.                        §

## FINAL JUDGMENT

On November 11, 2022, the Court issued an Opinion and Order (ECF No. 66)

**GRANTING IN PART** Plaintiffs' Motion for Summary Judgment and **GRANTING IN PART**

Defendants' Motion for Summary Judgment. The Court issues the following relief consistent with

that Opinion and Order.

1. The Court awards Plaintiffs and the certified class relief under 5 U.S.C. § 706(2). The Court **HOLDS UNLAWFUL** and **SETS ASIDE** Defendant Becerra's Notification of Interpretation and Enforcement of May 10, 2021.

2. The Court awards Plaintiffs and the certified class declaratory relief under 28 U.S.C. § 2201. The Court **DECLARES**:

   ▪ Plaintiffs and members of the certified class need not comply with the interpretation of "sex" discrimination adopted by Defendant Becerra in his Notification of Interpretation and Enforcement of May 10, 2021; and

   ▪ Section 1557 of the ACA does not prohibit discrimination on account of sexual orientation and gender identity, and the interpretation of "sex" discrimination that the Supreme Court of the United States adopted in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), is inapplicable to the prohibitions on "sex" discrimination in Title IX of the Education Amendments of 1972 and in Section 1557 of the ACA.

3. The Court **GRANTS** summary judgment for Defendants insofar as Plaintiffs and the certified class seek injunctive relief on any claim.

23-10078.1205

This final judgment fully and finally resolves all remaining claims in this suit and is appealable. The Court **DENIES** all other relief not expressly granted herein.

Judgment is rendered accordingly.

November 22, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

23-10078.1206

7.    **Declaration of Susan Neese (without exhibits)**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |
|---|---|
| **Susan Neese, M.D** and **James Hurly, M.D.**, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**Xavier Becerra**, in his official capacity as Secretary of Health and Human Services; **United States of America**,<br><br>Defendants. | Case No. 2:21-cv-00163-Z |

### DECLARATION OF SUSAN NEESE, M.D.

I, Susan Neese, being duly sworn, states as follows:

1.  My name is Susan Neese. I am over 18 years old and fully competent to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I am a plaintiff in this litigation.

4.  I practice general internal medicine for adults. My patients range in age from 16 to 105.

5.  I am board certified by American Board of Internal Medicine to practice internal medicine. I have a medical license to practice in Texas. My medical degree is from Texas Tech Health Sciences Center (1999).

6.  I treat my patients for everything from annual check-ups to chronic disease management.

7.  I have several patients that I treat who are transgender or suffering from gender dysphoria.

8.  I have several female-to-male transgender patients, as well as male-to-female transgender patients, for whom I manage their hormones and all their other medical conditions. These patients are all in their 30s or 40s.

9.  In one instance, I declined to take on a new patient who was 16 years old, whom I had never seen before, and whose mother, who was a longstanding patient of mine, came to me and asked if I would assist her teenage daughter in obtaining transition hormones. I did not take on this patient as I was not comfortable taking a teenager transition due to the complexity of the medical and emotional issues that case would present, and that is not my area of specialty. In addition, I do not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions. Most of the other transgender patients who have come to me have already transitioned and I maintain their care.

10.  For the reasons provided in paragraph 9, I am categorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning.

11.  I would also be reluctant to prescribe hormone therapy or assist a patient in a gender transition absent a longstanding relationship with that patient, because sometimes the appropriate response to gender dysphoria is a referral for counseling and psychological care rather than hormone therapy, and there is risk of suicide if the wrong option is pursued. It is difficult for a primary-care physician to discern whether hormone therapy is appropriate absent a longstanding doctor–patient relationship, and I would want a longstanding relationship to ensure that I recommend an appropriate response to gender dysphoria, consistent with my duty to do no harm.

12.   I have encountered situations in my practice in which the provision of "gender affirming" care to transgender patients or the accommodation of a patient's denial of biological realities will endanger their life or safety.

13.   For example, one of my adult patients in his late 30s is a biological female who identifies as male but has never had sex-reassignment surgery. This patient has frequently refused necessary preventive care that I have strongly recommended. For example, this patient refused to allow me to conduct a pap smear for 10 years, and refuses to allow me to conduct breast examinations. The patient also refuses to believe that he has a uterus or ovaries, and refuses to accept referrals to specialists for care that implicates his status as a biological woman.

14.   Recently, this patient started having pelvic pain and bladder issues but refused to allow me to conduct a pelvic examination. He finally allowed me to conduct a pelvic examination for the first time last month. I have recommended that he undergo a pelvic ultrasound, but he refuses to undergo this procedure because it would be conducted transvaginally, and he does not want medical personnel to discover that he has a vagina. I have tried gently and firmly to explain that he should undergo this pelvic ultrasound because he could have something ominous such as cervical or ovarian cancer that we need to check for and that I don't want to miss. This patient insists that his risk of cervical or ovarian cancer is extremely low and it would be unlikely and is quite adamant about it.

15.   I have three options for responding to this situation, all of which are unpalatable. One option is to terminate my doctor–patient relationship with this individual and insist that he seek care from a different primary-care physician. If I do that, however, Secretary Becerra could determine that I violated section 1557 and terminate federal funding for my medical practice, or I could get sued for violating section 1557. Another option is to insist that this patient seek and obtain preventive care consistent with his status as a biological woman, despite the patient's denials of

these biological realities. This also exposes me to loss of federal funding and lawsuits under Secretary Becerra's interpretation of section 1557. A final option is to play along with my patient's asserted gender identity and indulge his beliefs that he cannot be at risk for cervical cancer or ovarian cancer. This exposes me to a medical-mal-practice lawsuit if the patient turns out to have cancer (or some other condition related to his pelvic pain and bladder issues) that goes untreated. It is also incompatible with my ethical duties as a medical provider.

16.    My male-to-female transgender patients are all in their mid 30s to 40s, so I have not yet had to deal with issues regarding prostate-cancer screening. But I expect issues to arise in the future where a male-to-female transgender patient resists the need for prostate-cancer screening, just as my female-to-male transgender patient is resisting the need for a pelvic ultrasound. In these situations, I will confront the same trilemma discussed in paragraph 15, where my responsibilities as a medical provider conflict with Secretary Becerra's demands for gender-affirming medical care.

17.    Because I work as a general practitioner and primary-care physician, I will likely have additional future patients who are suffering from gender dysphoria, as well as patients who request care that I am unable or unwilling to provide. I have already had one 16-year-old ask me to provide hormone therapy for the purpose of a gender transition, which I declined. *See* paragraph 9, *supra*. I expect these types of requests to not only continue but increase, as recent empirical evidence indicates a sharp rise in the number of young people who identify as transgender. *See* Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times (June 10, 2022), https://nyti.ms/3HdQ6oI (reporting that "[t]he number of young people who identify as transgender has nearly doubled in recent years") (attached as Exhibit A); Jody L. Herman, Andrew R. Flores, and Kathryn K. O'Neill, *How Many Adults And Youth Identify As Transgender In The United States?*, The Williams Institute, UCLA School of Law (June 2022) (attached as Exhibit B).

