# No. 23-10078

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

SUSAN NEESE, M.D., *et al.*,

*Plaintiff-Appellees*,

v.

XAVIER BECERRA, *et al.*,

*Defendant-Appellants.*

**On Appeal from the United States District Court for the Northern District of Texas**

## BRIEF OF GENDER JUSTICE ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF APPELLANTS

Alexandra Z. Brodsky
Sean Ouellette
Adele P. Kimmel
Mollie Berkowitz
PUBLIC JUSTICE
1620 L Street NW
Suite 630
Washington, DC 20036
Phone: (202) 797-8600
abrodsky@publicjustice.net
*Counsel for Amici Curiae*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Amici Curiae:**
Public Justice
A Better Balance
Clearinghouse on Women's Issues
End Rape on Campus
Feminist Majority Foundation
Legal Momentum, the Women's Legal Defense and Education Fund
National Center for Youth Law
National Women's Law Center
Women's Law Project

**Counsel for Amici Curiae:**
Alexandra Z. Brodsky
Sean Ouellette
Adele P. Kimmel
Mollie Berkowitz
Public Justice

April 3, 2023

/s/ Alexandra Z. Brodsky
Alexandra Z. Brodsky
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ........................... i

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF AMICI CURIAE ........................................................ 1

INTRODUCTION .................................................................................. 5

ARGUMENT ......................................................................................... 6

I.    *Bostock* applies to Title IX .......................................................... 6

II.   The district court's reasoning threatens the rights of students who
      experience sex discrimination in school ...................................... 11

CONCLUSION ..................................................................................... 17

CERTIFICATE OF SERVICE ............................................................. 18

CERTIFICATE OF COMPLIANCE ..................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bostock v. Clayton Cnty.*,
    140 S. Ct. 1731 (2020) ................................................................*passim*

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) ............................................................................ 10

*Chadwick v. WellPoint, Inc.*,
    561 F.3d 38 (1st Cir. 2009) ................................................................ 12

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ............................................................................ 16

*Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*,
    No. 1:21-cv-00978, 2022 WL 816501 (D.N.M. Mar. 17, 2022) ........ 16

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) ............................................................ 7, 8

*Doe v. Univ. of Scranton*,
    No. 3:19-cv-01486, 2020 WL 5993766 (M.D. Pa. Oct. 9, 2020) ........ 16

*Est. of Brown v. Ogletree*,
    No. 11-cv-1491, 2012 WL 591190 (S.D. Tex. Feb. 21, 2012) ........... 16

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
    503 U.S. 60 (1992) ................................................................................ 7

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) ............................................................................ 16

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ............................................................... 7

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) .........................................................................5, 10

*Koenke v. St. Joseph's Univ.*,
    No. 19-4731, 2021 WL 75778 (E.D. Pa. Jan. 8, 2021) ..................... 16

*Phillips v. Martin Marietta Corp.*,
   400 U.S. 542 (1971) ...................................................................13

*Sewell v. Monroe City Sch. Bd.*,
   974 F.3d 577 (5th Cir. 2020) ...........................................6, 11, 13

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .....................................................................9

*Tingley-Kelley v. Trs. of Univ. of Pa.*,
   677 F. Supp. 2d 764 (E.D. Pa. 2010) ....................................12, 13

*Wittmer v. Phillips 66 Co.*,
   915 F.3d 328 (5th Cir. 2019) .......................................................8

**Statutes**

20 U.S.C. § 1681(a) ........................................................*passim*

20 U.S.C. § 1681(a)(2) ...........................................................9

20 U.S.C. § 1681(a)(5) ...........................................................9

20 U.S.C. § 1681(a)(6) ...........................................................9

 20 U.S.C. § 1681(a)(8) ..........................................................9

20 U.S.C. § 1681(a)(9) ...........................................................9

20 U.S.C. § 1686 ..................................................................10

42 U.S.C. § 2000e et seq. ..................................................*passim*

42 U.S.C. § 2000e–2(a) ...........................................................8

**Other Authorities**

Nondiscrimination on the Basis of Sex in Education Programs or Ac-
   tivities Receiving Federal Financial Assistance, 87 Fed. Reg.
   41,390 (proposed July 12, 2022) (to be codified at 34 C.F.R.
   pt. 106) ...........................................................................7, 12, 16

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf...................................................................14, 15

Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Just., Civ. Rts. Div., *Memorandum re: Application of* Bostock v. Clayton County *to Title IX of the Education Amendments of 1972* (Mar. 26, 2021), https://www.justice.gov/crt/page/file /1383026/download ............................................................................................7

