No. 23-10078

# In the United States Court of Appeals for the Fifth Circuit

———————————

SUSAN NEESE; JAMES HURLY,

*Plaintiffs-Appellees*,

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
HEALTH AND HUMAN SERVICES; UNITED STATES OF AMERICA,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
Case No. 2:21-cv-00163-Z

———————————

## BRIEF FOR PLAINTIFFS-APPELLEES

———————————

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs | Plaintiffs' Counsel |
|---|---|
| • Susan Neese<br>• James Hurly | Jonathan F. Mitchell<br>MITCHELL LAW PLLC<br><br>Gene P. Hamilton<br>AMERICA FIRST LEGAL FOUNDATION |

| Defendants | Defendants' Counsel |
|---|---|
| • Xavier Becerra<br>• United States of America | Charles W. Scarborough<br>Ashley C. Honold<br>Jeremy Newman<br>Brian Stoltz<br>UNITED STATES DEPARTMENT OF JUSTICE |

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

The plaintiffs-appellees agree with the government that oral argument is appropriate and would assist the Court in its consideration of this appeal.

# TABLE OF CONTENTS

Certificate of interested persons ...............................................................i

Statement regarding oral argument ........................................................ii

Table of contents...................................................................................iii

Table of authorities ............................................................................... v

Statement of jurisdiction ...................................................................... 2

Statement of the issues.......................................................................... 2

Statement of the case ............................................................................ 2

    I.     Section 1557 of the Affordable Care Act and *Bostock* ........................... 2

    II.    Secretary Becerra's Notification of May 10, 2021 ............................. 5

    III.   Dr. Susan Neese ................................................................. 7

    IV.   Dr. James Hurly ...............................................................11

    V.    The district-court proceedings ...........................................11

Summary of argument............................................................................ 13

Standard of review ................................................................................ 15

Argument ............................................................................................... 16

    I.     The district court correctly held that the plaintiffs have Article III standing to challenge Secretary Becerra's Notification of May 10, 2021................................................................................. 16

         A.    The plaintiffs need not demonstrate an "intention to engage in course of conduct arguably affected with a constitutional interest, but proscribed by a statute"................ 17

         B.    The Notification presents a "credible threat" that the Secretary will take enforcement action against the plaintiffs unless they change their behavior ............................. 21

         C.    The Notice of Proposed Rulemaking has no relevance to the plaintiffs' standing and does not obviate their Article III injuries in any event .........................................................28

II.   The district court correctly held that Secretary Becerra's
      Notification of May 10, 2021 is reviewable under the APA .............. 38

      A.   The Notification is final agency action under 5 U.S.C.
           § 704 ............................................................................................... 39

      B.   The post-enforcement judicial review provided by section
           1557 and Title IX is not an "adequate remedy" within the
           meaning of 5 U.S.C. § 704 .................................................... 43

      C.   *Thunder Basin* does not preclude a preenforcement
           challenge to the Secretary's Notification ................................. 46

III.  The district court correctly held that Secretary Becerra's
      Notification of May 10, 2021, should be held unlawful and set
      aside ........................................................................................................ 48

      A.   The Secretary's Notification misconstrues the holding of
           *Bostock* .............................................................................................. 48

      B.   *Bostock* did not purport to resolve the meaning of sex
           discrimination in Title IX or section 1557 ............................... 52

Conclusion ............................................................................................................ 54

Certificate of service ............................................................................................ 55

Certificate of compliance .................................................................................... 56

Certificate of electronic compliance .................................................................... 57

Addendum .......................................................................................................................

iv

# TABLE OF AUTHORITIES

**Cases**

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) ...............17, 26

*Biden v. Texas*, 142 S. Ct. 2528 (2022) ............................................................ 31, 42

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ...........................................passim

*Bowsher v. Synar*, 478 U.S. 714 (1986)...................................................................... 16

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) .............................................. 46

*Carney v. Adams*, 141 S. Ct. 493 (2020) ................................................................... 28

*Chamber of Commerce v. Federal Election Commission*, 69 F.3d 600 (D.C. Cir. 1995) ................................................................................................................ 21

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)........................................... 25, 27

*Clean Air Implementation Project v. EPA*, 150 F.3d 1200 (D.C. Cir. 1998) ............... 21

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986).........................34

*Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022) .................................................................................22

*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020) ........................................................................ 31

*Diamond v. Charles*, 476 U.S. 54 (1986) ....................................................................26

*Doe v. Bolton*, 410 U.S. 179 (1973) ........................................................................... 17

*Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508 (7th Cir. 2021)....................22

*El Paso Electric Co. v. FERC*, 667 F.2d 462 (5th Cir. 1982) .....................................29

*Ex parte Young*, 209 U.S. 123 (1908) ...................................................................20, 44

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................ 18

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167 (2000)................................................................................................28

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ................................................................. 25

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019) ....................48

*Hill v. Colorado*, 530 U.S. 703 (2000) ....................................................................... 25

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................ 17, 25, 26

*In re Louisiana Crawfish Producers*, 852 F.3d 456 (5th Cir. 2017) ............................ 15

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) .................................................... 38

*Kamen v. Kemper Financial Services*, 500 U.S. 90 (1991) ......................................... 52

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) ........................................................................................... 16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................. 16

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ....................................... 17

*Nat'l Wildlife Federation v. EPA*, 286 F.3d 554 (D.C. Cir. 2002) ............................ 34

*National Treasury Employees Union v. Cornelius*, 617 F. Supp. 365 (D.D.C. 1985) ......................................................................................................... 20

*Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318 (6th Cir. 2021) ....................................... 53

*Public Citizen, Inc. v. U.S. Dep't of Health & Human Services*, 332 F.3d 654 (D.C. Cir. 2003) .............................................................................. 34

*Roark & Hardee LP v. City of Austin*, 522 F.3d 533 (5th Cir. 2008) ......................... 15

*Sackett v. EPA*, 566 U.S. 120 (2012) ................................................................. 14, 45

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ......................................................... 42

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021) .......................................................... 42

*Steffel v. Thompson*, 415 U.S. 452 (1974) ..................................................... 16, 26, 44

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ..................................................... 17, 23, 25

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................... 17, 26, 27, 38

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ................................................... passim

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ......................................... 38, 46

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016) .......................... 39

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................... 42

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ............................ 26

*Whole Woman's Health v. Jackson*, 13 F.4th 434 (5th Cir. 2021) ............................... 21

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) .................................. passim

*Williams Natural Gas Co. v. FERC*, 872 F.2d 438 (D.C. Cir. 1989) ......................... 34

**Statutes**

20 U.S.C. § 1681(a) ..................................................................................... 3, 50

20 U.S.C. § 1681(a)(1)–(9) ................................................................................ 3

20 U.S.C. § 1682 ..................................................................................... 44, 47

20 U.S.C. § 1683 ................................................................................ 14, 47, 48

28 U.S.C. § 1291 ............................................................................................ 2

28 U.S.C. § 1331 ....................................................................................... 2, 46

42 U.S.C. § 2000e-2(a)(1)–(2) .......................................................................... 3

5 U.S.C. § 702 ........................................................................................ 19, 20

5 U.S.C. § 704 ................................................................................ 38, 39, 43, 44

5 U.S.C. § 706 ............................................................................................ 22

5 U.S.C. § 706(2)(A) ................................................................................... 1, 12

5 U.S.C. § 706(2)(B) ..................................................................................... 19

5 U.S.C. § 706(2)(C) ..................................................................................... 19

Tex. Health & Safety Code § 171.207(a) ............................................................. 24

**Rules**

Dep't of Health & Human Services, *Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking*, 87 Fed. Reg. 47,824 (Aug. 4, 2022) ...................................................................... 32

Department of Health And Human Services, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27,984 (May 25, 2021) ..................................................................... 1, 5

**Other Authorities**

Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times ( June 10, 2022).....................................................10

Jody L. Herman, Andrew R. Flores, and Kathryn K. O'Neill, *How Many Adults And Youth Identify As Transgender In The United States?*, The Williams Institute, UCLA School of Law ( June 2022)..............................11

Oliver Wendell Holmes, *The Path of the Law*, 110 Harv. L. Rev. 991 (1997) ............................................................................................................43

On May 10, 2021, Secretary Becerra issued a "Notification of Interpretation and Enforcement," which declares that section 1557 of the Affordable Care Act prohibits "discrimination on the basis of sexual orientation" and "discrimination on the basis of gender identity." *See* Department of Health and Human Services, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27,984 (May 25, 2021) (ROA.111-114). The Secretary's Notification not only announces the Department's views, but threatens to enforce this interpretation of the statute against every health program or activity that receives federal funds. *See id.* at 27,894 (ROA.111-112) ("[B]eginning May 10, 2021, the Department of Health and Human Services (HHS) will interpret *and enforce* section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include: Discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity." (emphasis added)).

The Secretary's Notification misconstrues section 1557 and the holding of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and the district court correctly held that the Notification should be "set aside" as "not in accordance with law." 5 U.S.C. § 706(2)(A); ROA.1205. This Court should affirm the vacatur of the Notification. The Court should also hold that *Bostock* does not prohibit discrimination on the basis of "sexual orientation" or "gender identity," but only discrimination on account of "sex"—and it allows discriminatory actions against homosexual, bisexual, or transgender individuals

so long as the same action would have taken against an identically situated individual of the opposite biological sex.

## STATEMENT OF JURISDICTION

The district court's jurisdiction rests on 28 U.S.C. § 1331. The appellate jurisdiction of this Court rests on 28 U.S.C. § 1291, as the defendants are appealing a final judgment. ROA.1205-1206. The district court entered judgment on November 22, 2022, and the defendants filed their notice of appeal on January 20, 2023. ROA.1205-1207.

