CASE NO. 23-10078

# In the United States Court of Appeals
# For the Fifth Circuit

---

SUSAN NEESE; JAMES HURLY,
*Plaintiffs-Appellees,*

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human
Services; UNITED STATES OF AMERICA
*Defendants-Appellants*

---

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
District Court Case No. 2:21-cv-00163-Z

---

**AMICUS CURIAE BRIEF OF
WOMEN'S DECLARATION INTERNATIONAL USA
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

Samuel J. Salario, Jr.
LAWSON HUCK GONZALEZ, PLLC
1700 South MacDill Avenue
Suite 300
Tampa, FL 33629
813-765-5113
samuel@lawsonhuckgonzalez.com

Kara Dansky
WOMEN'S DECLARATION
INTERNATIONAL USA
P.O. Box 21160
Washington, D.C., 20009
800-939-6636
president@womensdeclarationusa.com

*Counsel for Amicus Curiae*
*Women's Declaration International USA*

No. 23-10078
*Neese, et al v. Becerra, et al*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Under Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Amicus Curiae:**
Women's Declaration International USA

**Counsel for Amicus Curiae:**
Samuel J. Salario, Jr.
Lawson Huck Gonzalez, PLLC
Kara Dansky

*/s/ Kara Dansky*
Attorney of record for Amicus Curiae

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF AMICUS CURIAE ............................................................ 1

INTRODUCTION ...................................................................................... 3

ARGUMENT .............................................................................................. 5

I.    The Secretary's interpretation that discrimination "on the basis of gender identity" is discrimination "on the basis of sex" is legally incoherent and promotes stereotype discrimination against women ............................................. 5

    A. Sex is a coherent category upon which sex-discrimination laws can be based; "gender identity" is not. ............................................................................ 6

    B. The Secretary's interpretation reinforces invidious stereotypes about women and girls. ................................. 12

II.    The Secretary's interpretation harms women and girls by medicalizing "gender identity." .......................................... 17

III.    The Secretary's interpretation threatens sports for women and girls . 20

    A. Sex-based separation is essential to women's equal participation in the benefits of athletics. ............................................. 20

    B. Interpreting Title IX to prohibit discrimination "on the basis of gender identity" will exclude women and girls from athletics and their important benefits. ................................... 23

CONCLUSION ......................................................................................... 27

CERTIFICATE OF COMPLIANCE ....................................................... 28

CERTIFICATE OF SERVICE ................................................................. 29

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams by and through Kasper v. Sch. Bd. of St. John's Cty.*
   57 F.4th 791 (11th Cir. 2022) ...................................................................*passim*

*Bauer v. Lynch*
   812 F.3d 340 (4th Cir. 2016) ........................................................... 12

*Bostock v. Clayton County, Ga.*
   140 S.Ct. 1731 (2020)............................................................................*passim*

*Cf. U.S. v. Virginia*
   518 U.S. 515 (1996)...................................................................................10

*Cohen v. Brown Univ.*
   101 F.3d 155 (1st Cir. 1996) ...................................................................21

*Grimm v. Glouchester Cty. Sch. Bd.*
   972 F.3d 586 (4th Cir. 2020) ...................................................................8

*Parker v. Franklin Cty. Comm. Sch. Corp.*
   667 F.3d 910 (7th Cir. 2012) ...................................................................21

*Price Waterhouse v. Hopkins*
   490 U.S. 228 (1989)......................................................................13, 16, 26

*U.S. v. Virginia*
   518 U.S. 515 (1996)...................................................................................10

**Statutes**

20 U.S.C. § 1686 (2022) .........................................................................12

**Regulations**

34 C.F.R. § 106.33..................................................................................12

34 C.F.R. § 106.41.............................................................................12, 21

## Legislative Materials

Act of Mar. 23, 2023, 2023 Ky. Laws Ch. 132 (Ky. 2023) ............................... 19, 20

Act of Feb. 14, 2023, South Dakota Laws Ch. 127 (S.D. 2023) ....................... 19, 20

Act of Jan. 28, 2023, 2023 Utah Laws S.B. 16 (Utah 2023) ............................. 19, 20

Fla. S.B. 254, 2023 Leg., Reg Sess. (Fla. 2023) ...................................................... 19

Gender Transition Procedures for Minors, 2023 Ind. Legis. Serv. P.L. 10-2023 (Ind. 2023) ............................................................................................................. 19, 20

N.D. H.B. 1254, 68th Leg. Assemb., Reg. Sess. (N.D. 2023) (enacted) ........... 19, 20

Vulnerable Child Prot. Act, 2023 Idaho Laws Ch. 292 (Idaho 2023) .............. 19, 20

## Other Authorities

Allison Clayton, *Gender-Affirming Treatment of Gender Dysphoria in Youth: A Perfect Storm Environment for the Placebo Effect*,
    52 ARCHIVES OF SEXUAL BEHAVIOR 483 (2022). ......................................... 19

Allison K. Heather, *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*,
    INT. J. ENVIRON. RES. PUBLIC HEALTH (Jul. 26, 2022). ................................ 24

Amelia Goldman, *'An explosion': what is behind the rise in girls questioning their gender identity*,
    THE GUARDIAN (Nov. 24, 2022) ................................................................... 18

Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of Women's Issues and the Legal Danger of "Brain-Sex" Language*,
    17 NEV. L.J. 667 (2017) ............................................................................ 2, 6

Anke Samulowitz, et al., *"Brave Men" and "Emotional Women": A Theory-Guided Literature Review on Gender Bias in Health Care and Gendered Norms towards Patients with Chronic Pain*,
PAIN RES. MGT. (Feb. 25, 2018) .............................................................. 14, 15

Anthony Latham, *Puberty Blockers for Children: Can They Consent*,
28 THE NEW BIOETHICS 268 (2022). ........................................................... 18

Aria Schnebly, *Sex Determination in Humans*,
THE EMBRYO PROJECT ENCYCLOPEDIA (Jul. 16, 2021). ................................. 7

Christen Price, *Women's Spaces, Women's Rights: Feminism and the Transgender Rights Movement*,
103 MARQ. L. REV. 1509 (2020). ........................................................... 14, 16

