No. 23-10078

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

SUSAN NEESE; JAMES HURLY,

*Plaintiffs-Appellees,*

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH
AND HUMAN SERVICES; UNITED STATES OF AMERICA,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas
Case No. 2:21-CV-00163

## BRIEF OF THREE FEMALE ATHLETES AS *AMICI CURIAE* IN
## SUPPORT OF APPELLEES AND FOR AFFIRMANCE

JOHANNES WIDMALM-DELPHONSE
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jwidmalmdelphonse@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

*Attorneys for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the Appellants' Certificate of Interested Persons and Appellees' Certificate of Interested Persons–the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amici Curiae*

     Chelsea Mitchell

     Madison Kenyon

     Kassidy Comer

*Counsel for Amici Curiae*

     Johannes Widmalm-Delphonse

     John J. Bursch

     Alliance Defending Freedom

                   Respectfully submitted,

                 By: */s/ John J. Bursch*
                     JOHN J. BURSCH

             *Attorneys for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

TABLE OF AUTHORITIES................................................... iii

INTEREST OF AMICI CURIAE................................................1

INTRODUCTION...........................................................2

ARGUMENT ..............................................................4

I.    Title IX prohibits sex discrimination, not sex blindness.................4

    A.    Title IX's plain text prohibits treating one sex worse than the other sex. ...............................................4

    B.    Title IX does not prohibit all sex distinctions. .......................8

    C.    Title IX's regulations and post-enactment history confirms that sex distinctions are sometimes necessary to promote equal educational opportunities........................10

II.    Because Title IX permits and sometimes requires sex distinctions, *Bostock* is inapposite. ...............................18

    A.    Because Title IX permits sex distinctions, *Bostock* is inapposite. ...........................................................18

    B.    The federalism canon requires a narrow interpretation of Title IX............................................................25

CONCLUSION ...........................................................29

CERTIFICATE OF COMPLIANCE......................................31

CERTIFICATE OF SERVICE..............................................32

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. Kasper v. School Board of St. Johns County*,
  57 F.4th 791 (11th Cir. 2022)..................5, 10, 11, 13, 19, 20, 22, 23

*AMG Capital Management, LLC v. Federal Trade Commission*,
  141 S. Ct. 1341 (2021) ....................................................................17

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ..........................................................................7

*B.P.J. by Jackson v. West Virginia State Board of Education*,
  No. 23-1078, 2023 WL 2803113 (4th Cir. Feb. 22, 2023) ..............28

*Bauer v. Lynch*,
  812 F.3d 340 (4th Cir. 2016) ............................................................9

*BFP v. Resolution Trust Corp.*,
  511 U.S. 531 (1994) ........................................................................29

*Board of Education of Hendrick Hudson Central School District v. Rowley*,
  458 U.S. 176 (1982) ........................................................................26

*Bond v. United States*,
  572 U.S. 844 (2014) ..................................................................26, 27

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ................................. 2, 3, 4, 5, 19, 20, 22, 28

*Boulahanis v. Board of Regents*,
  198 F.3d 633 (7th Cir. 1999) ..........................................................22

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ..........................................................................8

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
  190 F.3d 705 (6th Cir. 1999) ..........................................................11

*Cannon v. University of Chicago,*
    441 U.S. 677 (1979) ........................................................8

*Cape v. Tennessee Secondary School Athletic Association,*
    563 F.2d 793 (6th Cir. 1977) .........................................11

*Chalenor v. University of North Dakota,*
    291 F.3d 1042 (8th Cir. 2002) ......................................21

*Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) ................................11, 17

*Cohen v. Brown University,*
    101 F.3d 155 (1st Cir. 1996) .......................8, 17, 20, 21

*Cohen v. Brown University,*
    991 F.2d 888 (1st Cir. 1993) ...................................16, 17

*CSX Transportation, Inc. v. Alabama Department of Revenue,*
    562 U.S. 277 (2011) .....................................................5, 6

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    142 S. Ct. 1562 (2022) ..............................................26, 29

*Fitzgerald v. Barnstable School Committee,*
    555 U.S. 246 (2009) ......................................................22

*Franciscan Alliance, Inc. v. Burwell,*
    227 F. Supp. 3d 660 (N.D. Tex. 2016) ..........................28

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) .........................................................5

*Gebser v. Lago Vista Independent School District,*
    524 U.S. 274at (1998) ...................................................29

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ......................................................27

*Grimm v. Gloucester County School Board,*
    972 F.3d 586 (4th Cir. 2020) ........................................27

*Grove City College v. Bell*,
465 U.S. 555 (1984) ...................................................................... 17

*Hang On, Inc. v. City of Arlington*,
65 F.3d 1248 (5th Cir. 1995) ..................................................... 9, 18

*Hecox v. Little*,
479 F. Supp. 3d 930 (D. Idaho 2020) ............................................ 28

*Hecox v. Little*,
No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023) ........... 28

*Jackson v. Birmingham Board of Education*,
544 U.S. 167 (2005) ................................................................. 6, 26

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905) ......................................................................... 26

*Kelley v. Board of Trustees*,
35 F.3d 265 (7th Cir. 1994) ...................................................... 16, 17

*Kleczek v. Rhode Island Interscholastic League, Inc.*,
612 A.2d 734 (R.I. 1992) ............................................................... 11

