No. 23-10078

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

SUSAN NEESE; JAMES HURLY,

Plaintiffs-Appellees,

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
HEALTH AND HUMAN SERVICES; UNITED STATES OF AMERICA,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

LEIGHA SIMONTON
  *United States Attorney*

CHARLES W. SCARBOROUGH
ASHLEY C. HONOLD
  *Attorneys, Appellate Staff
  Civil Division, Room 7261
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-9018*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .................................................................................................. 1

ARGUMENT ......................................................................................................... 2

I.      Plaintiffs Lack Standing. ........................................................................... 2

II.     Plaintiffs' Claims Are Not Reviewable. .................................................. 15

        A.      The Notice of Interpretation Is Not Final Agency Action Because
                It Has No Binding Legal Effect on Plaintiffs. ............................... 15

        B.      Plaintiffs Have an Adequate Alternative Remedy that Forecloses
                Pre-Enforcement Review Now. ...................................................... 17

        C.      Plaintiffs' Challenge Is Independently Barred Under *Thunder Basin*. ....... 19

III.    The Notice of Interpretation Is Not Contrary to Law Because *Bostock*'s
        Reasoning Applies to Title IX and Section 1557, and Plaintiffs'
        Interpretation of *Bostock* Is Incorrect. ...................................................... 21

CONCLUSION ................................................................................................... 26

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Arizona Christian Sch. Tuition Org. v. Winn*,
   563 U.S. 125 (2011) ...................................................................................7

*AT&T Co. v. EEOC*,
   270 F.3d 973 (D.C. Cir. 2001) .................................................................15

*Attala Cty., Miss. Branch of NAACP v. Evans*,
   37 F.4th 1038 (5th Cir. 2022).....................................................................3

*Beamon v. Brown*,
   125 F.3d 965 (6th Cir. 1997) ...................................................................19

*Bennett v. Spear*,
   520 U.S. 140 (1997) .................................................................................17

*Board of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) ..................................................20

*Bostock v. Clayton County*,
   140 S. Ct. 1731 (2020) ...............................................................1, 2, 23, 24

*Braidwood Mgmt., Inc. v. EEOC*,
   No. 22-10145, 2023 WL 4073826 (5th Cir. June 20, 2023) ................3, 8, 21

*Cannon v. University of Chicago*,
   441 U.S. 677 (1979) .................................................................................20

*Center for Biological Diversity v. U.S. EPA*,
   937 F.3d 533 (5th Cir. 2019) .........................................................3, 5, 13-14

*Central & S. W. Servs., Inc. v. U.S. EPA*,
   220 F.3d 683 (5th Cir. 2000) ...................................................................14

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ..............................................................................10, 14

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................ 7, 10, 11, 14

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ...................................................... 7

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ...................................................................... 4

*Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .................................................................. 4

*Doe v. Bolton*,
    410 U.S. 179 (1973) ...................................................................... 8

*E.T. v. Paxton*,
    41 F.4th 709 (5th Cir. 2022) ........................................................ 7

*Exxon Chems. Am. v. Chao*,
    298 F.3d 464 (5th Cir. 2002) ..................................................... 18

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ................................................... 17

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .................................................................. 4

*Glass v. Paxton*,
    900 F.3d 233 (5th Cir. 2018) ........................................................ 7

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ...................................................................... 7

*Hill v. Colorado*,
    530 U.S. 703 (2000) ...................................................................... 7

*Hinojosa v. Horn*,
    896 F.3d 305 (5th Cir. 2018) ................................................. 18, 19

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ...................................................................... 7-8

*Hosein v. Gonzales,*
452 F.3d 401 (5th Cir. 2006) ........................................................................... 4

*Houston Chronicle v. City of League City,*
488 F.3d 613 (5th Cir. 2007) ........................................................................ 14

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................................. 2, 3, 13

*Luminant Generation Co. v. U.S. EPA,*
757 F.3d 439 (5th Cir. 2014) ................................................................... 15, 16

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ...................................................................................... 11

*National Pork Producers Council v. U.S. EPA,*
635 F.3d 738 (5th Cir. 2011) ........................................................................ 15

*North Haven Bd. of Educ. v. Bell,*
456 U.S. 512 (1982) ...................................................................................... 18

*Prasco, LLC v. Medicis Pharm. Corp.,*
537 F.3d 1329 (Fed. Cir. 2008) ..................................................................... 10

*Rhea Lana, Inc. v. Department of Labor,*
824 F.3d 1023 (D.C. Cir. 2016) ..................................................................... 15

*Rollins v. Home Depot USA,*
8 F.4th 393 (5th Cir. 2021) ............................................................................. 5

*Sackett v. EPA,*
566 U.S. 120 (2012) ...................................................................................... 18

*Shrimpers & Fishermen of the RGV v. Texas Comm'n on Envtl. Quality,*
968 F.3d 419 (5th Cir. 2020) ........................................................................... 3

*Simon v. Eastern Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) .......................................................................................... 7

*Speech First, Inc. v. Fenves,*
979 F.3d 319 (5th Cir. 2020) ........................................................................ 14

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ...................................................................................8

