# United States Court of Appeals for the Fifth Circuit

No. 23-10078

United States Court of Appeals
Fifth Circuit
**FILED**
January 31, 2025
Lyle W. Cayce
Clerk

Susan Neese; James Hurly,

*Plaintiffs—Appellees,*

versus

Xavier Becerra, *in his official capacity as Secretary of Health and Human Services*; United States of America,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:21-CV-163

## ORDER ON REHEARING EN BANC

Before Jones, Haynes, and Douglas, *Circuit Judges*.

Per Curiam:

At the request of one of its members, the court was polled on a rehearing en banc. However, the rehearing en banc is DENIED because the court was polled, and a majority of the judges did not vote in favor of rehearing.

In the en banc poll, one judge voted in favor of rehearing (Judge Ho), and sixteen judges voted against rehearing (Chief Judge Elrod, and Judges Jones, Smith, Stewart, Richman, Southwick,

Haynes, Graves, Higginson, Willett, Duncan, Engelhardt, Oldham, Wilson, Douglas, and Ramirez).

Stuart Kyle Duncan, *Circuit Judge*, joined by Jones, Smith, Willett, Oldham, Engelhardt, and Wilson, *Circuit Judges*, concurring in the denial of rehearing en banc:

Even though the losing side chose not to seek en banc rehearing, one judge called for an en banc poll. The poll failed 16–1. That should surprise no one, because there was no plausible reason to rehear this case.

To begin with, the panel unanimously held the plaintiff physicians lacked standing to challenge the guidance at issue.[1] *Neese v. Becerra*, 123 F.4th 751, 753–54 (5th Cir. 2024). As Judge Jones's concurrence emphasized, the United States itself "readily affirm[ed]," "judicially admit[ted]," and "confirmed at oral argument" that the guidance exposed the plaintiffs to no "credible threat of investigation or losing federal funds based on their described medical practices." *Id.* at 754 (Jones, J., concurring).

But let's suppose, as our dissenting colleague argues, that there was some way to make a case for Dr. Neese's standing. *Post* at 3–6. Even so, en banc would have been pointless. That is for the simple reason that the challenged guidance has been superseded, not once but twice.

Over six months ago, the Biden Administration codified the guidance in a Final Rule, effective July 5, 2024. *See* HHS, *Final Rule: Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37522 (May 6, 2024). That new rule is now under challenge in at least three district

---

[1] *See* HHS, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Acre Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27984 (May 25, 2021).

courts, two in this circuit. *See Texas v. Becerra*, 2024 WL 3297147 (E.D. Tex. July 3, 2024); *Tennessee v. Becerra*, 2024 WL 3283887 (S.D. Miss. July 3, 2024); *Florida v. Dep't of Health & Human Servs.*, 8:24-CV-0108 (M.D. Fla. July 3, 2024). Those courts can address the issues posed here, but on a full administrative record and without the standing pitfalls presented by this case.

None of this may matter, however, in light of actions already taken by the new Administration. On his first day in office, President Trump ordered a reorientation of the Executive Branch around the "immutable biological reality of sex," and, in doing so, rescinded the guidance challenged here. *See* Exec. Order, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* §§ 1, 7 (Jan. 20, 2025).[2]

The Order directs the Executive Branch to "enforce all sex-protective laws" in accordance with the "fundamental and incontrovertible reality" that sex is an "immutable biological classification" and that there are only "two sexes, male and female." *Id.* at § 2. Pursuant to this policy, the Order directs the Attorney General to "correct" the Biden Administration's extension of *Bostock v. Clayton County*, 590 U.S. 644 (2020), to all "sex-based distinctions in agency activities," including in Title IX, which the Order deems "legally untenable." *Id.* at § 3(f). The Order further directs all agency heads to "promptly rescind all guidance documents inconsistent with" the policies announced in the Order. *Id.* at § 7(c).

---

[2] *See* https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/ (last accessed Jan. 30, 2025).

President Trump's Order binds the entire Executive Branch to embrace the "biological reality" that there are only "two sexes, male and female," and that these are "immutable." That moots this case.[3]

I concur in the denial of en banc rehearing.

---

[3] It remains to be seen what effect the executive order will have on pending litigation against the Final Rule noted above.