18.   I must discuss preventive care with all of my patients, and preventive care is specific to an individual's biological sex. I already have a female-to-male transgender patient who denies his need for preventive care that accords with his biological sex, as explained in paragraphs 13–15, *supra*, and in doing so is putting his health and potentially his life at risk. I will also be confronting issues regarding prostate-cancer screening as my male-to-female transgender patients approach the age where prostate-cancer screening is recommended. Biological men should receive prostate cancer screening by the time they reach a certain age regardless of whether they identify as a woman, as the prostate typically is not removed during a sex-change operation. I am ethically obligated to recommend prostate-cancer screenings to my biologically male patients, without regard to the gender identity that they assert.

19.   I do not believe that a refusal to provide hormone therapy to a minor patient who asks for it constitutes "discrimination on the basis of gender identity" or "discrimination on the basis of sex." In my view, a categorical refusal to provide hormone therapy to minors seeking to transition is not "discrimination on the basis of gender identity," because I would refuse the treatment regardless of the "gender identity" that the minor patient asserts. I would likewise refuse the treatment regardless of the minor patient's "sex." I am confident, however, that Secretary Becerra does not share this view, and that he will regard any refusal or unwillingness to provide hormone therapy to minors with gender dysphoria as a violation of section 1557, as well as an act that discriminates "on the basis of gender identity."

20.   I also do not believe that insisting that patients obtain preventive care consistent with their biological sex constitutes "discrimination on the basis of gender identity," but I believe that Secretary Becerra would regard that as discriminatory because it fails to affirm the gender identity that the patient is asserting.

21.   I have a reasonable fear that Secretary Becerra will terminate federal funding for my practice and disqualify us from participating in federally funded health

DocuSign Envelope ID: 68BE7BB7-896D-468C-98E0-705C25096618

programs if I do not provide everything a transgender patient might demand, or if I recommend preventive care that accords with the biological sex (rather than the gender identity) of my transgender patients.

22.   I am suing on behalf of all healthcare providers subject to section 1557 of the Affordable Care Act. My claims are typical because each of the class members, as medical professionals, wishes to provide appropriate and ethical health care to their patients without being countermanded or threatened by federal officials. And the demands of the transgender community to provide so-called gender-affirming care without exception, and Secretary Becerra's efforts to use section 1557 as a tool to impose those demands on every health-care provider that receives federal funds, will on occasion conflict with a health-care provider's duty to act in the best interest of his or her patients. I am suing to protect each of the class members from these competing demands.

This concludes my sworn statement. I swear under penalty of perjury that the facts stated in this declaration are true and correct.

Dated: ___8/5/2022___

SUSAN NEESE, M.D.

**8.**    **Susan Neese's Answers to First Set of Interrogatories**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **Susan Neese, M.D**; **James Hurly, M.D.**; and **Jeffrey Barke, M.D.**, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **Xavier Becerra**, in his official capacity as Secretary of Health and Human Services; **United States of America**, <br><br> Defendants. | Case No. 2:21-cv-00163-Z |

**PLAINTIFF SUSAN NEESE'S ANSWERS TO FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1 (To all Plaintiffs):** Describe your medical practice, including areas of specialization, services that you perform, the age range of patients treated, and any medical licenses or certifications.

**ANSWER**: I practice general internal medicine for adults. My patients range in age from 16 to 105. I treat them for everything from annual check-ups to chronic disease management. I am board certified by American Board of Internal Medicine to practice internal medicine. I have a medical license to practice in Texas. My medical degree is from Texas Tech Health Sciences Center (1999).

**INTERROGATORY NO. 2 (To all Plaintiffs):** Describe any instances in which you have treated a transgender patient or a patient suffering from gender dysphoria, including the patient's age, the services you provided to the patient, whether you refused to provide any services that the patient requested, and if so, why you refused to provide those services.

**ANSWER**: I have several patients that I treat who fall under this category. I have several female-to-male transgender patients, as well as male-to-female transgender patients, for whom I manage their hormones and all their other medical conditions. These patients are all in their 30s or 40s. I do not refuse to provide them services. When medically appropriate, I have made referrals. In one instance, I declined to take on a new patient who was 16 years old, whom I had never seen before, and whose mother, who was a longstanding patient of mine, came to me and asked if I would assist her teenage daughter in obtaining transition hormones. I did not take on this patient as I was not comfortable taking a teenager transition due to the complexity of the medical and emotional issues that case would present, and that is not my area of specialty. In addition, I do not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions. Most of the other transgender patients who have come to me have already transitioned and I maintain their care.

**INTERROGATORY NO. 3 (To all Plaintiffs)**: Describe any instances in which you have treated a gay, lesbian, or bisexual patient, including the patient's age, the services you provided to the patient, whether you refused to provide any services that the patient requested, and if so, why you refused to provide those services.

**ANSWER**: I treat gay and lesbian patients frequently, if not daily. I cannot recall ever refusing care to any of them.

**INTERROGATORY NO. 4 (To Dr. Neese)**: Set forth all facts supporting the allegation in Paragraph 22 of the First Amended Complaint that Dr. Neese "will on occasion decline to prescribe hormone therapy or provide referrals for sex-change operations," including describing any specific instances in which this occurred.

**ANSWER**: See the answer to Interrogatory No. 2, *supra*.

**INTERROGATORY NO. 5 (To all Plaintiffs)**: Have you ever been asked "to prescribe hormone therapy to minors who are seeking to transition" or "to provide

referrals to minors seeking a sex-change operation," including as described in Paragraphs 23 and 31 of the First Amended Complaint? If so, describe any such instances, including whether you provided the requested services, and if not, why you refused to do so.

**ANSWER**: Yes. As explained in my answer to Interrogatory No. 2, *supra*, a teenager requested my care in transitioning from female to male. She was the daughter of a longstanding patient of mine. I declined to provide this care because I did not believe that I could appropriately manage the transition of a teenager. These are complex medical issues which I do not specialize in. In addition, I do not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions.

**INTERROGATORY NO. 6 (To all Plaintiffs)**: Have you ever been asked "to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety," including as described in Paragraphs 24, 28, and 32 of the First Amended Complaint? If so, describe any such instances including whether you provided the requested services, and if not, why you refused to do so.

**ANSWER**: Yes. One of my adult patients in his late 30s is a biological female who identifies as male but has never had sex-reassignment surgery. This patient has frequently refused necessary preventive care that I have strongly recommended. For example, this patient refused to allow me to conduct a pap smear for 10 years, and refuses to allow me to conduct breast examinations. The patient also refuses to believe that he has a uterus or ovaries, and refuses to accept referrals to specialists for care that implicates his status as a biological woman.