Michelle M. Johns et al., U.S. Health & Hum. Servs. & Ctrs. for Disease Control & Prevention*, Trends in Violence Victimization and Suicide Risk by Sexual Identity Among High School Students — Youth Risk Behavior Survey, United States, 2015–2019* (2020), https://www.cdc.gov/mmwr/volumes/69/su/pdfs/su6901a3-H.pdf..............14, 15

Trevor Project, *National Survey on LGBTQ Youth Mental Health 2021* (2021), https://www.thetrevorproject.org/wp-content/uploads /2021/05/The-Trevor-Project-National-Survey-Results-2021.pdf ....................15

Trevor Project, *The Trevor Project Research Brief: Bullying and Suicide Risk among LGBTQ Youth* (2021), https://www.thetrevorproject.org/wp-content/uploads/2021/10 /The-Trevor-Project-Bullying-Research-Brief-October-2021.pdf ....................15

## STATEMENT OF AMICI CURIAE

Amici are Public Justice and eight other public interest organizations that advocate for sex equality in education. Through their litigation and other advocacy, amici work to end a range of forms of discrimination that students face at school, including, but not limited to, sexual harassment, harassment based on a student's sexual orientation or gender identity, discrimination in athletics, and discrimination based on pregnancy or parenting status. From their significant experience, amici recognize that judicial enforcement of Title IX of the Education Amendments of 1972 that is consistent with the statute's full breadth and promise is crucial to ensuring students receive the support and opportunities they need to learn and thrive in school. Amici have an interest in this case because the district court's ruling, if allowed to stand, would imperil important protections for students, including but not limited to lesbian, gay, bisexual, transgender, and queer (LGBTQ) young people.[1]

**Public Justice** is a national public interest advocacy organization that fights against abusive corporate power and predatory practices, the assault on civil rights and liberties, and the destruction of the earth's sustainability. In its Students' Civil Rights Project, Public Justice focuses on ensuring that educational institutions

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief. Appellants and Appellees consented to the filing of this brief.

comply with the Constitution and anti-discrimination laws, including Title IX, so that all students can learn and thrive.

**A Better Balance** is a national legal services and advocacy organization that uses the power of the law to advance justice for workers and students so they can care for themselves and their loved ones without jeopardizing their economic security or educations. A Better Balance regularly relies on Title VII and Title IX to protect the rights of all people, including LGBTQ people, new parents, and other caregivers, to work and learn free from discrimination.

The mission of the **Clearinghouse on Women's Issues** (CWI) is to provide information on issues relating to women, including discrimination on the basis of gender, age, ethnicity, marital status or sexual orientation, with particular emphasis on public policies that affect the economic, educational, health and legal status of women; cooperate and exchange information with organizations working to improve the status of women; and take action and positions compatible with its mission. For this reason, CWI supports Title IX protections for students in education programs and activities.

**End Rape On Campus** (EROC) works to end campus sexual violence through direct support for survivors and their communities, prevention through education, and policy reform at the campus, local, state, and federal levels. EROC envisions a world where each individual has an educational experience free from

violence, and until then, that all survivors are believed, trusted, and supported. Driven by its Centering the Margins framework, EROC aims to address and fill the disparity of resources between different communities, with the intention of centering historically excluded and systemically marginalized student survivors.

The **Feminist Majority Foundation** (FMF) is a nonprofit organization dedicated to eliminating sex discrimination and to the promotion of gender equality and women's empowerment. FMF programs focus on advancing the legal, social, economic, education, and political equality of women with men, countering the backlash to women's advancement, and recruiting and training young feminists to encourage future leadership for the feminist movement. To carry out these aims, FMF engages in research and public policy development, public education programs, litigation, grassroots organizing efforts, and leadership training programs. FMF conducts research on and supports the broad coverage and full implementation of Title IX to protect people from sex discrimination.

**Legal Momentum, the Women's Legal Defense and Education Fund** is the nation's first and longest-serving legal advocacy organization dedicated to advancing and protecting women's rights and gender equality. Through impact litigation, policy advocacy and education initiatives, Legal Momentum advances and protects rights related to Title IX and educational equity, employment and economic opportunities, reproductive justice, preventing and responding to gender-based

violence and eliminating gender bias in our justice system. Legal Momentum regularly appears at amici in federal and state cases addressing questions of sex-based discrimination.