## STATEMENT OF THE ISSUES

1.    Whether the plaintiffs have Article III standing to challenge the Notification of May 10, 2021.

2.    Whether the Notification of May 10, 2021, is reviewable under the APA.

3.    Whether the Notification of May 10, 2021, should be "held lawful and set aside" under section 706 of the APA.

## STATEMENT OF THE CASE

### I.    Section 1557 Of The Affordable Care Act And Bostock

Section 1557 of the Affordable Care Act provides:

> [A]n individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under, any health program or activity, any part of which is receiving Federal financial assistance . . . .

42 U.S.C. § 18116(a). None of the anti-discrimination statutes mentioned in section 1557 prohibit discrimination on the basis of "sexual orientation" or "gender identity." Title IX, however, prohibits educational institutions that receive federal funds from discriminating "on the basis of sex."[1]

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that Title VII, which prohibits employers from discriminating "because of [an] individual's . . . sex,"[2] prohibits employers from firing or refusing to hire individuals "for being homosexual or transgender." *Id.* at 1737; *id.* at 1741; *id.* at 1763. *Bostock* explained that an employer who fires someone for conduct or personal attributes that it would tolerate in a person of the opposite biological sex has made the employee's sex the "but-for cause" of his discharge, and that (in the Court's view) automatically violates the command of Title VII:

> If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an

---

1. 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). Title IX's prohibition on "sex" discrimination is subject to many exceptions. *See, e.g.*, 20 U.S.C. § 1681(a)(1)-(9).

2. 42 U.S.C. § 2000e-2(a)(1)-(2).

employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge.

*Bostock*, [140 S. Ct. at 1741-42](). *Bostock* also makes clear that an employer does *not* violate Title VII if it fires an employee for conduct or personal attributes that it would not tolerate in an employee of the opposite biological sex:

> Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Bostock*, [140 S. Ct. at 1742](). *Bostock* does not prohibit employers from discriminating on account of sexual orientation or gender identity, so long as they do not engage in "sex" discrimination when doing so.

For example, *Bostock* does not prohibit discrimination against bisexual employees or job applicants, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman. *Bostock* also allows employers to discriminate against homosexual or transgender employees or job applicants, so long as they do so according to rules that apply equally to both sexes and would lead to the same result if the employee's biological different were different. An employer, for example, may decide that it will not employ any person, male or female, who takes testosterone supplements—regardless of whether those supplements are being taken by a biological woman who wants to appear as a man, or by a biological man who wants bigger muscles. Or an employer may decide that it will not employ any person, male or female, who has undergone surgery to modify their genitals. Policies of that sort obviously discriminate against transgender individuals, but

they do not constitute "sex" discrimination because the rules apply equally to both biological sexes. *See Bostock*, 140 S. Ct. at 1746-47 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

## II.   SECRETARY BECERRA'S NOTIFICATION OF MAY 10, 2021

On May 10, 2021, Secretary Becerra issued a "Notification of Interpretation and Enforcement," which declares that section 1557 of the Affordable Care Act prohibits "discrimination on the basis of sexual orientation" and "discrimination on the basis of gender identity" by health-care providers that receive federal funds. *See* Department of Health And Human Services, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27,984 (May 25, 2021) (ROA.111-114). The Notification claims that this interpretation of section 1557 is "consistent . . . with *Bostock* and Title IX." ROA.111 (footnotes omitted); ROA.113 (same).

The Notification of May 10, 2021, however, categorically equates discrimination on account of sexual orientation and gender identity with "sex" discrimination. Yet there are many ways in which health-care providers can discriminate against homosexual, bisexual, or transgender patients without engaging in "sex" discrimination under *Bostock*, especially when it comes to denying or withholding controversial treatments demanded by these patients.

Consider a health-care provider who refuses to prescribe testosterone supplements to a biological woman who wishes to appear more masculine. If that provider would have equally refused to prescribe testosterone supple-

ments to a biological man who wishes to appear more masculine, then there is no "sex" discrimination under *Bostock*. Or consider a health-care provider who refuses to refer a biological man for a sex-change operation that would remove his penis and testicles. As long as that provider would have equally refused to refer a biological female for genital-modification surgery, then there is no "sex" discrimination under *Bostock*. Or consider a health-care provider who refuses to prescribe Truvada or PrEP drugs to homosexual men because he does not wish to facilitate homosexual sodomy, which he regards as immoral or contrary to his religious beliefs. So long as that provider would likewise refuse to prescribe Truvada or PrEP drugs to female patients, then he has not engaged in "sex" discrimination.

Yet the Becerra edict would consider all of this a violation of section 1557, because it falsely asserts that *Bostock* prohibits discrimination "on the basis of sexual orientation" or "gender identity." ROA.112 ("The *Bostock* majority concluded that the plain meaning of "because of sex" in Title VII necessarily included discrimination because of sexual orientation and gender identity."). *Bostock* held nothing of the sort. It remains legal after *Bostock* to "discrimi-nate" against homosexual, bisexual, or transgender individuals, so long as one does not treat a biological man differently from how he would treat an identically situated biological woman.

## III. Dr. Susan Neese

Plaintiff Susan Neese is an internal medicine specialist in Amarillo, Texas. She is affiliated with Baptist Saint Anthony's Hospital, which receives federal money and is subject to section 1557. ROA.103.

Dr. Neese's views on transgenderism are nuanced. She has treated patients with gender dysphoria and has on occasion prescribed hormone therapy for them. But she does not believe that hormone therapy or sex-change operations are medically appropriate for everyone who asks for them, and she will occasionally decline to prescribe hormone therapy or provide referrals for sex-change operations. ROA.103-104.

Dr. Neese has several patients who are transgender or suffering from gender dysphoria. ROA.420. These include female-to-male transgender patients, as well as male-to-female transgender patients. *See id.* Dr. Neese manages their hormones and their other medical conditions. *See id.* These transgender patients are all in their 30s or 40s. *See id.*

In one instance, Dr. Neese declined to take on a new transgender patient who was 16 years old. ROA.420. Dr. Neese had never seen this patient before, but the patient's mother was a longstanding patient of Dr. Neese. *See id.* The patient's mother asked Dr. Neese to help her teenager obtain transition hormones. *See id.* Dr. Neese did not take on this patient because she was uncomfortable taking a teenager transition due to the complexity of the medical and emotional issues involved. *See id.* In addition, Dr. Neese does not believe that the brains of minors are fully mature or that they fully understand the

consequences of their actions. *See id.* Most of the other transgender patients who come to Dr. Neese have already transitioned and she maintains their care. *See id.* But Dr. Neese is categorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning. *See id.*

Dr. Neese is also reluctant to prescribe hormone therapy or assist a patient in a gender transition absent a longstanding relationship with that patient. ROA.420. Dr. Neese believes that sometimes the appropriate response to gender dysphoria is counseling and psychological care rather than hormone therapy, as there is risk of suicide if the wrong option is pursued. *See id.* It is difficult for a primary-care physician to discern whether hormone therapy is appropriate absent a longstanding doctor-patient relationship, and Dr. Neese believes that a longstanding relationship is essential to ensure that she recommends appropriate responses to gender dysphoria, consistent with her duty to do no harm. *See id.*

Dr. Neese has encountered situations in which the provision of "gender affirming" care to transgender patients or the accommodation of a patient's denial of biological realities will endanger their life or safety. ROA.421. For example, one of Dr. Neese's adult patients is a late-30s biological female who identifies as male but never had sex-reassignment surgery. *See id.* This patient has frequently refused necessary preventive care that Dr. Neese has strongly recommended. *See id.* For example, this patient refused to allow Dr. Neese to conduct a pap smear for 10 years, and refuses to allow Dr. Neese to

conduct breast examinations. *See id.* The patient also refuses to believe that she has a uterus or ovaries, and refuses to accept referrals to specialists for care that implicates the patient's status as a biological woman. *See id.*

Recently, this patient started having pelvic pain and bladder issues but refused to allow Dr. Neese to conduct a pelvic examination. ROA.421. The patient finally allowed Dr. Neese to conduct a pelvic examination in July of 2022. *See id.* Dr. Neese recommended that the patient undergo a pelvic ultrasound, but the patient refuses to undergo this procedure because it would be conducted transvaginally, and the patient does not want medical personnel to discover the patient's vagina. *See id.* Dr. Neese has tried gently and firmly to explain that the patient should undergo this pelvic ultrasound because it could reveal cervical or ovarian cancer. *See id.* Yet the patient insists that the risk of cervical or ovarian cancer is extremely low and that the pelvic ultrasound is unnecessary. *See id.*

Dr. Neese has three options for responding to this situation, all of which are unpalatable. One option is to terminate her doctor-patient relationship with this individual and insist that the patient seek care from a different primary-care physician. If she does that, however, Secretary Becerra could determine that Dr. Neese violated section 1557 and terminate federal funding for her medical practice. Another option is to insist that this patient seek and obtain preventive care consistent with the patient's status as a biological woman. This also exposes Dr. Neese to loss of federal funding and lawsuits under Secretary Becerra's interpretation of section 1557. A final option is to

play along with the patient's asserted gender identity and indulge the patient's denials of health risks. This exposes Dr. Neese to a medical-malpractice lawsuit if the patient turns out to have cancer (or some other condition) that goes untreated. It is also incompatible with Dr. Neese ethical duties as a medical provider. ROA.421-422.