Cleveland Clinic, *Female-to-Male (FTM) Top Surgery*
https://my.clevelandclinic.org/health/treatments/21861-female-to-male-ftm-top-surgery (last accessed June 1, 2023) ...................................................... 19

Cleveland Clinic, *Phalloplasty*
https://my.clevelandclinic.org/health/treatments/21585-phalloplasty (last accessed June 1, 2023). ................................................................................ 19

Colin Wright, *A Biologist Explains Why Sex Is Binary*,
THE WALL STREET JOURNAL (Apr. 9, 2023) ................................................. 7

Collin M. Wright and Emma N. Hilton, *The Dangerous Denial of Sex*,
THE WALL STREET JOURNAL (FEB. 13, 2020) ............................................... 17

Dep't. of Health and Human Servs., *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*,
86 Fed. Reg. 27,984 (May 25, 2021). ............................................................. 3

Dep't. of Health and Human Servs., *Nondiscrimination in Health Programs and Activities*,
87 Fed. Reg. 47,824, 47,833-834 (Aug. 4, 2022) .......................................... 4

Dep't. of Health and Human Servs., *Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth*, (March 2, 2022) .................................................................................................4

Dionne L. Koller, *Not Just One of the Boys: A Post-Feminist Critique of Title IX's Vision for Gender Equity in Sports*,
    43 CONN. L. REV. 401 (2010)........................................................22

Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*,
    27 DUKE J. GENDER L. & POLICY 69 (2020). ........................21, 22, 23, 24, 25

Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*,
    51 SPORTS MEDICINE 199 (2020). ....................................................24, 26, 27

George Orwell, *Nineteen Eighty-Four* (Plume/Harcourt Brace 2003 ed.)...............7

Jean Hatchet, *The performance of a lifetime*, THE CRITIC (Apr. 10, 2023).............13

Jennifer Bilek, *Custom Vaginoplasty "For Your Inner Well Being,"*
    THE ELEVENTH HOUR (Oct 23, 2023)............................................................17

Jessica A. Clarke, *Sex Assigned at Birth*,
    122 COLUM. L. REV. 1821 (2022). ..................................................................7

Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*,
    48 ARCHIVES OF SEXUAL BEHAVIOR 5 (2019). .............................................18

Leor Sapir, *Yes, Europe Is Restricting "Gender-Affirming Care,"*
    CITY JOURNAL (Feb. 13, 2023) ................................................................19, 20

Lindsay Bever, *From heart disease to IUDs: How doctors dismiss women's pain*,
    THE WASHINGTON POST (Dec. 13, 2022). .........................................13, 14, 15

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*,

8 ARCHIVES OF SEXUAL BEHAVIOR 3553 (2021). .....................................9, 18

Lisa Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*,
PLOS ONE (Aug. 16, 2018). .........................................................................18

N.C.A.A, THE STATE OF WOMEN IN COLLEGE SPORTS 18 (2022) ...........................22

NAT'L. FED. OF STATE H.S. ASSOCS., HIGH SCHOOL ATHLETICS PARTICIPATION SURVEY (2022) .......................................................................................................21

Note, *Cheering On Women and Girls in Sports*,
110 HARV. L. REV. 1627 (1997) ...................................................................16

Pat Eaton-Robb, *Connecticut runners part of debate over transgender athletes*,
ASSOCIATED PRESS (Feb. 24, 2019)................................................................24

Rachyl Jones, *Tik Tok Watched Dylan Mulvaney Become a Woman One Day at a Time*,
OBSERVER (Sept. 10, 2022). .........................................................................14

Rebecca J. Cook, et al., *Unethical female stereotyping in reproductive health*,
109 INT'L. J. OF GYN. AND OBST. 255 (2010) ............................................9, 14

Rikki Schlott, *'I literally lost organs:' Why detransitioned teens regret changing genders*,
THE NEW YORK POST (June 18, 2022). ...........................................................19

Sex Matters
https://sex-matters.org/ ...............................................................................10

Sheila Jeffreys, *Gender Hurts: A Feminist Analysis of the Politics of Transgenderism*, (Routledge ed. 2014). ..............................................................8, 13

*The Evidence to support medicalized gender transitions in adolescents is worryingly weak*,
THE ECONOMIST (Apr. 5, 2023).....................................................................19

U.S. OFFICE OF PERSONNEL MGT., GUIDANCE REGARDING GENDER IDENTITY AND INCLUSION IN THE FEDERAL WORKPLACE 2-3 (2023). .............................................16

University of California San Francisco, *Information on Testosterone Hormone Therapy* (Jul. 2020)
    https://transcare.ucsf.edu/article/information-testosterone-hormone-therapy
    .................................................................................................... 18

Why *are so many teenage girls appearing in gender clinics?*
    THE ECONOMIST (Sep. 1, 2018) ..................................................................... 18

Yael Halon, *Lia Thomas exposed 'male genitalia' in women's locker room after meet, Riley Gaines says: Dropped 'his pants,'*
    FOX NEWS (Feb. 9, 2023). ..................................................................... 26, 27

Yaron Steinbuch, *Injured North Carolina Volleyball player urges transgender ban for female sports teams in schools,*
    NEW YORK POST (April 21, 2023) ................................................................. 26

## INTEREST OF AMICUS CURIAE

This appeal presents the question, critical to the continued progress of women and girls, of what it means to discriminate "on the basis of sex." Women's Declaration International USA ("WDI USA") is the U.S. chapter of an international group of volunteer women dedicated to protecting the sex-based rights of women and girls. Feminism is central to WDI USA, and its volunteers include female academics, writers, activists, and health practitioners.

The founders of WDI USA's parent organization authored the Declaration on Women's Sex-Based Rights, which affirms the sex-based rights of women and girls and challenges the discrimination they experience when the category of "sex" is replaced by the category of "gender identity." The Declaration is rooted in the idea that the right of women and girls to live free from discrimination, recognized under international human rights law, derives from being of the female "sex," not from "gender identity." Relevant in this case involving the obligations of medical providers, the Declaration provides that "[s]tates should recognize that medical interventions aimed at the 'gender reassignment' of children by the use of puberty suppressing drugs, cross-sex hormones and surgery" should be prohibited. The Declaration also states that promoting "gender identity" in education and allowing males to compete on female sports teams—important because Title IX is implicated here—are forms of sex-based discrimination against women and girls.