*Mansourian v. Regents of University of California*,
602 F.3d 957 (9th Cir. 2010) ............................................. 13, 14, 17

*McCormick ex rel. McCormick v. School District of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004) .................................................. 7, 13, 17

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ......................................................... 20

*Miami University Wrestling Club v. Miami University*,
302 F.3d 608 (6th Cir. 2002) ..................................................... 8, 21

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012) ....................................................................... 26

*Neal v. Board of Trustees of California State Universities*,
198 F.3d 763 (9th Cir. 1999) ............................................. 14, 20, 22

*Niz-Chavez v. Garland,*
    141 S. Ct. 1474 (2021) ..................................................... 4

*North Haven Board of Education v. Bell,*
    456 U.S. 512 (1982) ...................................................... 15

*Pederson v. Louisiana State University,*
    213 F.3d 858 (5th Cir. 2000) ............................. 11, 14, 17

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) ........................................ 20

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) .................................................... 26, 28

*Residents of Gordon Plaza, Inc. v. Cantrell,*
    25 F.4th 288 (5th Cir. 2022) ........................................ 25

*Roschen v. Ward,*
    279 U.S. 337 (1929) ....................................................... 2

*Sackett v. EPA,*
    598 U.S. ----, 2023 WL 3632751 (May 25, 2023) ............... 21, 25, 26

*Sandifer v. U.S. Steel Corp.,*
    571 U.S. 220 (2014) ...................................................... 19

*Texas Department of Housing & Community Affairs v. Inclusive
    Communities Project, Inc.,*
    576 U.S. 519 (2015) ...................................................... 18

*United States v. Champlin Refining Co.,*
    341 U.S. 290 (1951) ........................................................ 7

*United States v. Lauderdale County,*
    914 F.3d 96 (5th Cir. 2019) ............................................ 4

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985) ................................................. 15, 16

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................. 8, 9, 23

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) .......................................................................7

*Williams v. School District of Bethlehem*,
    998 F.2d 168 (3d Cir. 1993)................................................... 14, 17

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .....................................................................26

## Statutes

20 U.S.C. § 1681 ............................................................... 2, 4, 5, 6, 9

20 U.S.C. § 1686 ................................................................................9

20 U.S.C. § 1687 ..............................................................................17

42 U.S.C. § 18116 ......................................................................2, 26

Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974) .......................................15

## Other Authorities

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation
    of Legal Texts* (2012)................................................................. 7, 15

Black's Law Dictionary (5th ed. 1979) .......................................................5

Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in
    the Female Category of Sport: Perspectives on Testosterone
    Suppression and Performance Advantage*, 51 SPORTS
    MEDICINE (2021) .........................................................................25

Felix Frankfurter, *Some Reflections on the Reading of Statutes*,
    47 COLUM. L. REV. 527 (1947) .......................................................29

Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why
    Current Policies Are Required to Ensure Equality of
    Opportunity*, 14 MARQ. SPORTS L. REV. 11 (2003)..........................17

Office for Civil Rights, A Policy Interpretation: Title IX and
    Intercollegiate Athletics (Dec. 11, 1979).......................................16

Office for Civil Rights, Letter from Peter Holmes to Chief State
School Officers, Title IX Obligations in Athletics (Nov. 11,
1975) ........................................................................................... 16

U.S. Department of Education, Notice of Proposed Rulemaking,
Title IX of the Education Amendments of 1972 (Apr. 6,
2023) .................................................................................... 23, 24

Webster's Third New International Dictionary (1966) ................... 4, 5, 6

## **<u>Regulations</u>**

34 C.F.R. § 106.33 ...................................................................... 12

34 C.F.R. § 106.34 ................................................................. 10, 12

34 C.F.R. § 106.41 ............................................................ 12, 15, 23

44 Fed. Reg. 71,413 (Dec. 11, 1979) ........................................... 16

Nondiscrimination on the Basis of Sex in Education Programs and
Activities Receiving or Benefiting from Federal Financial
Assistance, 40 Fed. Reg. 24,128 (June 4, 1975) ...................... 12, 15

## INTEREST OF AMICI CURIAE[1]

Chelsea Mitchell, Madison Kenyon, and Kassidy Comer are female athletes who have benefited from Title IX's guarantee of equal educational opportunities for women and girls. Mitchell and Kenyon have also competed against—and lost—in track and field events to males who identified as women. Mitchell, Kenyon, and Comer's experiences show that incorporating *Bostock*'s reasoning to Title IX upends the very opportunities Title IX was meant to protect, and that the Secretary's reading of the statute is therefore wrong.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than Amici and their counsel made any monetary contribution intended to fund the preparation or submission of this brief. Counsel were timely notified of this brief as required by Fed. R. App. P. 29, and all parties consented to its filing.

# INTRODUCTION

Section 1557 of the Affordable Care Act (ACA) prohibits discrimination "on the ground prohibited under … title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Since Title IX prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681(a), that means the ACA does the same. No more, no less. As Justice Oliver Wendell Holmes said, "there is no canon *against* using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339 (1929) (emphasis added).

Yet Appellants Xavier Becerra, the Secretary of the Department of Health and Human Services, together with the United States, seek to reinterpret the ACA and, by extension, Title IX. They argue the ACA prohibits discrimination on the basis of sexual orientation and gender identity and argue that this comes directly from Title IX's text in light of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

But Title IX says nothing about sexual orientation or gender identity. Its text, purpose, and historical context each point to its true goal: remedying historical discrimination against women in education. Even the Secretary does not argue that the term "sex" means anything other than the biological differences between men and women.