*Stenberg v. Carhart,*
    530 U.S. 914 (2000) ...................................................................................7

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...................................................................................3

*Taylor-Callahan-Coleman Ctys. Dist. Adult Prob. Dep't v. Dole,*
    948 F.2d 953 (5th Cir. 1991) ...................................................................17

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ........................................................................1, 19-20

*Whole Woman's Health v. Jackson,*
    142 S. Ct. 522 (2021) .................................................................................7

**Statutes:**

5 U.S.C. § 704 ...........................................................................................17

20 U.S.C. § 1681(a) ...................................................................................24

20 U.S.C. § 1682 ....................................................................18, 19, 20, 21

20 U.S.C. § 1683 .............................................................................18, 19, 21

42 U.S.C. § 2000e-2(a)(1) .........................................................................23

42 U.S.C. § 18116(a) ...........................................................................18, 24

**Regulations:**

45 C.F.R. § 92.5 .........................................................................................18

45 C.F.R. § 92.206(c) .............................................................................9, 12

**Other Authorities:**

86 Fed. Reg. 27,984 (May 25, 2021) .......................................................................16

87 Fed. Reg. 47,824 (Aug. 4, 2022)............................................... 6, 9, 12, 13, 24

*Nondiscrimination on the Basis of Sex in Education Programs or Activities*
    *Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria*
    *for Male and Female Athletic Teams*,
    88 Fed. Reg. 22,860 (Apr. 13, 2023) ...............................................................22

## INTRODUCTION

The district court's decision was wrong in multiple respects. First, the district court erred in holding that plaintiffs have standing. Plaintiffs are two doctors who willingly treat transgender patients. Based on the record in this case, plaintiffs do not discriminate on the basis of sexual orientation, and their intended conduct does not constitute gender-identity discrimination under any reasonable reading of the challenged Notice of Interpretation. Plaintiffs thus face no threat of enforcement, let alone a *credible* threat, and they have not met their burden to demonstrate a concrete injury sufficient to support standing.

Second, plaintiffs' claims suffer from several additional threshold defects. Plaintiffs' claims are not reviewable under the Administrative Procedure Act (APA) because the Notice is not final agency action that altered the legal status quo. The Notice simply explained the Department of Health and Human Services' (HHS) interpretation of Section 1557's statutory requirements in light of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Additionally, plaintiffs have an adequate alternative remedy that forecloses their APA claims: they may challenge the interpretation of discrimination on the basis of sex set forth in the Notice in any future enforcement action that may be brought against them. Plaintiffs' challenge is also independently barred by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994), as Congress intended the administrative enforcement proceedings to be an exclusive remedy.

Finally, although this Court need not reach the merits, the district court also erred in holding that the Notice was unlawful. Even plaintiffs do not defend the district court's conclusion that *Bostock*'s reasoning does not apply to Title IX or Section 1557 and that those statutes do not prohibit discrimination on the basis of sexual orientation or gender identity. Instead, plaintiffs argue that this Court should affirm on the alternative ground that *Bostock*'s reasoning applies to Title IX or Section 1557 but that it permits health care providers to discriminate against gay or transgender patients if they would take the same action against "an identically situated member of the opposite biological sex." Pls.' Br. 49. But as the Supreme Court explained in *Bostock*, that kind of discrimination "doubles rather than eliminates" the sex-based discrimination. 140 S. Ct. at 1742-43.

Accordingly, this Court should vacate the district court's decision and remand with instructions to dismiss for lack of jurisdiction.

## ARGUMENT

### I.    Plaintiffs Lack Standing.

It is black letter law that to demonstrate standing, plaintiffs "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and quotation marks omitted). In a pre-enforcement challenge like this one, a plaintiff can satisfy that standard by proving (1) "an intention to engage in a course of conduct

2

arguably affected with a constitutional interest" that is (2) proscribed by the challenged agency action, and (3) "there exists a credible threat of prosecution thereunder." *Braidwood Mgmt., Inc. v. EEOC*, No. 22-10145, 2023 WL 4073826, at *6 (5th Cir. June 20, 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). "The 'actual or imminent' requirement is satisfied only by evidence of a 'certainly impending' harm or a 'substantial risk' of harm." *Shrimpers & Fishermen of the RGV v. Texas Comm'n on Envtl. Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (per curiam); *see also Susan B. Anthony List*, 573 U.S. at 159 (permitting pre-enforcement review "under circumstances that render the threatened enforcement sufficiently imminent"). Plaintiffs have not made the necessary showing.[1]

Rather than attempting to satisfy this test for pre-enforcement standing, plaintiffs instead argue that they do not need to meet the first or second part of this test because the APA authorizes review of agency rules and because the Declaratory Judgment Act (DJA) permits pre-enforcement challenges. Pls.' Br. 16-21, 23, 24-25. But the APA and the DJA do not permit plaintiffs to obviate the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560 (standing is an

---

[1] Plaintiffs contest whether the correct standard is "certainly impending" harm or a "substantial risk of harm." Pls.' Br. 26-27. But "[a]ny difference between 'certainly impending' and 'substantial risk' is immaterial here," as plaintiffs cannot meet either standard. *Center for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 537 n.2 (5th Cir. 2019); *see also Attala Cty., Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1043 (5th Cir. 2022) ("We see no necessary difference between the concepts of a substantial risk and a real and immediate threat, though immediacy does imply a short timeframe.").