James C. Ho, *Circuit Judge*, dissenting from denial of rehearing en banc:

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that transgender discrimination constitutes sex discrimination under Title VII of the Civil Rights Act of 1964. *Bostock* has been heralded by some as a landmark decision—and derided by others as an act of judicial "legislation." *Id.* at 683 (Alito, J., dissenting). *Cf. Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 333 (5th Cir. 2019) (Ho, J., concurring). Of course, we are duty-bound to faithfully apply *Bostock* as an inferior court, regardless of one's views on the matter. *See, e.g.*, *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595 (5th Cir. 2021) (applying *Bostock*). But we are not required to extend it. To the contrary, "we should decide every case faithful to the text to the maximum extent permitted by a faithful reading of binding precedent." *Hamilton v. Dallas County*, 79 F.4th 494, 506 (5th Cir. 2023) (Ho, J., concurring).

I agree with the district court that nothing in federal law (or *Bostock*) requires physicians to help enable minors to transition from their biological sex to the opposite sex. A panel of our court vacated that judgment, however, for lack of Article III standing. I disagree and accordingly dissent from the denial of rehearing en banc in this obviously important case.[4]

---

[4] A brief response to my concurring colleagues: The fact that Executive Branch officials have dutifully done their job doesn't mean that we needn't do ours. Nor is our job obviated by the fact that Plaintiffs calculated (correctly, as it turns out) that a rehearing petition would not be an efficient use of their resources. Our rules plainly authorize us to rehear cases en banc on our own motion, precisely to alleviate litigants of unnecessary litigation burdens. *See* Fed. R. App. Proc. I.O.P. 40 ("Requesting A Poll On Court's Own Motion"). The only question is whether a particular case warrants en banc.

By denying rehearing en banc, our court today leaves on the books a published, precedential ruling that overturns the district court's dutiful efforts and validates administrative overreach in an area of profound sensitivity. I've previously expressed my concerns about allowing government officials to engage in procedural stratagems to avoid

I.

Section 1557 of the Affordable Care Act incorporates and applies Title IX of the Educational Amendments of 1972 to any health program or activity that receives federal financial assistance. *See* 42 U.S.C. § 18116(a); 20 U.S.C. § 1681(a).

These provisions simply forbid "discrimination" "on the basis of sex." 20 U.S.C. § 1681(a). They impose no affirmative obligation on physicians to provide minor patients with puberty blockers, hormone therapy, or referrals for sex reassignment surgery.

This conclusion flows naturally from *Geduldig v. Aiello*, 417 U.S. 484 (1974). The Supreme Court there addressed—and rejected—the suggestion that excluding treatment of pregnancy constitutes sex discrimination. "While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Id.* at 496 n.20. *See also Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022) (quoting *Geduldig*, 417 U.S. at 496 n. 20).

And the same logic applies here. "[T]he fact that only transgender individuals experience gender dysphoria does not mean the exclusions discriminate based on transgender status, any more than the fact that 'only women can become pregnant' made the exclusion in *Geduldig* facially discriminatory." *Kadel v. Folwell*, 100 F.4th 122, 174 (4th Cir. 2024) (Richardson, J., dissenting). *See also id.* ("As in *Geduldig*, the challenged exclusions do not deny coverage to anyone because of their sex or transgender status. Instead, they merely decline coverage for a particular

---

judicial review. *See U.S. Navy SEALs 1-26 v. Biden*, 72 F.4th 666, 677 (5th Cir. 2023) (Ho, J., dissenting) (citing *Tucker v. Gaddis*, 40 F.4th 289, 293 (5th Cir. 2022) (Ho, J., concurring)). Our decision today continues the pattern.

No. 23-10078

risk: gender dysphoria. And *Geduldig* held that a health plan that declines to cover a risk that only members of a protected class face does not facially classify people based on their membership in that class.") (cleaned up); Oral Arg. Tr. 21, *United States v. Skrmetti*, No. 23-477 (2024) ("The Court has addressed . . . how an equal protection claim should be analyzed when the law in question treats a medical condition or procedure differently based on a characteristic that is associated with just one sex. And that was *Geduldig* in 1974, reaffirmed in *Dobbs* in 2022.") (quoting Justice Alito).

## II.

So it's not surprising that the district court granted summary judgment to Dr. Susan Neese.

Dr. Neese is a physician of general internal medicine, with patients ranging in age from 16 to 105. According to her sworn declaration, Dr. Neese is able and willing to provide hormone treatments to transgender patients "who have come to me . . . already transitioned and I maintain their care."

But she is "categorically unwilling to prescribe hormone therapy to minors who are seeking to transition." *Neese v. Becerra*, 640 F. Supp. 3d 668, 673 (N.D. Tex. 2022). In addition, she is "equally unwilling to provide referrals to minors seeking a sex-change operation." *Id.*

Dr. Neese is concerned, however, that her unwillingness to do so will cause the Secretary of Health and Human Services to exclude her from health programs that receive federal financial assistance.