Recently, this patient started having pelvic pain and bladder issues but refused to allow me to conduct a pelvic examination. He finally allowed me to conduct a pelvic examination for the first time last month. I have recommended that he undergo a

pelvic ultrasound, but he refuses to undergo this procedure because it would be conducted transvaginally, and he does not want medical personnel to discover that he has a vagina. I have tried gently and firmly to explain that he should undergo this pelvic ultrasound because he could have something ominous such as cervical or ovarian cancer that we need to check for and that I don't want to miss. This patient insists that his risk of cervical or ovarian cancer is extremely low and it would be unlikely and is quite adamant about it.

I have three options for responding to this situation, all of which are unpalatable. One option is to terminate my doctor–patient relationship with this individual and insist that he seek care from a different primary-care physician. If I do that, however, Secretary Becerra could determine that I violated section 1557 and terminate federal funding for my medical practice, or I could get sued for violating section 1557. Another option is to insist that this patient seek and obtain preventive care consistent with his status as a biological woman, despite the patient's denials of these biological realities. This also exposes me to loss of federal funding and lawsuits under Secretary Becerra's interpretation of section 1557. A final option is to play along with my patient's asserted gender identity and indulge his beliefs that he cannot be at risk for cervical cancer or ovarian cancer. This exposes me to a medical-malpractice lawsuit if the patient turns out to have cancer (or some other condition related to his pelvic pain and bladder issues) that goes untreated. It is also incompatible with my ethical duties as a medical provider.

My male-to-female transgender patients are all in their mid 30s to 40s, so I have not yet had to deal with issues regarding prostate-cancer screening. But I expect issues to arise in the future where a male-to-female transgender patient resists the need for prostate-cancer screening, just as my female-to-male transgender patient is resisting the need for a pelvic ultrasound. In these situations, I will confront the same trilemma

discussed above, where my responsibilities as a medical provider conflict with Secretary Becerra's demands for gender-affirming medical care.

**INTERROGATORY NO. 7 (To Dr. Neese and Dr. Barke)**: Set forth all facts supporting the allegation in Paragraphs 25 and 33 of the First Amended Complaint that Dr. Neese and Dr. Barke are "likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that [he or she] [are] unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive care that corresponds to their biological sex."

**ANSWER**: I am a general practitioner and primary-care physician, and I serve patients of all ages and gender identities. I am currently treating several transgender patients, as explained in my answer to Interrogatory No. 2, *supra*. I am certain to continue treating these patients. And because I work as a general practitioner and primary-care physician, I will likely have additional future patients who are suffering from gender dysphoria, as well as patients who request care that I am unable or unwilling to provide. I have already had one 16-year-old ask me to provide hormone therapy for the purpose of a gender transition, which I declined. I expect these types of requests to not only continue but increase, as recent empirical evidence indicates a sharp rise in the number of young people who identify as transgender. *See* Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times (June 10, 2022), https://nyti.ms/3HdQ6oI (reporting that "[t]he number of young people who identify as transgender has nearly doubled in recent years") (attached as Exhibit A); Jody L. Herman, Andrew R. Flores, and Kathryn K. O'Neill, *How Many Adults And Youth Identify As Transgender In The United States?*, The Williams Institute, UCLA School of Law (June 2022) (attached as Exhibit B).

I must discuss preventive care with all of my patients, and preventive care is specific to an individual's biological sex. I already have a female-to-male transgender patient

who denies his need for preventive care that accords with his biological sex, as explained in my answer to Interrogatory No. 6, and in doing so is putting his health and potentially his life at risk. I will also be confronting issues regarding prostate-cancer screening as my male-to-female transgender patients approach the age where prostate-cancer screening is recommended. Biological men should receive prostate cancer screening by the time they reach a certain age regardless of whether they identify as a woman, as the prostate typically is not removed during a sex-change operation. I am ethically obligated to recommend prostate-cancer screenings to my biologically male patients, without regard to the gender identity that they assert.

**INTERROGATORY NO. 10 (To all Plaintiffs)**: Have you ever engaged in conduct that you believe would constitute "discrimination on the basis of gender identity" as that phrase is used in the Notification? If so, describe all instances of engaging in such conduct.

**ANSWER**: I have never engaged in conduct that *I* regard as "discrimination on the basis of gender identity," because I do not believe that a refusal to provide hormone therapy to a minor patient who asks for it constitutes "discrimination on the basis of gender identity" or "discrimination on the basis of sex." In my view, a categorical refusal to provide hormone therapy to minors seeking to transition is not "discrimination on the basis of gender identity," because I would refuse the treatment regardless of the "gender identity" that the minor patient asserts. I would likewise refuse the treatment regardless of the minor patient's "sex." I am confident, however, that Secretary Becerra does not share this view, and that he will regard any refusal or unwillingness to provide hormone therapy to minors with gender dysphoria as a violation of section 1557, as well as an act that discriminates "on the basis of gender identity."

I also do not believe that insisting that patients obtain preventive care consistent with their biological sex constitutes "discrimination on the basis of gender identity,"

but I believe that Secretary Becerra would regard that as discriminatory because it fails to fully affirm the gender identity that the patient is asserting.

Each of these episodes is described in detail in my answers to Interrogatories Nos. 2, 6, and 7, *supra*.

**INTERROGATORY NO. 11 (To all Plaintiffs)**: Have you ever engaged in conduct that you believe would constitute "discrimination on the basis of sexual orientation" as that phrase is used in the Notification? If so, describe all instances of engaging in such conduct.

**ANSWER**: I have never engaged in conduct that I regard as "discrimination on the basis of sexual orientation," or that I believe Secretary Becerra would regard as "discrimination on the basis of sexual orientation."

**INTERROGATORY NO. 12 (To all Plaintiffs)**: Are there any services that you would refuse to provide to a transgender patient or other conduct you believe you are likely to engage in with respect to a transgender patient that you believe would constitute "discrimination on the basis of gender identity" as that phrase is used in the Notification? If so, describe such services or conduct.

**ANSWER**: I would refuse to prescribe puberty blockers or hormone therapy to minors seeking to transition, as I have explained in my answers to Interrogatories No. 2, 7, and 10. But I do not regard that as "discrimination on the basis of gender identity," even though I believe that Secretary Becerra does. I would also be reluctant to prescribe hormone therapy or assist a patient in a gender transition absent a longstanding relationship with that patient, because sometimes the appropriate response to gender dysphoria is a referral for counseling and psychological care rather than hormone therapy, and there is risk of suicide if the wrong option is pursued. It is difficult for a primary-care physician to discern whether hormone therapy is appropriate absent a longstanding doctor–patient relationship, and I would want a longstanding relation-

A007
23-10078.616

ship to ensure that I recommend an appropriate response to gender dysphoria, consistent with my duty to do no harm. Apart from those situations, I cannot think of any other services that I would refuse to provide to a transgender patient.