The **National Center for Youth Law** (NCYL) is a non-profit organization that works to build a future in which every child thrives and has a full and fair opportunity to achieve the future they envision for themselves. For five decades, NCYL has worked to protect the rights of children and to ensure that they have the resources, support, and opportunities they need. As part of this work, NCYL has fought against sex discrimination in schools on behalf of LGTBQ youth.

The **National Women's Law Center** (NWLC) is a non-profit legal advocacy organization that fights to advance gender justice—in the courts, through public policy, and within our society. NWLC has worked across issues central to the lives of women and girls—especially women and girls of color, LGBTQI+ people, and low-income individuals and families. Since its founding in 1972, NLWC has worked to secure equal opportunity in education for women and girls through enforcement of the Constitution, Title IX of the Education Amendments of 1972, and other laws prohibiting sex discrimination. NWLC has participated in numerous cases to emphasize that the text of Title IX prohibits discrimination based on sexual orientation, gender identity, and transgender status, and to ensure that all people can access the education they are entitled to, free from the bars of sex discrimination.

Founded in 1974, **Women's Law Project** is a nonprofit public interest legal organization working to defend and advance the rights of women, girls, and LGBTQ+ people in Pennsylvania and beyond. Women's Law Project uses an intersectional analysis to prioritize work on behalf of people facing multiple forms of oppression based on sex, gender, race, ethnicity, class, disability, incarceration, pregnancy, and immigration status. Women's Law Project leverages impact litigation, policy advocacy, public education, and direct assistance and representation to dismantle discriminatory laws, policies, and practices and eradicate institutional biases and unfair treatment based on sex or gender.

## INTRODUCTION

Fifty-one years ago, President Nixon signed a law prohibiting sex discrimination in education. Title IX of the Education Amendments of 1972 provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The civil rights statute is "broadly written" with "a broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). And the Supreme Court has repeatedly stressed that courts "must accord" Title IX "a sweep as broad as its language." *Id.* at 173 (quoting *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521 (1982)).

This single sentence has provided essential protections for students who face a range of forms of sex discrimination. Yet the district court's opinion in this case threatens to undermine those rights. The parties agreed, below, that the reasoning of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), applies to Title IX. *See* Br. Supp. Pls.' Mot. for Summ. J., Dist. Ct. ECF No. 47 at 3. Yet the district court held that it does not. ROA.1205. In doing so, the district court unnecessarily and wrongly imperiled the rights of students who rely on Title IX's expansive protections. In this brief, amici explain why the district court was wrong to hold that *Bostock* does not apply to Title IX. Amici then discuss the stakes of that decision for students, including those who face discrimination based on a combination of their sex and another characteristic, which this Court has previously held violates Title IX. *See Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 583–85 (5th Cir. 2020).

## ARGUMENT

### I.    *Bostock* applies to Title IX.

1. In *Bostock*, the Supreme Court held that discrimination based on sexual orientation or transgender status is discrimination "on the basis of sex" that violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. 140 S. Ct. at 1743; *see also id.* at 1747. The Court explained that, whenever an employer fires a worker for being gay or transgender, sex is necessarily a but-for cause of the termination, whether or not it is the sole cause. *Id.* at 1741–42. The Court also rejected

the employers' argument that their discriminatory practices were permissible because they did not disadvantage one sex, taken as a group, over another. *Id.* at 1742–43. As the statutory text made clear, Title VII prohibits discrimination against "individuals, not groups." *Id.* at 1740.

Courts, including the Supreme Court, regularly look to Title VII case law to determine what constitutes sex discrimination under Title IX. *E.g.*, *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992); *see also* U.S. Opening Br. at 33 (collecting cases). For that reason, both the Fourth and Ninth Circuits have held that *Bostock* applies to Title IX. *Doe v. Snyder*, 28 F.4th 103, 113–114 (9th Cir. 2022); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–619 (4th Cir. 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

The U.S. Department of Education and Department of Justice have come to the same conclusion. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,531–33, 41,571 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106) (proposing Title IX regulation that defines sex discrimination to encompass discrimination based on sexual orientation or gender identity, and relying on *Bostock*); Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Just., Civ. Rts. Div., *Memorandum re: Application of* Bostock v. Clayton County *to Title IX of the Education Amendments of 1972* (Mar. 26, 2021), https://www.justice.gov/crt/page/

file/1383026/download (explaining *Bostock* applies to Title IX because the language used in Title VII and Title IX's prohibitions of sex-based discrimination is "sufficiently similar . . . as to be considered interchangeable").