Dr. Neese is also treating male-to-female transgender patients. ROA.420. All of these patients are in their mid 30s to 40s, so Dr. Neese has not yet had to deal with issues regarding prostate-cancer screening. ROA.422. But Dr. Neese expects issues to arise where a male-to-female transgender patient resists the need for prostate-cancer screening. *See id.* In these situations, Dr. Neese will confront the same trilemma discussed in the previous paragraph, where her responsibilities as a medical provider conflict with Secretary Becerra's demands for gender-affirming care. *See id.*

Because Dr. Neese works as a general practitioner and primary-care physician, she will likely have additional future patients with gender dysphoria, as well as patients who request care that Dr. Neese is unable or unwilling to provide. ROA.422. This is especially likely given recent empirical evidence showing a sharp rise in the number of young people who identify as transgender. *See* Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, New York Times (June 10, 2022), https://nyti.ms/3HdQ6oI (reporting that "[t]he number of young people who identify as transgender has nearly doubled in recent years") (ROA.426-431); Jody L. Herman, Andrew R. Flores, and Kathryn K. O'Neill, *How*

*Many Adults And Youth Identify As Transgender In The United States?*, The Williams Institute, UCLA School of Law ( June 2022) (ROA.433-458).

## IV.  DR. JAMES HURLY

Plaintiff James Hurly is a board-certified pathologist in Amarillo, Texas. He is employed by the Amarillo Pathology Group, which receives federal money and is subject to section 1557. ROA.104.

Dr. Hurly's views on transgenderism are nuanced. Although he recognizes that some biological men may identify as women (and vice versa), he has encountered situations when he must insist that a patient acknowledge his biological sex rather than the gender identity that he asserts. ROA.460. Sometimes his patients have denied a diagnosis because they wrongly insist that they no longer belong to a particular biological sex. *See id.* For example, Dr. Hurly's group once diagnosed a biological male patient with prostate cancer, but the patient refused to accept this diagnosis because the patient identified as a woman and insisted that it was impossible for a woman to have a prostate. *See id.* Dr. Hurly's group had to firmly explain to this patient that the patient was indeed a biological man with a prostate and needed to seek urgent medical treatment. *See id.* Dr. Hurly expects these types of situations and encounters to not only continue but increase, given the sharp rise in young people who identify as transgender. *See id.*; *see also supra* at 10-11.

## V.  THE DISTRICT-COURT PROCEEDINGS

Dr. Neese and Dr. Hurly brought a class-action lawsuit against Secretary Becerra and the United States, on behalf of all health-care providers subject

to Section 1557. ROA.107. They sought relief under section 706 of the APA, which requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A). ROA.108-109. They also sought a declaratory judgment that section 1557 does not prohibit discrimination on account of sexual orientation and gender identity, as Secretary Becerra claims, but that it prohibits only acts in which a provider would have acted differently toward an identically situated member of the opposite biological sex. ROA.108-109. They also sought to enjoin Secretary Becerra from using or enforcing the interpretation of section 1557 that appears in the Notification of May 10, 2021. ROA.109.

The district court certified a class of all health-care providers subject to Section 1557 of the Affordable Care Act. ROA.1204; ROA.1150-1166. Then it granted summary judgment in part to Dr. Neese and Dr. Hurly. ROA.1205-1206; ROA.1167-1192. The district court agreed that Secretary Becerra's Notification of May 10, 2021, should be held unlawful and set aside under section 706 of the APA. ROA.1205. Then it issued declaratory relief that went beyond what the plaintiffs had requested, declaring that *Bostock*'s holding was categorically inapplicable to Title IX and section 1557 of the ACA. ROA.1205; *see also* ROA.1174 ("*Bostock* does not apply to Section 1557 or Title IX."). The district court, however, denied the plaintiffs' request for injunctive relief because the plaintiffs did not brief the factors relevant to the propriety of an injunction. ROA.1205; ROA.1187 ("The Court, however, will

not assess the propriety of injunctive relief because Plaintiffs do not brief factors relevant to the appropriateness of injunctive relief.").

The defendants filed a timely notice of appeal.

## SUMMARY OF ARGUMENT

The district court correctly held that the plaintiffs have Article III standing to challenge the Notification of May 10, 2021. The Secretary's Notification not only announces the Department's interpretation of section 1557, but threatens to enforce this interpretation of the statute against every health program or activity that receives federal funds. ROA.111 ("[B]eginning May 10, 2021, the Department of Health and Human Services (HHS) will interpret *and enforce* section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include: Discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity." (emphasis added)). The plaintiffs claim that the Secretary is misinterpreting *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and they claim that Secretary's "Notification" threatens them with loss of federal funds if they practice medicine in accordance with their ethical beliefs. ROA.103-107.[3] The plain-

---

3.   *See also* ROA.423-424 (Dr. Neese) ("I have a reasonable fear that Secretary Becerra will terminate federal funding for my practice and disqualify us from participating in federally funded health programs if I do not provide everything a transgender patient might demand, or if I recommend preventive care that accords with the biological sex (rather than the gender identity) of my transgender patients."); ROA.461 (Dr. Hurly) ("I have a reasonable fear that Secretary Becerra will terminate federal funding for my practice and disqualify us from participating in federally funded health programs if I do not unconditionally play along with a pa-

tiffs have every right to seek pre-enforcement relief to challenge the Secretary's interpretation of *Bostock*. They are not required to await a Department enforcement action before asserting their rights under federal law, and they are not required to endure the *in terrorem* effects of the Secretary's Notification, which is threatening and intimidating health-care providers throughout the United States.

The district court was equally correct in holding that the Secretary's Notification is reviewable under the Administrative Procedure Act. The Notification qualifies as "final agency action" under 5 U.S.C. § 704 because it rejects the plaintiffs' interpretation of *Bostock* and instructs HHS to "enforce" section 1557 in accordance with the Secretary's views. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). The defendants are wrong to claim that the plaintiffs would have an "adequate remedy" by forgoing preenforcement review and waiting until HHS initiates enforcement proceedings against them, because they would have to risk the loss of federal funding in those proceedings. *See Sackett v. EPA*, 566 U.S. 120 (2012). Finally, the defendants cannot show that Congress implicitly precluded pre-enforcement review under the APA because the Title IX statute expressly preserves the availability of "judicial review as may otherwise be provided by law." 20 U.S.C. § 1683.

---

tient's asserted gender identity, such as insisting that a biological man with gender dysphoria has a prostate and needs urgent and immediate treatment for his prostate cancer that I have diagnosed.").

The Court should affirm the district court's decision to "hold unlawful and set aside"[4] the Notification under section 706 of the APA, regardless of whether it agrees with the district court's holding that *Bostock* is categorically inapplicable to Title IX and section 1557. Even if this Court were to assume or hold that *Bostock* applies to Title IX and section 1557, the Notification should still be vacated because it misconstrues the holding of *Bostock*. *Bostock* does not prohibit "discrimination on the basis of sexual orientation" or "discrimination on the basis of gender identity." It prohibits only discrimination on the basis of *sex*, and it allows discrimination against homosexuals or transgender individuals if (and only if) the same action would have been taken against an identically situated member of the opposite biological sex.

## STANDARD OF REVIEW

Each of the issues on this appeal presents questions of law subject to de novo review. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) ("[W]e review all justiciability issues, including standing and ripeness, de novo."); *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) ("We review grants of summary judgment *de novo*, applying the same standard as the district court.").

---

4. Final Judgment ¶ 1 (ROA.1205).

## ARGUMENT

### I. The District Court Correctly Held That The Plaintiffs Have Article III Standing To Challenge Secretary Becerra's Notification Of May 10, 2021

To establish Article III standing, a plaintiff needs to show: (1) an injury in fact, which is (2) fairly traceable to the challenged conduct of the defendants, and is (3) likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Only one of the plaintiffs needs Article III standing to seek the requested relief; if a single plaintiff can establish Article III standing, then the remaining plaintiffs may seek the same relief, regardless of whether they would have standing in their own right. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).

Each of the plaintiffs is unwilling to provide gender-affirming care, in at least some situations, to patients who assert a gender identity that departs from their biological sex. Yet Secretary Becerra is threatening to cut off federal funding from these plaintiffs and health-care providers throughout the United States unless they immediately cease all forms of "discrimination on the basis of gender identity"—a phrase that is left undefined in the Notification of May 10, 2021. The Declaratory Judgment Act and the rules of Article III have long permitted pre-enforcement challenges in these situations. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to

challenge a statute that he claims deters the exercise of his constitutional rights."); *Doe v. Bolton*, <u>410 U.S. 179, 188</u> (1973) (allowing abortion providers to challenge a state abortion statute "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes."); *Stenberg v. Carhart*, <u>530 U.S. 914, 938-46</u> (2000); *MedImmune, Inc. v. Genentech, Inc.,* <u>549 U.S. 118, 128-129</u> (2007); *Holder v. Humanitarian Law Project*, <u>561 U.S. 1, 15-16</u> (2010); *Texas v. Equal Employment Opportunity Commission*, <u>933 F.3d 433, 446-49</u> (5th Cir. 2019).

The defendants deny that the plaintiffs have standing to bring a pre-enforcement challenge to the Secretary's Notification of May 10, 2021, but none of their arguments have merit.