WDI USA is interested in this appeal because it threatens the erasure of the female *sex* as a legal category worthy of protection. Women and girls have endured centuries of discrimination precisely because they are members of the female sex, as defined by genetics and biology. The categories of "gender identity," "transgender woman," and "transgender girl" erase the female *sex* by replacing the objective *fact* of being a woman with a claimed, subjective *sense* of being a woman.[1]

This linguistic destabilization of the meaning of sex permits males who claim a female identity to make demands on women and girls that were previously unheard of and that undermine women's dignity and safety. In view of its work on these issues, WDI USA has a meaningful perspective to offer the Court.

No counsel for a party authored this brief in whole or in part. No party or counsel for a party contributed money that was intended to fund preparing or submitting this brief. No person—other than WDI USA, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. WDI USA is authorized to file this amicus brief because Appellants and Appellees have consent to its timely filing.

---

[1]    Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of Women's Issues and the Legal Danger of "Brain-Sex" Language*, 17 NEV. L.J. 667, 693 (2017) ("[T]he postmodern identity movement calls into question the ability of human beings to be put into sexed or gendered categories at all.").

## **INTRODUCTION**

Relying on *Bostock*,[2] the Secretary of Health and Human Services decided that the Affordable Care Act's sex-discrimination provision—defined by Title IX's prohibition of discrimination "on the basis of sex"—bars "discrimination on the basis of gender identity."[3] But *Bostock* did not prohibit discrimination based on "gender identity." It held an employer discriminated based upon sex in violation of Title VII when it fired a male employee for a reason irrelevant to his ability to do his job, and when the employer would not have fired a woman.

Nothing about that says either that *men who claim to identify as women* are entitled *to legal recognition as women* or denies that there are objective differences between females and males that are legally consequential. Put simply, *Bostock* did not hold that "sex" and "gender identity" are categorically the same thing—indeed, it assumed that they are *not*[4]—and thus does not imply that discrimination "on the basis of gender identity" categorically is "discrimination on the basis of sex."

The Secretary, however, says otherwise. And although he avoids mentioning it, his brief does not deny that refusals to provide nonsensical medical treatment

---

[2]    *Bostock v. Clayton County, Ga.*, 140 S.Ct. 1731 (2020).

[3]    *See* Dep't. of Health and Human Servs., *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972,* 86 Fed. Reg. 27,984 (May 25, 2021).

[4]    *Bostock*, 140 S.Ct. at 1738.

(*e.g.*, a pelvic exam for a male), cross-sex hormones, and transformative surgical interventions are what he thinks constitute discrimination "on the basis of gender identity." In fact, the Secretary has said as much elsewhere.[5]

There can thus be no denying that the Secretary seeks to require medical providers to recognize members of one sex as members of the other sex based on their claimed "gender identity." That conclusion necessarily depends upon saying that "sex" and "gender identity" are the same thing. They aren't.

Sex is an objective legal category referring to females and males, as defined by genetics and biology, that makes a prohibition against discrimination "on the basis of sex" legally coherent. That is important because it is females, not males who claim to identify as women, who have suffered and continue to face discrimination solely "on the basis of sex"—*i.e.*, on the basis of being female—and who will suffer new versions of that old harm if medical providers and schools cannot account for material and immutable differences between the female and male sexes.

---

[5]    *See, e.g.*, Dep't. of Health and Human Servs., *Nondiscrimination in Health Programs and Activities*, 87 Fed. Reg. 47,824, 47,833-834 (Aug. 4, 2022) (characterizing denials of "gender-affirming care" and "gender-affirming surgery" as discrimination based on sex); Dep't. of Health and Human Servs., *Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth* (March 2, 2022) (stressing the importance of "access to affirming care for transgender youth" and stating that "denials of health care based on gender identity are illegal").

4

"Gender identity" is not an objective legal category, and equating it with sex renders the notion of discrimination "on the basis of sex" meaningless. On its face, "gender identity" refers to a person's *identity*, not to their *sex*, defined by whatever feeling the person has of what it means to "be of the gender with which he or she identifies" and whatever expression the person gives that feeling. When men and boys claim to identify as women or girls, "gender identity" reduces to regressive stereotypes about what it means to be female, deprives women of agency to define their role in the world for themselves, and subjects women to sex-based discrimination contrary to the purpose, evident from the text of Title IX, to prohibit discrimination on the basis of the objective fact of "sex."

The Secretary's effort to equate "sex" with "gender identity" renders a prohibition against discrimination "on the basis of sex" incoherent, with foreseeable and disastrous consequences for women and girls.

## **ARGUMENT**

### I.    **The Secretary's interpretation that discrimination "on the basis of gender identity" is discrimination "on the basis of sex" is legally incoherent and promotes stereotype discrimination against women.**

The Secretary's interpretation replaces an objective ban on discrimination based on the *fact* of being female or male with an incoherent ban on discrimination based on whether a person *feels* like a woman or man. His effort to enforce this interpretation is not excused by *Bostock*, which one could at least argue involved

genuine sex discrimination. Unlike the circumstances in *Bostock*, in medicine and education—to which the ACA and Title IX apply—the objective fact of sex matters, and treating women and men differently in light of those facts is not discrimination "on the basis of sex." The Secretary's denial of the immutable and material reality of sex entrenches discrimination against women.

### A. Sex is a coherent category upon which sex-discrimination laws can be based; "gender identity" is not.

It should go without saying that sex and "gender identity" are not synonyms.[6] Historically, the term sex universally referred to the observable fact of the distinction between female and male—based on genetic characteristics and reproductive biology—not a mutable status that everyone, as if by accident, is "assigned at birth."[7] Women and girls are the female sex.[8]

---

[6]    *Bostock*, 140 S.Ct. at 1746-47 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

[7]    *See id.* 140 S.Ct. at 1756 & App. A (Alito, J., dissenting) (collecting dictionary definitions of "sex" at the time of the adoption of Title VII); Kathleen Stock, *Changing the concept of "woman" will cause unintended harms*, THE ECONOMIST (Jul. 6, 2018), https://www.economist.com/open-future/2018/07/06/changing-the-concept-of-woman-will-cause-unintended-harms

[8]    *See* Orwall, *supra*, at 670 ("There are undeniable legal consequences of living in a female body. . . . Thus, woman specific language must be used in legal discussions of sex-based discrimination. . . .").