Undeterred by the text and evident purpose, the Secretary invokes *Bostock*. But *Bostock* only said that employers may not consider sex when firing employees. *Bostock* does not prohibit noticing sex in other

contexts, whether under Title VII (*e.g.* bathrooms) or Title IX. In fact, Title IX expressly allows sex distinctions—and sometimes requires them. *Bostock*'s demand for sex-blindness loses its moorings in contexts where sex can and must be taken into account.

Worse, the Secretary's theory would scuttle "one of [Title IX's] major achievements, giving young women an equal opportunity to participate in sports." *Id.* at 1779 (Alito, J., dissenting). Amici curiae are female athletes who have received scholarships and other opportunities to compete on collegiate sports teams—opportunities almost unheard of 50 years ago, before Title IX required women's-only teams. Amici curiae want to ensure that women's sports continue so that future female athletes also have opportunities to compete, earn scholarships, and win on a fair playing field.

The Secretary's interpretation finds no support in Title IX or *Bostock* and would leave women and girls without equal opportunities in its wake. This Court should affirm the district court's judgment.

# ARGUMENT

## I.     Title IX prohibits sex discrimination, not sex blindness.

Title IX says no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity." 20 U.S.C. § 1681(a). The statute's plain meaning and purpose are to prohibit sex-based discrimination in educational programs, particularly discrimination against women. This does not prohibit schools from noticing sex. Just the opposite. Sex-conscious decisions are sometimes necessary to promote equal educational opportunities.

### A.     Title IX's plain text prohibits treating one sex worse than the other sex.

1. To interpret a statute, "we begin with the text." *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019). We give "terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021). And courts must not "add to, remodel, update, or detract from old statutory terms" to fit their "own imaginations," *Bostock*, 140 S. Ct. at 1738, or to "better reflect the current values of society," *id.* at 1756 (Alito, J., dissenting).

Start with the phrase "on the basis of sex." In 1972, "sex" was commonly understood to refer to the biological differences between males and females. *See Sex*, Webster's Third New International Dictionary (Webster's Third) 2081 (1966) ("one of the two divisions of

4

organic esp. human beings respectively designated male or female");
*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812
(11th Cir. 2022) (noting "the overwhelming majority of dictionaries" in
the 1970's defined "'sex' on the basis of biology and reproductive
function"). As the Supreme Court put it just after Congress passed Title
IX, sex is an "immutable" trait, "determined solely by the accident of
birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). And the
Secretary agrees that this Court "can assume … that sex refers only to
biological distinctions between male and female." Br. for Defs.-
Appellants (Defs.' Br.) 32 n.2 (Doc. 19) (cleaned up).

Next, consider the word "discrimination." In one sense, to
"discriminate" can simply mean "to make a distinction." Webster's
Third 648. But to "be subjected to discrimination," 20 U.S.C. § 1681,
implies a distinction for the wrong reasons, or "to make a difference in
treatment or favor on a class or categorical basis in disregard of
individual merit," Webster's Third 648. In other words, discrimination
is the "failure to treat all persons equally when no reasonable
distinction can be found between those favored and those not favored."
*CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286 (2011)
(quoting Black's Law Dictionary 420 (5th ed. 1979)); *accord Bostock*, 140
S. Ct. at 1740 ("To 'discriminate against' a person … would seem to
mean treating that individual worse than others who are similarly
situated.").

So to subject someone to discrimination on the basis of sex must mean subjecting them to "differential" or "less favorable" treatment based on their biological status as male or female, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where "there is no justification for the difference in treatment," *CSX*, 562 U.S. at 287.

Add to this that the statute prohibits "discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). So, understanding what constitutes a reasonable distinction between men and women depends on whether the sexes are similarly situated in educational programs like classrooms, social organizations, extracurricular activities, and athletics.

Nearby language adds further clarity. The statute says no person "shall, on the basis of sex, be excluded from participation in [or] be denied the benefits of … any education program or activity." 20 U.S.C. § 1681(a). To "exclude" means "to shut out," "hinder the entrance of," or "bar from participation, enjoyment, consideration, or inclusion." Webster's Third 793. And to "deny" in this context means "to turn down or give a negative answer to." *Id.* 603.

Put this all together and the plain meaning is straightforward: Title IX prohibits schools from treating one sex worse than the other sex when it comes to the full and equal enjoyment of *educational opportunities*, which of course includes athletics.

2. While we start with the words themselves, the text should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). Title IX's historical backdrop—the lack of educational opportunities for women—reveals the statute's purpose: to promote opportunities for women.

A text "cannot be divorced from the circumstances existing at the time [the statute] was passed, and from the evil which Congress sought to correct and prevent." *United States v. Champlin Refin. Co.*, 341 U.S. 290, 297 (1951). After all, "interpretation always depends on context," and "context always includes evident purpose."[2] Here, understanding a document's "overarching purpose," which is "evident in the text" itself, is an intuitive part of interpreting the statute. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

"The circumstances and the evil" that motivated Title IX "are well-known." *Champlin*, 341 U.S. at 297. Numerous courts have recognized that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704

---

[2] Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012).