"essential" "part of the case-or-controversy requirement of Article III"); *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006) (the DJA's "'case of actual controversy' requirement [is] coterminous with Article III's 'case or controversy' requirement"); *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (plaintiffs had standing to bring an APA claim where they had demonstrated a "sufficiently concrete and imminent injury to satisfy Article III"). Accordingly, plaintiffs are still required to demonstrate a "concrete" and "imminent" injury in fact. *Department of Commerce*, 139 S. Ct. at 2565. Moreover, plaintiffs cannot invoke the APA's judicial review provision because the Notice is not final agency action reviewable under the APA. *See* Gov't Opening Br. 23-26; *infra* pp. 15-17.

**A.** Plaintiffs cannot demonstrate any concrete injury because plaintiffs face *no* threat of enforcement (much less a *credible* threat) based on the description of their intended conduct in this case. Plaintiffs thus have not demonstrated *any* risk of harm, let alone "certainly impending" harm or a "substantial risk" of harm. Plaintiffs identify no present activity or future plans that would qualify as gender-identity discrimination under any reading of Section 1557.[2]

---

[2] Plaintiffs concede that they are not injured by the Notice's prohibition against discrimination on the basis of sexual orientation. Pls.' Br. 22 n.10. Plaintiffs nevertheless argue that the district court properly declared this portion of the Notice unlawful. *Id.* However, the Supreme Court has made clear that "'standing is not dispensed in gross'" and that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)).

4

As an initial matter, plaintiffs do not advance any standing arguments specific to Dr. Hurly, and thus any such arguments are forfeited. *See* Pls.' Br. 16 (arguing that only one of the plaintiffs needs Article III standing to seek the requested relief); *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal."); *Center for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived."). Dr. Hurly does not have standing for the reasons discussed in the government's opening brief. Gov't Opening Br. 20-21.

Nor can plaintiffs demonstrate standing for Dr. Neese. It is undisputed that Dr. Neese practices general internal medicine for adults and does not accept patients below the age of 16, and that she manages the hormone therapy of her adult transgender patients without objection. ROA.610; ROA.726:16-727:11; ROA.420, ¶¶ 7-8; ROA.611. Although she is unwilling to assist minors with transitioning, Dr. Neese testified that she does not believe she could appropriately manage the transition of a minor because "[t]hese are complex medical issues which I do not specialize in." ROA.612; *see also* ROA.420, ¶ 9 (testifying that she would not be "comfortable [managing] a teenager transition due to the complexity of the medical and emotional issues that case would present"); ROA.731:3-13 (testifying that she is "not familiar" with the medical processes for managing gender transition for a patient who is going

through puberty). Moreover, the record also does not demonstrate that Dr. Neese provides hormone therapy for cisgender minors.

Plaintiffs argue that Dr. Neese still faces a credible threat of enforcement because she has stated that she is "categorically unwilling" to "assist a minor with transitioning" and that she "do[es] not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions." ROA.420, ¶¶ 9-10. But a medical provider's refusal to provide a service (here, hormone therapy for minors) because it is outside their specialty area (here, general internal medicine for adults) does not constitute gender-identity discrimination. For example, consider a podiatrist who has a minor patient who requests hormone therapy for purposes of transitioning. If the podiatrist refuses to provide this service because it is outside of their area of specialty, there would be no reasonable argument that the podiatrist engaged in gender-identity discrimination. This would be true, even if the podiatrist also stated that they were categorically unwilling to provide hormone therapy and did not believe that minors should ever receive hormone therapy. Dr. Neese's testimony and intended conduct should be analyzed the same way: her stated unwillingness to provide treatment outside her specialty area does not demonstrate that she faces any threat of enforcement under the interpretation of Section 1557 set forth in the Notice, let alone a credible threat of enforcement. *See also* HHS's 2022 Notice of Proposed Rulemaking, 87 Fed. Reg. 47,824, 47,866, 47,867 (Aug. 4, 2022) (NPRM)

(emphasizing that the proposed rule would "not require health care professionals to perform services outside of their normal specialty area").

Plaintiffs also argue that they have Article III standing because the Notice "*could* be interpreted or enforced against them" and there is a "*possibility* that the [Notice] might be interpreted in the manner" plaintiffs fear. Pls.' Br. 23, 25. That is wrong. The Supreme Court and this Court have repeatedly emphasized that "'[a]llegations of *possible* future injury' are not sufficient." *Crane v. Johnson*, 783 F.3d 244, 251-52 (5th Cir. 2015) (alteration in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *Glass v. Paxton*, 900 F.3d 233, 241 (5th Cir. 2018) (a plaintiff must show that the harm she fears is "certainly impending," not merely "objectively understandable and reasonable" (quotation marks omitted)); *E.T. v. Paxton*, 41 F.4th 709, 714-16 (5th Cir. 2022) ("[U]nadorned speculation will not suffice to invoke the federal judicial power." (alteration in original) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976))).