Her concern is well taken. In 2021, HHS issued a formal notification that it would construe section 1557 consistent with the Supreme Court's interpretation of Title VII of the Civil Rights Act of 1964 in *Bostock*. 86 Fed. Reg. 27984 (2021). And there is little doubt what that means. During the course of this litigation, HHS has not denied that it reads *Bostock* in the

manner that Dr. Neese fears. To the contrary, it has been the official position of the United States that physicians who are able but unwilling to enable minors to transition to the opposite sex are guilty of sex discrimination.

Last year, HHS promulgated a rule indicating that doctors receiving federal funds "must not" "[d]eny or limit health services sought for purpose of gender transition or other gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." 45 C.F.R. § 92.206(b)(4).

And just weeks ago, the Solicitor General argued before the Supreme Court that a Tennessee law that takes the exact same view as Dr. Neese—that doctors should not be in the business of providing puberty blockers, hormone therapy, or sex reassignment surgery to minors—is unconstitutional sex discrimination. To quote the Solicitor General, Tennessee law discriminates on the basis of sex because it "restricts medical care only when provided to induce physical effects inconsistent with birth sex. Someone assigned female at birth can't receive medication to live as male, but someone assigned male can." Oral Arg. Tr. 5, *United States v. Skrmetti*, No. 23-477 (2024). It's "facial sex classification, full stop, and a law like that can't stand." *Id*.

If, as argued by the United States, Tennessee is indeed guilty of sex discrimination, then so is Dr. Neese. If Tennessee law discriminates because it "categorically bans treatment when and only when it's inconsistent with the patient's birth sex," *id.* at 4–5, then Dr. Neese likewise discriminates because she is "categorically unwilling to . . . assist a minor with transitioning" for the same reason.

### III.

The United States contends that Dr. Neese lacks Article III standing to bring this suit. It does so by analogizing Dr. Neese to a podiatrist.

The theory goes something like this: HHS would never exclude a physician for refusing to offer services outside her specialty—for example, a podiatrist lacks the relevant medical training to help a patient transition to the opposite sex. During oral argument before our court, counsel for HHS claimed that Dr. Neese "says that she's unwilling to—she doesn't provide transition services to teenagers. But then she's no different than someone like a podiatrist, right? A podiatrist might be categorically unwilling to provide transition services. But it's not discriminatory, because a podiatrist doesn't provide those services. And so there's no discrimination there, because there's a legitimate, non-discriminatory reason for that person not to provide that service." Oral Arg. Audio 40:50–41:15.

HHS's podiatrist analogy is unpersuasive. Unlike a podiatrist, Dr. Neese is a physician of general internal medicine who is fully able to prescribe hormone treatments or puberty blockers. As her declaration makes clear, Dr. Neese provides hormone treatments to transgender patients "who have come to me . . . already transitioned and I maintain their care." She's just unwilling to do so when it comes to minors.

To be sure, her declaration also says that providing these services to 16- and 17-year olds is "not my area of specialty." But Dr. Neese explains what she means by that. She says that she is "not comfortable . . . due to the complexity of the medical and emotional issues." After all, "I do not believe the brains of minors are fully mature or that they fully understand the ramifications of their actions. Most of the other transgender patients who have come to me have already transitioned and I maintain their care."

So Dr. Neese is fully capable of providing such services to minors. She just thinks it's wrong to do so. She's says she's "not comfortable"—not that she's "not qualified."

And tellingly, the panel has acknowledged as much: Dr. Neese is "'unwilling to provide gender-affirming care, in at least some situations, to patients who assert a gender identity that departs from their biological sex.'" *Neese v. Becerra*, 123 F.4th 751, 753 (5th Cir. 2024).

### IV.

Moreover, separate and apart from her ability (but unwillingness) to provide puberty blockers or hormone therapy to 16- and 17-year olds, there's also the simple fact that Dr. Neese is obviously able but categorically unwilling to refer minors to other doctors who specialize in sex reassignment surgery. *See Neese*, 640 F. Supp. 3d at 673 (noting that Dr. Neese is "categorically unwilling . . . to provide referrals to minors seeking a sex-change operation").

If there's a plausible basis for theorizing that it's somehow outside of Dr. Neese's specialty to simply make a referral of a minor patient to another doctor who specializes in the field, the United States has not offered one.

* * *

I respectfully dissent from the denial of rehearing en banc.