I would also recommend preventive care to my patients consistent with their biological sex, *i.e.*, I would strongly recommend that my male-to-female transgender patients get screened for prostate cancer when they reach the appropriate age, even if they identify as a woman. Again, I do not regard that as "discrimination on the basis of gender identity," but I believe that Secretary Becerra would regard that as discriminatory because it fails to affirm and fully embrace the gender identity that the patient is asserting.

**INTERROGATORY NO. 13 (To all Plaintiffs)**: Are there any services that you would refuse to provide to a gay, lesbian, or bisexual patient or other conduct you believe you are likely to engage in with respect to a gay, lesbian, or bisexual patient that you believe would constitute "discrimination on the basis of sexual orientation" as that phrase is used in the Notification? If so, describe such services or conduct.

**ANSWER**: There are no services that I would refuse to provide to a gay, lesbian, or bisexual patient, nor is there any other conduct that I would engage in with respect to a gay, lesbian, or bisexual patient, that I believe would constitute "discrimination on the basis of sexual orientation" as that phrase is used in the Notification.

**INTERROGATORY NO. 14 (To all Plaintiffs)**: Have you refused to perform any of the services described in paragraphs 17–19 of the First Amended Complaint (i.e., "refus[ing] to prescribe testosterone hormones to a biological woman who wishes to appear as a man," "refus[ing] to refer a biological man for a sex-change operation that would remove his penis and testicles," "refus[ing] to prescribe Truvada or PrEP drugs to homosexual men")? If so, describe such refusals, including why you refused to provide those services.

**ANSWER**: See my answers to Interrogatories Nos 2, 6, 7, 10, and 12, *supra*. Apart from the situations described in those answers, I do not recall other situations in which I refused to provide the services described in paragraphs 17–19 of the first amended complaint.

**INTERROGATORY NO. 15 (To all Plaintiffs)** Would you refuse to perform any of the services described in paragraphs 17–19 of the First Amended Complaint if a patient asked you to do so? If so, describe what services you would refuse to provide, and why.

**ANSWER**: See my answers to Interrogatories Nos 2, 6, 7, 10, and 12, *supra*. Apart from the situations described in those answers, I cannot think of other situations in which I would refuse to provide the services described in paragraphs 17–19 of the first amended complaint.

**INTERROGATORY NO. 16 (To all Plaintiffs)**: Are there any circumstances in which complying with the legal interpretation set forth in the Notification would substantially burden your exercise of religion? If so, describe such circumstances and why your religious exercise would be substantially burdened.

**ANSWER**: No. My concerns are entirely medical and professional in nature, not religious.

**INTERROGATORY NO. 17 (To all Plaintiffs)**: Do you contend that the Notification has "induce[d]" you "to provide gender-affirming care even when doing so would violate the Hippocratic Oath or [your] ethical beliefs," including as alleged in Paragraph 34 of the First Amended Complaint? If so, describe any specific instances of this occurring, including the specific services that you provided that you believe violated the Hippocratic Oath or your ethical beliefs.

**ANSWER**: No, it hasn't yet. But I have a reasonable fear that Secretary Becerra will terminate federal funding for my practice and disqualify us from participating in federally funded health programs if I do not provide everything a transgender patient

might demand, or if I recommend preventive care that accords with the biological sex (rather than the gender identity) of my transgender patients. All of this is explained in detail in my answers to Interrogatories Nos 2, 6, 7, 10, and 12, *supra*.

**INTERROGATORY NO. 18 (To all Plaintiffs)**: Set forth all facts supporting your allegation in Paragraph 41 of the First Amended Complaint that Plaintiffs' claims "are typical of other members of the class, as each of them wishes to preserve the autonomy of their medical practice."

**ANSWER**: I am suing on behalf of all healthcare providers subject to section 1557 of the Affordable Care Act. My claims are typical because each of the class members, as medical professionals, wishes to provide appropriate and ethical health care to their patients without being countermanded or threatened by federal officials. And the demands of the transgender community to provide so-called gender-affirming care without exception, and Secretary Becerra's efforts to use section 1557 as a tool to impose those demands on every health-care provider that receives federal funds, will on occasion conflict with a health-care provider's duty to act in the best interest of his or her patients. I am suing to protect each of the class members from these competing demands, and in that sense my claims are typical of the other class members.

**INTERROGATORY NO. 19 (To all Plaintiffs)**: Set forth all facts supporting your allegation in Paragraph 42 of the First Amended Complaint that Plaintiffs "adequately represent the interests of the class, and they have no interests antagonistic to" the class.

**ANSWER**: The relief that we are seeking will not compel any class member to conduct his or her medical practice in any particular manner. It can only increase the autonomy of class members and provide needed clarity on what section 1557 means post-*Bostock* and how it will be enforced under Secretary Becerra's notification and directives. None of the relief that we are seeking will make any member of the class

worse off, and the declaratory relief that we requesting can only help class members
by clarifying their obligations under federal law.

Gene P. Hamilton
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721 (phone)
gene.hamilton@aflegal.org

Dated: June 14, 2022

_/s/ Jonathan F. Mitchell_
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and*
*the Proposed Classes*

9.    **Transcript of Deposition of Susan Neese (excerpts)**

Susan Neese                                              July 22, 2022

Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2           DISTRICT OF TEXAS AMARILLO DIVISION

3    _____

4    SUSAN NEESE, M.D., ET AL.,

5          Plaintiffs,

6       v.                         Case No.

7    XAVIER BECERRA, ET AL.,            2:21-cv-163-Z

8          Defendants.

9    _____

10             VIDEOTAPED DEPOSITION OF

11                  SUSAN NEESE

12   DATE:         Friday, July 22, 2022

13   TIME:         9:05 a.m.

14   LOCATION:     Remote, via Zoom

15   REPORTED BY:  Josh Divers, Videographer

16             Merienne Gasca, Notary Public

17   JOB No.:    5329209

18

19

20

21

22

Susan Neese                                          July 22, 2022

Page 22

1   prohibition on discrimination on the basis of sex to

2   include, one, discrimination on the basis of sexual

3   orientation, and two, discrimination on the basis of

4   gender identity."  Do you see that?

5        A   Yes, sir.

6        Q   Okay.  And we'll get to gender identity

7   later but I want to start by asking you about sexual

8   orientation.  Have you ever engaged in any conduct

9   that you believe would constitute discrimination on

10  the basis of sexual orientation as that phrase is used

11  in this document?

12       A   No.

13       Q   Have you ever engaged in any conduct that

14  you believe secretary Becerra would regard as

15  discrimination on the basis of sexual orientation?

16       A   No.

17       Q   Is there any conduct that you believe you're

18  likely to engage in in the future with respect to a

19  gay, lesbian or bisexual patient that you believe

20  would constitute discrimination on the basis of sexual

21  orientation as that phrase is used in this document?