2. The district court wrongly held that *Bostock* does not apply to Title IX. ROA.1174–78. In doing so, it designed a novel theory of discrimination that, it appears, would require a plaintiff to establish she was discriminated against solely because of her sex in a manner that disadvantages not just her but her sex as a class. ROA.1178–87. The district court's reasoning and conclusion cannot be reconciled with Title IX's text or Supreme Court precedent.

*First*, the district court said that *Bostock*'s logic does not translate to Title IX because of a slight variation in the relevant statutes' wording: Title VII forbids discrimination "because of . . . sex," 42 U.S.C. § 2000e–2(a), and Title IX prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681(a). But those words mean the same thing. Indeed, "*Bostock* used those phrases interchangeably throughout the decision." *Snyder*, 28 F.4th at 114 (Callahan, J.) (citing *Bostock*, 140 S. Ct. at 1737–38, 1743–45, 1753). *Bostock* therefore cannot "be limited [to Title VII] in the manner the district court suggested." *Id.*; *see also Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337–38 (5th Cir. 2019) (Ho, J., concurring) (observing that if discrimination based on sexual orientation and transgender status violates Title VII, it would also violate

Title IX because "federal statutes governing educational institutions employ language indistinguishable from Title VII").

*Second*, the district court held that Title IX bans discrimination against "each sex as a whole." ROA.1185. But Title IX bans discrimination against any "person," 20 U.S.C. § 1681(a), just as Title VII bans discrimination against any "individual," *Bostock,* 140 S. Ct. at 1740–41. So, the same textual reasons *Bostock* held Title VII "focus[es] . . . on individuals, not groups" apply equally to Title IX. *Id.* at 1740. If, in passing either statute, Congress instead wanted to outlaw discrimination against "one sex or another," or to forbid "'sexist policies' against women as a class," *id.* at 1741–42, it would have done so. Lest there be any doubt Congress could have found the right words, Title IX includes various exemptions for practices that apply to members of "one sex" or "the other sex." 20 U.S.C. § 1681(a)(2), (5), (6), (8), (9). Yet, in Title IX's general prohibition, Congress chose to protect each "person" rather than each "sex." 20 U.S.C. § 1681(a). Those variations are meaningful: "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th rev. ed. 2000)).

Congress's focus on individual "person[s]" rather than groups aligns with Title IX's purpose, as identified by the Supreme Court: "to provide *individual citizens*

9

effective protection against" discrimination. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1979). Accordingly, a school violates Title IX if it discriminates against a person based on sex, regardless of whether doing so disadvantages women as a class or men as a class. *Cf. Jackson*, 544 U.S. at 179 n.3 (noting a school violates Title IX if it punished both a boy and a girl for reporting discrimination against a girls' sports team). And *Bostock* held that discrimination against an individual based on his or her sexual orientation or gender identity is necessarily discrimination on the basis of sex. 140 S. Ct. at 1754.

*Third*, the district court reasoned that *Bostock* must not apply to Title IX because Section 1686 of Title IX states that "nothing contained herein shall be construed to prohibit any educational institution . . . from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Far from supporting the district court's conclusion, Section 1686 further demonstrates that when Congress intended to address treatment of "the different sexes" as groups—rather than discrimination against an individual "person," 20 U.S.C. § 1681(a)—it knew how to do so. Congress's decision to authorize group-based treatment in Section 1686 only underscores that in all other contexts Title IX focuses on the individual.

Title IX's application to sex-separated living facilities or other sex-separated programs is simply not at issue in this case, *see* U.S. Opening Br. at 38, just as it was not at issue in *Bostock*, 140 S. Ct. at 1753. The only question presented is whether

discrimination against a "person" based on sexual orientation or transgender status is discrimination against a "person" "on the basis of sex." 20 U.S.C. § 1681(a). The answer to that question is yes.

## II.    The district court's reasoning threatens the rights of students who experience sex discrimination in school.

1. The decision below does not just contradict Title IX's text and precedent. It also threatens to deprive students of crucial protections against sex discrimination that this Court has previously affirmed. If the district court were right, schools would be free to engage in the many forms of discrimination that target students based on a combination of their sex and another characteristic, such as their race or parenting status, rather than discrimination against men or women "as a whole," ROA.1185. That is not, and should not be, the law.