### A.   The Plaintiffs Need Not Demonstrate An "Intention To Engage In Course Of Conduct Arguably Affected With A Constitutional Interest, But Proscribed By A Statute"

The defendants claim that the plaintiffs must satisfy the test from *Susan B. Anthony List v. Driehaus*, <u>573 U.S. 149</u> (2014), which allows pre-enforcement challenges when a plaintiff alleges "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (quoting *Babbitt v. Farm Workers*, <u>442 U.S. 289, 298</u> (1979)). The three-part *Susan B. Anthony* test is inapposite because the plaintiffs are not challenging the constitutionality of a statute; they are litigating

whether statutory authority exists for an agency rule. The plaintiffs are not contending that they have a constitutional right to engage in the conduct prohibited (or arguably prohibited) by Secretary Becerra's Notification, so they obviously cannot show that they intend to "engage in a course of conduct arguably affected with a constitutional interest." *Id.* A litigant who brings a non-constitutional challenge to the validity of an agency rule is not required to allege that he intends to engage in constitutionally protected conduct, or conduct "arguably affected with a constitutional interest," as a condition of challenging the rule in a pre-enforcement lawsuit. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (allowing tobacco companies to challenge FDA rulemaking pre-enforcement without any showing that they intended to engage in conduct "arguably affected with a constitutional interest"); *Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433, 446-49 (5th Cir. 2019) (allowing Texas to challenge an EEOC guidance document pre-enforcement without any showing that the State intended to engage in conduct "arguably affected with a constitutional interest").

If the defendants' argument were accepted, then no litigant could ever challenge an agency rule pre-enforcement unless he were challenging the agency rule on constitutional grounds. That is assuredly not the law. The APA not only authorizes but requires courts to "hold unlawful and set aside"

agency action that violates either the Constitution[5] or federal statutes,[6] and it authorizes pre-enforcement lawsuits to be brought by anyone "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. A litigant need not assert a constitutional claim as a condition to seeking pre-enforcement relief under the APA, and there is no authority even suggesting that litigants who challenge an agency rule pre-enforcement must satisfy *Susan B. Anthony* by showing an intent to engage in conduct "arguably affected with a constitutional interest."

For the same reasons, the plaintiffs need not show that their intended course of conduct is "arguably . . . proscribed by a statute" such as section 1557[7] because they are challenging the Secretary's Notification rather than a statute. Indeed, the entire crux of the plaintiffs' claim is that section 1557 *cannot* "arguably" be construed to prohibit the conduct in which they engage, because *Bostock* does not prohibit health-care providers from denying or withholding gender-affirming care unless they would have acted differently

---

5. *See* 5 U.S.C. § 706(2)(B) (requiring reviewing courts to vacate agency action that is "contrary to constitutional right, power, privilege, or immunity").

6. *See* 5 U.S.C. § 706(2)(C) (requiring reviewing courts to vacate agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

7. *See* Appellants' Br. at 18 (criticizing the plaintiffs because they "have not demonstrated that their intended course of conduct is even arguably proscribed by Section 1557").

toward an identically situated patient of the opposite biological sex. *See supra* at 3-6; *infra* at 48-52.  Because the plaintiffs are challenging an agency rule and not a statute, and because they are claiming that the underlying statute cannot support the challenged agency rule, there is no need for them to show that their intended conduct is "arguably . . . proscribed" by section 1557 or any other federal statute.

Finally, the defendants' citation of *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537-38 (2021),[8] is inapposite because the Administrative Procedure Act explicitly confers a statutory right to pre-enforcement review of agency action and waives sovereign immunity. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."); *National Treasury Employees Union v. Cornelius*, 617 F. Supp. 365, 367 (D.D.C. 1985) ("Preenforcement judicial review of final agency rules is appropriate under the APA"). The litigants in *Whole Woman's Health*, by contrast, could not identify any cause of action that authorized pre-enforcement review of the Texas Heartbeat Act because there were no state officials who could be sued under 42 U.S.C. § 1983, and neither Article III nor *Ex parte Young*, 209 U.S. 123 (1908), permits pre-enforcement lawsuits against state-court judges or court clerks. *See id.* at 163 (1908) ("[T]he right to enjoin an individual, even though a state official, from com-

---

8.    *See* Appellants' Br. at 17, 27.

mencing suits . . . does not include the power to restrain a court from acting in any case brought before it, either of a civil or criminal nature."); *Whole Woman's Health*, 142 S. Ct. at 532 (state-court judges and clerks are not "adverse" to litigants challenging the constitutionality of a statute); *Whole Woman's Health v. Jackson*, 13 F.4th 434, 444 (5th Cir. 2021) (same). The defendants are surely right to observe that there is no "unqualified" entitlement to pre-enforcement review,[9] but that observation is irrelevant when the APA authorizes pre-enforcement lawsuits over the legality of agency rules. *See Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998) ("'[P]reenforcement review of agency rules and regulations has become the norm, not the exception'" (quoting Stephen G. Breyer & Richard B. Stewart, *Administrative Law And Regulatory Policy* 1137 (2d ed. 1985)); *Chamber of Commerce v. Federal Election Commission*, 69 F.3d 600, 604 (D.C. Cir. 1995) ("[A]n agency rule . . . is typically reviewable without waiting for enforcement").

## B. The Notification Presents A "Credible Threat" That The Secretary Will Take Enforcement Action Against The Plaintiffs Unless They Change Their Behavior

The defendants also claim that the plaintiffs lack standing because they have not "demonstrated" that Secretary Becerra regards their intended con-

---

9.   *See Whole Woman's Health*, 142 S. Ct. at 537-38; *see also id.* at 539 (Thomas, J., concurring in part and dissenting in part) ("[T]here is no freestanding constitutional right to pre-enforcement review in federal court.").

duct as "gender-identity discrimination" within the meaning of his Notification. *See* Appellants' Br. at 19 ("[P]laintiffs have not demonstrated that they intend to engage in any conduct that HHS views as gender-identity discrimination."). The defendants observe that the Notification merely states in general terms that section 1557 prohibits "discrimination on the basis of gender identity" and "sexual orientation"[10]—without purporting to prejudge the application of this general principle to any specific set of facts. *See id.* at 6 (emphasizing that the Notification states that it "'does not itself determine the outcome in any particular case or set of facts.'" (quoting 86 Fed. Reg. at 27,985 (reprinted at ROA.113))); *id.* at 24 (same); *id.* at 25 (same). But the plaintiffs do not need to show that the Secretary *will* interpret the Notification to require the provision of hormone therapy to minors, or that he will enforce section 1557 in a manner that specifically targets the plaintiffs' conduct

---

10. The defendants correctly observe that the plaintiffs are uninjured by the portion of the Notification that prohibits discrimination on account of "sexual orientation." *See* Appellants' Br. at 18-19. But judicial review under the APA requires courts to review the challenged agency *action*—and to "hold unlawful and set aside" the challenged action if it is "not in accordance with law." 5 U.S.C. § 706. The relevant "action" is the Notification of May 10, 2021, and the plaintiffs' injuries are "fairly traceable" to this action—even if they are not injured by every single word that appears in the Notification. And the proper remedy under the APA, upon finding an agency action "not in accordance with law," is to formally revoke the "action," (*i.e.* the Notification), rather than merely enjoin the enforcement of the disputed provisions. *See Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022); *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021).

or practices. The plaintiffs have Article III standing to bring a pre-enforcement challenge if the Notification *could* be interpreted or enforced against them; they do not need to wait and see how the Secretary goes about interpreting or enforcing the Notification before seeking declaratory relief.

The holding of *Stenberg v. Carhart*, 530 U.S. 914 (2000), makes this abundantly clear. *Stenberg* permitted abortion providers to bring a pre-enforcement challenge to Nebraska's partial-birth abortion statute on the ground that it would prohibit the dilation and evacuation (D&E) procedure— despite the fact that the Attorney General of Nebraska had *specifically disclaimed* any intention to enforce the statute against doctors who perform D&E abortions. *See id.* at 938-46. The Court allowed the doctors to raise this pre-enforcement challenge because "some present prosecutors and future Attorneys General *may choose to pursue* physicians who use D & E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment." *Id.* at 945 (emphasis). The Court found that this mere *possibility* of future enforcement—even though it had been specifically disclaimed by the current Attorney General—not only imposed an Article III injury on abortion providers, but also violated the Constitution by imposing an "undue burden" on women seeking abortions. *See id.* at 945-46.

The holding of *Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021), is in a similar vein. The abortion providers in *Whole Woman's Health* argued

that provisions of the Texas Heartbeat Act *could* be interpreted to allow state licensing officials to discipline medical professionals that perform or assist post-heartbeat abortions—even though state officials vigorously contested this interpretation of the statute, and even though the Texas Heartbeat Act is most naturally read to prohibit this type of enforcement. *Compare id.* at 535-37 (plurality opinion of Gorsuch, J.), *with* Tex. Health & Safety Code § 171.207(a) ("Notwithstanding Section 171.005 or any other law, the requirements of this subchapter shall be enforced exclusively through the private civil actions described in Section 171.208."); *Whole Woman's Health*, 142 S. Ct. at 539-43 (Thomas, J., concurring in part and dissenting in part). Yet the Supreme Court allowed the abortion providers' pre-enforcement challenge to proceed, because it was enough for them to identify statutory language that "appears" to empower state licensing officials to take adverse action against them. *See id.* at 536 (plurality opinion of Gorsuch, J.) ("[A]t this stage of the litigation, *it appears that* the licensing defendants do have authority to enforce S. B. 8." (emphasis added)); *id.* at 537 (plurality opinion of Gorsuch, J.) ("[T]hey have identified provisions of state law that *appear to impose* a duty on the licensing-official defendants to bring disciplinary actions against them if they violate S. B. 8." (emphasis added)). So too here: The Secretary's notice of May 10, 2021, *could* be interpreted to prohibit healthcare providers from denying hormone therapy to minors. If the abortion providers in *Stenberg* and *Whole Woman's Health* had standing to sue pre-enforcement, then the plaintiffs in this case can likewise seek pre-

enforcement declaratory relief against the Secretary's Notification—and they do not need to prove that the Secretary will in fact come after them for refusing to assist a minor in transitioning, or for refusing to accommodate a transgender patient's denial of biological realities.