Sex is established at conception, when an X sperm or a Y sperm fertilizes an egg.[9] It is easily identifiable and is recorded with nearly 100% accuracy.[10] In contrast, the expression "assigned at birth" was developed to indicate that medical professionals had "assigned" a sex to members of a tiny class of babies whose sex could not easily be determined because they had both male and female reproductive characteristics, but who were nonetheless genetically either female or male.[11]

The extension of this limited medical description to imply that *every* human is arbitrarily "assigned" a sex that might not be his or her "real" sex serves the same purpose as Orwell's Newspeak: It denies women and girls the language necessary, when discussing priorities of the "transgender" movement, to speak out loud that they are unchangeably different from men and boys in ways that matter—especially in their experience of sex-based discrimination.[12] But just as two plus two equals four, every person is a member of either the female or male sex.

---

[9]     *See* Risa Aria Schnebly, *Sex Determination in Humans*, THE EMBRYO PROJECT ENCYCLOPEDIA (Jul. 16, 2021), https://embryo.asu.edu/pages/sex-determination-humans.

[10]     *See* Colin Wright, *A Biologist Explains Why Sex Is Binary*, THE WALL STREET JOURNAL (Apr. 9, 2023) (refuting arguments that the existence of intersex people renders "sex" indeterminate).

[11]     *See* Jessica A. Clarke, *Sex Assigned at Birth*, 122 COLUM. L. REV. 1821, 1834-36 (2022).

[12]     George Orwell, *Nineteen Eighty-Four* 309-10 (Plume/Harcourt Brace 2003 ed.); *see also* Stock, *supra* (discussing "conceptual engineering").

"Gender identity" is not sex and cannot be equated with sex. Courts have defined "gender identity" as some people's "deeply felt, inherent sense" that they are not the sex they are, which causes them to "express a gender" opposite to their sex.[13] To define it that way, however, necessarily means that gender identity is not objectively ascertainable and is instead the product of social convention, not the immutable fact of sex.[14] After all, how can a male "feel" or "sense" that the male is a woman and "express" that feeling by wearing dresses, earrings, and makeup, except by having lived in a society where that is demanded and expected of women?

Thus, to say that discrimination "on the basis of sex" is the same thing as discrimination "on the basis of gender identity" is to define sex discrimination by reference to a person's "feeling" of who they are and the "expression" they choose to give it. That is no way to run a railroad. The purpose of a legal category is to place people on notice of who is included and what is prohibited. Saying that discrimination "on the basis of sex" means discrimination based on the fact of being female or male does that by reference to objectively ascertainable characteristics.

---

[13]     *Grimm v. Glouchester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020); *see also Adams by and through Kasper v. Sch. Bd. of St. John's Cty.*, 57 F.4th 791, 834 (11th Cir. 2022) (Jill Pryor, J., dissenting);

[14]     *See* Sheila Jeffreys, *Gender Hurts: A Feminist Analysis of the Politics of Transgenderism* 1-2, 4 (Routledge ed. 2014).

Saying that sex discrimination hinges on "gender identity," however, erases sex as an ascertainable category and renders prohibitions against sex discrimination meaningless. A "feeling" of being a "gender" and an outward "expression" of that feeling are not sex. If someone is whatever sex she or he "feels," then sex discrimination happens whenever one "feels" that it happens. And because "gender" is a social construct, not a biological fact, a person's sense of his or her "gender identity" can change, to the extent that anyone "has a gender identity."[15] Thus, what is unlawful discrimination one day could well be perfectly legal the next.

That "gender identity" is incoherent as a category for sex-discrimination purposes is vividly illustrated by the record here. A doctor could lose federal funding because she has a female patient who claims to identify as a man who won't permit testing for cervical or ovarian cancer because the patient won't accept having female reproductive organs. (R.422). Another could lose federal funding because he has a male patient who claims to identify as a woman who resists a routine exam for prostate cancer because the patient won't accept having a prostate. (*Id.*). These

---

[15]    *See* Rebecca J. Cook, et al., *Unethical female stereotyping in reproductive health*, 109 INT'L. J. OF GYN. AND OBST. 255-58 (2010) ("Sex is biologically determined, whereas gender is socially or culturally constructed, as for romance language nouns."); *see generally* Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 8 ARCHIVES OF SEXUAL BEHAVIOR 3553 (2021).

examples put in stark relief the absurdity that the Secretary's replacement of the coherent category of sex with the incoherent category of "gender identity" will inevitably produce *en masse*.

Ultimately, the Secretary seeks to deny that *sex matters*.[16] But sex matters immensely where the objective biological facts of sex are determinative as to what conditions a patient might (or might not) have, what treatments might (or might not) be appropriate, and whether medical providers can be compelled over principled objections to administer opposite-sex hormones or perform radical surgeries in a futile effort to transform male bodies into female ones (or vice versa).[17] To say that a doctor who refuses puberty blockers to a minor who cannot know the consequences or denies life-altering surgery to a patient who may regret it later engages in discrimination "on the basis of sex" denies the reality of sex. It is Kafkaesque to threaten to bring the weight of a federal bureaucracy to bear upon providers who accept the objective fact of sex.

Nothing in *Bostock* permits this, for the reasons the answer brief and District Court's order explain. Furthermore, unlike this case, one could at least argue in

---

[16]    *See* Sex Matters, https://sex-matters.org/.

[17]    *Cf. U.S. v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring: The two sexes are not fungible. . . .") (internal quotation omitted).

*Bostock* that the objective fact of sex was irrelevant to the activity (employment) in which the plaintiffs experienced adverse treatment (firing) that members of the opposite sex would not. That Aimee Stephens was a man who wanted to "live and work full-time as a woman" didn't mean Stephens was not capable of performing Stephens's job at a funeral home equally as well as a woman.[18]  Stephens was fired because Stephens was male or, put differently, because of Stephens's sex.