& n.36 (1979).[3] That means "Title IX's remedial focus is, quite properly, not on the overrepresented gender, but on the underrepresented gender; in this case, women." *Cohen v. Brown Univ.*, 101 F.3d 155, 175 (1st Cir. 1996) (*Cohen II*); *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002) (making the same point).

### B.    Title IX does not prohibit all sex distinctions.

While Title IX prohibits sex *discrimination*, it does not proscribe all sex *distinctions*. That is because men and women are sometimes differently situated.

*United States v. Virginia* (*VMI*) illustrates this point. 518 U.S. 515 (1996). When the Supreme Court ordered the all-male Virginia Military Institute to accept female cadets, it recognized that the "physical differences between men and women are … enduring: the two sexes are not fungible." *Id.* at 533 (cleaned up). So "[a]dmitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." *Id.* at 550 n.19.

Other courts have recognized the same principle in different contexts. Employers may consider physiological differences by using physical fitness standards tailored for each sex. *Bauer v. Lynch*, 812

---

[3] "[W]hatever approach" cases like *McCormick* or *Cannon* "may have used" to deduce Title IX's purpose, we may rely on them as "an integral part of our jurisprudence" on Title IX. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 286 n.17 (1993).

F.3d 340, 350–51 (4th Cir. 2016) (finding sex-specific FBI training requirements did not violate Title VII). And cities and municipalities may consider anatomical differences by passing topless ordinances. *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1256–57 (5th Cir. 1995) (nudity ordinance did not improperly discriminate based on sex).

In educational programs too, "a community made up exclusively of one sex is different from a community composed of both." *VMI*, 518 U.S. at 533 (cleaned up). That is why Title IX permits schools to "separate living facilities for the different sexes." 20 U.S.C. § 1686. It permits single-sex educational institutions. *Id.* § 1681(a)(1)-(5). It also allows schools to have organizations and groups like fraternities, sororities, and "youth service organizations" traditionally "limited to persons of one sex." *Id.* § 1681(a)(6)–(8). The Act even allows schools to award beauty pageant scholarships "limited to individuals of one sex only." *Id.* § 1681(a)(9).

For one, these carveouts reinforce that "sex" refers only to biology, not gender identity or sexual orientation. For example, the statute allows "father-son or mother-daughter activities." *Id.* § 1681(a)(8). And "if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*." *Id.* (emphases added). This provision speaks of "one sex" and "the other sex"—terms that assume sex is binary; it also uses parental and filial terms rooted in biology. "If 'sex' were ambiguous enough to

9

include 'gender identity' … the various carveouts … would be rendered meaningless." *Adams*, 57 F.4th at 813 (cleaned up).

Second, these provisions reinforce that Title IX allows schools to notice sex. Though fraternities, sororities, and beauty pageants are not absolutely necessary to providing educational opportunities, Congress protected them anyway, recognizing that traditional single-sex spaces need not be discriminatory.

### C. Title IX's regulations and post-enactment history confirms that sex distinctions are sometimes necessary to promote equal educational opportunities

1. Title IX's implementing regulations confirm that Title IX allows for and sometimes requires sex distinctions to promote educational opportunities.

Start with regulations about sex-designated classes. They allow human sexuality classes to be separated by sex. 34 C.F.R. § 106.34(a)(3). They also allow schools to separate choirs "based on vocal range or quality that may result in a chorus or choruses of one or predominantly one sex." *Id.* § 106.34(a)(4). Similar to the statutory provisions for single-sex social organizations, these regulations recognize that sex-specific programs can be valuable even if they aren't necessary.

It follows that Title IX must allow sex distinctions that *are* critical to providing equal educational opportunities in areas like sports. "[D]ue

to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark v. Ariz. Interscholastic Ass'n,* 695 F.2d 1126, 1131 (9th Cir. 1982). So "failing to field women's varsity teams … certainly creates a barrier for female students" to participate in athletics. *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000). Indeed, "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement," without sex-distinct teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam) (abrogation on other grounds recognized in *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 190 F.3d 705 (6th Cir. 1999)); *see also Kleczek v. R.I. Interscholastic League, Inc.*, 612 A.2d 734, 739 (R.I. 1992) (per curiam) ("distinguishing between boys and girls in interscholastic sports will help promote safety").

Or consider places like bathrooms, showers, and locker rooms where students may appear in a state of undress. When it comes to bathrooms, biological sex determines whether persons are similarly situated "because biological sex is the sole characteristic on which [separate men's and women's bathrooms] are based." *Adams*, 57 F.4th at 803 n.6 (cleaned up).

Title IX's implementing regulations reflect these realities. These regulations allow schools to "sponsor separate [sports] teams for members of each sex where selection for such teams is based upon

11

competitive skill or the activity involved is a contact sport." 34 C.F.R.
§ 106.41(b). They also require schools to provide "equal athletic
opportunity for members of both sexes." *Id.* § 106.41(c). This includes
equal opportunities in "the selection of sports and levels of competition"
necessary to "effectively accommodate the interests and abilities of
members of both sexes." *Id.* As the Department of Health, Education,
and Welfare ("HEW"—the Department of Education's predecessor)
explained when it promulgated these regulations, a school is "required
to provide separate teams for men and women in situations where the
provision of only one team would not 'accommodate the interests and
abilities of members of both sexes.'"[4]

Title IX's regulations similarly allow schools to notice sex in
"physical education classes or activities during participation in
wrestling, boxing, rugby, ice hockey, football, basketball, and other
sports the purpose or major activity of which involves bodily contact."
*Id.* § 106.34(a)(1). They also allow for "separate toilet, locker room, and
shower facilities on the basis of sex" so long as the facilities are compa-
rable for each sex. 34 C.F.R. § 106.33.