Plaintiffs cite inapposite cases to support their theory of standing. Pls.' Br. 23-26. *Stenberg v. Carhart*, 530 U.S. 914 (2000), *Gonzales v. Carhart*, 550 U.S. 124 (2007), and *Hill v. Colorado*, 530 U.S. 703 (2000), did not discuss standing at all. *See Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed."). *Whole Woman's Health v. Jackson* held the plaintiffs *lacked* standing to sue a private individual for whom there

was no record evidence showing he intended to file an enforcement action against the plaintiffs. *See* 142 S. Ct. 522, 537 (2021). In *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15-16 (2010), the Court concluded that the plaintiffs had demonstrated a credible threat of prosecution where the government had charged about 150 persons under the challenged criminal statute. And in *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), the Court held that the plaintiff had standing where he was twice instructed that if he did not cease challenged conduct, he would be prosecuted. In contrast, HHS has not brought any enforcement actions against covered entities who refused to provide medical care outside of their normal specialty area, much less threatened an enforcement action against plaintiffs. In *Doe v. Bolton*, 410 U.S. 179, 186-88 (1973), the abortion providers alleged that they were "chilled and deterred" from their practice by the challenged abortion statute. Here, plaintiffs have not alleged, let alone demonstrated, that their conduct has been chilled. *See infra* p. 14.

Nor does this Court's recent decision in *Braidwood* support plaintiffs' standing. In that case, this Court concluded that the plaintiffs established a credible threat of enforcement where there was no doubt that the plaintiffs' professed course of action—taking adverse employment actions against gay and transgender employees and applicants—violated Title VII. *Braidwood*, 2023 WL 4073826, at *6. Here, there is no indication that HHS views plaintiffs' intended actions as unlawful discrimination under Section 1557. Additionally, this Court concluded that the plaintiffs in *Braidwood*

had demonstrated a history of past enforcement. *Id.* at \*7-8. In contrast, HHS has never brought any enforcement action against a medical provider who denied gender-affirming care because it was outside of their area of specialty.

**B.** Plaintiffs' lack of standing is underscored by HHS's 2022 NPRM. In the NPRM, HHS explains that "[n]othing in [the proposed rule] requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual." 87 Fed. Reg. at 47,918 (proposed 45 C.F.R. § 92.206(c)); *see also* Gov't Opening Br. 6-7. The proposed rule "does not require health care professionals to perform services outside of their normal specialty area; therefore a provider that declines to provide services outside its specialty area would have a legitimate, nondiscriminatory reason for its action." *Id.* at 47,867; *see also id.* at 47,866.

Plaintiffs argue that the NPRM is irrelevant because it was issued after plaintiffs filed their lawsuit. Pls.' Br. 28-38. Although this Court does not have to consider the NPRM to conclude that plaintiffs lack standing, the NPRM underscores what was true at the time of the filing of this lawsuit: plaintiffs face no credible threat of enforcement because HHS does not believe that their intended conduct constitutes unlawful gender-identity discrimination under Section 1557.

9

Plaintiffs complain that HHS has not identified safe harbors in the Notice or identified "any document or statement from HHS that predates the filing of this lawsuit and embraces any type of safe harbor for providers who fear liability under section 1557." Pls.' Br. 30 (emphasis omitted). But plaintiffs overlook that it is *their* burden to demonstrate standing. *See Clapper*, 568 U.S. at 411-12 ("The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party . . . must set forth by affidavit or other evidence specific facts." (quotation marks omitted)). It is not the government's burden to *disprove* a credible threat of enforcement. And plaintiffs have not identified any statements or actions by HHS that support their speculation that HHS will enforce Section 1557 against them. Indeed, HHS has never interpreted Section 1557 to prohibit physicians from declining to perform procedures outside their medical specialty or providing or offering medically appropriate care based on transgender patients' sex characteristics.

Plaintiffs contend that "[t]erms like 'legitimate' or 'nondiscriminatory' are in the eye of the beholder," suggesting that this alleged uncertainty is sufficient to demonstrate standing. Pls.' Br. 32-33. But mere uncertainty is inadequate. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) (observing that "subjective apprehensions" are insufficient and "a real and immediate threat of future injury" is required to confer standing); *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338 (Fed. Cir. 2008) (the plaintiff's "paralyzing uncertainty" from fear that it might be sued was not sufficient to confer standing). If mere uncertainty about what might

constitute unlawful discrimination were enough to demonstrate standing, then anyone could sue at any time to prospectively enjoin the enforcement of any potentially applicable anti-discrimination statute. That is not the law, and this Court should reject plaintiffs' invitation to disregard fundamental Article III limits on the adjudication of hypothetical controversies. For example, an employer who is merely uncertain about whether firing a Black employee would be considered unlawful discrimination does not have standing to seek an injunction prospectively enjoining the enforcement of Title VII, and a doctor's uncertainty about whether they can decline to provide certain services to a female patient does not give them standing to seek an injunction prospectively prohibiting enforcement of Section 1557. Similarly, plaintiffs do not have standing to challenge the Notice because of mere uncertainty about whether certain actions may constitute gender-identity discrimination.