22       A   No.

Page 23

1        Q    When HHS stated that and interpreted section

2   1557 to prohibit discrimination on the basis of sexual

3   orientation, do you believe that harmed you have any

4   way?

5        A    No.

6        Q    If the Judge issues a ruling in this case

7   saying that it is permissible for healthcare providers

8   to discriminate on the basis of sexual orientation, do

9   you believe that would benefit you in any way?

10       A    Repeat that one more time.

11       Q    If the Judge if the judge issues a ruling in

12   this case saying that it's permissible for healthcare

13   providers to discriminate on the basis of sexual

14   orientation, do you believe that would benefit you in

15   any way?

16       A    No.

17       Q    Okay.

18            MR. NEWMAN:   I am going to introduce

19   another exhibit.   Okay.   I have just introduced

20   Exhibit 3.

21            (Exhibit 3 was marked for

22            identification.)

Case: 23-10078    Document: 20    Page: 121    Date Filed: 03/27/2023
Case 2:21-cv-00163-Z   Document 59   Filed 08/26/22   Page 49 of 117   PageID 743
Susan Neese                                                    July 22, 2022

Page 26

1    statements in these interrogatory answers that were

2    not correct?

3         A    No.

4         Q    Okay.  So, please turn back to page one.

5    And I'm going to ask you about your response to

6    interrogatory number one.  In that answer you wrote,

7    "I practice general internal medicine for adults."

8    Can  you explain to me what is general internal

9    medicine?

10        A    General internal medicine is specialized in

11   adult medicine or teenagers and adults medicine.  We

12   treat a broad range.  We are diagnosticians

13   essentially and treat chronic medical conditions long

14   term throughout somebody's life.  Kind of like a

15   pediatrician before adults.

16        Q    And when you wrote that you practice general

17   internal medicine for adults, what did you mean by

18   adults?

19        A    My age group is 16 and above.

20        Q    Okay.  So --

21        A    That's what I have set at my practice in my

22   office.

Susan Neese                                                    July 22, 2022

Page 27

 1      Q   So, you -- do you treat anyone below the age

 2   of 16?

 3      A    No.  Actually I have in the past.  Yes, I

 4   have in the past.  I don't believe I have anybody in

 5   my practice that's below the age of 16 right now.

 6      Q    If someone -- if a parent of a patient below

 7   the age of 16 asked you to treat their child who's

 8   below the age of 16, would you treat a patient below

 9   the age of 16?

10      A    I don't any longer, no.  I refer them to the

11   pediatrician.

12              MR. MITCHELL:  Mr. Newman.

13              MR. NEWMAN:  Yes.

14              MR. MITCHELL:  My internet connection

15   was stuck for the last 5 or 10 seconds so I did not

16   hear the question you asked, Dr. Neese.  Could you

17   please repeat it?

18              MR. NEWMAN:  It's something along the

19   lines of if you were -- if a parent asked you to treat

20   a patient below the age of 16, would you treat that

21   patient.

22              MR. MITCHELL:  Did Dr. Neese answer the

Page 31

1    hormone therapy for quite some time.  For several

2    years post puberty.

3        Q   Now, I'd like to go back to the person that

4    you're talking about in this interrogatory response.

5    And you wrote at the end of the sentence I just read,

6    that is not my area of specialty.  Can you explain

7    what you meant by that?

8        A   When you have a pubertal -- pre pubertal or

9    a patient that's in puberty, for transgender care you

10   have to put them on puberty blockers and then over

11   time you start them on hormone therapy.  I have never

12   done puberty blockers and I'm not familiar with that

13   or comfortable in doing that.

14           And don't -- and I'm quite concerned about

15   the long term ramifications of doing that in young

16   patients.  I mean, puberty sometimes starts at 9 years

17   old or sooner for people now.

18       Q   As a general matter, do you provide services

19   to patients that are outside your area of specialty?

20       A   No.

21       Q   Okay.

22       A   You mean…

**10.**     **Declaration of James Hurly (without exhibits)**

DocuSign Envelope ID: C6F65E73-05E0-4457-9946-2AAAE370EB8A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |
|---|---|
| **Susan Neese, M.D** and **James Hurly, M.D.**, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **Xavier Becerra**, in his official capacity as Secretary of Health and Human Services; **United States of America**, <br><br> Defendants. | Case No. 2:21-cv-00163-Z |

### DECLARATION OF JAMES HURLY, M.D.

I, James Hurly, being duly sworn, states as follows:

1.  My name is James Hurly. I am over 18 years old and fully competent to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I am a plaintiff in this litigation.

4.  I am a medical doctor with an M.D. degree and a diplomate of the American Board of Pathology. I am licensed to practice by the Texas Medical Board.

5.  I am a community-based pathologist, certified in anatomic and clinical pathology. My specialty involves rendering diagnoses in all branches of medicine based on sampling of body fluids and tissues. This encompasses all areas of the clinical laboratory, including blood bank, immunology, hematology, clinical chemistry, and microbiology. I spend most of my time rendering pathologic diagnoses based on microscopic analysis.

23-10078.459

DocuSign Envelope ID: C6F65E73-05E0-4157-9946-2AAAF370EB8A

6.  The age range that I treat is newborns up to patients in their 90s.

7.  In my practice, I have encountered situations in which patients have denied a diagnosis, wrongly claiming they cannot have it because they are no longer of a particular gender. For example, my group once diagnosed a biologic male patient with prostate cancer, but the patient refused to accept this diagnosis because he identified as a woman and insisted that he could not have a prostate and that he had a cervix instead. We had to firmly explain to this patient that he was indeed a biologic man with a prostate, and that he needed to seek urgent medical treatment for his prostate cancer.

8.  I expect these types of situations and encounters to not only continue but increase, as recent empirical evidence indicates a sharp rise in the number of young people who identify as transgender. *See* Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times (June 10, 2022), https://nyti.ms/3HdQ6oI (reporting that "[t]he number of young people who identify as transgender has nearly doubled in recent years") (attached as Exhibit A); Jody L. Herman, Andrew R. Flores, and Kathryn K. O'Neill, *How Many Adults And Youth Identify As Transgender In The United States?*, The Williams Institute, UCLA School of Law (June 2022) (attached as Exhibit B).

9.  I am ethically obligated to inform biologically male patients with prostate cancer of the fact that they have a prostate, and that they must seek treatment for prostate cancer. It is unethical to provide so-called gender-affirming care in situations where a patient's denial of biological realities will endanger their life or safety. As more people become accustomed to thinking that they can choose their sex, or have no biological sex at all, it is inevitable that all doctors, myself included, will face these dilemmas more often.