Consider, for example, *Sewell v. Monroe City School Board*, 974 F.3d 577 (5th Cir. 2020). There, the student-plaintiff claimed that "school officials mistreated him not just because he is African American or male, but because he is both." *Id.* at 583. For example, the school's dean of students harassed the plaintiff based on "a discriminatory view that African American males should not have two-toned blonde hair." *Id.* at 584. "[W]hite students and black students wore a variety of dyed hairstyles," but the plaintiff "was the only student punished . . . for violating" the school's policy against dyed hair. *Id.* Because the plaintiff had pleaded sex was a but-for cause of the discrimination, he had plausibly alleged a Title IX violation. *Id.*

11

at 584–86. That was true even though sex was not the sole motivation for the discipline, and male students "as a whole" were not disadvantaged by the policy, ROA.1185.

Women with children also often experience discrimination based on a combination of their sex and another characteristic: their parenting status. *See, e.g.*, 87 Fed. Reg. at 41,513 (noting school discrimination against "mothers," who are "often denied" educational and "professional development opportunities"). Much of this discrimination is based on stereotypes that mothers, assumed to be primary caregivers for their children, will be distracted from work or school by their parenting duties. *See, e.g.*, *id.* at 41,516 (noting "that sex stereotypes about who bears responsibility for raising children are still common and may affect student and employee-parents in accessing educational opportunities"); *see also Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009) (noting discriminatory "assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities"). For example, one woman was denied entry to the University of Pennsylvania because its admissions committee "stereotyp[ed] her as a busy mother . . . who would have a difficult time handling both graduate school and her childcare responsibilities." *Tingley-Kelley v. Trs. of Univ. of Pa.*, 677 F. Supp. 2d 764, 777 (E.D. Pa. 2010). That stereotype was not one about women "as a whole,"

or about sex on its own, but about women with children. Still, it was impermissible. *Id.* at 781.

Any argument to the contrary was, by the time the University of Pennsylvania applicant filed her suit, foreclosed by *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971). There, the Supreme Court permitted a Title VII claim challenging a company's ban on hiring women with young children, but not men with young children. The Court did so over the employer's objection that its policy "depended not only on the employee's sex as a female but also on the presence of another criterion—namely, being a parent of young children." *Bostock*, 140 S. Ct. at 1743. "The company maintained, too, that it hadn't violated the law because, as a whole, it tended to favor hiring women over men." *Id.* The Supreme Court was not convinced that the policy therefore did not violate Title VII. *See Martin Marietta*, 400 U.S. at 544. "That an employer discriminates intentionally against an individual only in part because of sex supplies no defense to Title VII." *Bostock*, 140 S. Ct. at 1743.

The district court said the opposite was true of Title IX—that the statute, unlike Title VII, only forbids single-motive discrimination against men or women "as a whole." ROA.1185. If that were true, the mother stereotyped by the University of Pennsylvania and the black male student in *Sewell* would not have had Title IX claims. After all, neither was discriminated against solely because of his or her sex in a manner that disadvantaged that "sex as a whole." Rather, the plaintiffs in both

cases were discriminated against based on their sex combined with "the presence of another criterion." *Bostock*, 140 S. Ct. at 1743. The district court's misreading of both *Bostock* and Title IX, then, would permit these grave forms of discrimination that courts, including this one, have consistently rejected as inconsistent with Title IX.

2. Its misreading would also, for straightforward reasons, put LGBTQ students at risk for discrimination, including severe and pervasive harassment. According to a recent national survey of LGBTQ students, 76.1% had been verbally harassed based on their sexual orientation, gender expression, or gender identity over the last year. Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* 19 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf. Three in ten had been physically harassed, and 12.5% had been assaulted, for the same reason. *Id*. And another study found that lesbian, gay, and bisexual youth are bullied at nearly twice the rate of their heterosexual peers. Michelle M. Johns et al., U.S. Dep't of Health & Hum. Servs. & Ctrs. for Disease Control & Prevention, *Trends in Violence Victimization and Suicide Risk by Sexual Identity Among High School Students — Youth Risk Behavior Survey, United States, 2015–2019* 19 (2020), https://www.cdc.gov/mmwr/volumes/69/su/pdfs/su6901a3-H.pdf.