Courts entertain pre-enforcement constitutional vagueness challenges to statutes and agency rules all the time, and they never require plaintiffs in those cases to prove that the defendants *will* interpret or enforce the allegedly vague language against them. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010); *Gonzales v. Carhart*, 550 U.S. 124, 148-50 (2007); *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Stenberg*, 530 U.S. at 938-46. In all these cases, the injury comes from the *possibility* that the disputed law might be interpreted in the manner that the plaintiff fears, which presents a "credible threat" that the law will be enforced against the plaintiff unless the plaintiff changes his behavior. *See Holder*, 561 U.S. at 15; *Whole Woman's Health*, 142 S. Ct. at 536. The plaintiffs have demonstrated the same injury here: The Secretary's categorical ban on "discrimination on the basis of gender identity" could be interpreted to require health-care providers to provide hormone therapy to minors and gender-affirming care to every transgender patient that walks through the door, and that (in turn) presents a "credible threat" that the Secretary will take enforcement action against the plaintiffs unless they change their ways.

Against all of this the defendants cite *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), which says that future injuries must be "immi-

nent" or "certainly impending" to create standing under Article III. *See* Appellants' Br. at 17. But the plaintiffs are not alleging a future injury; they claim that they are suffering injury *now* from the "credible threat" that the Notification poses to physicians who are unwilling to provide the full panoply of gender-affirming care that might be requested by their transgender patients. And *Clapper* assuredly does not require the plaintiffs to show that an adverse enforcement proceeding against them is "certainly impending." When a litigant sues to prevent government officials from initiating enforcement proceedings against him, he needs only to allege a "credible threat" of enforcement; he is *not* required to allege or show a future enforcement proceeding is "certainly impending." *See Whole Woman's Health*, 142 S. Ct. at 536; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see also Holder*, 561 U.S. at 15 (conferring Article III standing when the "[p]laintiffs face 'a credible threat of prosecution'"); *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (allegations were sufficient when plaintiffs alleged an "*actual and well-founded fear* that the law will be enforced against them" (emphasis added)); *Diamond v. Charles*, 476 U.S. 54, 64 (1986) ("Appellees, however, had standing to bring suit against the state officials who were charged with enforcing the Abortion Law because appellees faced *possible criminal prosecution*." (emphasis added)); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 302 (1979); *Steffel v. Thompson*, 415 U.S. 452, 475 (1974) ("[F]ederal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a *genuine*

*threat of enforcement* of a disputed state criminal statute" (emphasis added)). *Clapper* also acknowledged that a "certainly impending" injury is not a uniform requirement of Article III standing doctrine, and declared that it was *not* overruling or abrogating prior cases that require plaintiffs to show only a "substantial risk" of future harm (rather than a "certainly impending" injury). *See Clapper*, 568 U.S. at 414 n.5 ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a 'substantial risk' that the harm will occur"). The Court made abundantly clear in *Susan B. Anthony List* that *Clapper* did not disturb or in any way alter the standing test for pre-enforcement challenges that had been previously established in cases such as *Holder*, *American Booksellers Ass'n*, *Babbitt*, and *Steffel*. *See Susan B. Anthony List*, 573 U.S. at 159-61; *see also id.* at 158 ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or* there is a '"substantial risk" that the harm will occur.'" (quoting *Clapper*, 568 U.S. at 415 n. 5) (emphasis added)). And it has been long been established—both before and after *Clapper*—that a "credible threat" of enforcement is all that is needed when a litigant sues to enjoin government officials from initiating enforcement proceedings against him.

**C.    The Notice Of Proposed Rulemaking Has No Relevance To The Plaintiffs' Standing And Does Not Obviate Their Article III Injuries In Any Event**

The defendants suggest throughout their brief that any "credible threat" that plaintiffs might assert has been obviated (or at least mitigated) by the Notice of Proposed Rulemaking that HHS issued on August 4, 2022, which (according to the defendants) disclaims any interpretation of the Notification that would prohibit the conduct that the plaintiffs wish to engage in. *See* Appellants' Br. at 3; *id.* at 6-7; *id.* at 14-15; *id.* at 20; *id.* at 21-23. There are many problems with this argument.

First, a plaintiff's standing is assessed at the moment the lawsuit is filed and is unaffected by post-filing developments. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020) ("[S]tanding is assessed 'at the time the action commences'" (citation omitted)). The Notice of Proposed Rulemaking was issued on August 4, 2022—nearly one year *after* the plaintiffs filed their lawsuit—so it has no relevance to standing and concerns only whether the plaintiffs' claims have become moot. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189-90 (2000) (explaining distinction between standing and mootness). But the defendants are not making a mootness argument,[11] and even if they were they could not show that the Notice of Proposed Rulemaking moots the plaintiffs' claims when the rulemaking process is not complete and the contents of the proposed rule could change be-

---

11.    *See* Appellants' Br. at 21 ("This case does not involve a question of mootness").

tween now and when the rule becomes final. *See El Paso Electric Co. v. FERC*, 667 F.2d 462, 467 (5th Cir. 1982) ("A case is not rendered moot simply because there is a possibility, or even a probability, that the outcome of a separate administrative proceeding may provide the litigant with similar relief."); ROA.568 (acknowledging that the Notice of Proposed Rulemaking merely "sets forth a proposed rule, and HHS must consider any significant comments it receives before issuing a final rule.").

The defendants disclaim any mootness argument yet insist that the Notice of Proposed Rulemaking remains relevant to whether the plaintiffs demonstrated a "credible threat" that the Secretary might interpret or enforce his Notification against them. *See* Appellants' Br. at 21 ("This case does not involve a question of mootness . . . . Instead, the question here is whether plaintiffs have demonstrated a credible threat that HHS will view their proposed conduct as discriminatory and initiate some type of enforcement action against them."). But the problem for the defendants is that the existence of a "credible threat" must be assessed on August 25, 2021—the date on which the plaintiffs filed their lawsuit[12]—and at that time there was no Notice of Proposed Rulemaking describing safe harbors for providers who withhold or deny gender-affirming care, or who gently but firmly insist that transgender patients acknowledge biological realities when recommending treatments or sex-specific preventive care.

---

12.  ROA.13 (original complaint).

The defendants try to get around this by claiming that the Notice of Proposed Rulemaking is nothing more than a reflection of HHS's longstanding views on the meaning of section 1557,[13] but they cannot point to anything in the Notification of May 10, 2021, that provides or even gestures toward the safe harbors described in the Notice of Proposed Rulemaking. Indeed, the Notification of May 10, 2021, eschews any suggestion of safe harbors by insisting that it "does not itself determine the outcome in any particular case or set of facts." 86 Fed. Reg. at 27,985 (reprinted at ROA.113)). And the defendants do not identify any document or statement from HHS that predates the filing of this lawsuit and embraces *any* type of safe harbor for providers who fear liability under section 1557. No rational health-care provider would regard the Notification of May 10, 2021, as anything other than a "credible threat" to their continued federal funding if they do not fully accommodate the demands of their transgender patients, and the defendants' post-filing efforts to allay these concerns have no bearing on the Article III standing inquiry.

The second problem is that a Notice of Proposed Rulemaking has no legal force, and it does not withdraw or nullify the earlier agency "action" that the plaintiffs are challenging. The Notice of Proposed Rulemaking will cul-

---

13. *See* Appellants' Br. at 22 ("The NPRM is not a change that mooted plaintiffs' claims; it merely underscores what was true before: that plaintiffs' intended conduct does not constitute gender-identity discrimination. HHS has consistently maintained this position, and it is now reflected in the NPRM.").

minate in a separate and distinct final agency action that can be challenged under the APA, but the mere issuance of a Notice of Proposed Rulemaking does nothing to affect the Notification of May 10, 2021, or its contents. *See Biden v. Texas*, 142 S. Ct. 2528, 2544-45 (2022) (explaining how separate DHS memoranda that sought to terminate the Migrant Protection Protocol were distinct agency "actions"). The plaintiffs are challenging the legality of the agency "action" taken on May 10, 2021—and subsequent agency actions have no bearing on whether *that* agency action should be set aside as "not in accordance with law" under section 706(2)(A) of the APA. *See Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *id.* at 1909 ("An agency must defend its actions based on the reasons it gave when it acted.").

The final problem is that the Notice of Proposed Rulemaking does nothing to alleviate the plaintiffs' objections to the Secretary's Notification of May 10, 2021. The proposed rule goes well beyond *Bostock* by interpreting section 1557's prohibition on "sex" discrimination to encompass "discrimination on the basis of sex stereotypes; sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; and gender identity." Dep't of Health & Human Services, *Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking*, 87 Fed. Reg. 47,824,

47,916 (Aug. 4, 2022) (text of proposed 45 C.F.R. § 92.101). It also forbids covered entities to "[d]eny or limit health services, including those that are offered exclusively to individuals of one sex, to an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded," a prohibition that would appear to compel providers to offer and provide prostate-cancer screenings to biological women who identify as men on the same terms that they would give them to biological men. *See id.* at 47,918 (text of proposed 45 C.F.R. § 92.206(b)(1)). And the supposed "safe harbors" in the proposed rule only reaffirm the legal jeopardy that the plaintiffs will face if they refuse to refer minors for puberty blockers or sex-change operations, or if they refuse to provide "gender-affirming care" to any patient with gender dysphoria. Consider the text of proposed 45 C.F.R. § 92.206(c):

> Nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual. However, a provider's belief that gender transition or other gender-affirming care can never be beneficial for such individuals (or its compliance with a state or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate.