But contrary to the Secretary's interpretation, *Bostock* does not hold that sex and "gender identity" are the same, does not hold that "gender identity" discrimination and sex discrimination are the same, and does not hold that men who claim to identify as women are entitled to legally compelled recognition as women— *e.g.*, that medical providers and schools must regard men who claim to identify as women as though they are women.[19] It holds that men cannot be discriminated against in employment because they are of the male sex. But when the objective fact of sex is relevant—when there are consequential differences between the sexes—it

---

[18]    *See* 140 S.Ct. at 1738 (describing Stephens's employment).

[19]    *Id.* at 1753 ("The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.").

not does not deny men equal treatment or discriminate to deal with those differences as they are.[20]

That is doubtless why *Bostock* refused to "prejudge" whether Title VII says anything about "sex-segregated bathrooms [and] locker rooms."[21] Sex, not "gender identity," matters in those places. Title IX and its regulations likewise recognize that sex, not "gender identity," matters with respect to living conditions, bathrooms, and sports teams at schools.[22] The Secretary's power to enforce the ACA is not a license to redefine discrimination "on the basis of sex" to make the fact of sex—the object of the statute—legally irrelevant.

### B.    The Secretary's interpretation reinforces invidious stereotypes about women and girls.

As discussed, the "expression" a person gives his or her "sense" of being a "gender" necessarily derives from social conventions about what it means to be a woman or a man. Unfortunately, those conventions typically reduce to harmful

---

[20]    *See, e.g.*, *id.* at 1740 ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are *similarly situated*.") (emphasis added); *Adams*, 57 F.4th at 816-17 (discussing separate-sex sports and bathrooms under Title IX and its regulations); Bauer *v. Lynch*, 812 F.3d 340, 351 (4th Cir. 2016) ("Put succinctly, an employer does not contravene Title VII when it utilizers physical fitness standards that distinguish between the sexes on the basis of their physiological differences but impose an equal burden of compliance. . . .").

[21]    140 S.Ct. at 1753.

[22]    *See, e.g.* 20 U.S.C. § 1686 (2022); 34 C.F.R. §§ 106.33, § 106.41.

stereotypes about roles, personalities, and behavioral traits produced by a culture that expects males to be assertive, hard-charging, and stoic and females to be passive, demure, and emotional.[23] There is a long history of discrimination against women and girls who resist those stereotypes and who dare to think and behave in ways that society typically expects of men.[24] Plainly, it is stigmatizing and harmful to women and girls to allow men to define womanhood by reference to overbroad, essentializing stereotypes about what it means to be female.

Take Dylan Mulvaney as an example. Mulvaney claims to be a woman by reference to damaging stereotypes of females, portraying them as controlled by emotion, unserious, fashion-obsessed, and irresponsible, among other things.[25] And because powerful players like Walmart and Maybelline demand that Mulvaney be recognized as a woman notwithstanding Mulvaney's male sex, Mulvaney has a gigantic platform to convey these stereotypes to millions, including young women

---

[23]    *E.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 256 (1989) (involving a woman told she should "walk more femininely, talk more femininely, dress more femininely, wear make-up," etc.); Jeffries, *supra*, at 1-2 ("Gender, in traditional patriarchal thinking, ascribes skirts, high heels and a love of unpaid domestic labor to those with female biology, and comfortable clothing, enterprise, and initiative to those with male biology."); Lindsay Bever, *From heart disease to IUDs: How doctors dismiss women's pain*, THE WASHINGTON POST (Dec. 13, 2022).

[24]    *See, e.g.*, *Hopkins*, 490 U.S. at 256-58.

[25]    *See* Jean Hatchet, *The performance of a lifetime*, THE CRITIC (Apr. 10, 2023), https://thecritic.co.uk/the-performance-of-a-lifetime/.

and girls just beginning to decide who they are, what they want, and what they can achieve.[26]

So, we have a male defining *for women* what it means to be a woman in ways that reduce women to the stereotypes they have fought to eliminate. Perhaps not in intention, but certainly in effect, Mulvaney's expression of the female "sex" is no different from men telling women that their place is in the kitchen or that they don't need to go to college. In the same way, it "elevates male identities, priorities, and desires, and undermines women's rights" to equal treatment.[27]

To say that a male who expresses stereotypes of women and girls as an "identity" must be recognized by medical providers as a woman or girl—*i.e.*, must be treated as woman or girl—entrenches these damaging stereotypes. That hurts women, profoundly so in medical care, where women have historically suffered discrimination because of those stereotypes.[28] One need not look far for examples of

---

[26]    *See* Rachyl Jones, *Tik Tok Watched Dylan Mulvaney Become a Woman One Day at a Time*, OBSERVER (Sept. 10, 2022), https://observer.com/2022/09/tiktok-watched-dylan-mulvaney-become-a-woman-one-day-at-a-time/.

[27]    Christen Price, *Women's Spaces, Women's Rights: Feminism and the Transgender Rights Movement*, 103 MARQ. L. REV. 1509, 1511 (2020).

[28]    *See* Bever, *supra*; *see also* Anke Samulowitz, et al., *"Brave Men" and "Emotional Women": A Theory-Guided Literature Review on Gender Bias in Health Care and Gendered Norms towards Patients with Chronic Pain*, PAIN RES. MGT. (Feb. 25, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5845507/; Cook, et al., *supra*.

women who, based on stereotypes, are told their complaints of pain are "dramatic" or "hysterical" or that they "looked too good" to be suffering.[29] The Rolling Stones' song *Mother's Little Helper* says all anyone needs to know.

When they inform a provider's decisions, these stereotypes have potentially devastating consequences, like missed diagnoses of life-threatening ailments and the treatment of pain as a psychological rather than physical problem.[30] The Secretary's effort to compel medical providers to recognize men who claim to "identify as women"—and who present to clinicians by reference to such stereotypes—as though they actually are women can only exacerbate this kind of sex discrimination by reinforcing those stereotypes.

Furthermore, this sea change in defining discrimination "on the basis of sex" grants men license to make extreme demands of women that would have been unthinkable until recently. These include demands that women affirmatively validate a man's claimed sense of identity as a woman by using opposite-sex pronouns and admitting the man to spaces where women are intimate and vulnerable, such as

---

[29]    *See* Bever, *supra* ("One woman was told she was being 'dramatic' when she pleaded for a brain scan after suffering months of headaches and pounding in her ears."); Sumulowitz, et al., *supra* (describing forms of stereotype-bias in the provision of pain management to women documented in scientific literature).