Sex-specific sports teams are necessary to achieve the statute's
remedial purpose too. "[G]irls and women were historically denied

---

[4] Nondiscrimination on the Basis of Sex in Education Programs and Activities
Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,128,
24,134 (June 4, 1975) (now codified at 34 C.F.R. pt. 106).

opportunities for athletic competition based on stereotypical views that participating in highly competitive sports was not 'feminine' or 'ladylike.'" *McCormick*, 370 F.3d at 295. And because men would overwhelmingly displace women in a head-to-head matchup, the sports regulations sought to promote equal opportunities by providing women with their own field of competition.

Consider female athletes like Amici Chelsea Mitchell, Madison Kenyon, and Kassidy Comer. They each received scholarships to participate on their collegiate women's basketball or track and cross-country teams. And for Kenyon this opened educational doors that would otherwise have been closed. Because males have significant physiological advantages compared to women in most sports, these opportunities were only available because Amici's schools fielded women's-only teams. *Adams*, 57 F.4th at 819 (Lagoa, J., concurring) (discussing physical differences between the sexes).

Conversely, consider what happened at one college after it eliminated its women's varsity wrestling team. *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957 (9th Cir. 2010). It gave the female wrestlers the opportunity to continue, "conditioned on their ability to beat male wrestlers in their weight class, using men's collegiate wrestling rules." *Id.* at 962. "As a result … the female students were unable to participate on the wrestling team and lost the benefits associated with varsity status, including scholarships and academic

13

credit." *Id.*; *see also Pederson*, 213 F.3d at 878 (explaining that "of course fewer women participate in sports" when a school "refus[es] to offer them comparable athletic opportunities to those it offers its male students").

Athletes like Mitchell, Kenyon, and Comer have benefited from "real opportunities, not illusory ones." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). "[T]he mere opportunity for girls to try out" for a team is not enough if they don't stand a realistic chance of making the roster because of competing men. *Id.* And the mere opportunity to participate also isn't enough if they don't have a realistic chance to win scholarships or "enjoy the thrill of victory" because the sport is dominated by men. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999). Schools must field women's-only teams so women have the chance to compete, win, and become champions in their sport. That is what Title IX is all about.

2. In addition to Title IX's text, context, and purpose, all three branches of government have also understood Title IX to allow sex-specific bathrooms, locker rooms, and sports teams. The statute's post-enactment history ratifies the Act's plain meaning and purpose.

When Congress uses or adopts words that have received a "uniform construction by inferior courts or a responsible administrative agency, they are to be understood according to that construction." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of*

14

*Legal Texts* 322–26 (2012) (explaining prior-construction canon). "One might even say that the body of law of which a statute forms a part … is part of the statute's context." *Id.*

The Supreme Court has already held that Title IX's "postenactment history" sheds light on its "intended scope." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982). Shortly after Title IX was enacted, Congress passed the Javits Amendments, directing HEW to publish regulations implementing Title IX, including athletic regulations. Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). The agency promulgated the sports regulations now codified at 34 C.F.R. 106.41(b). *Compare* 40 Fed. Reg. 24,128, 24,142–43, *with* 34 C.F.R. § 106.41. Atypically, Congress required HEW to submit the rules to Congress for review. 40 Fed. Reg. 24,128. After six days of congressional hearings "to determine whether the HEW regulations were 'consistent with the law and with the intent of the Congress in enacting the law,'" Congress allowed the regulations to take effect. *N. Haven*, 456 U.S. at 531–32.

In this way, Congress gave Title IX's sports regulations its stamp of approval. To be sure, courts are normally "chary of attributing significance to Congress' failure to act." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985). But it's different when Congress refuses "to overrule an agency's construction … particularly where the administrative construction has been brought to Congress' attention." *Id.* And it's more different yet where Congress mandated

15

congressional review of the agency's regulations before they took effect. *See id.* (finding mere refusal to overrule an agency rule that Congress was aware of provided "at least some evidence of the reasonableness of that construction").

Add a long and unbroken line of federal administrations who have understood Title IX to permit and sometimes require sex-specific sports teams. In 1975, for example, HEW explained in a letter to state officials that a school could not eliminate women's teams and direct women to try out for the men's team if "only a few women were able to qualify."[5] And in 1979, the agency issued an additional guidance document stating that schools who sponsor a sports team "for members of one sex," "may be required … to sponsor a separate team for the previously excluded sex." 44 Fed. Reg. 71,413 (Dec. 11, 1979).[6]

Courts have long said the same thing. For one, courts have given these implementing regulations a "high" degree of deference "because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX." *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) (*Cohen I*); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994) (same). And courts have also understood the statute itself to permit sex-conscience decisions by affirming the need

---

[5] Off. for Civ. Rts., Letter from Peter Holmes to Chief State School Officers, Title IX Obligations in Athletics (Nov. 11, 1975), https://perma.cc/7T36-TJCZ.