Plaintiffs also argue that nothing in the NPRM addresses whether the conduct in which Dr. Neese intends to engage is prohibited by Section 1557. Pls.' Br. 34-35. But as explained above, it is *plaintiffs'* burden to demonstrate standing, not the government's burden to disprove it. *See Clapper*, 568 U.S. at 411-12. And plaintiffs do not explain how the conduct in which Dr. Neese intends to engage could reasonably be considered gender-identity discrimination. First, plaintiffs emphasize that Dr. Neese is unwilling to prescribe hormone therapy to minors. Pls.' Br. 34. However, she testified that this is because doing so is outside of her area of specialty of treating adults. ROA.612; *see also* ROA.420, ¶ 9; 87 Fed. Reg. at 47,867. Second, Dr. Neese is

reluctant to assist a patient with transitioning absent a longstanding doctor-patient relationship, as sometimes the appropriate response to gender dysphoria is counseling or psychological care.  Pls.' Br. 34-35.  But the Notice nowhere suggests that doctors may not exercise their reasonable medical judgment in such circumstances.  *See also* 87 Fed. Reg. at 47,918 (proposed 45 C.F.R. § 92.206(c)) (explaining that "[n]othing in [the proposed rule] requires the provision of any health service . . . where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual.").

Third, Dr. Neese is unwilling to provide care to transgender patients "when the patient's 'denial of biological realities will endanger their life or safety,'" Pls.' Br. 35, but the Notice does not remotely suggest that doctors must do so to comply with Section 1557.  Indeed, Section 1557 also prohibits disability discrimination, but no reasonable doctor would interpret this prohibition to mean that they must accede to a disabled patient's requests for care if that care would endanger her life or safety.  Fourth, Dr. Neese intends to urge her patients to seek preventative care consistent with their sex assigned at birth, such as encouraging a patient who was assigned male at birth to obtain a prostate-cancer screening.  *Id.*  Again, any reasonable reading of the Notice does not prohibit this conduct.  To the contrary, the NPRM explains that under the proposed rule, a covered entity "could not refuse to provide a transgender woman a prostate cancer screening because her sex is listed female in her electronic

health record, if the entity otherwise provides these screenings to cisgender individuals." 87 Fed. Reg. at 47,865-47,866.

Plaintiffs also assert that they "want to *provide* preventative care that aligns with a transgender patient's" sex assigned at birth. Pls.' Br. 36. But plaintiffs again do not explain how any rational reading of the Notice prohibits this conduct. And HHS emphasized in the NPRM that it would *not* consider such conduct to be gender-identity discrimination. The proposed rule would not "prohibit a covered entity from treating an individual for conditions that may be specific to their sex characteristics." 87 Fed. Reg. at 47,866.

**C.** Plaintiffs do not advance their argument by asserting that they "are not alleging a future injury" but instead "are suffering injury *now* from the 'credible threat'" that the Notice poses to physicians. Pls.' Br. 26. This argument only underscores that plaintiffs have no coherent theory of how they are being injured, as it contradicts plaintiffs' argument that they face a future injury through the loss of federal funding. *See* Pls.' Br. 16, 30, 43. Moreover, plaintiffs cite no evidence to support the suggestion that they are currently suffering any concrete injury from the specter of hypothetical future enforcement against them. *See Lujan*, 504 U.S. at 561 (explaining that to demonstrate standing at the summary-judgment stage, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to satisfy the plaintiff's burden of proof); *Center for Biological*

13

*Diversity*, 937 F.3d at 542 ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").

Plaintiffs' "subjective fears" "cannot possibly serve as the basis for standing." *Central & S. W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 701 (5th Cir. 2000); *see also Lyons*, 461 U.S. at 107 n.8 ("It is the *reality* of the threat of . . . injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."). Moreover, plaintiffs have neither alleged nor documented any cognizable costs caused by their speculation about hypothetical future agency action. Indeed, plaintiffs have not alleged, let alone demonstrated, that their conduct has been chilled in any way or that they have altered their conduct because of the Notice or any fear of future enforcement. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (explaining that "in the pre-enforcement context," the "[c]hilling [of] a plaintiff's speech" generally forms the "constitutional harm adequate to satisfy the injury-in-fact requirement" (first alteration in original) (quoting *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007))). Even if they had, plaintiffs are not entitled to relief for any injuries they incur to protect against "hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416 (rejecting the court of appeals' holding that the plaintiffs had standing because their injury was not "fanciful, paranoid, or otherwise unreasonable" and explaining that such a standard "improperly waters down the fundamental requirements of Article III" (quotation marks omitted); *see also id.* at 418.

## II.    Plaintiffs' Claims Are Not Reviewable.

### A.    The Notice of Interpretation Is Not Final Agency Action Because It Has No Binding Legal Effect on Plaintiffs.

The Notice is not final agency action subject to review under the APA because it "create[s] no new legal obligations beyond those the [statute] already imposed." *Rhea Lana, Inc. v. Department of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016); *see also National Pork Producers Council v. U.S. EPA*, 635 F.3d 738, 756 (5th Cir. 2011). As this Court has explained, agency action is non-final when, as here, "an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party." *Luminant Generation Co. v. U.S. EPA*, 757 F.3d 439, 442 & n.7 (5th Cir. 2014) (quotation marks omitted).