10.  I do not believe that informing a biologic man who has prostate cancer of his urgent need to seek treatment, and contradicting the patient's belief that he is a

DocuSign Envelope ID: C6F65E73-05E0-4157-9946-2AA4E370EB8A

woman who lacks a prostate, constitutes "discrimination on the basis of gender iden-tity" or "discrimination on the basis of sex." I am confident, however, that Secretary Becerra does not share this view, and that he will regard any refusal or unwillingness to affirm a patient's asserted gender identity as a violation of section 1557, as well as an act that discriminates "on the basis of gender identity." That is why I am seeking declaratory and injunctive relief against the Secretary.

11.   I have a reasonable fear that Secretary Becerra will terminate federal fund-ing for my practice and disqualify us from participating in federally funded health programs if I do not unconditionally play along with a patient's asserted gender iden-tity, such as insisting that a biological man with gender dysphoria has a prostate and needs urgent and immediate treatment for his prostate cancer that I have diagnosed.

12.   Insofar as the Hippocratic oath and my ethical beliefs require me to provide proper diagnosis so as not to harm a patient, the concept of "gender-affirming care" has a very strong potential of requiring me to refrain from assigning the correct di-agnosis of a reproductive-organ-specific cancer to a patient who does not identify with their biological sex and refuses to accept my diagnosis. For example, if I diag-nose prostate cancer in a biologic male and this patient refuses to accept that they are male, I may be forced to refrain from correctly diagnosing prostate cancer and may even be forced to diagnose the tumor as something such as endometrial or cer-vical cancer. So far I have not been specifically requested to do this, but a strong potential exists that I will be requested to do this in the future and will face retaliation from the federal government if I do not.

13.   I am suing on behalf of all healthcare providers subject to section 1557 of the Affordable Care Act, to preserve their ability to provide appropriate and ethical health care to their patients without being countermanded or threatened by federal officials. And the demands of the transgender community to provide so-called gen-der-affirming care without exception, and Secretary Becerra's efforts to use section

DocuSign Envelope ID: C6F65E73-05E0-4457-9946-2AAAF370EB6A

1557 as a tool to impose those demands on every health-care provider that receives federal funds, will on occasion conflict with a health-care provider's duty to act in the best interest of his or her patients. I am suing to protect each of the class members from these competing demands.

This concludes my sworn statement. I swear under penalty of perjury that the facts stated in this declaration are true and correct.

Dated: _8/5/2022_____

DocuSigned by:

*James Hurly*

C00G7FAC8C764F2...

JAMES HURLY, M.D.

11.     **James Hurly Answers to First Set of Interrogatories**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **Susan Neese, M.D**; **James Hurly, M.D.**; and **Jeffrey Barke, M.D.**, on behalf of themselves and others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>**Xavier Becerra**, in his official capacity as Secretary of Health and Human Services; **United States of America**,<br><br>          Defendants. | Case No. 2:21-cv-00163-Z |

**PLAINTIFF JAMES HURLY'S ANSWERS TO FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1 (To all Plaintiffs):** Describe your medical practice, including areas of specialization, services that you perform, the age range of patients treated, and any medical licenses or certifications.

**ANSWER**: I am a community-based pathologist, certified in anatomic and clinical pathology. My specialty involves rendering diagnoses in all branches of medicine based on sampling of body fluids and tissues. This encompasses all areas of the clinical laboratory, including blood bank, immunology, hematology, clinical chemistry, and microbiology. I spend most of my time rendering pathologic diagnoses based on microscopic analysis. The age range that I treat is newborns up to patients in their 90s. I am a medical doctor with an M.D. degree and a diplomate of the American Board of Pathology. I am licensed to practice by the Texas Medical Board.

**INTERROGATORY NO. 2 (To all Plaintiffs):** Describe any instances in which you have treated a transgender patient or a patient suffering from gender dysphoria,

including the patient's age, the services you provided to the patient, whether you refused to provide any services that the patient requested, and if so, why you refused to provide those services.

**ANSWER**: I do not directly treat patients. As a pathologist, I analyze lab work to confirm a patient's diagnosis for their treating physician.

**INTERROGATORY NO. 3 (To all Plaintiffs)**: Describe any instances in which you have treated a gay, lesbian, or bisexual patient, including the patient's age, the services you provided to the patient, whether you refused to provide any services that the patient requested, and if so, why you refused to provide those services.

**ANSWER**: See my answer to Interrogatory No. 2, *supra*.

**INTERROGATORY NO. 5 (To all Plaintiffs)**: Have you ever been asked "to prescribe hormone therapy to minors who are seeking to transition" or "to provide referrals to minors seeking a sex-change operation," including as described in Paragraphs 23 and 31 of the First Amended Complaint? If so, describe any such instances, including whether you provided the requested services, and if not, why you refused to do so.

**ANSWER**: See my answer to Interrogatory No. 2, *supra*.

**INTERROGATORY NO. 6 (To all Plaintiffs)**: Have you ever been asked "to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety," including as described in Paragraphs 24, 28, and 32 of the First Amended Complaint? If so, describe any such instances including whether you provided the requested services, and if not, why you refused to do so.

**ANSWER**: See my answer to Interrogatory No. 2, *supra*.

**INTERROGATORY NO. 8 (To Dr. Hurly)**: Describe all instances in which Dr. Hurly "has encountered situations in his medical practice when he must insist that

a patient acknowledge his biological sex rather than the gender identity that he asserts," including as alleged in Paragraph 27 of the First Amended Complaint.

**ANSWER**: In my practice, I have encountered situations in which patients have denied a diagnosis, wrongly claiming they cannot have it because they are no longer of a particular gender. For example, my group once diagnosed a biologic male patient with prostate cancer, but the patient refused to accept this diagnosis because he identified as a woman and insisted that he could not have a prostate and that he had a cervix instead. We had to firmly explain to this patient that he was indeed a biologic man with a prostate, and that he needed to seek urgent medical treatment for his prostate cancer.

**INTERROGATORY NO. 9 (To Dr. Hurly)**: Set forth all facts supporting the allegation in Paragraph 29 of the First Amended Complaint that "Dr. Hurly is likely to encounter transgender patients who will deny or dispute their need for health care that corresponds to their biological sex."

**ANSWER**: I have already encountered one patient who refused to accept his prostate-cancer diagnosis because he claimed to be a woman and denied that he had a prostate, and insisted that he had a cervix. I expect these types of situations and encounters to not only continue but increase, as recent empirical evidence indicates a sharp rise in the number of young people who identify as transgender. *See* Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times (June 10, 2022), https://nyti.ms/3HdQ6oI (reporting that "[t]he number of young people who identify as transgender has nearly doubled in recent years") (attached as Exhibit A); Jody L. Herman, Andrew R. Flores, and Kathryn K. O'Neill, *How Many Adults And Youth Identify As Transgender In The United States?*, The Williams Institute, UCLA School of Law (June 2022) (attached as Exhibit B).