This harassment poses a grave threat to students' education. Sexual orientation- and gender identity-based harassment leads to lower academic performance and grade point averages, avoidance of school functions and extracurriculars, and higher rates of absenteeism. Kosciw, *supra*, at 10–13. It also leads to "lower educational aspirations." *Id.* at 35. Younger students, for example, are more likely to drop out of school and less likely to plan to attend college if they have been subjected to severe anti-LGBTQ harassment. *Id.* at 36. Harassment also has significant effects on LGBTQ students' mental health. In a 2021 study, LGBTQ students who reported being bullied in the past year were three times more likely to have attempted suicide during the same period than those who had not been bullied. The Trevor Project, *The Trevor Project Research Brief: Bullying and Suicide Risk among LGBTQ Youth* 2 (2021), https://www.thetrevorproject.org/wp-content/uploads/2021/10/The-Trevor-Project-Bullying-Research-Brief-October-2021.pdf.[2]

---

[2] Rates of suicidality among LGBTQ youth are devastatingly high. In one recent study, 46.8% of LGB youth reported seriously considering suicide, compared to 14.5% of heterosexual peers. Johns, *supra*, at 23 tbl.2. Over 40% of lesbian, gay, and bisexual youth reported making a suicide plan, and almost a quarter had attempted suicide. *Id*. In a survey published last year, 52% of transgender and nonbinary youth reported considering suicide and 20% reported having attempted suicide. The Trevor Project, *National Survey on LGBTQ Youth Mental Health 2021* 3 (2021), https://www.thetrevorproject.org/wp-content/uploads/2021/05/The-Trevor-Project-National-Survey-Results-2021.pdf. Nearly one-third of transgender students who were harassed at school attempted suicide. *The Trevor Project Research Brief: Bullying and Suicide Risk among LGBTQ Youth, supra,* at 2.

Fortunately, Title IX—rightfully construed—offers important protections against such anti-LGBTQ harassment. Just as Title VII requires employers to address sex-based harassment against workers, Title IX requires schools to address sex-based harassment against students. *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281–82 (1998) (recognizing schools' responsibility to address sexual harassment of students by teachers, analogizing to employer liability under Title VII); *see also Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (explaining schools may be liable for failing to address student-on-student harassment). Because, per *Bostock*, anti-LGBTQ discrimination is inherently sex discrimination, anti-LGBTQ harassment is inherently sex-based harassment. So, Title IX requires schools to address anti-LGBTQ harassment. *See, e.g.*, *Doe v. Univ. of Scranton*, No. 3:19-cv-01486, 2020 WL 5993766, at *5 n.61 (M.D. Pa. Oct. 9, 2020); *Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, No. 1:21-cv-00978, 2022 WL 816501, at *4 (D.N.M. Mar. 17, 2022); *Koenke v. St. Joseph's Univ.*, No. 19-4731, 2021 WL 75778, at *2 (E.D. Pa. Jan. 8, 2021); *Est. of Brown v. Ogletree*, No. 11-cv-1491, 2012 WL 591190, at *16–17 (S.D. Tex. Feb. 21, 2012); *see also* 87 Fed. Reg. at 41,568–69, 41,571–75, 41,577–78 (proposing Title IX regulation that requires schools to address harassment based on sexual orientation or gender identity).

However, if the district court were right about Title IX's scope, the statute would not require schools to address anti-LGBTQ harassment. That would have devastating impacts on students. If this Court were to adopt the district court's erroneously narrow view of Title IX, schools throughout the Fifth Circuit could ignore severe and pervasive harassment of LGBTQ youth—even as that harassment drove students out of school and put their lives at risk.

It is good news, then, that for the reasons explained above and in the United States' opening brief, the district court was wrong. *Bostock* applies to Title IX, which prohibits discrimination based on sexual orientation and transgender status.

## CONCLUSION

The Court should vacate the judgement below.

April 3, 2023                                    Respectfully submitted,

                                                /s/Alexandra Z. Brodsky
                                                Alexandra Z. Brodsky
                                                Sean Ouellette
                                                Adele P. Kimmel
                                                Mollie Berkowitz
                                                PUBLIC JUSTICE
                                                1620 L Street NW
                                                Suite 630
                                                Washington, DC 20036
                                                Phone: (202) 797-8600
                                                abrodsky@publicjustice.net

                                                *Counsel for Amici Curiae*

17

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this Brief of Amici Curiae with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on April 3, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Alexandra Z. Brodsky
Alexandra Z. Brodsky

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(4) because it contains 4,003 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and typestyle requirements of Rule 32(a) and Fifth Circuit Rule 32.1 because it has been prepared using Microsoft Office Word and is set in 14-point Times New Roman font.

April 3, 2023

/s/ Alexandra Z. Brodsky
Alexandra Z. Brodsky