Dep't of Health & Human Services, *Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking*, 87 Fed. Reg. 47,824, 47,918 (Aug. 4, 2022). Terms like "legitimate" or "nondiscriminatory" are in the

eye of the beholder—and providers can only guess as to whether the powers that be at HHS will regard their refusal to provide puberty blockers to a minor (or any type of gender-affirming care to a transgender patient) as "legitimate" or "nondiscriminatory." Worse, the proposed rule makes clear that Dr. Neese's belief that gender transitioning is categorically inappropriate for minors[14] can *never* be considered a "legitimate" or "nondiscriminatory" reason for refusing to provide or assist in the gender transition of a minor. *See id.* ("[A] provider's belief that gender transition or other gender-affirming care can never be beneficial for such individuals . . . is not a sufficient basis for a judgment that a health service is not clinically appropriate.").

The defendants also rely on language that appears in the *preamble* to the Notice of Proposed Rulemaking, yet is nowhere to be found in the proposed rule. *See* Appellants' Br. at 20 (quoting language from the preamble of the NPRM saying that "'this provision does not require health care professionals to perform services outside of their normal specialty area'" (quoting 87 Fed. Reg. at 47,867)); *id.* at 23 (same); *id.* (quoting language from the preamble of the NPRM saying that "[t]his provision does not, however, prohibit a covered entity from treating an individual for conditions that may be specific to their sex characteristics." (quoting 87 Fed. Reg. at 47,866)). But a preamble

---

14. *See* Neese Decl. ¶¶ 9-10 (ROA.420) ("I do not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions. . . . I am categorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning.").

has no binding authority even in a final rule,[15] and it certainly has no binding effect in a *proposed* rule that is still going through the notice-and-comment process. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986) ("It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound."); *Williams Natural Gas Co. v. FERC*, 872 F.2d 438, 446 (D.C. Cir. 1989) ("An NOPR is by definition the expression of an agency's *tentative* position. . . . [T]he issuance of an NOPR—even a strongly worded NOPR—in no way binds the Commission to promulgate the proposed regulation."); *Public Citizen, Inc. v. U.S. Dep't of Health & Human Services*, 332 F.3d 654, 669 (D.C. Cir. 2003) ("The interpretation contained in the agency's proposed rule does not, of course, bind it here.").

But the more serious problem is that there is *nothing* in the preamble that purports to shield the conduct that Dr. Neese and Dr. Hurly intend to engage in. Dr. Neese claims that she is:

1. "[C]ategorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning," because she "do[es] not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions," Neese Decl. ¶¶ 9-10 (ROA.420).

2. "[R]eluctant to prescribe hormone therapy or assist a patient in a gender transition absent a longstanding relationship with that pa-

---

15. *See Nat'l Wildlife Federation v. EPA*, 286 F.3d 554, 569-70 (D.C. Cir. 2002)

tient, because sometimes the appropriate response to gender dysphoria is a referral for counseling and psychological care rather than hormone therapy," *id*. at ¶ 11 (ROA.420).

3. Unwilling to provide "gender-affirming care" to transgender patients when the patient's "denial of biological realities will endanger their life or safety," *id*. at ¶ 12 (ROA.421); *see also id*. at ¶¶ 13-16 (ROA.421-422).

4. Determined to urge her patients to seek and obtain preventive care consistent with their biological sex rather than accommodate the beliefs of a male-to-female transgender patient who refuses to acknowledge his or her need for prostate-cancer screening, *see id*. at ¶ 18 (ROA.423); *see also* Hurly Decl. ¶¶ 7-9 (ROA.460) (same).

The passages that the defendants quote from the Notice of Proposed Rulemaking do not purport to establish a safe harbor for *any* of this. The defendants tout a passage that says covered entities may "treat[] an individual for conditions that may be specific to their sex characteristics," such as treating a woman-to-man transgender patient for pregnancy. *See* Appellants' Br. at 20 (quoting 87 Fed. Reg. at 47,866). But Dr. Neese is asserting her right to *deny* "gender-affirming" care or treatment to transgender patients when doing so would endanger their health or safety, and to insist that transgender patients who deny biological realities seek and obtain preventive care in accordance with their biological sex. Neither the proposed rule nor the preamble in the Notice of Proposed Rulemaking provides any protection for this. Indeed, both the proposed rule and the preamble explicitly forbid any practice that "prevents an individual from participating in a health program or activity

consistent with the individual's gender identity,"[16] which does not leave any room for the practices described in Dr. Neese's (and Dr. Hurly's) declarations. And although the proposed rule and the preamble prohibit covered entities from denying or withholding preventive care that accords with a transgender patient's *biological* sex,[17] neither Dr. Neese nor Dr. Hurly is seeking to withhold preventive care of that sort. Quite the opposite: They want to *provide* preventive care that aligns with a transgender patient's biological sex—and insist that a transgender patient who refuses to acknowledge their biological sex to seek and obtain that care. There is nothing in the rule or the preamble that protects health-care providers who attempt to overcome the obstinance of a transgender patient rather than "affirm" a patient's delusional beliefs.

---

16. *See* 87 Fed. Reg. at 47,918 (quoting proposed 42 C.F.R. § 92.206(b)(3)); *see also id.* at 47,866 ("[T]his provision would prohibit the adoption of a policy, or engaging in a practice, that prevents any individual from participating in a covered entity's health program or activity consistent with their gender identity.").

17. *See* 87 Fed. Reg. at 47,918 (proposed 42 C.F.R. § 92.206(b)(1)); *id.* at 47,865-66 ("Under this provision, a covered entity that routinely provides gynecological or obstetric care could not deny an individual a pelvic exam or pregnancy-related care because the individual is a transgender man or nonbinary person assigned female at birth, if the entity otherwise provides that care to cisgender individuals. Similarly, a community clinic that receives funding from the Department could not refuse to provide a transgender woman a prostate cancer screening because her sex is listed female in her electronic health record, if the entity otherwise provides these screenings to cisgender individuals.").

The defendants also suggest that Dr. Neese has a "legitimate, nondiscriminatory reason" for refusing to provide puberty blockers or hormone therapy to minors, or to patients with whom she lacks a longstanding relationship, and that she would therefore be shielded under proposed 42 C.F.R. § 92.206(c):

> Nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual. However, a provider's belief that gender transition or other gender-affirming care can never be beneficial for such individuals (or its compliance with a state or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate.

87 Fed. Reg. at 47,918. But the last sentence in proposed 42 C.F.R. § 92.206(c) gives the game away. Dr. Neese believes that gender transitioning is categorically inappropriate for minors,[18] and the proposed rule specifically negates that belief as a "legitimate, nondiscriminatory reason" for denying puberty blockers or hormone therapy. There is also nothing in the proposed rule (or the preamble) that indicates that a refusal to provide transitioning services absent a "longstanding relationship" qualifies as a legitimate, non-

---

18. Neese Decl. ¶¶ 9 (ROA.420) ("I do not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions."); *id.* at ¶ 10 (ROA.420) ("I am categorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning.").

discriminatory reason for withholding hormone therapy. In all events, it is clear that the proposed rule will prohibit Dr. Neese from denying transitioning services to minors based on her belief that gender transitioning is categorically inappropriate for "such individuals," and that is all that is needed to establish a "credible threat" of enforcement. *See Susan B. Anthony List*, 573 U.S. at 159; *see also Justice v. Hosemann*, 771 F.3d 285, 291-92 (5th Cir. 2014) ("Plaintiffs have thus shown that they have a legitimate fear of . . . penalties for failure to comply with Chapter 17.").

## II. THE DISTRICT COURT CORRECTLY HELD THAT SECRETARY BECERRA'S NOTIFICATION OF MAY 10, 2021 IS REVIEWABLE UNDER THE APA

The defendants deny that the Secretary's Notification of May 10, 2021, qualifies as "final agency action" under 5 U.S.C. § 704, and they further deny that it qualifies as agency action "for which there is no other adequate remedy in a court." Appellants' Br. at 23-28 (quoting 5 U.S.C. § 704). The defendants also claim that Congress implicitly foreclosed pre-enforcement challenges to the Secretary's Notification by because health-care providers may challenge the Secretary's interpretation of section 1557 in post-enforcement administrative proceedings. *See id.* at 28-31 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994)). None of these arguments hold water.

### A.    The Notification Is Final Agency Action Under 5 U.S.C. § 704

The APA allows litigants to seek judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An agency action is "final" if it: (1) "mark[s] the consummation of the agency's decisionmaking process"; and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016); *see also* Appellants' Br. at 23-23 (reciting this two-part test).[19]

The first of these requirements is satisfied because the Notification reflects the "consummation" of the agency's decision to interpret section 1557 and *Bostock* as categorically prohibiting discrimination on the basis of sexual orientation and gender identity. The Secretary's Notification clearly and unequivocally rejects the plaintiffs' interpretation of *Bostock*, which (on the plaintiffs' view) allows discriminatory actions against homosexual, bisexual, or transgender individuals as long as the allegedly discriminatory action would have been taken against an identically situated member of the opposite biological sex. ROA.101-103; ROA.108. The defendants do not argue that the Secretary's Notification leaves this issue open; indeed, they have insisted throughout this litigation that the plaintiffs are simply wrong to interpret *Bostock* in that manner, and that the courts should dismiss the plaintiffs' claims

---

19.  In the Fifth Circuit, the finality of agency action is a jurisdictional issue rather than a merits question. *See Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433, 441 n.8 (5th Cir. 2019).

because they misconstrue the Supreme Court's ruling. ROA.156-158. There
is no going back; the agency has unequivocally and finally decided to con-
strue *Bostock* and section 1557 as categorically prohibiting discrimination on
the basis of sexual orientation and gender identity.