[30]    *See* Bever, *supra*; Sumulowitz, et al., *supra*.

changing rooms, showers, and domestic violence shelters.[31] The Secretary would add to that list women doctors who know that male patients have male biology, who feel obligated to treat them in accord with that reality, and who deny that any medical intervention can transform a male into a female. The social costs (e.g., harassment, deplatforming) to women who resist demands like these are already severe.

Empowering the Secretary to redefine discrimination "on the basis of sex" as discrimination "on the basis of gender identity" makes these demands legally coercive. Sadly, the Secretary is not alone: In March, the Office of Personnel Management issued guidance threatening that federal employees who refuse to refer to a male who claims to identify as a woman with female pronouns with culpability for unlawful sexual harassment.[32] The result of measures like these is legalized discrimination against women who resist sexist stereotypes and maintain that women are different from men in ways that are important.

That is an affront to what Title IX promises women—namely, that women will *not* be governed by male-engineered stereotypes of womanhood.[33] To say that it

---

[31]    *See* Price, *supra*, at 1525-1535; *see also Adams*, 57 F.4th at 812-14 (describing the unambiguous meaning of the term "sex").

[32]    *See* U.S. Office of Personnel Mgt., Guidance Regarding Gender Identity and Inclusion in the Federal Workplace 2-3 (2023).

[33]    *See* Note, *Cheering On Women and Girls in Sports*, 110 Harv. L. Rev. 1627, 1640 (1997) ("[W]omen's attitudes towards sports are socially constructed and have

instead requires females to accept the categorical untruth that *a male is a female* breaks that promise and offends the separate and equal dignity of women. After all, Title IX is supposed to protect women's rights to develop and display the same assertiveness, confidence, and authority historically permitted only in men.

## II.  The Secretary's interpretation harms women and girls by medicalizing "gender identity."

So-called "gender affirming care" is the endgame of the Secretary's interpretation of the ACA and Title IX.[34] That euphemism for drugs and surgery classifies "gender identity" as a medical problem requiring medical interventions and, as a principle for enforcing the ACA, dangerously incentivizes providers to prescribe them when they otherwise might not.[35]

That incentive is profoundly flawed and gravely hazardous. Many people who claim to "identify as a gender" opposite to their sex—including many diagnosed

---

been limited by discrimination and stereotypes. Congress passed Title IX to combat such discrimination and stereotypes . . . .").

[34]     *See supra* at 5 & n.4.

[35]     *See* Collin M. Wright and Emma N. Hilton, *The Dangerous Denial of Sex*, THE WALL STREET JOURNAL (FEB. 13, 2020), https://www.wsj.com/articles/the-dangerous-denial-of-sex-11581638089; Jennifer Bilek, *Custom Vaginoplasty "For Your Inner Well Being*," THE ELEVENTH HOUR (Oct 23, 2023) ("Transgenderism seems to be the only non-medical condition needing medical intervention, medical insurance and social validation as an identity."), https://www.the11thhourblog.com/post/custom-vaginoplasty-for-your-inner-well-being.

with gender dysphoria—ultimately desist and resume identification with their sex.[36] There is ample reason to conclude that "gender identity" is heavily influenced by psychological, social, and peer-group factors that are transitory or treatable without medical interventions.[37] With minors, issues of maturity and judgment raise the important question whether a minor can ever consent to radical interventions to "affirm" a feeling that she or he has a "gender" opposite to her or his sex.[38]

These risks are acutely borne by teenage girls. There has been a recent and sharp increase in teenage girls presenting in clinics, claiming a male "identity," and seeking "gender affirming" interventions like hormones and surgery.[39] Opposite-sex hormones cause irreversible deepening of the voice, facial hair growth, male pattern baldness, and changes to sexual organs in women and girls.[40] Other consequences

---

[36]     *See* Anthony Latham, *Puberty Blockers for Children: Can They Consent*, 28 THE NEW BIOETHICS 268, 270-72 (2022); Littman, *supra*, at 3364-68.

[37]     *See* Latham, supra; Littman*, supra*; Kenneth J. Zucker, *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 ARCHIVES OF SEXUAL BEHAVIOR 5 (2019).

[38]     *See* Latham, *supra*.

[39]     Amelia Goldman, *'An explosion': what is behind the rise in girls questioning their gender* identity, THE Guardian (Nov. 24, 2022); Why *are so many teenage girls appearing in gender clinics?*, THE ECONOMIST (Sep. 1, 2018); Lisa Littman, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*, PLOS ONE, at 4 (Aug. 16, 2018).

[40]     University of California San Francisco, *Information on Testosterone Hormone Therapy* (Jul. 2020), https://transcare.ucsf.edu/article/information-testosterone-hormone-therapy.

like effects on fertility, sexual function, and bone and cardiac health are, at best, poorly understood.[41]

So-called female-to-male surgeries include so-called "top surgery," including the removal of breasts, and "bottom surgery," including the removal of all or parts of female reproductive organs and "phalloplasty," the creation of a "neopenis" from tissue removed from other parts.[42] The consequences can be tragic—heartbreaking stories of detransitioners are not hard to find[43]—and are ultimately futile. Hormones and surgery cannot make a female a male any more than a sense of identity can.

The dangers these interventions present are exactly why many governments in Europe and this country are moving to limit or prohibit puberty blockers, hormone therapy, and other interventions for minors.[44] Legislative debate and deliberation is

---

[41]    *See, e.g.*, *The Evidence to support medicalized gender transitions in adolescents is worryingly weak*, THE ECONOMIST (Apr. 5, 2023); Allison Clayton, *Gender-Affirming Treatment of Gender Dysphoria in Youth: A Perfect Storm Environment for the Placebo Effect*, 52 ARCHIVES OF SEXUAL BEHAVIOR 483, 485-486 (2022).

[42]    *See, e.g.*, Cleveland Clinic, *Female-to-Male (FTM) Top Surgery*, https://my.clevelandclinic.org/health/treatments/21861-female-to-male-ftm-top-surgery (last accessed June 1, 2023); Cleveland Clinic, *Phalloplasty*, https://my.clevelandclinic.org/health/treatments/21585-phalloplasty (last accessed June 1, 2023).