[6] Off. for Civ. Rts., A Policy Interpretation: Title IX and Intercollegiate Athletics (Dec. 11, 1979), https://perma.cc/338U-LD4S.

for women's-only sports teams. *E.g.*, *Mansourian*, 602 F.3d at 973;
*Pederson*, 213 F.3d at 871, 878; *Cohen II*, 101 F.3d at 177; *Kelley*, 35
F.3d at 269–70; *Williams*, 998 F.2d at 175.

Congress also adopted this construction when it amended Title IX
in 1987 through the Civil Rights Restoration Act, 20 U.S.C.
§ 1687(2)(A). This Act reversed *Grove City College v. Bell*, which held
that Title IX only applied to programs that actually received federal
funds. 465 U.S. 555 (1984). The Restoration Act reversed this decision
by dictating that Title IX's provisions applied to *all education programs*
(including sports) at schools under the statute. In doing so, Congress
did not merely amend portions of the statute that had nothing to do
with sports. *See AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S.
Ct. 1341, 1351 (2021) (dismissing "isolated amendments" that "tell [the
Court] nothing about the words" in question). It passed the statute out
of particular concern "about ensuring equal opportunities for female
athletes." *McCormick*, 370 F.3d at 287; *Cohen I*, 991 F.2d at 894;
Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current
Policies Are Required to Ensure Equality of Opportunity*, 14 MARQ.
SPORTS L. REV. 11, 23–24 (2003) (explaining that Restoration Act shows
that regulations "correctly reflected Congress' intent with regard to
Title IX's application to athletics").

In short, Congress acted affirmatively to ensure that the
implementing regulations' understanding of school sports applied to

everyone. And in passing the Restoration Act, Congress voluntarily accepted the consensus view—of courts and federal agencies—that Title IX allowed for the consideration of sex. That is more than "convincing" evidence that Congress adopted this reading of the statute. *Cf. Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 537–38 (2015) (amendments to Fair Housing Law that "assume[d] the existence of disparate-impact claims" showed "that Congress ratified disparate-impact liability").

## II.  Because Title IX permits and sometimes requires sex distinctions, *Bostock* is inapposite.

Though the biological differences between men and women are "self-evident truths about the human condition," the Secretary seems determined to disprove that "water is wet." *Hang On*, 65 F.3d at 1257. He says that Title IX prohibits schools from noticing sex because of *Bostock*. But as already explained, the statute doesn't just permit but sometimes requires schools to make sex-conscience decisions. And the Secretary's interpretation actively undermines Title IX's goals by eviscerating the educational opportunities it was designed to promote.

### A.  Because Title IX permits sex distinctions, *Bostock* is inapposite.

Pointing to *Bostock*, the Secretary argues that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." Defs.' Br.

31–32. So, according to the Secretary, an entity that discriminates based on sexual orientation or gender identity also discriminates based on sex under the statute.

But this reading of *Bostock* is misplaced. *Bostock* held that sexual orientation or gender identity discrimination *in the employment hiring and firing context* violates Title VII. 140 S. Ct. at 1741. The Court observed that an employer who so discriminates bases their decision, in part, on sex, and "sex is not relevant to the selection, evaluation, or compensation of employees." *Id.* (cleaned up).

The Secretary's reliance on *Bostock* fails for three reasons.[7] First, *Bostock* does not change the "ordinary, contemporary, common meaning" of sex under Title IX. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014). Just the opposite: *Bostock* recognized that sex, gender identity, or sexual orientation are "distinct concepts." *Bostock,* 140 S. Ct. at 1746–47. And the Secretary does not argue that this Court should read sexual orientation and gender identity into the word "sex" under the statute. Defs.' Br. 32 n.2.

Second, *Bostock* dealt with hiring and firing in employment, while Title IX deals with educational opportunities. "[T]he school is not the workplace." *Adams*, 57 F.4th at 808. So "it does not follow that

---

[7] Plaintiffs in this case make different arguments about *Bostock*'s scope and application. Br. for Pls.-Appellees 48–52 (Doc. 37-2) (arguing *Bostock* permits sexual orientation and gender identity discrimination that does not consider sex). Amici curiae take no position on such arguments.

principles announced in the Title VII context automatically apply in the Title IX context." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Automatically extending *Bostock*'s reasoning to Title IX ignores the different statutory context and purposes at play.

Third, *Bostock*'s analysis does not work under Title IX because Title IX does not prohibit all sex distinctions. Though sex is irrelevant to hiring or firing decisions, sex *is* relevant in contexts like sports. *Cohen II*, 101 F.3d at 177 (athletics and employment "require[] a different analysis in order to determine the existence *vel non* of discrimination"). "Unlike most employment settings, athletic teams are gender segregated…." *Neal*, 198 F.3d at 772 n.8 (Title VII "precedents are not relevant in the context of collegiate athletics."). Otherwise, every school that has male and female basketball teams would be in violation of Title IX.

*Bostock* itself recognizes this. The Court expressly disclaimed any application of its holding outside the Title VII employment context. *Bostock*, 140 S. Ct. at 1753. Even under the same statute, the Court declined to extend its holding to "bathrooms, locker rooms, or anything else of the kind," where sex is a relevant consideration. *Id.* For this reason, other courts have correctly concluded that "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *accord Adams*, 57 F.4th at 808.