The Notice has no independent legal force. Plaintiffs vaguely assert that the Notice "may not have the same legal effects as notice-and-comment rulemaking" but that it has some undefined "'legal effect' from the standpoint of health-care providers." Pls.' Br. 43. This is incorrect. Even when HHS believes that a provider has violated the interpretation of Section 1557 expressed in the Notice, any "adverse legal consequences will flow only if" HHS were to initiate enforcement proceedings and if a statutory violation were to be found at the end of those proceedings, which are subject to judicial review. *See Luminant Generation*, 757 F.3d at 442; *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) (explaining that the agency's expressed

15

"view of the law" is non-final when it "has force only to the extent the agency can persuade a court to the same conclusion").

Plaintiffs argue that legal consequences flow from the Notice because HHS will enforce Section 1557 in accordance with the Notice. Pls.' Br. 40-41. But any enforcement action would rest on the statute itself, not on the challenged Notice. And plaintiffs do not dispute that HHS could still enforce Section 1557 to prohibit discrimination based on sexual orientation or gender identity in accordance with *Bostock*, even if HHS had not issued the Notice. The Notice thus has no independent legal effect. *See Luminant Generation*, 757 F.3d 442 (concluding that challenged notices setting forth the agency's interpretation of the Clean Air Act and notifying the petitioners of the agency's view that they were in violation of the statute were not final agency action because it was the Clean Air Act itself, "not the notices," that established "[the petitioners'] rights and obligations").

Plaintiffs' argument that legal consequences flow from the Notice because it binds HHS (Pls.' Br. 41) is similarly flawed. The Notice does not bind HHS to a legal position with respect to any particular medical procedure or set of facts. 86 Fed. Reg. 27,984, 27,985 (May 25, 2021) (Notice explicitly stating that it "does not itself determine the outcome in any particular case or set of facts"). Additionally, the existence of the NPRM, which explains that the agency is considering the issues in the Notice and plans to issue a rule on the same issues addressed in the Notice, further underscores that the Notice itself is not final agency action. And even if the Notice

16

did bind the agency to a legal position, that does not make it final agency action, as any legal consequences flow not from the Notice, but from Section 1557 itself. *See Bennett v. Spear*, 520 U.S. 140, 178 (1997).

**B.    Plaintiffs Have an Adequate Alternative Remedy that Forecloses Pre-Enforcement Review Now.**

Plaintiffs' APA claim is unreviewable for the additional reason that plaintiffs have an adequate alternative remedy within the meaning of 5 U.S.C. § 704.  Plaintiffs do not dispute that they may raise their legal challenges to the Notice asserted here in any hypothetical future enforcement action.  Nor do they dispute that future enforcement actions would afford them an opportunity for de novo review of agency action. *See Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009).  The availability of this "adequate remedy" renders plaintiffs' claim unreviewable under the APA. *Taylor-Callahan-Coleman Ctys. Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953, 959 (5th Cir. 1991) (concluding that the plaintiff had an "adequate remedy" in the form of "defend[ing]" on the basis of the same arguments in an "enforcement action").  Moreover, requiring plaintiffs to raise their arguments in the context of an actual enforcement action ensures that the federal courts address only those legal theories that the government has actually chosen to pursue.

Plaintiffs argue that the administrative enforcement scheme is not an adequate remedy under the APA because "plaintiffs must risk the loss of federal funding if they choose to contest" the Notice in such proceedings.  Pls.' Br. 44.  But plaintiffs'

17

argument ignores that the administrative enforcement scheme does not permit the agency to withdraw federal funding "until *after . . .* the recipient is given a hearing before an administrative law judge, who makes a recommendation subject to administrative and judicial review." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 515 n.2 (1982) (emphasis added); *see also* 20 U.S.C. § 1683 (providing "judicial review" of funding decisions "in accordance with [the APA]"); 42 U.S.C. § 18116(a) (incorporating the enforcement mechanisms under referenced statutes, including Title IX); 20 U.S.C. § 1682 (administrative process under Title IX); 45 C.F.R. § 92.5.

In any event, this Court has held that plaintiffs can "obtain meaningful judicial review" even *after* the agency concludes that they have committed statutory violations. *See Exxon Chems. Am. v. Chao*, 298 F.3d 464, 469 (5th Cir. 2002) (dismissing for lack of jurisdiction where the plaintiff could "obtain meaningful judicial review" after the agency concluded that the plaintiff had violated the challenged statutes). Plaintiffs are thus wrong in comparing this case to *Sackett v. EPA*, 566 U.S. 120, 127 (2012), which concerned a compliance order directed to particular parties that had immediate legal effect—not a general notice intended to provide guidance to the public at large. Pls.' Br. 45; *see* Gov't Opening Br. 27-28. Plaintiffs assert that the context in which *Sackett* arose "has no bearing on the *adequacy* of a post-enforcement remedy," but that is incorrect. Pls.' Br. 45. As this Court has explained, to determine whether alternative relief is adequate, the court must "look[] specifically at the party seeking relief and its particular claim." *Hinojosa v. Horn*, 896 F.3d 305, 311 (5th Cir. 2018) (per curiam).