I am ethically obligated to inform biologically male patients with prostate cancer of the fact that they have a prostate, and that they must seek treatment for prostate

cancer. It is unethical to provide so-called gender-affirming care in situations where a patient's denial of biological realities will endanger their life or safety. As more people become accustomed to thinking that they can choose their sex, or have no biological sex at all, it is inevitable that all doctors, myself included, will face these dilemmas more often.

**INTERROGATORY NO. 10 (To all Plaintiffs)**: Have you ever engaged in conduct that you believe would constitute "discrimination on the basis of gender identity" as that phrase is used in the Notification? If so, describe all instances of engaging in such conduct.

**ANSWER**: I have never engaged in conduct that *I* regard as "discrimination on the basis of gender identity," because I do not believe that informing a biologic man who has prostate cancer of his urgent need to seek treatment, and contradicting the patient's belief that he is a woman who lacks a prostate, constitutes "discrimination on the basis of gender identity" or "discrimination on the basis of sex." I am confident, however, that Secretary Becerra does not share this view, and that he will regard any refusal or unwillingness to affirm a patient's asserted gender identity as a violation of section 1557, as well as an act that discriminates "on the basis of gender identity." That is why I am seeking declaratory and injunctive relief against the Secretary.

**INTERROGATORY NO. 11 (To all Plaintiffs)**: Have you ever engaged in conduct that you believe would constitute "discrimination on the basis of sexual orientation" as that phrase is used in the Notification? If so, describe all instances of engaging in such conduct.

**ANSWER**: I have never engaged in conduct that I believe would constitute "discrimination on the basis of sexual orientation" as that phrase is used in the Notification.

**INTERROGATORY NO. 12 (To all Plaintiffs)**: Are there any services that you would refuse to provide to a transgender patient or other conduct you believe

you are likely to engage in with respect to a transgender patient that you believe would constitute "discrimination on the basis of gender identity" as that phrase is used in the Notification? If so, describe such services or conduct.

**ANSWER**: See my answers to Interrogatories Nos. 2, 5, 8, 9, and 10, *supra*.

**INTERROGATORY NO. 13 (To all Plaintiffs)**: Are there any services that you would refuse to provide to a gay, lesbian, or bisexual patient or other conduct you believe you are likely to engage in with respect to a gay, lesbian, or bisexual patient that you believe would constitute "discrimination on the basis of sexual orientation" as that phrase is used in the Notification? If so, describe such services or conduct.

**ANSWER**: There are no services that I would refuse to provide to a gay, lesbian, or bisexual patient, nor is there any other conduct that I would engage in with respect to a gay, lesbian, or bisexual patient, that I believe would constitute "discrimination on the basis of sexual orientation" as that phrase is used in the Notification.

**INTERROGATORY NO. 14 (To all Plaintiffs)**: Have you refused to perform any of the services described in paragraphs 17–19 of the First Amended Complaint (i.e., "refus[ing] to prescribe testosterone hormones to a biological woman who wishes to appear as a man," "refus[ing] to refer a biological man for a sex-change operation that would remove his penis and testicles," "refus[ing] to prescribe Truvada or PrEP drugs to homosexual men")? If so, describe such refusals, including why you refused to provide those services.

**ANSWER**: No. As a pathologist, I do not directly treat patients, prescribe patient medication, or provide referrals (except on a very limited basis to members of my family). Instead, I analyze lab work to confirm a patient's diagnosis for their treating physician.

**INTERROGATORY NO. 15 (To all Plaintiffs)** Would you refuse to perform any of the services described in paragraphs 17–19 of the First Amended Complaint if

a patient asked you to do so? If so, describe what services you would refuse to provide, and why.

**ANSWER**: The situations described in paragraphs 17–19 of the First Amended Complaint will not arise in may practice, as explained in my answer to Interrogatory No. 14.

**INTERROGATORY NO. 16 (To all Plaintiffs**): Are there any circumstances in which complying with the legal interpretation set forth in the Notification would substantially burden your exercise of religion? If so, describe such circumstances and why your religious exercise would be substantially burdened.

**ANSWER**: No. My concerns are entirely medical and professional in nature, not religious.

**INTERROGATORY NO. 17 (To all Plaintiffs**): Do you contend that the Notification has "induce[d]" you "to provide gender-affirming care even when doing so would violate the Hippocratic Oath or [your] ethical beliefs," including as alleged in Paragraph 34 of the First Amended Complaint? If so, describe any specific instances of this occurring, including the specific services that you provided that you believe violated the Hippocratic Oath or your ethical beliefs.

**ANSWER**: No, it hasn't yet. But I have a reasonable fear that Secretary Becerra will terminate federal funding for my practice and disqualify us from participating in federally funded health programs if I do not unconditionally play along with a patient's asserted gender identity, such as insisting that a biological man with gender dysphoria has a prostate and needs urgent and immediate treatment for his prostate cancer that I have diagnosed.

Insofar as the Hippocratic oath and my ethical beliefs require me to provide proper diagnosis so as not to harm a patient, the concept of "gender-affirming care" has a very strong potential of requiring me to refrain from assigning the correct diagnosis of a reproductive-organ-specific cancer to a patient who does not identify with

their biological sex and refuses to accept my diagnosis. For example, if I diagnose prostate cancer in a biologic male and this patient refuses to accept that they are male, I may be forced to refrain from correctly diagnosing prostate cancer and may even be forced to diagnose the tumor as something such as endometrial or cervical cancer. So far I have not been specifically requested to do this, but a strong potential exists that I will be requested to do this in the future and will face retaliation from the federal government if I do not.

**INTERROGATORY NO. 18 (To all Plaintiffs)**: Set forth all facts supporting your allegation in Paragraph 41 of the First Amended Complaint that Plaintiffs' claims "are typical of other members of the class, as each of them wishes to preserve the autonomy of their medical practice."

**ANSWER**: I am suing on behalf of all healthcare providers subject to section 1557 of the Affordable Care Act. My claims are typical because each of the class members, as medical professionals, wishes to provide appropriate and ethical health care to their patients without being countermanded or threatened by federal officials. And the demands of the transgender community to provide so-called gender-affirming care without exception, and Secretary Becerra's efforts to use section 1557 as a tool to impose those demands on every health-care provider that receives federal funds, will on occasion conflict with a health-care provider's duty to act in the best interest of his or her patients. I am suing to protect each of the class members from these competing demands, and in that sense my claims are typical of the other class members.

**INTERROGATORY NO. 19 (To all Plaintiffs)**: Set forth all facts supporting your allegation in Paragraph 42 of the First Amended Complaint that Plaintiffs "adequately represent the interests of the class, and they have no interests antagonistic to" the class.