The defendants observe that the Notification does not purport to resolve
every particular situation that might arise under the Secretary's interpreta-
tion of section 1557 and *Bostock*. *See* Appellants' Br. at 25 ("[T]he HHS No-
tice of Interpretation does not bind the agency to a legal position with respect
to any *particular* medical procedure or set of facts." (emphasis added)). But
that does nothing to defeat the finality of the Notification, as it indisputably
endorses a categorical prohibition on sexual-orientation and gender-identity
discrimination and compels both HHS and providers subject to section 1557
to respect the Secretary's announced interpretation. That the Secretary has
not yet filled in all the details does not mean that his decision to read a prohi-
bition on sexual-orientation and gender-identity discrimination into section
1557 has not been consummated, or that it lacks legal consequences.

The defendants also try to deny that "legal consequences" flow from the
Secretary's Notification,[20] but that is simply untrue. The Secretary's Notifi-
cation announces that the Department of Health and Human Services will
interpret section 1557 as categorically prohibiting discrimination on the basis
of sexual orientation and gender identity—and it will enforce the statute ac-

---

20.   *See* Appellants' Br. at 24-26.

cordingly. This binds everyone in the Department to follow the Secretary's interpretation of section 1557 and *Bostock*, and it requires them to initiate enforcement proceedings against health-care providers that violate the Secretary's interpretation of the statute. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of [the final-agency-action test].").[21] The Notification also determines the "rights and obligations" of health-care providers that receive federal funds, as well as the rights and obligations of homosexual and transgender patients. And it ensures that "legal consequences will flow" if any health-care provider has the temerity to act in a manner contrary to the Secretary's interpretation of section 1557, because those providers will face enforcement proceedings and the potential loss of federal funds. And there are additional "legal consequenc-

---

21. The defendants' attempts to distinguish *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019), go nowhere. The defendants rely on the fact that the Notification is stated in general terms and does not attempt to resolve every possible circumstance that might arise under the Secretary's interpretation of section 1557. *See* Appellants' Br. at 25. But the Notification *still* establishes, at the very least, that: (1) *Bostock* applies to section 1557; and (2) Section 1557 (and *Bostock*) prohibit discrimination "on the basis of sexual orientation" and "gender identity," even in situations where a health-care provider would treat a biological man no differently from an identically situated biological woman. The defendants never deny that the Secretary's notification resolves at least that much, so they cannot plausibly assert that the Notification "does not bind to the agency to a legal position," or that "no legal consequences flow from" the Notification. *Id.*

es" that "flow" from the Secretary's Notification, as the Secretary's interpretation of section 1557 will receive *Skidmore* deference from any court that considers the matter. *See United States v. Mead Corp.*, 533 U.S. 218 (2001); *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).[22]

The defendants try to deny all of this by claiming that the Notification does nothing more than inform the public of what the Secretary thinks. *See* Appellants' Br. at 24 ("The Notice of Interpretation simply informs the public of HHS's interpretation of Section 1557 in light of . . . *Bostock*"). But the defendants do not deny that the Secretary's Notification binds the Department of Health and Human Services, and that by itself is enough to show that "legal consequences" flow from the Notification. *See Biden v. Texas*, 142 S. Ct. 2528, 2544-45 (2022); *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett*."). And the defendants' suggestion that "interpretive rules" or "guidance documents" do not qualify as final agency action has been repeatedly and emphatically rejected by this Court. *See id.*; *State v. Biden*, 10 F.4th 538, 550 (5th Cir. 2021) (citing authorities).

---

22. The defendants tell this Court that they "would not seek deference" to the interpretation described in the Secretary's notice, *see* Appellants' Br. 26, but they cannot bind a future administration to this litigating position, and in all events *Skidmore* deference is not dependent upon whether an agency requests it.

Documents such as the Secretary's Notification do not go through notice and comment, but they still serve as warnings and threats to anyone who would depart from the agency's announced interpretation of the statute. These announcements are agency "rules" within the meaning of the APA—even though they are not *substantive* rules that go through notice and comment—and they qualify as final agency action that is subject to challenge under 5 U.S.C. § 704. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). The Secretary's Notification may not have the same legal effects as notice-and-comment rulemaking, but it most assuredly has "legal effect" from the standpoint of health-care providers who are being forced to choose between abandoning their ethical convictions and subjecting themselves to the risk of enforcement proceedings and loss of federal funding. *See* Oliver Wendell Holmes, *The Path of the Law*, 110 Harv. L. Rev. 991, 992 (1997) ("[A] legal duty so called is nothing but a prediction that if a man does or omits certain things he will be made to suffer in this or that way").

### B. The Post-Enforcement Judicial Review Provided By Section 1557 And Title IX Is Not An "Adequate Remedy" Within The Meaning Of 5 U.S.C. § 704

The defendants also try to defeat pre-enforcement review under 5 U.S.C. § 704 by claiming that the plaintiffs can challenge the Secretary's Notification in subsequent enforcement proceedings that may be brought against them. *See* Appellants' Br. at 24-26. But post-enforcement review of this sort is not an "adequate remedy" within the meaning of section 704, because the

plaintiffs must risk the loss of federal funding if they choose to contest the Secretary's Notification in those proceedings. *See* 20 U.S.C. § 1682 (acknowledging that the government may terminate, or refuse to grant or continue, federal funding in response to violations of Title IX or section 1557). The Secretary cites no authority to support its view that post-enforcement challenges to agency action qualify as an "adequate remedy" under 5 U.S.C. § 704 when a litigant must risk draconian penalties (such as the complete loss of federal funding) by waiting to raise his claims in those proceedings. And the courts have long recognized that forcing litigants to undertake these risks as the price of challenging the legality of government conduct is unacceptable and may even violate the Due Process Clause; that is the entire reason for allowing pre-enforcement challenges in federal court. *See, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."). The post-enforcement remedy is doubly inadequate because the plaintiffs are seeking classwide relief on behalf of all physicians and health-care providers subject to section 1557, and it is impossible for any litigant to obtain classwide prospective relief when seeking judicial review of an agency enforcement action.

The defendants do not deny that the plaintiffs would have to risk the loss of all federal funding if they wait to challenge the Secretary's Notification in a subsequent enforcement proceeding. So it is hard to see how the defend-

ants can insist that the plaintiffs must wait for the Secretary to bring enforcement proceedings against them. And it is even harder to see how the defendants' stance can be squared with *Sackett v. EPA*, 566 U.S. 120 (2012), which rejected the notion that post-enforcement litigation serves as an "adequate" remedy when a litigant "cannot initiate that process" and could face stiff penalties by waiting to raise his claims in an agency enforcement proceeding. *See id.* at 127 ("[T]he Sacketts cannot initiate that process, and each day they wait for the Agency to drop the hammer, they accrue, by the Government's telling, an additional $75,000 in potential liability."). The defendants try to distinguish *Sackett* by noting that the plaintiffs in that case were immediately threatened by the EPA's compliance order,[23] but that has no bearing on the *adequacy* of a post-enforcement remedy. Here, as in *Sackett*, the option of post-enforcement litigation is not "adequate" under section 704 because: (1) The plaintiffs "cannot initiate" that process; and (2) The plaintiffs would risk substantial penalties by forgoing a pre-enforcement challenge and waiting to challenge the Secretary's Notification in an agency enforcement proceeding. *See Sackett*, 566 U.S. at 127. Finally, the defendants' claim that the "default rule under the APA" is that "challenges to agency action are raised as defenses in enforcement action" is simply false. Pre-enforcement judicial review of agency rules is the norm, not the exception,[24]

---

23.  *See* Appellants' Br. at 28 ("[P]laintiffs face no immediate consequences from the Notice of Interpretation.").

24.  *See supra* at 21.

and *Sackett* recognizes that the APA establishes a "presumption" of judicial review of agency action that must be "overcome" with countervailing evidence. *See id*. at 129.

### C.   *Thunder Basin* Does Not Preclude A Preenforcement Challenge To The Secretary's Notification

The defendants also claim that Congress implicitly foreclosed the plaintiffs' pre-enforcement challenge under the APA by establishing "an elaborate statutory review scheme for administrative enforcement proceedings," which (in the defendants' view) "was intended to create an exclusive remedy." Appellants' Br. at 28 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994)). The defendants' argument is hard to square with *Cannon v. University of Chicago*, 441 U.S. 677 (1979), which rejected the notion that Title IX's administrative enforcement proceedings were "exclusive" and allowed injured parties to sue entities that violate Title IX for damages and injunctive relief. If Title IX's administrative enforcement proceedings are not "exclusive" enough to preclude victims of Title IX violations from invoking an "implied" cause of action, how can the existence of those proceedings simultaneously foreclose the plaintiffs from relying on an *explicit* cause of action in section 702 of the APA, or the explicit jurisdictional grant in 28 U.S.C. § 1331? Neither the defendants nor any court (to our knowledge) has attempted to answer this question.