[43]    *See, e.g.*, Rikki Schlott, *'I literally lost organs:' Why detransitioned teens regret changing genders*, THE NEW YORK POST (June 18, 2022).

[44]    *See, e.g.,* Fla. S.B. 254, 2023 Leg., Reg Sess. (Fla. 2023); Vulnerable Child Prot. Act, 2023 Idaho Laws Ch. 292 (Idaho 2023); Gender Transition Procedures for

the right way to resolve these controversies. An unaccountable Department head purportedly interpreting a statute prohibiting discrimination "on the basis of sex" has no right to incentivize medical experimentation on young women and girls.

## III.     The Secretary's interpretation threatens sports for women and girls.

The Secretary's power grab does not end at the clinician's office. Because the ACA's antidiscrimination provision incorporates Title IX, endorsing his claim of authority to redefine discrimination "on the basis of sex" threatens separate-sex sports and the important advances women and girls have made because of them.

### A.     Sex-based separation is essential to women's equal participation in the benefits of athletics.

To understand why single-sex sports are closely linked to reducing sex-based discrimination against women and girls, start with this observation:

> At nearly every park in the country, young girls chase each other up and down soccer fields, volley back and forth on tennis courts, and shoot balls into hoops. And at colleges, it is now commonplace to see young women training in state-of-the-art athletic facilities, from swimming pools to basketball arenas, with the records of their accolades hung from the rafters.[45]

---

Minors, 2023 Ind. Legis. Serv. P.L. 10-2023 (Ind. 2023); Act of Mar. 23, 2023, 2023 Ky. Laws Ch. 132 (Ky. 2023); N.D. H.B. 1254, 68th Leg. Assemb., Reg. Sess. (N.D. 2023) (enacted); Act of Feb. 14, 2023, South Dakota Laws Ch. 127 (S.D. 2023); Act of Jan. 28, 2023, 2023 Utah Laws S.B. 16 (Utah 2023); Leor Sapir, *Yes, Europe Is Restricting "Gender-Affirming Care,"* CITY JOURNAL (Feb. 13, 2023), https://www.city-journal.org/article/yes-europe-is-restricting-gender-affirming-care

[45]     *Adams*, 57 F.4th at 818  (Lagoa, J., specially concurring).

The ubiquity of female participation in high school and collegiate athletics is the direct result of Title IX and its implementing regulations.[46]

Title IX and its regulations ensure that women and girls enjoy equal participation in athletics—or, put differently, that they do not suffer discrimination "on the basis of sex"—by requiring that women have equal access to and funding for sports and permitting (and sometimes requiring) separate, single-sex sports teams.[47] The results for women and girls have been astounding.

Take high school. In 1972—the year Title IX was adopted—girls represented only 7.4% of total student-athletes, with boys dominating at 92.6%.[48] That's a participation gap of 85.2% or a ratio of 12.5 boy athletes for every girl. By 2022, however, girls represented 42.5% of student-athletes and boys represented 57.5%.[49]

---

[46]     *See Parker v. Franklin Cty. Comm. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012) ("Title IX has gone a long way in changing society's view of female athletes by . . . encouraging female participation and interest in sports."); *Cohen v. Brown Univ.*, 101 F.3d 155, 188 (1st Cir. 1996) ("[T]itle IX has changed the face of women's sports as well as our society's interest in and attitude toward women athletes and women's sports.").

[47]     *See* 34 C.F.R. § 106.41; *see also* Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. GENDER L. & POLICY 69, 71-73 (2020).

[48]     *See* NAT'L. FED. OF STATE H.S. ASSOCS., HIGH SCHOOL ATHLETICS PARTICIPATION SURVEY (2022), https://www.nfhs.org/media/5989280/2021-22_participation_survey.pdf (showing 294,015 girls and 3,666,917 boys).

[49]     *See id.* (showing 3,241,472 girls and 4,376,582 boys).

In fifty years, girls' participation jumped by 35.1%, narrowing the gap with boys to 15%. For every 1.35 boys playing sports, there is at least one girl also competing.

The effect at colleges and universities has been the same. In 1982, the participation gap in NCAA Division I athletics was 47.2%, with women comprising 26.4% of total athletes and men comprising 73.6%.[50] That was almost three male athletes for every female. By 2020, the gap closed to 47.1% women and 52.9% men or 1.1 male athletes for every female.[51] DII and III sports mirror that trend.[52]

These increases in female athletic participation are inextricably tied to women's advances in business, government, and society. It is no secret that participation in school athletics correlates with academic success, social integration, and personal satisfaction.[53] If you want to know what that means for women:

> Girls who play sports stay in school longer, suffer fewer health problems, enter the labor force at higher rates, and are more likely to land better jobs. They are also more likely to lead. Research shows stunningly that 94 percent of women C-Suite executives today played sport, and over half played at a university level. Being engaged in sports

---

[50]    N.C.A.A, THE STATE OF WOMEN IN COLLEGE SPORTS 18 (2022), https://s3.amazonaws.com/ncaaorg/inclusion/titleix/2022_State_of_Women_in_College_Sports_Report.pdf (showing 26,461 women and 73,742 men).

[51]    *Id.* (showing 86,645 women and 97,423 men).

[52]    *See id.* at 18-19.

[53]    *See* Coleman, *supra*, at 104-05; Dionne L. Koller, *Not Just One of the Boys: A Post-Feminist Critique of Title IX's Vision for Gender Equity in Sports*, 43 CONN. L. REV. 401, 412-13 (2010).

inculcates the values of fitness and athleticism for lifelong health and wellness and imparts additional socially valuable traits, including teamwork, sportsmanship, and leadership, as well as individually valuable traits including goal setting, time management, and grit.[54]

For example, Hewlett Packard and eBay CEO Meg Whitman, Sunoco CEO Lynn Elsenhans, General Motors CEO Mary Barra, U.S. Senator Kelley Ayotte, U.S. Senator Kristin Gillibrand, North Dakota Governor Kristi Noem, and Massachusetts Governor Maura Healey were all college athletes.

### B. Interpreting Title IX to prohibit discrimination "on the basis of gender identity" will exclude women and girls from athletics and their important benefits.