20

Sports prove the point. *Bostock* held that Title VII forbids employers' taking sex into consideration (even in part) when they fire an employee. Applying the same reasoning here would mean Title IX forbids schools' taking sex into consideration (even in part) when they field a soccer team. But "athletics programs *necessarily* allocate opportunities separately for male and female students." *Cohen II*, 101 F.3d at 177. And because males would largely displace females in sports if they were forced to compete against one another, the Secretary's interpretation would be the death knell of women's sports. Here, "only one" reading of the statute "produces a substantive effect that is compatible with the rest of the law." *Sackett v. EPA*, 598 U.S. ----, 2023 WL 3632751, at *13 (May 25, 2023) (citation omitted).

Plenty of plaintiffs have already tried, and failed, to show that Title IX prohibits schools from noticing sex. When some schools began cutting men's sports teams to bring themselves into compliance with Title IX, male athletes sued for sex discrimination. *E.g.*, *Miami Univ. Wrestling Club*, 302 F.3d at 615; *Chalenor v. Univ. of N.D.*, 291 F.3d 1042 (8th Cir. 2002). And they argued the very same thing as the Secretary: that "these discriminatory actions would not have been taken 'but for' the sex of the participants," and therefore facially violated Title IX. *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636 (7th Cir. 1999), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*,

555 U.S. 246, 259 (2009); *see* Defs.' Br. 34 (arguing an action taken but for the plaintiff's sex violates Title IX).

Courts have roundly rejected these arguments because Title IX does not prohibit schools "from making gender-conscious decisions to reduce the proportion of roster spots assigned to men." *Neal*, 198 F.3d at 765. "[T]he effect of Title IX and the relevant regulation and policy interpretation is that institutions will sometimes consider gender when decreasing their athletic offerings." *Boulahanis*, 198 F.3d at 639 (citation omitted).

The Secretary implausibly posits that "the issue of whether Title IX and Section 1557 generally prohibit gender-identity discrimination does not turn on the specifics of how students will be deemed eligible for certain sex-separate sports teams." Defs.' Br. 39. But the existence of sex-designated teams requires schools to notice sex. Yet according to the Secretary, "sex is not relevant to the selection" of men's and women's sports teams, *Bostock*, 140 S. Ct. at 1741 (cleaned up), making men's and women's teams illegal, as noted above.

The Secretary's interpretation untethers sports teams from their biological foundations. Sex-designated teams exist to accommodate the average physiological differences between men and women that are rooted in biology. "After all, only sex-specific interests could justify a sex-specific policy." *Adams*, 57 F.4th at 806. Take that biological distinction away and you're left with men's and women's teams based

on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 533. That's why Title IX correctly allows for sex-specific sports and physical education classes *only* "where selection for such teams is based upon competitive skill or the activity involved is a contact sport" to accommodate real physiological differences. 34 C.F.R. § 106.41(b). The Secretary simply takes women's teams for granted without stopping to consider the pivotal role that biology-based classifications have played in promoting equal opportunities. *Adams*, 57 F.4th at 817 ("[E]quating 'sex' to 'gender identity' … would also call into question the validity of sex-separated sports teams.").

Even the Department of Education concedes that schools can sometimes exclude biological males from women's teams. Its newly proposed Title IX rules implausibly disapprove of broad biological classifications but nonetheless allow that schools can sometimes "exclude some students on the basis of sex."[8] Indeed, "[t]his longstand-ing requirement reflects the Department's recognition that a recipient's provision of male and female teams can advance rather than undermine overall equal opportunity in the unique context of athletics by creating

---

[8] U.S. Dep't of Educ., Notice of Proposed Rulemaking, Title IX of the Education Amendments of 1972 at 64 (Apr. 6, 2023), https://perma.cc/3PFB-Z5CU.

meaningful participation opportunities that were historically lacking for women and girls."[9]

The Department's position would violate the Secretary's logic under *Bostock* because it would still exclude *some* males (who identify as female) from the women's category, and thereby discriminate against those males on the basis of gender identity and sex. According to the Secretary, every male (who identifies as female) gets to participate in women's sports—regardless of medical interventions or athletic ability.

The results are predictable. This was the policy in Connecticut which allowed two biological males to dominate girls' track events for several years. Chelsea Mitchell competed head-to-head with these male athletes on more than 20 occasions and never won a race in which both male athletes were running. The two male athletes won 15 state championship titles and set 17 new meet records from 2017 to 2020.

Madison Kenyon experienced the same. In the first race of her collegiate career, Kenyon was surprised to find that one of her competitors—June Eastwood—was a male. Eastwood began to compete in women's cross country and track teams after competing in the men's category for three years. And Kenyon went on to race Eastwood several times, always losing by a wide margin. And despite being a mediocre competitor in the men's category, testosterone suppression did not stop

[9] *Id.*

Eastwood from winning the women's mile at the 2020 NCAA Big Sky Championship, where Kenyon witnessed one of her teammates lose a bronze medal after Eastwood bumped the teammate from third to fourth place.[10]

Because the application of *Bostock*'s logic to Title IX contradicts the statute's plain text and purpose, the Secretary's arguments are unpersuasive, should not receive any deference, and should be rejected. *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 298 (5th Cir. 2022) (deference depends on "the validity of [the agency's] reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade").

## B.   The federalism canon requires a narrow interpretation of Title IX.

Owing to our system's division of powers, the federalism cannon compels a narrow reading of Title IX.