18

Here, as explained above, plaintiffs face no immediate consequences from the Notice. *Supra* Part I.

Nor do plaintiffs advance their argument by noting that they could not obtain classwide relief when seeking judicial review of an agency enforcement action. Pls.' Br. 44. If seeking classwide relief were enough to preclude a court from concluding that plaintiffs have an adequate alternative remedy under § 704, any plaintiff could seek class certification and nullify this requirement of § 704. *See Beamon v. Brown*, 125 F.3d 965, 970 (6th Cir. 1997) (concluding that the plaintiffs had an adequate alternative remedy even though the alternative remedy did not permit class actions). As this Court has explained, "[t]he adequacy of the [alternative] relief available need not provide an identical review that the APA would provide." *Hinojosa*, 896 F.3d at 310.

## C. Plaintiffs' Challenge Is Independently Barred Under *Thunder Basin*.

The district court also lacked authority to review plaintiffs' claims because the scheme of administrative and judicial review that Congress established for Section 1557 and Title IX enforcement-related disputes is exclusive. As the government explained, Gov't Opening Br. 28-31, Congress channels such disputes through the agency followed by judicial review in the court of appeals. *See* 20 U.S.C. §§ 1682, 1683. The scheme affords regulated entities "meaningful review," in part because any claims can ultimately be "addressed in the Court of Appeals." *Thunder Basin Coal Co. v.*

*Reich*, 510 U.S. 200, 207, 215 (1994). It is also "fairly discernible" that Congress intended that scheme to be exclusive, *id.* at 207 (quotation marks omitted), as other courts have held. *See Board of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 862-63 (S.D. Ohio 2016) (concluding that *Thunder Basin* precluded similar challenge by recipient to agency's interpretation of Title IX).

Plaintiffs suggest that this argument is in tension with *Cannon v. University of Chicago*, 441 U.S. 677 (1979), Pls.' Br. 46, but *Cannon* is inapposite. *Cannon* held that victims of discrimination had an implied private right of action to enforce Title IX, and that this private right of action was "necessary or at least helpful to the accomplishment" of Title IX's purpose of "provid[ing] individual citizens effective protection against" discriminatory practices. 441 U.S. at 694, 703-04. The Court's analysis of whether individuals protected by Title IX have an implied statutory right to pursue private causes of action against universities has no bearing on the distinct question of whether regulated entities can bring a pre-enforcement challenge to the agency's interpretation of Section 1557 instead of raising their arguments through the agency's Section 1557 administrative enforcement proceedings.

Plaintiffs' argument that "Title IX explicitly preserves" their right to seek pre-enforcement review under the APA is similarly misguided. Pls.' Br. 46-47. 20 U.S.C. § 1682 authorizes the agency to "effectuate" Title IX's nondiscrimination provisions by "issuing rules, regulations, or orders of general applicability," and provides that the agency may effectuate compliance through (1) the termination of funding or (2) any

other means authorized by law.  20 U.S.C. § 1682.  And 20 U.S.C. § 1683, in turn, provides that "agency action pursuant to section 1682" "shall be subject to such judicial review." *Id.* § 1683.  But the agency has not taken any "action pursuant to section 1682" that would be subject to judicial review.  Plaintiffs therefore cannot invoke this judicial review provision.

**III.    The Notice of Interpretation Is Not Contrary to Law Because *Bostock*'s Reasoning Applies to Title IX and Section 1557, and Plaintiffs' Interpretation of *Bostock* Is Incorrect.**

This Court need not reach the merits, as plaintiffs lack standing and their claims are not reviewable under the APA.  In any event, the district court erred in concluding that the Notice is contrary to law, and plaintiffs' attempts to defend the court's ruling on alternate grounds lack merit.

**A.**  For the reasons explained in the government's opening brief, the challenged Notice is lawful because the Supreme Court's reasoning for its conclusion in *Bostock* that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity also applies to the prohibitions against sex discrimination in Title IX and Section 1557.  *See* Gov't Opening Br. 31-40; *see also Braidwood*, 2023 WL 4073826, at *1 (stating that *Bostock* concluded that "'on the basis of sex'" includes "sexual orientation and . . . gender identity").  Indeed, plaintiffs do not defend the district court's conclusion that *Bostock* does not apply to Title IX and Section 1557.  Pls.' Br. 53 (noting that "there are some difficulties that will confront a court that tries to resolve the case this way"); *see also id.* at 49 (stating that

"[i]f a health-care provider refuses to treat a man because he is sexually attracted to men, but would have no objection to treating a biological woman who is sexually attracted to men, then that indisputably constitutes 'sex' discrimination under *Bostock*"); *id.* (conceding that a health care provider who refuses to treat a transgender woman patient "simply because the individual identifies as a woman" would be discriminating on the basis of sex); *id.* at 53 (conceding that "[i]t is hard to find any daylight between the phrase 'on the basis of' sex in Title IX and 'because of' sex in Title VII").