**ANSWER**: The relief that we are seeking will not compel any class member to conduct his or her medical practice in any particular manner. It can only increase the autonomy of class members and provide needed clarity on what section 1557 means post-*Bostock* and how it will be enforced under Secretary Becerra's notification and directives. None of the relief that we are seeking will make any member of the class worse off, and the declaratory relief that we requesting can only help class members by clarifying their obligations under federal law.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

Gene P. Hamilton                    Jonathan F. Mitchell
Virginia Bar No. 80434              Texas Bar No. 24075463
Vice-President and General Counsel  Mitchell Law PLLC
America First Legal Foundation      111 Congress Avenue, Suite 400
300 Independence Avenue SE          Austin, Texas 78701
Washington, DC 20003                (512) 686-3940 (phone)
(202) 964-3721 (phone)              (512) 686-3941 (fax)
gene.hamilton@aflegal.org           jonathan@mitchell.law

                                    *Counsel for Plaintiffs and*
Dated: June 13, 2022                *the Proposed Classes*

**12.**     **Transcript of Deposition of James Hurly (excerpts)**

                                                    Page 1

1                IN UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF TEXAS

3                     AMARILLO DIVISION

4    SUSAN NEESE, M.D., et al.,      )

                                     )

5                                    )

          Plaintiffs,                )

6                                    )   CIVIL ACTION NO.

     VS.                             )   2:21-CV-163-Z

7                                    )

     XAVIER BECERRA, et al.,         )

8                                    )

          Defendants.                )

9

10

11   ****************************************************************

            REMOTE ORAL VIDEOTAPED DEPOSITION OF

12                  JAMES HURLY, M.D.

                    JULY 28, 2022

13                  VOLUME 1

     ****************************************************************

14

15

16

17

18

19           REMOTE ORAL VIDEOTAPED DEPOSITION OF JAMES HURLY,

20   M.D., produced as a witness at the instance of the Defendants

21   taken in the above-styled and -numbered cause on the 28th day

22   of July, 2022, from 2:12 p.m. to 3:30 p.m., before Schias K.

23   Carmon-Brown, a Certified Shorthand Reporter in and for the

24   State of Texas, reported by machine shorthand, remotely via

25   Zoom, pursuant to the Federal Rules of Civil Procedure.

Page 17

```
 1    that HHS will interpret Section 1557 to prohibit discrimination

 2    on the basis of sexual orientation.

 3                  Have you -- have you ever engaged in any conduct

 4    that you believe would constitute discrimination on the basis

 5    of sexual orientation as that phrase is used in this document?

 6         A.   No.

 7         Q.   Have you ever engaged in any conduct that you believe

 8    Secretary Becerra would regard as discrimination on the basis

 9    of sexual orientation?

10         A.   No.

11         Q.   Is there any conduct you believe you are likely to

12    engage in, in the future with respect to a gay, lesbian or

13    bisexual patient that you believe would constitute

14    discrimination on the basis of sexual orientation as that

15    phrased --

16         A.   No.

17         Q.   -- is used in this document?

18         A.   No.

19         Q.   When HHS said that it interpreted Section 1557 to

20    prohibit discrimination on the basis of sexual orientation, do

21    you believe that that harmed you in any way?

22         A.   No.

23         Q.   If the judge in this case issues a ruling stating

24    that it is permissible for health care providers to

25    discriminate on the basis of sexual orientation, do you believe
```

James Hurly                                                      July 28, 2022

Page 23

```
 1          Q.    How often?

 2          A.    Oh, gosh, maybe once or twice in my career.

 3          Q.    So suppose that based on lab work you -- you

 4    diagnosed a patient with a certain condition, who do you

 5    deliver that diagnosis to?

 6          A.    To the physician that ordered the test.

 7          Q.    And then your understanding is that the physician

 8    would deliver the diagnosis to the patient?

 9          A.    Correct.

10          Q.    Do you perform any kind of surgery on any patients?

11          A.    I do not.

12          Q.    Do you provide hormone therapy -- do you provide

13    hormone therapy of any kind to any patients?

14          A.    No, I do not.

15          Q.    So please look at interrogatory number eight, which

16    begins at the bottom of page two and your answer is on page

17    three.  In your answer, you wrote, In my practice, I have

18    encountered situations in which patients have denied a

19    diagnosis wrongly claiming they cannot have it because they are

20    no longer of a particular gender.  For example, my group once

21    diagnosed a biologic male patient with prostate cancer but the

22    patient refused to accept this diagnosis because he identified

23    as a woman and insisted that he could not have a prostate and

24    that he had a cervix instead.  We had to firmly explain to this

25    patient that he was indeed a biologic man with a prostate, and
```

A175
23-10078.784

James Hurly                                    July 28, 2022

Page 24

1    that he needed to seek urgent medical treatment for his

2    prostate cancer.  Do you see that?

3         A.   I do.

4         Q.   So the first sentence of this response says, I have

5    countered -- encountered situations, plural, and then you

6    describe one --

7         A.   Yeah.  It's one -- yeah.  It's one situation.  I have

8    had one encounter.

9         Q.   Okay.  So there -- other than the example you

10   describe, there have been no other examples of someone wrongly

11   claiming that they can't have a diagnosis because of their --

12        A.   No, only one so far.

13        Q.   Okay.  Can you just describe generally what happened

14   with the patient that you describe in this answer?

15        A.   I was informed by one of our secretaries who took a

16   phone call directly from the patient that the patient was

17   arguing with her and in denial that they had a prostate cancer

18   because they were a woman and it was not possible that they

19   could have prostate cancer and it must be a misdiagnosis and it

20   should be either cervical or endometrial cancer.

21        Q.   Did you deliver the diagnosis directly to the

22   patient?

23        A.   No, I did not.  Our secretary handled that.  And I'm

24   not sure which pathologist in our group made that diagnosis.

25        Q.   So you did not make the diagnosis to that patient?

A176
23-10078.785

Page 25

1    A.   I may have but I don't know.  There's seven of us

2    pathologists, so it may have been me.

3    Q.   Did you ever have any interaction with this patient?

4    A.   No.

5    Q.   Do you know -- strike that.

6         What did your secretary tell you about what the

7    patient had said?

8    A.   Repeated that the patient was in denial that they

9    could possibly have prostate cancer, since they were a woman.

10   Q.   Do you know -- do you know what -- how the secretary

11   responded to the patient?

12   A.   I couldn't give you specifics.  I would be

13   paraphrasing.  But she assured the patient that it was prostate

14   cancer.

15   Q.   Do you know what happened to this patient after this

16   interaction over the phone?

17   A.   No, sir, I have no idea.

18   Q.   Do you believe that your group's care for this

19   patient was medically appropriate?

20   A.   Yes.

21   Q.   Do you believe that your group -- strike that.

22        Based on your personal understanding of what it

23   means to discriminate on the basis of gender identity, do you

24   believe that your group discriminated against this patient on

25   the basis of gender identity?

# CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2023, I electronically filed the foregoing record excerpts with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*s/ Ashley C. Honold*
Ashley C. Honold