The more serious problem with the defendants' *Thunder Basin* argument is that Title IX explicitly preserves the right of litigants to seek pre-

enforcement judicial review of agency action under the APA. 20 U.S.C. § 1683 says:

> Any department or agency action taken pursuant to section 1682 of this title *shall be subject to such judicial review as may otherwise be provided by law* for similar action taken by such department or agency on other grounds.

20 U.S.C. § 1683 (emphasis added). And section 1682, in turn, is the provision that authorizes agency rulemaking to implement the commands of Title IX and section 1557:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity *by issuing rules, regulations, or orders of general applicability* which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.

20 U.S.C. § 1682 (emphasis added). Secretary Becerra's Notification of May 10, 2021 is a "rule" under section 1682, as well as an "agency action taken pursuant to section 1682" within the meaning of section 1683. It is therefore "subject to such judicial review as may otherwise be provided by law," which includes judicial review under the APA. The defendants cannot claim that "Congress did not intend to permit pre-enforcement review"[25] of the Secretary's Notification when the language of 20 U.S.C. § 1683 *expressly preserves* "judicial review as may otherwise be provided by law." *See Bostock*, 140 S. Ct.

---

25. Appellants' Br. at 29.

at 1737 ("Only the written word is the law"); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019) ("[W]e are not at liberty to re-write the statute passed by Congress and signed by the President."). So the *Thunder Basin* argument cannot get off the ground, and the express language of 20 U.S.C. § 1683 trumps any three-factor test that might exist for divining congressional "intent." *See Bostock*, 140 S. Ct. at 1754 ("Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations.").

## III. The District Court Correctly Held That Secretary Becerra's Notification Of May 10, 2021, Should Be Held Unlawful And Set Aside

On the merits, the Court should affirm the district court's decision to "hold unlawful and set aside"[26] the Notification under section 706 of the APA—regardless of whether it agrees with the district court's holding that *Bostock* is categorically inapplicable to Title IX and section 1557.

### A. The Secretary's Notification Misconstrues The Holding Of *Bostock*

Even if this Court were to assume or hold that *Bostock* applies to Title IX and section 1557, the Notification should still be vacated because it miscon-strues the holding of *Bostock*.

The Notification claims that *Bostock* categorically prohibits "discrimina-tion on the basis of sexual orientation" and "discrimination on the basis of

---

26.  Final Judgment ¶ 1 (ROA.1205).

gender identity." That is wrong; *Bostock*'s holding extends *only* to acts that discriminate on the basis of *sex*, which occurs only when an individual would have acted differently toward an identically situated member of the opposite biological sex. *See Bostock*, 140 S. Ct. at 1741 ("[I]f changing the employee's sex would have yielded a different choice by the employer . . . a statutory violation has occurred."). If a health-care provider refuses to treat a man because he is sexually attracted to men, but would have no objection to treating a biological woman who is sexually attracted to men, then that indisputably constitutes "sex" discrimination under *Bostock*. The same is true for a health-care provider that refuses to treat a man-to-woman transgender patient simply because the individual identifies as a woman, while remaining willing to treat biological women who identify as women. That is an act of "sex" discrimination under *Bostock* because changing the biological sex of the patient changes the outcome.

Where the Notification goes wrong is in claiming that all acts of discrimination "on the basis of sexual orientation" or "gender identify" qualify as "sex" discrimination under *Bostock*. That is assuredly not what *Bostock* held. Health-care providers may continue to take discriminatory actions against homosexual or transgender patients if (and only if) the same action would have been taken against an identically situated member of the opposite biological sex. *See Bostock*, 140 S. Ct. at 1742 ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the

wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.").

For example, an employer or health-care provider who discriminates against bisexuals—regardless of whether they are male or female—cannot possibly be engaged in "sex" discrimination under *Bostock*. That is because the "same trait" (sexual attraction toward members of both sexes) is treated exactly the same regardless of whether that "trait" appears in a man or a woman. This is assuredly discrimination "on the basis of sexual orientation," but it is *not* sex discrimination under the holding of *Bostock*.

In like manner, a refusal to provide an identical medical treatment to men and women cannot qualify as "sex" discrimination, either under the text of Title IX or under *Bostock*. If a health-care provider subjects men and women to the exact same rules, and refuses to prescribe the identical hormone therapy regardless of the sex of the patient who asks for it, then it is impossible to see how the provider has discriminated "on the basis of sex." 20 U.S.C. § 1681(a). To hold otherwise would effectively amend the text of Title IX by converting its prohibition on "sex" discrimination into a statute that outlaws discrimination on account of sexual orientation and gender identity—which is exactly what *Bostock* said it was *not* doing. *See Bostock*, 140 S. Ct. at 1746-47 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

So a health-care provider may refuse to prescribe testosterone hormones to a biological woman who wishes to appear more masculine, and he cannot

be guilty of "sex" discrimination unless he would willingly prescribe the same testosterone hormones to a biological man who wishes to appear more masculine. If a health-care provider denies this treatment equally across the sexes, then there is no "sex" discrimination under *Bostock*. *See Bostock*, 140 S. Ct. at 1742. The same is true for a health-care provider who refuses to refer a biological man for breast implants or breast-augmentation surgery. The provider is guilty of "sex" discrimination only if he would willingly provide an identical referral to a biological female. *See id.* at 1740. If a provider refuses to provide these referrals to members of both biological sexes, then there can be no "sex" discrimination under *Bostock*—even though the provider may very well be discriminating on account of "gender identity" by withholding gender-affirming care from patients suffering from gender dysphoria.

To be sure, *Bostock* rejected the idea that employers could establish a sex-neutral rule of conduct by prohibiting "homosexual behavior" and extending that rule equally to men and women. *See Bostock*, 140 S. Ct. at 1741-42; *id.* at 1745-46. But that is because the Court held that the relevant prohibition could not be defined at that level of abstraction, and insisted that one must instead look to the employee's precise behavior (sexual attraction to a particular person) and then ask whether that exact situation would be tolerated in a member of the opposite biological sex. *See Bostock*, 140 S. Ct. at 1741 ("Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If

the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague."). That is the same approach to be used in section 1557: Keep *everything* about the patient the same and change *only* his biological sex, and then ask whether the change in sex would change the provider's conduct. The Secretary has shunned this approach in favor of a crude and insufficiently nuanced rule that prohibits any discriminatory act based on sexual orientation or gender identity.

### B.    *Bostock* Did Not Purport To Resolve The Meaning Of Sex Discrimination In Title IX Or Section 1557

The Court could also affirm on the grounds provided by the district court, which held that *Bostock*'s holding extends only to Title VII and is categorically inapplicable to Title IX and section 1557. We conceded in the district court that *Bostock* applies to Title IX and section 1557,[27] but courts are permitted to raise issues and arguments sua sponte,[28] and the defendants extensively briefed the issue in the district court notwithstanding our concession. ROA.153-155.

The district court was correct to observe that *Bostock* claims only to resolve the meaning of Title VII's prohibition on sex discrimination, and it declined to rule on whether its holding extends to Title IX or section 1557. *See*

---

27.  ROA.409

28.  *See Kamen v. Kemper Financial Services*, 500 U.S. 90, 99 (1991) ("[T]he court is not limited to the particular legal theories advanced by the parties").

*Bostock*, 140 S. Ct. at 1753. The district court was also right to observe that extending *Bostock* to Title IX could imperil women's sports, which is at odds with the seeming purpose of the statute. ROA.1180-1187. So it is possible to construe *Bostock*'s holding as limited to Title VII, as some courts have done. *See, e.g.*, *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself. . . . [T]he rule in *Bostock* extends no further than Title VII").

But there are some difficulties that will confront a court that tries to resolve the case this way. The first problem is *Bostock*, which held that its interpretation of "because of . . . sex" in Title VII was the *only* reasonable construction of the text. *See Bostock*, 140 S. Ct. at 1749 ("[N]o ambiguity exists about how Title VII's terms apply to the facts before us."). It is hard to find any daylight between the phrase "on the basis of" sex in Title IX and "because of" sex in Title VII. The second problem is the issue of agency deference. Even if *Bostock* stops short of mandating a particular reading of Title IX, shouldn't the Secretary at least get *Skidmore* deference on whether to extend the holding of *Bostock* to section 1557—especially in light of *Bostock*'s insistence that administrative agencies would be *compelled* to adopt its interpretation of Title VII at *Chevron* Step One? Perhaps there are ways to overcome these obstacles, but it seems to us that the safer approach is to vacate the Notification on the ground that it misconstrues the holding of *Bostock*.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted.

/s/ Jonathan F. Mitchell

| | |
|---|---|
| GENE P. HAMILTON | JONATHAN F. MITCHELL |
| Vice-President and General Counsel | Mitchell Law PLLC |
| America First Legal Foundation | 111 Congress Avenue, Suite 400 |
| 611 Pennsylvania Avenue SE, #231 | Austin, Texas 78701 |
| Washington, DC 20003 | (512) 686-3940 (phone) |
| (202) 964-3721 | (512) 686-3941 (fax) |
| gene.hamilton@aflegal.org | jonathan@mitchell.law |

Dated: May 26, 2023                     *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I certify that on May 26, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

CHARLES W. SCARBOROUGH
ASHLEY C. HONOLD
Appellate Staff Civil Division, Room 7261
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-9018
charles.scarborough@usdoj.gov
ashley.c.honold@usdoj.gov

*Counsel for Defendants-Appellants*

      /s/ Jonathan F. Mitchell
      JONATHAN F. MITCHELL
      *Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 14,062 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.


/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Dated: May 26, 2023                         *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on May 26, 2023, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through the court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov/

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.


 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiffs-Appellees*