Recognizing discrimination "on the basis of gender identity" as sex discrimination under Title IX means backtracking on women's equal participation in sports by opening their teams to male competitors who "express themselves as women," which will roll back the gains women and girls have made through robust participation in single-sex sports because the male comparative advantage in athletics makes it impossible for females to compete with males on equal terms.

Why males have overwhelming advantages in athletic competition needn't be rehashed in detail here.[55] It suffices to say that those advantages "appear, on

---

[54]    *Adams*, 57 F.4th at 820-21 (Lagoa, J., specially concurring) (cleaned up) (citing sources).

[55]    *See* Coleman, *supra*, at 88-99.

assessment of the performance data, insurmountable,"[56] and they exist "across the board, at both the elite and non-elite levels of almost all standard sports and events."[57] When females are forced to compete against males, even those who claim to identify as women or girls, females "have little chance of winning."[58]

Examples aren't hard to find. Everyone knows about Lia Thomas, who dominated NCAA Women's Division I women's swimming after a so-so career on a men's team. CeCe Telfer placed in multiple events at the women's DII Outdoor Track and Field Championships after competing without success on a men's team. June Eastwood earned a spot on a Women's DI cross-country team after competing without success with men. High school athletes have similar experiences.[59]

Plainly, then, "removing distinctions based on biological sex from sports . . . harms not only girls' and women's prospects in sports, but also hinders their

---

[56]    Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 SPORTS MEDICINE 199, 200 (2020).

[57]    Coleman, *supra*, at 87.

[58]    *See* Allison K. Heather, *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*, Int. J. Environ. Res. Public Health (Jul. 26, 2022), https://doi.org/10.3390/ijerph19159103.

[59]    *E.g.*, Pat Eaton-Robb, *Connecticut runners part of debate over transgender athletes*, ASSOCIATED PRESS (Feb. 24, 2019), https://apnews.com/article/ct-state-wire-north-america-gender-identity-connecticut-sports-dcbca5cf940548628dba351f6c91bcd9.

development and opportunities beyond the realm of sports."[60] It's not hard to see why. If a male places first in a female track event, there are females who place second, eighth, or not at all. For every male starter on a female lacrosse team, there are females who sit on the bench or don't make the cut. Those women lose opportunities for college recruitment, athletic scholarships, and the traits that make athletics so important to female achievement. Disillusionment and dropout aren't hard to predict; no one wants to play with a stacked deck.

Thus, conflating sex and "gender identity" renders the category sex meaningless in school sports.[61] Allowing males to use the male comparative athletic advantage to run the board against females in competition after competition seems an awful lot like discrimination against women and girls "on the basis of sex."

That is doubly true when one considers the risks to women's physical safety from defining males as females for purposes of women's sports. Last September, a North Carolina high school senior named Payton McNabb suffered a concussion and neck injury after a male athlete who claims a "transgender" identity spiked a ball into her face during a volleyball game. Testifying before the state legislature in

---

[60]    *Adams*, 57 F.4th at 821 (Lagoa, J., specially concurring).

[61]    Coleman, *supra*, at 87 ("[I]f both 'sex' and 'gender identity' became the basis for eligibility for girls' and women's sport . . . inherent differences would no longer be the rationale for separate sex sport. . . .").

support of a bill to maintain single-sex sports, she stated that she continues to struggle with the effects of her injuries, including impaired vision, partial paralysis on the right side of her body, unremitting headaches, anxiety, and depression.[62]

Further still, if Title IX requires schools to refrain from discriminating "on the basis of gender identity," males who claim to identify as women or girls will ultimately be defined as women and girls in the locker room. Male intrusion where women are most vulnerable is a "threat to women's boundaries," denies them intimate spaces, and increases their exposure to sexual violence.[63] To say that any male whose "gender identity" is woman or girl can access a female locker room is necessarily to say that "sex-based boundaries do not matter (or matter less than the wishes of males who wish to cross them)."[64] As a Lia Thomas competitor explained after seeing Thomas in the locker room with male genitals exposed, "[w]e did not give our consent, [and] they did not ask for our consent" and that violation of female dignity was "worse than" being forced to compete against a male.[65]

---

[62]    Yaron Steinbuch, *Injured North Carolina Volleyball player urges transgender ban for female sports teams in schools,* NEW YORK POST (April 21, 2023), https://nypost.com/2023/04/21/nc-volleyball-player-urges-transgender-ban-for-schools-female-sports/

[63]    Price, *supra,* at 1535, 1539.

[64]    *Id.*

[65]    Yael Halon, *Lia Thomas exposed 'male genitalia' in women's locker room after meet, Riley Gaines says: Dropped 'his pants',* FOX NEWS (Feb. 9, 2023),

In sports, sex matters. And separation based on sex is as essential to a safe and equal playing field for women and girls as weight or age classes often are for other competitors.[66] To deny that objective reality, as the Secretary does, renders it legally irrelevant and deprives women and girls of the life-changing benefits that robust participation in school-sponsored athletics confers.

## **CONCLUSION**

The District Court's judgment correctly recognizes that sex and being female are objective facts that matter. It should be affirmed.

Dated: June 2, 2023                    Respectfully Submitted,

*/s/ Kara Dansky*
Kara Dansky
WOMEN'S DECLARATION INTERNATIONAL USA
P.O. Box 21160
Washington, D.C.  20009
(800) 939-6636
president@womensdeclarationusa.com

Samuel J. Salario, Jr.
LAWSON HUCK GONZALEZ, PLLC
1700 South MacDill Avenue
Suite 300
Tampa, FL. 33629
813-765-5113
samuel@lawsonhuckgonzalez.com

---

https://www.foxnews.com/media/lia-thomas-exposed-male-genitalia-womens-locker-room-after-meet-riley-gaines-dropped-pants .

[66]     *See* Hilton, *supra*, at 200.

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that:

1. This brief complies with the type-volume limitation, as provided in Circuit Rule 32.2 and Fed. R. App. P. 29(a)(5), because, exclusive of the exempted portions of the brief as provided by Fed. R. App. P. 32(f), the brief contains 6,447 words.

2. This brief complies with the type-face and type-style requirements, as provided in Fed. R. App. P. 32(a) and Circuit Rule 32 because the brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

3. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: June 2, 2023                         */s/ Kara Dansky*
                                             Kara Dansky

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Kara Dansky*
Kara Dansky