First, the Supreme Court has recently reiterated that it "requires Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett*, 2023 WL 3632751, at *14 (cleaned up). Even in interpreting "expansive language," a court may "insist on a clear" statement before intruding on

---

[10] *See also* Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 199–214 (2021), https://doi.org/10.1007/s40279-020-01389-3 (reviewing literature showing testosterone suppression does not mitigate males' biological advantages).

the state's traditional police powers. *Bond v. United States*, 572 U.S. 844, 860 (2014). This includes public education, "the very apex of the function of a State." *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). Health and medicine also fall squarely within the state's historic "police power." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). This Court should demand a clear statement for "[a]n overly broad interpretation" of Title IX that impinges on these traditional areas of state regulation. *Sackett*, 2023 WL 3632751, at *14.

Second, "Title IX was enacted as an exercise of Congress' powers under the Spending Clause." *Jackson*, 544 U.S. at 181. So was § 1557 of the ACA. 42 U.S.C. § 18116(a); *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012). When the legislature acts under this authority, courts may insist that "Congress speak with a clear voice." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). This is to give recipients of federal funds sufficient notice of their obligations. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022). The government cannot surprise school districts or hospitals with "retroactive conditions" on accepting federal dollars. *Pennhurst*, 451 U.S. at 25. And it cannot impose "a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 190 n.11 (1982).

Both of these federalism concerns call for a "clear statement" rule in this case. *Bond*, 572 U.S. at 858. The Secretary's interpretation imposes federal antidiscrimination obligations in areas traditionally policed by the states via statutes that regulate recipients of federal funds. So Congress' "intention" to cover sexual orientation and gender identity discrimination under Title IX (and therefore § 1557) must be "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up). The Secretary's interpretation, however, goes against the statute's plain text and purpose. In doing so, it infringes core state responsibilities and upends settled expectations; moreover, it seeks to redefine notions of privacy, fairness, and biological differences that have "been commonplace and universally accepted – across societies and throughout history." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 634 (4th Cir.) (Niemeyer, J., dissenting), *as amended* (Aug. 28, 2020).

Consider the way in which schools must allow males to compete in women's sports. *Supra* § II.A. Recall that Congress did not address sexual orientation or gender identity when it codified Title IX in 1972. *Supra* § I.A. For 50 years, everyone has accepted that schools may recognize biological differences between males and females. *Supra* § I.C. And applying *Bostock*'s logic to Title IX has already had momentous consequences for states seeking to ensure fair play for women in sports. *E.g.*, *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, No. 23-1078, 2023

WL 2803113 (4th Cir. Feb. 22, 2023) (enjoining state law prohibiting male athletes from competing in women's sports); *Hecox v. Little*, 479 F. Supp. 3d 930 (D. Idaho 2020) (same), *aff'd*, No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023). That's an unfair "surpris[e]" to states and their citizens if there ever was one. *Pennhurst*, 451 U.S. at 25.

Mechanistically applying *Bostock*'s reasoning to § 1557—when the Supreme Court instructed not to do so—raises the stakes. Hospitals naturally provide medical care "according to the biological differences between men and women." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 674 & n.8 (N.D. Tex. 2016). And many states and religious employers object to facilitating "sex reassignment procedures" that go against a person's natural biology. *Bostock*, 140 S. Ct. at 1782 (Alito, J., dissenting). Applying *Bostock* to § 1557 means that states, hospitals, and employers cannot tailor their health care or insurance coverage according to biological sex and thrusts states and their constituents into the center of a heated debate about medical ethics and our human condition. *Id.* at 1781 n.57 (Alito, J., dissenting) (citing biological female's discrimination lawsuit under the ACA against a Catholic hospital after it declined to perform a hysterectomy to treat the patient's gender dysphoria).

*Bostock* does not help the Secretary here. Title IX's "contractual framework distinguishes [it] from Title VII," because Title IX conditions funds on compliance, while Title VII operates as "an outright prohibit-

tion." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). So Title IX's validity does not rest on the government's "sovereign authority to enact binding laws," but on the recipient having "voluntarily and knowingly" accepted the contractual terms. *Cummings*, 142 S. Ct. at 1570. Courts and interpreting agencies have all understood that Title IX allows for sex distinctions, *supra* § I.C, proving that the Secretary's construction was not part of the deal.

The Secretary's interpretation "radically readjusts the balance of state and national authority." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 539–540 (1947). This Court should reject the Secretary's argument and affirm that Title IX means what it has always said: equal opportunities for men and women according to biological sex.

## CONCLUSION

This Court should affirm the district court's ruling.

Respectfully submitted,

By:*/s/ John J. Bursch*

JOHANNES WIDMALM-DELPHONSE          JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM          ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy                440 First Street, NW
Lansdowne, VA 20176                 Suite 600
(571) 707-4655                      Washington, DC 20001
jwidmalmdelphonse@ADFlegal.org      (616) 450-4235
                                    jbursch@ADFlegal.org

June 2, 2023

*Attorneys for Amici Curiae*

30

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because it contains 6,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

Dated: June 2, 2023

*/s/ John J. Bursch*
John J. Bursch
Attorney for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2023, I electronically filed the foregoing amicus brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ John J. Bursch*
John J. Bursch
Attorney for Amici Curiae