Plaintiffs and their amici argue that applying *Bostock*'s reasoning to Title IX "could imperil women's sports."  Pls.' Br. 53; *see also* Amicus Br. of Women's Decl. Int'l USA; Amicus Br. of Three Female Athletes.  But challenges to the scope of Title IX protections with regard to women's sports are irrelevant and are not addressed by the challenged Notice, and whether Title IX and Section 1557 generally prohibit gender-identity discrimination does not turn on the specifics of how students will be deemed eligible for certain sex-separate sports teams under Title IX.  *See* Gov't Opening Br. 39-40.  Moreover, the Department of Education recently issued a notice of proposed rulemaking proposing a standard under which some criteria limiting transgender students' eligibility to participate on certain athletic teams would not violate Title IX's prohibition on gender identity discrimination.  *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-*

*Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860, 22,860-22,861, 22,866, 22,871-22,877, 22,891 (Apr. 13, 2023) (proposed § 106.41).

**B.**    Instead of defending the district court's decision on the merits, plaintiffs urge affirmance on a different basis.  Plaintiffs argue that the Notice is unlawful because although *Bostock* applies to Title IX and Section 1557, *Bostock*'s reasoning permits health care providers to discriminate against gay or transgender patients if they would take the same action against "an identically situated member of the opposite biological sex."  Pls.' Br. 49.  But the Supreme Court explained in *Bostock* that it is "impossible" to discriminate against a person for being gay or transgender "without discriminating against that individual based on sex."  *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020).

In plaintiffs' view, a health care provider could discriminate against bisexual people without violating Section 1557, so long as the provider is discriminating against both male and female bisexual patients.  In *Bostock*, however, the Supreme Court rejected exactly the same argument under Title VII.  140 S. Ct. at 1741.  The Court stressed that Title VII speaks in terms of discrimination against "any individual" because of "such *individual's* . . . sex."  *Id.* at 1740 (alteration in original) (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also id.* at 1742 ("[T]he law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII.").  For this reason, the Court explained, "it doesn't matter if the employer treated women as a group the same when compared to men as

a group." *Id.* at 1741.  Indeed, the Court reasoned, when an employer discriminates against both a woman for being insufficiently feminine and a man for being insufficiently masculine, the employer "doubles" its exposure to Title VII liability rather than avoids it.  *Id.*

Section 1557 and Title IX similarly prohibit discrimination against individuals. Section 1557 provides that "an *individual* shall not[] . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in federally funded health programs or activities on the basis of sex.  42 U.S.C. § 18116(a).  Title IX uses the same language (as applied to federally funded educational programs or activities), except that it uses the word "person" instead of "individual."  20 U.S.C. § 1681(a) (citation omitted).  Plaintiffs' alternative argument thus fails under a plain reading of *Bostock*.  *See Bostock*, 140 S. Ct. at 1742-43 ("So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.").

Plaintiffs argue that a health care provider may refuse to prescribe testosterone to a transgender man who wishes to appear more masculine, so long as the provider would also refuse to provide testosterone to a cisgender man who wishes to appear more masculine.  Pls.' Br. 50-51.  But whether this is unlawful discrimination under Section 1557 would depend on the reason for the provider's refusal.  For example, if the provider does not provide testosterone therapy at all because it is outside their

area of specialty or for some other legitimate, nondiscriminatory reason, that would not violate Section 1557. *See* 87 Fed. Reg. at 47,867 (HHS emphasizing in the 2022 NPRM that the proposed rule would "not require health care professionals to perform services outside of their normal specialty area"); *id.* at 47,918 (proposed 45 C.F.R. § 92.206(c)). But if a provider adopted this policy explicitly to target and exclude transgender individuals, or the policy were otherwise pretext for animus or bias towards transgender individuals, that would constitute unlawful discrimination under Section 1557. Plaintiffs' hypothetical example thus does not refute the Notice's basic conclusion that Section 1557 prohibits discrimination on the basis of gender identity and sexual orientation.

Finally, plaintiffs' alternative argument underscores their lack of standing. Plaintiffs have not demonstrated that they intend to discriminate against gay or transgender patients and take the same actions against "an identically situated member of the opposite biological sex." Pls.' Br. 49. For example, plaintiffs have not demonstrated that they intend to discriminate against bisexual patients. To the contrary, they concede that they are not injured by the Notice's prohibition against discrimination on the basis of sexual orientation. Pls.' Br. 22 n.10. Accordingly, a decision accepting plaintiffs' alternative argument on the merits would not redress plaintiffs' alleged injuries.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated

and remanded with instructions to dismiss for lack of jurisdiction.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

LEIGHA SIMONTON
*United States Attorney*

CHARLES W. SCARBOROUGH

*s/ Ashley C. Honold*
ASHLEY C. HONOLD
*Attorneys, Appellate Staff*
*Civil Division, Room 7261*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-9018*
*ashley.c.honold@usdoj.gov*

June 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Ashley C. Honold*
Ashley C. Honold

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,488 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ashley C. Honold*
Ashley C. Honold
